For Publication

## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | |
| **v.** ) | |
| ) | |
| ) | **Civil Action No. 1986-265** |
| **TERRITORY OF THE VIRGIN ISLANDS,** ) | |
| **et al.,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————————————————) | |

**Attorneys:**
**Jonathan M. Smith, Esq.,**
**Laura L. Coon, Esq.,**
**Alyssa C. Lareau, Esq.,**
**Emily A. Gunston, Esq.,**
Washington, D.C.
　　　*For the United States*

**Richard S. Walinski, Esq.,**
Toledo, OH.
　　　*For the Defendants*

**Nathan T. Oswald, Esq.,**
Pemberville, OH.
　　　*For the Defendants*

**Aquannette Y. Chinnery, Esq.,**
St. Thomas, U.S.V.I.
　　　*For the Defendants*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendants' Motion to Terminate

Prospective Relief, which was filed on July 28, 2011, and on which this Court heard oral

argument on December 6, 2011.[1]  The litigation, which began in 1986, concerns the issue

of continuing Eighth Amendment violations inside the Golden Grove Adult Correctional

Facility ("Golden Grove") on St. Croix, United States Virgin Islands, and the sufficiency

of Defendants' actions during the past two and one-half decades to remedy the alleged

and proven constitutional infirmities. In their Motion to Terminate Prospective Relief,

filed pursuant to § 3626(b)(2) of the Prison Litigation Reform Act ("PLRA"), Defendants

seek the immediate termination of all relief entered by the Court in the 25-year history of

this case. 18 U.S.C. § 3626(b)(2) (1996). Plaintiff opposes this Motion.

For the reasons that follow, the Court finds that: 1) Each Order entered in this

case, except the 2006 Contempt Order, constitutes prospective relief within the meaning

of the PLRA;[2] 2) Due to the absence of the necessary PLRA findings, all prospective

relief ordered by the Court in this matter may be subject to immediate termination under

§ 3626(b)(2) of the PLRA; and 3) An evidentiary hearing is appropriate in order for the

Court to determine whether prospective relief remains necessary to correct a current and

ongoing violation of a federal right at Golden Grove under § 3626(b)(3) of the PLRA,

and, if so, to ensure that the prospective relief is narrowly tailored to that violation in the

manner required by the PLRA.

## I.    BACKGROUND

This litigation began in 1986 when the United States filed a Complaint seeking to

enjoin the Virgin Islands Government from allegedly depriving inmates at Golden Grove

---

[1] The matter was fully briefed, with Plaintiff's Opposition filed on August 11, 2011, Defendants' Reply filed on August 25, 2011, Plaintiff's Surreply filed on September 8, 2011, and Defendants' Surreply filed on September 20, 2011.

[2] Recognizing that the Court has issued several case management-related Orders in the 25-year history of this case, for the purposes of this Memorandum, the "Orders" of the Court refer to the 1986 Consent Decree; 1990 Plan of Compliance; 2003 Stipulated Agreement; 2006 Contempt Order; 2007 Order; 2009 Order; February 2010 Order; and December 2010 Order.

of the rights, privileges and immunities provided and secured by the United States Constitution. The Complaint alleged that Defendants had failed to: 1) Provide inmates with "minimally adequate medical care for their serious medical needs;" 2) Protect prisoners from "unreasonable fire safety risks to their lives and safety;" 3) Afford the necessary staff supervision and security to protect inmates from "wanton and reckless physical violence by other inmates or staff;" and 4) Provide "minimally adequate sanitation to protect inmates from unreasonable risks to their physical health." Compl. at 3.

Without conceding liability, but recognizing that the constitutional interests of the inmates were at stake, Defendants entered into a Consent Decree with Plaintiff in 1986 that outlined agreed-upon measures that Defendants would undertake in an effort to eliminate the alleged harms occurring inside Golden Grove. The Consent Decree outlined the objectives of protecting inmates from "unreasonable fire safety risks to their lives and safety" and "wanton and reckless physical violence by other inmates or staff," as well as providing "minimally adequate sanitation to protect inmates from unreasonable risks to their physical health" and "minimally adequate medical care for the serious medical needs of inmates." Consent Decree at 3-4. Defendants agreed to complete certain measures to meet these objectives, including the removal of fire hazards, the assignment of a guard in each inmate living unit and a plan for safely evacuating inmates in the event of an emergency. Defendants further agreed to file plans with the Court describing the procedures, strategies and actions to be taken to achieve compliance with the broad objectives of the Consent Decree.

Four years later, Plaintiff filed a Motion asking the Court to hold Defendants in contempt for their alleged failure to comply with the 1986 Consent Decree. Instead of finding Defendants in contempt, the Court adopted and issued the 1990 Plan of Compliance, which was prepared by Plaintiff's experts. Plaintiff and Defendants agreed upon the terms of the Plan, which contained additional provisions, including measures to improve fire safety and medical care.

In February 2003, experts retained by Plaintiff visited Golden Grove for the purpose of providing technical, compliance-related assistance. Their evaluations, conclusions and proposed remedial action addressing Defendants' compliance with the Consent Decree and the 1990 Plan of Compliance were embodied in the 2003 Agreement, to which the parties stipulated and Defendants agreed to implement. Among other measures, the Agreement required Defendants to update correctional procedures and practices, including tool control and suicide prevention; take steps to provide a health assessment to each incoming inmate within fourteen days of arrival; establish a chronic disease clinic; provide nutritionist and psychiatric services; obtain medical and dental equipment; and modernize life safety and environmental sanitation by requiring that all correctional officers receive fire safety training, conduct quarterly fire drills and test the sanitation of kitchen sinks by using chemical indicator strips.

On November 8, 2005, Plaintiff filed a Motion for an Order to Show Cause Why Defendants Should Not be Held in Contempt for their failure to carry out the requirements set forth in the 1986 Consent Decree, the 1990 Plan of Compliance and the 2003 Stipulated Agreement. On February 8, 9, 10 and 13, 2006, the Magistrate Judge of this Court held a hearing on the Motion, after which both parties submitted proposed

findings of fact and conclusions of law. The Court adopted the findings of fact and conclusions of law submitted by Plaintiff, which contained a detailed account of Defendants' non-compliance with the Consent Decree, the 1990 Plan of Compliance and the 2003 Stipulated Agreement in the areas of fire safety, inmate security, medical care, and environmental and structural dangers. Based on the factual findings, the Court concluded that there were continuing and ongoing constitutional violations at Golden Grove and held Defendants in contempt of the Court's 1986 Consent Decree, the 1990 Plan of Compliance and the 2003 Stipulated Agreement.  The Court also appointed a Special Master to assist the Court in evaluating Defendants' compliance with the Orders of the Court.

On April 3, 2007, a compliance-related hearing was held before the Court. After reviewing the submissions of the Special Master and the parties, the Court implemented the recommendations of the Special Master and Plaintiff through a remedial Order to "address some of the current and ongoing conditions at Golden Grove that contribute to the continued inability of Golden Grove authorities to remedy the findings of contempt entered by this Court on March 23, 2006." 2007 Order at 2. The May 2007 Order required Defendants to comply with a detailed and comprehensive compliance scheme, including purchases of food services, sanitation products and audible fire alarms; the implementation of a specific command structure; relocation of inmates; new security checkpoints; roofing and electrical repairs; and the completion of pending medical requests and suicide prevention training.

To evaluate Defendants' compliance with the 1986 Consent Decree, the 1990 Plan of Compliance, the 2003 Stipulated Agreement and the May 2007 Order, the Court

held periodic status hearings during which the Court emphasized the importance of health care services. On December 10, 2009, the Court issued a fifth Order requiring Defendants to secure a contract with a dental service provider for ongoing dental services at Golden Grove.  This Order also required that Defendants report monthly on the provision of dental care, including the number of inmates treated by a dentist and the number of inmates on the waiting list for dental care.

On February 2, 2010, the Court issued a sixth Order, imposing "one final set of extended compliance deadlines as recently agreed to by the parties." Feb. 2010 Order at 4.  This Order required Defendants to create and submit plans for hiring, improvements to the physical plant, inmate security, medical services, and the provision of telephone services. The Court made clear that non-compliance with the deadlines for these requirements would provide grounds for subsequent extraordinary relief.

In its most recent Order embodying relief, entered on December 6, 2010, the Court found that Defendants failed to demonstrate substantial compliance with the Court's previous Orders "regarding their duty to provide and maintain constitutionally adequate conditions of confinement" at Golden Grove. Dec. 2010 Order at 1. The Court noted that, while "deadlines have expired without full compliance, progress is being made, albeit slowly . . . ." *Id.* at 2. The Special Master's recommendations, which included the development of an implementation plan of security-related policies and procedures, and a plan for officer recruitment and incentives, were adopted by the Court. *Id*. at 2-3.

Seven months later, Defendants filed their Motion to Terminate Prospective Relief. Defendants' filing triggered the automatic stay provision of the PLRA, which

served to stay all prospective relief issued in this case effective October 27, 2011. § 3626(e)(2)-(3). Pursuant to the dictates of the PLRA, the prospective relief embodied in the Orders issued by this Court will remain stayed until the Court's resolution of Defendants' Motion to Terminate.

## II.    THE PRISON LITIGATION REFORM ACT

### A.  Background of the PLRA

Congress enacted the PLRA in 1996 to offset the steep increase in prison litigation lawsuits filed in the federal court system. *Woodford v. Ngo*, 548 U.S. 81, 114 (2006) ("The PLRA contains a variety of provisions to bring this [prison condition] litigation under control."). The PLRA sponsors described "overzealous Federal courts . . . micromanaging our Nation's prisons," 141 CONG. REC. S14418 (daily ed. Sept. 27, 1995) (remarks of Sen. Hatch), and criticized "judicial orders entered under Federal law [which] have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts." *Id.* at S14419 (remarks of Sen. Abraham.).

In response to these types of concerns, the PLRA was enacted to require that remedies in prison condition lawsuits "do not go beyond the measures necessary to remedy federal rights violations," H.R. REP. NO. 104-378, at 166 (1995), but rather are limited "to the minimum necessary to correct the violation of the federal right." *Id.* at 24 n.2. In narrowing the scope of prospective relief to be issued in prison litigations, the PLRA also sought to diminish the discretion of federal district judges. *See, e.g., Miller v. French,* 530 U.S. 327, 328 (2000) (explaining that "curbing the equitable discretion of district courts was one of the PLRA's principal objectives. . . ."). By requiring that relief

be the least intrusive means of remedying a violation of a federal right, the PLRA "stops judges from imposing remedies intended to effect an overall modernization of local prison systems or provide an overall improvement in prison conditions." H.R. Rep. No. 104-378 at 166.

### B.  The Immediate Termination Provisions of the PLRA

Defendants filed their Motion to Terminate Prospective Relief pursuant to the immediate termination provision embodied in § 3626(b)(2) of the PLRA. With the single exception noted below, that provision entitles a defendant to immediate termination of any prospective relief in prison condition lawsuits when "the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." ("Narrowness-Need-Intrusiveness" findings). § 3626(b)(2).

The exception to the immediate termination provision is contained in § 3626(b)(3) of the PLRA. Specifically, even when prospective relief is granted by a court without the requisite Narrowness-Need-Intrusiveness findings, the PLRA prohibits the termination of such relief when "the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right," and the prospective relief satisfies the Narrowness-Need-Intrusiveness standard. § 3626(b)(3).

### C.  Issues Presented

The immediate termination provisions of § 3626(b)(2)-(3) suggest that up to a four-part inquiry would be appropriate in directing this Court's analysis in the instant

matter. First, the Court must determine which of this Court's prior Orders constitute prospective relief within the meaning of the PLRA. *See* § 3626(b)(2). Second, the Court must determine if the Order(s) granting prospective relief contain the required Narrowness-Need-Intrusiveness findings. If the Court determines that the prospective relief was ordered without the findings required by the PLRA, the relief will be eligible for termination and the Court must then delve into the third inquiry and consider whether there is a "current and ongoing violation of a Federal right" at Golden Grove. § 3626(b)(3). If such a violation exists, the Court must address the fourth and final inquiry, as to whether prospective relief remains necessary to correct the current and ongoing violation of the federal right, and whether such relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* The issues presented are discussed below.

### III.   DISCUSSION

### A.  The Meaning of Prospective Relief Within the PLRA

What constitutes "prospective relief" is at the heart of the PLRA because it is only relief of this nature that, upon entry, must contain Narrowness-Need-Intrusiveness findings by the court, and that is subject to scrutiny when considering possible termination. *See* § 3626(a)-(b). It is the Narrowness-Need-Intrusiveness findings that are at the core of the PLRA's central purpose of ensuring that relief does not "go beyond the measures necessary to remedy federal rights violations," H.R. Rep. No. 104-378 at 166, and that serve the PLRA's objective to cabin the discretion of federal courts.

Here, Defendants and Plaintiff disagree on which Orders constitute prospective relief within the meaning of the PLRA. Plaintiff narrowly interprets prospective relief to include only the 1986 Consent Decree,[3] while Defendants broadly construe prospective relief to include each Order from this Court except the 2006 Order appointing a Special Master. The Court agrees with Defendants' construction of the term.

When a statute includes an explicit definition, that statutory definition is given controlling weight. *See, e.g., Meese v. Keene*, 481 U.S. 465, 484 (1987). Thus, to determine which of this Court's Orders contain prospective relief, the Court will look to the definitions found within the PLRA. *See Benjamin v. Jacobson*, 172 F.3d 144, 156 (2d Cir. 1999).

The PLRA defines "prospective relief" as "all relief other than compensatory monetary damages." § 3626(g)(7). The term "relief," in turn, is defined as "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements." § 3626(g)(9). While this broad definition of prospective relief leaves a wide-ranging category of remedial Orders subject to Narrowness-Need-Intrusiveness findings upon entry and the Court's scrutiny for purposes of termination, this outcome is consistent with the animating purpose of the PLRA, to restrict the authority of federal courts to issue and enforce compliance with orders for prospective relief, and thus to curb the involvement of the federal judiciary in prison management. *See, e.g., Gilmore v. California*, 220 F.3d 987, 991 (9th Cir. 2000) ("It is clear that Congress intended the PLRA to revive the hands-off doctrine," the former "rule of judicial quiescence" that the federal judiciary not be involved with the

---

[3] As Plaintiff explained during oral argument, under its theory all of the pre-2006 Orders would either stand or fall with the 1986 Consent Decree.

problems of state-run prisons.); *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997) ("Congress passed the PLRA in an effort, in part, to oust the federal judiciary from day-to-day prison management.").

The relief previously issued in this matter did not include compensatory monetary damages and consequently falls within the Act's broad definition of prospective relief. Nonetheless, Plaintiff maintains that only the 1986 Consent Decree constitutes prospective relief within the meaning of the PLRA because the Court's post-1986 Orders were entered simply to enforce compliance with the 1986 Consent Decree. Pl.'s Resp. at 2-3. To support this argument, Plaintiff relies on *Jones-El v. Berge*, in which the Seventh Circuit concluded that a court order requiring prison officials to air condition cells did not constitute prospective relief within the meaning of the PLRA because the Order was simply enforcing compliance with a previous consent decree that required prison officials to cool cells. 374 F.3d 541 (7th Cir. 2004). In *Jones-El*, the Court stated that "[t]he enforcement of a valid consent decree is not the kind of 'prospective relief' considered by § 3626(a)." *Id.* at 545.

*Jones-El* is distinguishable from the instant matter and thus does not provide an apt analogy. In *Jones-El*, the defendant admitted that "the only practical way to cool the cells was to install air conditioning." *Id.* at 543. Thus, the elaboration in the subsequent order did not change the defendant's obligation, because the consent decree and the subsequent order—by defendant's own admission—required defendant to perform the same task.

Here, by contrast, the 1986 Consent Decree issued general directives to Defendants to take steps to protect inmates from unreasonable fire safety risks and

wanton and reckless violence, and to provide inmates with minimally adequate sanitation and medical care. The Consent Decree largely left to Defendants the means through which these goals would be accomplished.[4] With the single exception of the 2006 Order appointing a Special Master,[5] the Orders entered after the 1986 Consent Decree were increasingly more specific and prescriptive, thus reducing—and sometimes eliminating—the discretion afforded to Defendants under the broad mandates of the Consent Decree. Defendants were therefore required to take particular actions that they would not necessarily have been obligated to undertake to achieve the general objectives set forth in the Consent Decree.[6]

That this is so is readily apparent from a sampling of the provisions in the Orders themselves. For example, with regard to medical care, the 1986 Consent Decree ordered

---

[4] The 1986 Consent Decree provided that its purposes and objectives would be satisfied by Defendants' implementation of the specific requirements set forth in Part II of the Consent Decree and by Defendants' development and implementation of plans described in Part III of the Consent Decree. Part II of the Consent Decree enumerated only three requirements: "1. All fire hazards will be removed from inmate cells; 2. At all times, at least one guard will be on duty and present in each inmate living unit; and 3. All living units will have adequate means to safely evacuate inmates in case of emergency." Part III, on the other hand, required Defendants to develop and submit plans: (1) Regarding the procedures for achieving adequate security, including creation of policies and ascertainment of equipment for adequate communication; (2) Providing for adequate medical care, including procedures for storage and administration of medicine; (3) Ensuring fire safety, including procedures for emergency evacuations; and (4) Affording minimally adequate sanitary conditions.

[5] Plaintiff and Defendants agree that the appointment of a Special Master does not constitute prospective relief because such an appointment is simply a means of achieving previously ordered relief, rather than a form of relief itself. *See Coleman v. Wilson*, 933 F. Supp. 954 (E.D. Cal. 1996) (explaining that the compensation of a Special Master is not prospective relief within the meaning of the PLRA because a Special Master is a means for achieving relief, not a form of relief itself); *Madrid v. Gomez*, 940 F. Supp. 247, 250 (N.D. Cal. 1996) (finding that neither the payment nor the appointment of a Special Master constitutes prospective relief for PLRA purposes because a Special Master "is simply a device utilized by the Court to assist in the formulation of appropriate relief or to monitor relief that is ordered."); *Williams v. Edwards*, 87 F.3d 126, 128, 133 (5th Cir. 1996) (noting that the appointment of an expert to investigate and report to the court on the conditions and bed space problems in Louisiana prisons did not constitute prospective relief under the PLRA).

[6] The fact that these specific actions may have been ordered by the Court because Defendants were not making sufficient progress in developing their own plans under the broad mandates of the 1986 Consent Decree does not make the successive Orders any less prospective in terms of the nature of the relief ordered.

Defendants to develop and submit "steps to be taken . . . to provide for adequate medical care for the serious medical needs of inmates, including procedures to provide for appropriate storage and administration of medications." 1986 Consent Decree. The 1990 Plan of Compliance required Defendants to have a physician available for two hours a day, ensure that inmates obtain medicine within six hours of prescription, and discard outdated medications. The 2003 Order obligated Defendants to hire a Registered Nurse; implement immediate psychiatric services; establish a chronic disease clinic; provide a health assessment of inmates within fourteen days of their arrival; and purchase a fax machine, sterilization equipment, a vital signs machine, and an EKG machine. The 2007 Order required Defendants to report on the medical, dental and mental health records of all inmates identified by the Special Master; implement a menu developed by a dietician to meet the inmates' medical needs; create and employ an expedited contract award process for health care services; procure emergency cutting tools for suicide prevention; and complete officer training in suicide prevention. The 2009 Order required that Defendants secure a contract with a dentist. The February 2010 Order required the completion of medical policies and procedures and the training of the medical staff on those policies and procedures.

Similarly, with regard to security, the 1986 Consent Decree included a general mandate which required Defendants to provide security to protect inmates from "reckless and wanton" violence. Consent Decree at 4. The 1990 Plan of Compliance required the monitoring of primary and secondary exits from inmate living areas. The Stipulated Agreement of 2003 ordered the training of correctional officers so that searches of hair, shoes and other body parts would be sufficient to find contraband; movement of a

particular entry point so that incoming or returning inmates would not have access to other inmates; and an update of shadow boards and tool logs in areas where tools or kitchen utensils are stored. The 2007 Order required Defendants to adopt a particular command structure, in addition to a Staffing Plan and Mandatory Emergency Staffing Posts; place security at the walkway checkpoint between the shops and kitchen areas; develop a long and short-term hiring plan to counteract the understaffing believed to contribute to violence; regularly search cells; and manually search inmates. The February 2010 Order required Defendants to submit a hiring plan; produce and provide a plan to reduce inmate idleness in order to alleviate tension and hostility; and create a plan to control the use of all chemical and cleaning agents inside the facility. The December 2010 Order required Defendants to produce a plan to offer incentives to senior officers to remain with the Bureau of Corrections after their retirement dates.

One might argue—as Plaintiff does—that each of the post-1986 Orders are simply compliance measures designed to achieve adequate medical care and to protect against wanton and reckless violence as mandated by the 1986 Consent Decree. However, unlike *Jones-El*, the particular actions ordered by the Court do not constitute the "only practical way[s]" of achieving the broad objectives. Instead, each successive Order includes specific acts that, taken together, create a web of prolific requirements governing various aspects of medical care and security that binds Defendants to one of many compliance strategies that could be employed to remedy each violation.[7]

---

[7] The various Court Orders in the other two areas covered by the Consent Decree—fire safety and sanitation—follow the same pattern. As Plaintiff asserted in its Proposed Findings of Fact filed in connection with the 2006 contempt proceedings, which were adopted by the Court, "[t]he Consent Decree and subsequent remedial Orders required detailed measures to provide a reasonably safe security environment at Golden Grove with adequate medical and mental health care in an environmentally safe facility." Pl.'s Prop. Factual Findings at 2-3. "The Plan of Compliance provided further detailed guidance and direction to the Defendants to remedy unconstitutional conditions at Golden Grove." *Id.* at 3.

In sum, because the Orders issued by the Court do not include compensatory monetary damages, they fall within the broad definition of prospective relief within the PLRA. Moreover, because, unlike *Jones-El*, all of the Orders entered after the 1986 Consent Decree, with the exception of the 2006 Order, imposed specific obligations on Defendants not necessarily required by the broad mandates of the 1986 Consent Decree, the Court rejects Plaintiff's characterization of the Orders as simply enforcing compliance and non-prospective. Accordingly, the Court concludes that each Order issued in this case, except the 2006 Order appointing a Special Master, constitutes prospective relief, and is therefore eligible for termination under § 3626(b)(2) of the PLRA unless it meets the Narrowness-Need-Intrusiveness requirement.[8]

## B. Presence of the Narrowness-Need-Intrusiveness Findings

Prospective relief is subject to immediate termination under the PLRA when the relief was ordered in the absence of a Narrowness-Need-Intrusiveness finding by the Court—that is, a finding that the relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." § 3626(b)(2). Of the eight Orders issued by the Court, only the 2006 Contempt Order expressly contains the findings required by the PLRA. That Order states: "The Court further concludes that the relief in this Order is narrowly drawn, extends no further than necessary to correct the violations of federal rights at Golden Grove and the Court's Orders, [and] is the least intrusive means necessary to remedy Defendants' contempt . . . ." 2006 Order at 3.

---

[8] The web of requirements created by the successive Orders here underscores the importance of ensuring that the Congressional intent behind the PLRA, as manifested by a broad definition of the term prospective relief, is not undermined by a narrow interpretation of that term and thus a limited applicability of the Narrowness-Need-Intrusiveness requirement.

15

Plaintiff and Defendants agree that the Court made Narrowness-Need-Intrusiveness findings in the 2006 Order, but the parties draw very different conclusions from this agreed-upon fact. Plaintiff argues that the Court's Narrowness-Need-Intrusiveness findings in 2006 applied to the 1986 Consent Decree, the 1990 Plan of Compliance and the 2003 Stipulated Agreement. According to Plaintiff, because the 2006 Order vested a Special Master with the power and authority to "take appropriate actions to . . . monitor, review, and report on compliance with the Consent Decree, the Plan of Compliance, and the Stipulated Agreement, and any future orders of this Court . . . .", *id.* at 6, the 2006 Order necessarily applied to the earlier Orders. Pl.'s Resp. at 2-3. Plaintiff claims that the Court could not find that the appointment of the Special Master was narrowly drawn if she were appointed to oversee relief that was not itself narrowly drawn. Consequently, Plaintiff argues that the findings attached to the 2006 Order necessarily bathed the Court's prior Orders with the requisite findings. *Id.*

Defendants, on the other hand, argue that the 2006 Order lacks any language suggesting whether or how the Narrowness-Need-Intrusiveness findings could be connected to the Court's previous Orders, especially given that the Narrowness-Need-Intrusiveness findings in the 2006 Order were expressly limited to "the relief in this Order." 2006 Order at 3; Def.'s Reply at 5. Defendants further argue that the Narrowness-Need-Intrusiveness findings which apply to the non-prospective appointment of a Special Master cannot apply to the qualitatively different prospective relief embodied in the Court's other Orders. Although appointment of a Special Master may have been a narrow, necessary and least intrusive manner of remedying Defendants' non-compliance with Court Orders, Defendants claim that these findings do not speak to the narrowness,

necessity or intrusiveness of the Court's other Orders. Finally, Defendants stress that the Narrowness-Need-Intrusiveness findings made in 2006 cannot apply to the Court's Orders of May 2007, December 2009, February 2010 and December 2010, because the Court could not have made findings about the narrowness, need and intrusiveness of relief that was not yet in existence. Def.'s Reply at 5.[9]

The Court recognizes the theoretical plausibility of Plaintiff's argument, but will ground its decision instead in a common sense construction of the plain language of the 2006 Order in this case as informed by the plain language of the governing statute and the applicable case law. Under § 3626(b)(2), Defendants are entitled to immediate termination "when relief was approved or granted in the absence of a finding by the court" that the relief met the Narrowness-Need-Intrusiveness test. § 3626(b)(2). When determining whether findings are present for PLRA purposes, courts have required that the findings be explicitly connected to the ordered relief. *See Benjamin v. Jacobson*, 172 F.3d at 158 ("[W]e think it clear from the statute itself that, if those findings were not made in connection with the entry of the decree [and there is not a finding of a current and ongoing violation of a Federal right,] the Act requires termination of such a consent decree."); *Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999) ("[T]he Prison Litigation Reform Act (PLRA) does not provide an avenue for district courts to make, *post hoc* and *nunc pro tunc*, the findings required by the Act in order to avoid termination of a consent

---

[9] During oral argument, counsel for Plaintiff conceded that the 2006 PLRA findings could not have applied to the Court's subsequent Orders issued in May 2007, December 2009, February 2010 and December 2010.

decree in prison conditions litigation . . . .”). The reasoning employed by these courts is in-keeping with the letter and spirit of the PLRA.[10]

Rather than making the unverifiable determination of whether this Court silently intended to bathe other Orders with the Narrowness-Need-Intrusiveness findings it entered in 2006, the Court considers the language on the face of the other Orders–none of which even hints at such findings—and the Act's plain requirement that prospective relief be issued in the presence of the requisite findings. The Court also takes into account the substance and spirit of the PLRA, which militate against the conclusion that findings may be silently transposed from order to order when the PLRA explicitly sought to curb prospective relief issued in the absence of such findings. *See Miller v. French*, 530 U.S. at 347 (“The PLRA has restricted courts' authority to issue and enforce prospective relief

---

[10] In a counterpoint to the Second and Fourth Circuits, the Ninth Circuit in *Gilmore v. California* reasoned that the PLRA does not require explicit findings to be made on the record “so long as the record, the court's decision ordering prospective relief, and relevant case law fairly disclose that the relief actually meets the § 3626(b)(2) narrow tailoring standard.” 220 F.3d at 1008. The Ninth Circuit sought to avoid an outcome where “relief which was in fact narrowly tailored would be subject to termination merely because an express finding to that effect, totally unnecessary under the law at the time of the decision, [if the Order predated the PLRA] was not made.” *Id*. It would appear from the plain language of § 3626(b)(2) of the PLRA, however, that just such a result is intended when the narrowly tailored relief is ordered without an express Narrowness-Need-Intrusiveness finding or a subsequent finding of a current and ongoing violation of a federal right together with a determination that prospective relief remains necessary to correct that violation.

On a related vein, Plaintiff cites a number of Supreme Court cases demonstrating that before the enactment of the PLRA, the scope of injunctive relief had been restricted to the nature and extent of the violation. *See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971); *Milliken v. Bradley*, 433 U.S. 267, 280 (1977); Pl.'s Resp. at 5-6. Plaintiff presumably cites these cases to make the point that the Court's orders were narrowly tailored as a function of the governing law, which required the scope of injunctive relief not to exceed the scope of the injury, thus rendering an express finding unnecessary. Such an argument, however, would render § 3626 of the PLRA a nullity. In considering the plain language and the congressional intent underlying the PLRA, the Court concludes that the PLRA was intended to change the governing standard for the entry and termination of relief in prison condition lawsuits by requiring that particular findings be expressly entered in connection with prospective relief. *Para-Profess. Law Clinic, SCI-Graterford v. Beard*, 334 F.3d 301 (3d Cir. 2003) (explaining that § 3626 “reduces the federal courts' oversight role by limiting . . . the courts' continued ability to enforce previously entered consent decrees and injunctions . . . .”). As a result, the Court considers the requirements set forth by § 3626(b)(2)-(3) to be a new and more particularized governing standard that must be met and expressly stated in rulings in the prison context in order to withstand a challenge under the PLRA.

concerning prison conditions, requiring that such relief be supported by findings and [be] precisely tailored to what is needed to remedy the violation of the federal right."). As a result, the Court will not interpret the 2006 Order to have blessed preceding or subsequent Orders with its findings, given that such a construction would violate the purpose and plain language of the PLRA. Because the 2006 Order is the only Order issued by this Court containing the requisite PLRA findings, the Court concludes that it is the only Order to which the findings apply. Accordingly, the Court finds that none of this Court's Orders containing prospective relief—the 1986 Consent Decree, the 1990 Plan of Compliance, the 2003 Stipulated Agreement, or the May 2007, December 2009, February 2010 or December 2010 Orders—contain the requisite Narrowness-Need-Intrusiveness findings to withstand a challenge under § 3626(b)(2).

## C.  Current and Ongoing Violation of a Federal Right

### 1. Applicable Legal Principles

Even in the absence of the requisite Narrowness-Need-Intrusiveness findings, the PLRA does not permit the immediate termination of prospective relief when "the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right." § 3626(b)(3). [11] In determining whether a current and ongoing violation exists at Golden Grove, the Court is aware that the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), but also recognizes that the Constitution "does not permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and

---

[11] Termination under § 3626(b)(2) does not take effect until the Court has conducted the § 3626(b)(3) analysis. *Benjamin v. Jacobson*, 172 F.3d at 165-66 (stating that the "written findings" requirement under § 3626(b)(3) renders the "immediate termination" provision under § 3626(b)(2) non-instantaneous); *Berwanger v. Cottey*, 178 F.3d 834, 839 (7th Cir. 1999) (explaining that because courts must make the § 3626(b)(3) finding, "immediate" should not be confused with "instant" termination).

the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 114 S. Ct. 1970, 1976 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).

The Supreme Court has made clear that "a prison official violates the Eighth Amendment only when two requirements are met." *Farmer*, 114 S. Ct. at 1977. Under the first requirement, for a claim predicated on the failure to prevent harm, the inmate must prove that the conditions of his incarceration pose a substantial risk of serious harm. *Id.* In *Helling v. McKinney*, the Supreme Court explained that such a risk requires

> more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused . . . [by the condition in question]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

509 U.S. at 32-33, 35; *See also Farmer*, 114 S. Ct. at 1977 (explaining that under the first requirement "the deprivation alleged must be, objectively, 'sufficiently serious,'" (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991))).

In *Betts v. New Castle Youth Development Center*, the Third Circuit divided the first step of the *Farmer* test into a three-part inquiry, explaining that for a substantial risk of serious harm to exist: 1) The injury must be sufficiently serious; 2) There must be a sufficient likelihood that serious injury will result from the condition of deprivation; and 3) The risk must violate contemporary standards of decency. 621 F.3d 249, 257 (3d Cir. 2010). In *Betts*, the Third Circuit found that a youth inmate suffered a sufficiently serious injury playing tackle football without protective equipment, but that the inmate did not provide sufficient evidence to prove frequency or likelihood of injuries resulting from

playing unprotected tackle football or that the risks associated with that practice violated contemporary standards of decency. *Id.* at 258. Accordingly, this Court must make a three-part finding to satisfy the first element of the *Farmer* test.

Under the second requirement, the inmate must prove that the state of mind of the prison official was one of deliberate indifference to inmate safety or health. *Farmer*, 114 S. Ct. at 1977. Under the deliberate indifference standard, it is not sufficient merely to prove that an excessive risk to inmate health or safety existed. *Id.* at 1979. In *Wilson v. Seiter*, the Supreme Court rejected an interpretation of the Eighth Amendment that would permit the imposition of liability on prison officials solely because of objectively inhumane conditions. 501 U.S. at 299-302. Instead, the Court required an "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Id.* at 299. Under this subjective standard, it is not necessary for an Eighth Amendment claimant to prove that a prison official's act or failure to act was motivated by a belief that harm would actually occur; instead, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 114 S. Ct. at 1981.[12] Additionally, when a prison official actually knew of a substantial risk to the health or safety of an inmate, he may escape liability if he responded reasonably to that risk, even if the harm in question ultimately occurred. *Id.* at 1982-83. Because the Constitution requires a prison official to provide "reasonable safety," *Helling v. McKinley*, 509 U.S. at 33, "prison officials who act reasonably cannot

---

[12] The Court explained that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ." *Farmer*, 114 S. Ct. at 1980. The Court continued that if an Eighth Amendment claimant presents evidence of a substantial risk of harm that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it," this kind of evidence would "permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 1981-82.

be found liable under the Cruel and Unusual Punishment Clause." *Farmer*, 114 S. Ct. at 1983.

Plaintiff bears the burden of proving the existence of a "current and ongoing violation of a Federal right" under § 3626(b)(3). *See, e.g., Imprisoned Citizens Union v. Shapp*, 11 F.Supp.2d 586, 604 (E.D. Pa. 1998) ("In this case, the burden imposed by the PLRA—that inmates prove a 'current and ongoing violation' of a federal right—is not unreasonable and does not violate the equal protection rights of inmates."), *aff'd on other grounds sub nom Imprisoned Citizens Union v. Ridge*, 169 F.3d 178 (3d Cir. 1999); *Guajardo v. Texas Dept. of Criminal Justice*, 363 F.3d 392, 395 (5th Cir. 2004) ("We agree with the great majority of courts to address this issue: a plain reading of the PLRA, including its structure, imposes the burden on prisoners."); *Laaman v. Warden*, *N.H. State Prison*, 238 F.3d 14, 20 (1st Cir. 2001) (concluding that prisoners shouldered the burden to prove ongoing violations under § 3626(b)(3)).

## 2. The Propriety of a § 3626(b)(3) Evidentiary Hearing

The PLRA does not require that a district court hold an evidentiary hearing to determine whether there is a current and ongoing violation under § 3626(b)(3). *See, e.g., Cagle v. Hutto*, 177 F.3d at 258 ("The plain language of § 3626(b)(3) imposes no requirement that a district court conduct an evidentiary hearing in order to determine whether there is a current and ongoing violation of federal rights."). Nonetheless, various courts of appeal have recognized the necessity or propriety of conducting evidentiary hearings in making the § 3626(b)(3) findings. *See Benjamin v. Jacobson*, 172 F.3d at 156 (interpreting § 3626(b)(3) as imposing a mandatory obligation on district courts to provide plaintiffs with an opportunity to show a current and ongoing violation); *Loyd v.*

*Alabama Dept. of Corrs.*, 176 F.3d 1336, 1342 (11th Cir. 1999) (finding that a district court's failure to hold an evidentiary hearing constituted an abuse of discretion because "[i]t would read all meaning out of [§ 3626(b)(3)] to force the party opposing termination to show that the consent decree meets the requirements of § 3626(b)(3) and then not provide that party with the opportunity to present evidence on that point."); *Cagle v. Hutto*, 177 F.3d at 258 (concluding that a district court "may, in its discretion conduct a pretermination evidentiary hearing," but a district court "must hold such a hearing when the party opposing termination alleges specific facts which, if true, would amount to a current and ongoing constitutional violation.").

Despite the existence of legal support for an evidentiary hearing, Plaintiff here contends that such a hearing is not necessary for this Court to make a finding that there is a current and ongoing violation of a federal right at Golden Grove.  Instead, Plaintiff argues that the March 2011 Special Master Report, which the Court adopted,[13] updates the 2006 Order such that the two documents, considered together, provide a "sufficient record for new findings . . . ." Pl.'s Resp. at 9. The Court declines to accept Plaintiff's argument because the 2006 findings and the 2011 Report fail to create a sufficient legal or factual foundation for the Court's § 3626(b)(3) analysis.

### a.    Insufficiency of the 2006 Order and 2011 Report for Legal Conclusions

Plaintiff suggests that an evidentiary hearing is unnecessary because this Court found that a current and ongoing violation of a federal right existed at Golden Grove in 2006, and because conditions have either remained the same or deteriorated since that

---

[13] Rule 52(a)(4) of the Federal Rules of Civil Procedure states that "[a] master's findings, to the extent adopted by the court, must be considered the court's findings." Fed. R. Civ. P. 52(a)(4). Accordingly, through the adoption of the March 5, 2011, Special Master Report, the findings of the Special Master are considered the findings of the Court.

23

time, a constitutional violation necessarily persists. Plaintiff claims, therefore, that the findings from the 2006 Contempt Order and the adoption by the Court of the March 2011 Special Master Report support the finding of a present constitutional violation. Pl.'s Resp. at 9, 13, 17, 18.

Notwithstanding the otherwise logical construction of Plaintiff's argument, it does not embody the governing constitutional inquiry under § 3626(b)(3) of the PLRA, because the two-part test outlined in *Farmer* is absent from the 2006 Order itself and the conclusions of law that were incorporated by the Court. Instead, the 2006 Order focused on the issue of contempt and the appointment of a Special Master.[14] Thus, the legal analysis provided by the 2006 Order fails to capture the relevant inquiry before the Court—whether there is a substantial risk of serious harm at Golden Grove and whether Defendants were deliberately indifferent to that risk. *See Farmer*, 114 S. Ct. at 1977.

Further, while Plaintiff argues that Defendants' failure to improve conditions at Golden Grove since 2006—as allegedly reflected in the 2011 Special Master Report— leads to the conclusion of a continuing Eighth Amendment violation, the Court cannot reach this conclusion on the existing record. In addition to the deficiency in the 2006 Order noted above, the 2011 Report focuses on Defendants' compliance with Court Orders rather than on Defendants' alleged constitutional violation.

In the 2006 Order, the Special Master was charged with taking "all appropriate actions to fulfill the orders of the Court to monitor, review, and report on compliance with the [Court Orders] regarding the conditions of confinement at Golden Grove." 2006 Order at 6. Accordingly, the March 2011 Special Master Report evaluates Defendants'

---

[14] While the 2006 Order included the Court's finding that a current and ongoing violation of a constitutional right existed at Golden Grove, the Court did not elaborate upon this conclusion.

actions through the prism of compliance rather than considering whether Defendants' responses, while potentially falling short of compliance, were nonetheless sufficient to rise above the constitutional floor. *See Hadix v. Johnson*, 228 F.3d 662, 670 (6th Cir. 2000) ("The fundamental problem with the district court's order is that it focused not on the inquiry required by the PLRA, but rather on the question whether the consent decree had been substantially complied with."). In other words, there is reason to be concerned that the undergirding purpose of the March 2011 Special Master Report—to evaluate Defendants' compliance with the Orders of the Court—has caused the Special Master's analysis to be filtered through the perspective of compliance in such a way as to diminish its utility for the constitutional inquiry. Thus, if the Court were to embrace the Special Master's characterizations of and judgments about Defendants' failures and improvements vis-à-vis compliance, it may run the risk of obscuring the inquiry regarding the conditions at Golden Grove relative to the constitutional baseline.[15]

In sum, Plaintiff's argument that the 2006 Order coupled with the 2011 Special Master Report forms the basis for a finding of a current and ongoing Eighth Amendment violation misses the mark of the *Farmer* inquiry that this Court must undertake in its § 3626(b)(3) analysis. Accordingly, the 2006 findings and the 2011 Report do not obviate the need for an evidentiary hearing to conduct the relevant constitutional inquiry.

---

[15] In accordance with the 2006 Order, the periodic reports from the Special Master evaluate Defendants' compliance with the Court's Orders. In 2006, the Court also ordered Defendants to submit monthly status reports outlining their efforts to comply with this Court's Orders. Similar to the Special Master's reports, the monthly status reports submitted by Defendants contain spreadsheets with titles including "Compliance Report," *see, e.g.,* Def.'s Rep. Sept. 21, 2010, and "[Golden Grove Adult Correctional Facility] Compliance Implementation Dates," *see, e.g.*, Def.'s Rep. Jan. 14, 2011.

b.        **Insufficiency of the 2006 Order and 2011 Report as a Factual Foundation**

Plaintiff also claims that the facts outlined in the 2006 findings, as updated by the 2011 Report, provide a sufficient factual basis for the Court to make the legal determination that a current and ongoing violation exists at Golden Grove. Pl.'s Resp. at 18. The Court declines to accept Plaintiff's suggestion that the record provides a sufficient factual basis for the Court to conduct its § 3626(b)(3) analysis because the 2006 Order is too dated to support a finding of a "current and ongoing violation," and the March 2011 Special Master Report fails to comprehensively update those findings.

That the 2006 Order is too dated to support a finding of a current and ongoing violation is supported by the legislative history of the PLRA and applicable case law. As originally enacted, § 3626(b)(3) contained the language "current *or* ongoing violation," and in 1997, Congress amended the phrase to read "current *and* ongoing violation." *See* Dep't of Justice Appropriations Act, Pub. L. No. 105-119, § 123(a)(2), 111 Stat. 2440, 2470 (1997).  The conference report for the amendment explains:

> These dual requirements are necessary to ensure that court orders do not remain in place on the basis of a claim that a current condition that does not violate a prisoners' Federal rights nevertheless requires a court decree to address it, because the condition is somehow traceable to a prior policy that did violate Federal rights, or that government officials are "poised" to resume a prior violation of federal rights.

H.R. Conf. Rep. No. 105-405, at 133 (1997).

Accordingly, a current and ongoing violation must exist at the time of the § 3626(b)(3) inquiry. *Para-Profess. Law Clinic, SCI-Graterford v. Beard*, 334 F.3d at 304 ("We conclude that the plain meaning of the words 'current and ongoing' used in the PLRA does not encompass future violations. This interpretation is supported by the statute's history . . . in 1997, the section was amended to require a current *and* ongoing

violation . . . ."); *Cason v. Seckinger*, 231 F.3d 777, 783-84 (11th Cir. 2000) ("The legislative history of the [amendment] . . . clearly shows that Congress intended 'current and ongoing' to mean a presently existing violation . . . Accordingly, we hold that a 'current and ongoing violation' is a violation that exists at the time the district court conducts the § 3626(b)(3) inquiry."); *Castillo v. Cameron Cnty., Tex.,* 238 F.3d 339, 353 (5th Cir. 2001) ("to make the required finding of a current and ongoing violation of a Federal right required by § 3626(b)(3) a court must look at the conditions in the jail at the time termination is sought, not at conditions that existed in the past . . . ."); *Hadix v. Johnson*; 228 F.3d at 671 ("the PLRA directs a district court to look to current conditions"); *Benjamin v. Jacobson*, 172 F.3d at 155 ("Evidence presented at a prior time, however, could not show a violation that is 'current and ongoing.' Hence, the 'record' referred to cannot mean the prior record but must mean a record reflecting conditions at the time termination is sought."). Considering Congress' unambiguous desire for the § 3626(b)(3) inquiry to evaluate "current and ongoing" conditions, as confirmed by the pronouncements of the Third and other Circuits, this Court concludes that the factual findings from the 2006 Order—notwithstanding their comprehensiveness—are too dated to serve as the foundation for the § 3626(b)(3) "current and ongoing violation" analysis.

The Court acknowledges that, while too dated to stand on its own, the factual findings incorporated in the 2006 Order provide an extensive and well-documented account of the conditions at Golden Grove at that time and, if properly updated by current findings, could serve as an appropriate factual foundation. The Court also recognizes that "[i]n order to assess compliance" the Special Master was charged with "the review of a

sufficient number of documents and materials to assess accurately current conditions . . . ." 2006 Order at 11. Thus, the March 2011 Special Master Report includes some factual findings that would be useful in helping to update the 2006 Order and in conducting the *Farmer* analysis.[16] However, the factual underpinnings that underlie the 2011 Report do not systematically match or track the detailed 2006 findings in a way that presents a coherent and comprehensive picture of the current conditions at Golden Grove.

For example, the 2006 findings evaluate the provision of health care through twenty pages of findings, spanning twenty-one categories of assessment, including "emergency care," "intake screening process," "documentation," "sick call process," "chronic care," "medication administration," and "women's health." Pl.'s Prop. Factual Findings at 22-42 (Dkt. No. 574-2). The 2011 Report, on the other hand, contains only two pages of information on this critical topic, and includes general conclusions about the areas of medical, mental, and dental health services, many of which are unsupported by specific facts.

Similarly, the 2006 findings detail the fire safety hazards inside Golden Grove through testimony that Defendants failed to provide a "centrally monitored fire alarm system" and sprinkler system. *Id.* at 45. The 2006 findings also included expert testimony that the fire system at Golden Grove is inoperable; that "there is no way to detect a fire or allow for evacuation in the event of a fire;" and that "because many of the centrally controlled doors cannot be operated electronically, officers have to manually operate the doors, but keys for the exit doors in the living units were not readily available." *Id.* at 46-

---

[16] For example, the 2011 Report details incidences of violence at Golden Grove—including four inmate stabbings between June 23, 2010, and January 26, 2011—that could assist the Court in determining whether a substantial risk of serious harm exists at Golden Grove. However, the Court also recognizes that the parties may stipulate to facts of this nature in the context of an evidentiary hearing regarding current conditions.

47. In contrast, the 2011 Report does not address fire safety—one of the core areas of concern outlined in the Consent Decree—except to identify "fire life safety" in a list of operational policies required from Defendants; to note in a discussion of sanitation that breached mattresses are a fire hazard; and to observe in a footnote that "the electronic override to open cell doors has not functioned since I have bee[n] touring Golden Grove, therefore the only way to release detainees/inmates in the case of an emergency (e.g. fire) is for officers to enter the units with keys and open each door individually." Mar. 2011 Special Master Rep. at 10, 36, 38 n.39.

The absence of detailed and well-documented factual findings is readily apparent in the 2011 Report, leaving major gaps between the extensive, but outdated, 2006 findings, and the more recent, but significantly less comprehensive, 2011 Report. In addition, the absence of a precise match between the 2006 findings and many of the facts that purportedly update the findings leaves questions regarding the interpretation of the alleged updates and the ultimate facts that are being proposed. Consequently, the Court is concerned that the 2011 Report does not adequately update the 2006 findings, and would instead create a patchwork record with substantial pockets of outdated factual findings— a far cry from the complete, coherent and current picture of the conditions at Golden Grove that the Court deems necessary to conduct the constitutional inquiry.[17]

Finally, since the March 4, 2011, Report, the Special Master has submitted two additional reports on July 21, 2011, and August 16, 2011. The parties are in substantial disagreement on the legal and factual premises of these two reports. This disagreement

---

[17] As noted earlier, in the context of an evidentiary hearing, the parties can stipulate to those facts that they deem to be current and undisputed.

further militates in favor of an evidentiary hearing to resolve the issues surrounding the question of a current and ongoing violation.

The Court recognizes that the reports submitted by the Special Master and the details proffered by Plaintiff paint a bleak picture of persistent infirmities at Golden Grove. However, the Supreme Court has made clear that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual punishment." *Farmer*, 114 S. Ct. at 1979. Despite the extensive reports filed by the Special Master outlining the grim factual conditions at Golden Grove and Defendants' history of unsatisfactory compliance with Court Orders, under *Farmer*, the Court must make determinations regarding the current objective likelihood of injury at Golden Grove and the current subjective state of mind of the prison officials at Golden Grove—an inquiry that requires the Court to consider more than whether Defendants complied with prior Court Orders. *See Farmer*, 114 S. Ct. at 1976-83. Thus, while the reports from Defendants and the Special Master are voluminous, they do not provide the complete portrait of Golden Grove needed for the relevant constitutional inquiry mandated by the Supreme court in *Farmer*, as further articulated by the Third Circuit in *Betts*. 621 F.3d at 257. Accordingly, pursuant to § 3626(b)(3) of the PLRA, the Court will hold an evidentiary hearing to determine whether there is a "current and ongoing violation of a Federal right" at Golden Grove and the prospective relief that may remain necessary to correct any such violation.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that: 1) Each Order entered in this case, except the 2006 Order appointing a Special Master, constitutes prospective relief as

defined in the PLRA; 2) None of the Orders containing prospective relief contain the requisite Narrowness-Need-Intrusiveness findings; and 3) An evidentiary hearing will be conducted to determine if there is a "current and ongoing violation of a Federal right" at Golden Grove for which properly tailored prospective relief remains necessary, and if so, to determine such relief. § 3626(b)(3).

Date: February 8, 2012                         _____/s/_____
                                               WILMA A. LEWIS
                                               District Judge