## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | **Civil Action No. 1986-265** |
| **TERRITORY OF THE VIRGIN ISLANDS,** | ) | |
| **et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| —————————————————————— | ) | |

**Attorneys:**
**Jonathan M. Smith, Esq.,**
**Laura L. Coon, Esq.,**
**Rita K. Lomio, Esq.,**
**Sharon I. Brett, Esq.,**
**Marlysha Myrthil, Esq.,**
Washington, D.C.
**Angela Tyson-Floyd, Esq.,**
St. Croix, U.S.V.I.
         *For the United States*

**Carol Thomas-Jacobs, Esq.,**
**Aquannette Y. Chinnery, Esq.,**
St. Thomas, U.S.V.I.
**Kenrick E. Robertson, Esq.,**
**Shari N. D'Andrade, Esq.,**
St. Croix, U.S.V.I.
         *For the Defendants*

## <u>MEMORANDUM OPINION</u>

THIS MATTER came before the Court for a Show Cause Hearing on December 10, 2014. The subject of the hearing was Defendants' Response to an Order entered on November 13, 2014, in which the Court directed Defendants, *inter alia*, to show cause why they should not be sanctioned for their failure—for the third time this year—to pay the Monitor in this matter in a timely manner. (*See* Dkt. No. 866 at 2). The Show Cause Hearing was scheduled after the

Court found that Defendants' written response to the Court's November 13, 2014, Order to Show Cause (Dkt. No. 867), was "both factually and legally inadequate" (Dkt. No. 868 at 2).

For the reasons that follow, the Court finds Defendants in contempt of this Court's June 6, 2014 Order requiring timely payment of the Monitor, and will impose a fine of $1,000.00 for Defendants' noncompliance. Further, because of Defendants' repeated failure to timely pay the Monitor, the Court—to coerce compliance—will order that any future noncompliance with this Court's June 6, 2014 Order, without good cause or other legally sufficient reason, will subject Defendants to a fine of $250.00 per day for each day that Defendants are noncompliant, plus payment to the Monitor of any reasonable fees and expenses incurred as a result of the untimely payment.

## I.   BACKGROUND[1]

### A.  Overview

This litigation began in 1986 when the United States filed a Complaint seeking to enjoin the Virgin Islands Government from depriving inmates at the Golden Grove Adult Correctional Facility ("Golden Grove") of the rights, privileges, and immunities provided and secured by the United States Constitution. (*See* Dkt. No. 1). After decades of litigation, the Court, on May 14, 2013, accepted a Settlement Agreement executed by the parties (Dkt. No. 689-1), and entered it as an Order of the Court (Dkt. No. 742).[2] In the Order, the Court adopted the United States'

---

[1] The facts and procedural history pertaining to the untimely payment of the Monitor were previously chronicled in a Memorandum Opinion issued by this Court on June 6, 2014. *See* Dkt. No. 831, *United States v. Terr. of the V.I.*, 2014 U.S. Dist. LEXIS 77204 (D.V.I. June 6, 2014). Although the previous opinion describes many of the facts relevant to the instant matter, the Court will again set forth the pertinent background because of its importance to the Court's ruling herein.

[2] During the course of the litigation, the parties had previously entered into a Consent Decree, a Plan of Compliance, and a Stipulated Agreement (all of which were entered as Orders of the Court) to remedy the constitutional violations at Golden Grove. In a Memorandum Opinion issued on February 8, 2012, this Court found that these Orders did not comply with the Prison Litigation Reform Act. (*See* Dkt. No. 630). The ensuing litigation resulted in the May 14, 2013 Order of the Court adopting the parties' Settlement Agreement.

Proposed Findings of Fact and Conclusions of Law (Dkt. No. 716), and found, as agreed by the parties, that "Defendants are violating the Eighth Amendment rights of prisoners at Golden Grove[.] " (Dkt. No. 742 at 2).

In the Settlement Agreement, the parties agreed to a broad plan to "remedy the ongoing constitutional violations" at Golden Grove. (Dkt. No. 689-1 at Part II.1). A key provision of the Settlement Agreement was that the parties "jointly select a person to serve as the Monitor to oversee the implementation of the Agreement." (Dkt. No. 689-1 at Part X.A.1). By Order entered on June 19, 2013, the Court approved the parties' joint selection of Kenneth A. Ray and appointed him to serve as the Monitor in this matter. (Dkt. No. 750).[3] Under the terms of the Settlement Agreement, "[t]he cost for the Monitor's fees and expenses [are to] be borne by Defendants." (Dkt. No. 689-1 at Part X.C.1).[4]

As discussed further below, over the span of nine months in 2014, the United States, on behalf of the Monitor, filed, on *three* occasions, a "Notice and Request for Emergency Telephonic Status Conference" ("Notice") related to Defendants' untimely payment of the Monitor's monthly invoices. On the first two occasions, the Court ordered a response from Defendants and held a status conference. At each of the hour-long status conferences, the Court, the parties, and the Monitor discussed, in substantial detail, the causes of the delay in payment; the adverse implications of Defendants' failure to timely pay the Monitor's invoices; the Court's

---

[3] By the terms of the Settlement Agreement, the Monitor's duties include: reviewing, modifying, and approving Defendants' implementation schedule and training procedures (Dkt. No. 689-1 at Parts VIII.1 and IX.2-5); advising Defendants regarding substantive requirements of the Settlement Agreement (*id*. at Part X.H); resolving disputes between the parties (*id*. at Part IX.2-3, 5); and comprehensively reporting to the Court on Defendants' progress in implementing the substantive provisions of the Settlement Agreement (*id*. at Part X.F-G).

[4] The Settlement Agreement states that Defendants are to "provide the Monitor with a budget sufficient to allow the Monitor to carry out the responsibilities described in [the] Agreement," and the Monitor is to "submit detailed monthly [invoices] of fees and expenses to the parties[.]" (Dkt. No. 689-1 at Parts X.C.2 and X.C.1, respectively). In furtherance thereof, Defendants and the Monitor entered into a contract, which provides, in relevant part, that "[t]he Government shall, within THIRTY (30) DAYS of the receipt of an invoice, pay the invoice in full or, if it contests any charge or charges on the invoice and fails to resolve the dispute by agreement, submit the dispute to the Court and the Court will determine the appropriate amount to be paid." (Dkt. No. 817-1 at 42).

expectations of Defendants regarding timely payment going forward; and Defendants' assurances that untimely payments would not recur. Following the second status conference, the Court issued a Memorandum Opinion on June 6, 2014 detailing the relevant factual and legal issues that supported the accompanying Order. In the June 6 Order, the Court directed Defendants to "pay the Monitor's monthly invoices within thirty days of receipt—in accordance with the Defendants' contract with the Monitor, executed pursuant to the Court's May 14, 2013 Order adopting the parties' Settlement Agreement—or be subject to sanctions." (Dkt. No. 830 at 2).[5]

Five months after the June 6, 2014 Order, the United States filed a third Notice regarding yet another untimely payment of the Monitor's monthly invoice. That Notice led to the issuance of the Court's November 13, 2014 Order to Show Cause, Defendants' written response, and the December 10, 2014 Show Cause Hearing.

**B. Factual and Procedural History**

**1. Defendants' First Failure to Timely Pay the Monitor**

On February 18, 2014, the United States filed a Notice advising the Court that Defendants had failed to pay the Monitor for any of the work he had completed, totaling over $80,000. (Dkt. No. 766 at 1). Because Defendants had not paid the Monitor—even after a reminder from the Monitor which contained a final deadline for payment—the Monitor suspended his services, including the March 2014 monitoring tour and the Second Compliance Report due to the Court on March 10, 2014. (*Id*. at 1-2).[6] The United States requested an emergency telephonic status conference to address the issue. (*Id*. at 2).

---

[5] For the relevant text of the contract, see note 4, *supra*.

[6] The Monitor performed both of these services once the payment issue was resolved.

In an Order entered on February 19, 2014, the Court granted the United States' request for an emergency telephonic status conference; set a telephonic status conference for February 20, 2014; and ordered Defendants to file a response to the United States' Notice. (Dkt. No. 767 at 2). As ordered, Defendants filed a "Response to Notice and Request for Emergency Telephonic Status Conference" on February 19, 2014. (Dkt. No. 768).

In their Response, Defendants acknowledged that they are "obligated to pay the fees and expenses of the Monitor and the Monitor's consultants" under the terms of the Settlement Agreement, and explained that in "September 2013[,] the Monitor and the Defendants agreed to a monitoring budget for the first year of the monitorship." (*Id.* at 1). Defendants further explained that they executed a contract with the Monitor on December 12, 2013 containing "terms . . . consistent with the provisions of the Settlement Agreement," and that "[b]etween December 12, 2013 and February 13, 2014, the contract obtained the approval of different [Virgin Islands] agencies as required by law," after "back-and-forth discussion to resolve concerns about the contract." (*Id.*).

According to Defendants, the "contract was finally approved on February 13, 2014," and a check was issued to the Monitor for his outstanding invoices on February 19, 2014—the same date that Defendants filed their Response to the United States' Notice. (*Id.* at 2). Defendants stated that "the delay in making payment to the Monitor . . . was not because the Defendants disputed their obligation to pay the Monitor or the amounts claimed on the Monitor's invoice. Rather, the Monitor's contract took time to finalize and approve." (*Id.*). Defendants concluded that they "do not anticipate this kind of delay in making payments going forward." (*Id.*).

At the telephonic status conference held on February 20, 2014, the Monitor expressed his concern that the payment issue interfered with his business relationships with the two consultants

who are part of the monitoring team, and that they had both informed him that unless they are consistently paid on time, they will not be able to continue being a part of the team. The Monitor explained that he and his consultants had spent money, out of pocket, to finance trips to the Virgin Islands for two site visits in September and December of 2013 and, further, that untimely payments interfere with their other business obligations.

Counsel for Defendants explained that the sole reason for the delay in payment of the Monitor's invoice was the time necessary for the development and approval of the Monitor's contract. The parties and the Monitor agreed that, under the terms of the contract, Defendants are to pay the Monitor within thirty days of receipt of an invoice.[7] Counsel for Defendants assured the Court that the process for payment of invoices takes "no more than three days" and, thus, there would be no issue in the future with payments beyond the thirty-day period.

The Court emphasized that the Settlement Agreement was entered as an Order of the Court, and that the Court "does not view lightly the findings that were made in its Order." The Court stressed the urgency of remedying the constitutional violations found to exist at Golden Grove, and expressed its expectation that the parties are "doing their utmost to ensure that the terms of the Settlement Agreement and, therefore, the Order entered by the Court are, in fact, fulfilled." The Court emphasized that the Monitor, his consultants, and their work are "integral and essential" to the Settlement Agreement, and expressed its concern that delays in the contract process caused the Monitor to issue an ultimatum, and ultimately halt his monitoring services. The Court concluded by stating its expectation that counsel for Defendants would make clear to individuals involved in the implementation of the Settlement Agreement that the Court expects

---

[7] Counsel for Defendants informed the Court that, under the terms of the contract, Defendants are permitted to raise objections to the invoice and to bring unresolved disputes to the Court. Both counsel for Defendants and the Monitor expressed the mutual understanding, however, that the contract requires the Monitor to be paid within thirty days of receipt of an invoice, even if a dispute is unresolved, and that the resolution of any dispute would lead to an adjustment of future invoices, as appropriate.

them to "move with dispatch with regard to the activities that are necessary to implement the Agreement, and the Court's Order in connection therewith."

### 2.   Defendants' Second Failure to Timely Pay the Monitor

Approximately two-and-a-half months later, on May 8, 2014, the United States filed a second Notice advising the Court that the Monitor had not received payment for his March 2014 invoice. (Dkt. No. 813). The United States explained that the Monitor sent the March invoice to the parties via e-mail on April 2, 2014, and that after not receiving payment, the Monitor emailed the parties on May 5, 2014, advising them that if he was not paid by May 7, 2014, "he would once again suspend monitoring and seek court involvement." (*Id*. at 1). According to the Notice, "[a]s of close of business on May 7, 2014, Mr. Ray had still not received payment for the March invoice." (*Id*.). The United States requested that the Court set an emergency telephonic status conference. (*Id*. at 2).

By Order entered later that same day, the Court ordered Defendants to file a response to the United States' Notice, "explain[ing] with specificity the reason for their failure to timely pay the Monitor . . ., including an identification of any agency or agencies, or any individual or individuals, that contributed to the delay of the payment." (Dkt. No. 814 at 2). In their "Notice of Filing and Amended Response to Notice and Request for Emergency Telephonic Status Conference," Defendants explained that "[t]here was an oversight regarding the payment of the March 2014 invoice"; that "the March 2014 invoice was sent both to Attorney Robertson and [Bureau of Corrections] Director Julius Wilson"; and that "Director Wilson takes responsibility for this oversight regarding the payment not having been made." (Dkt. No. 817 at 2). According to Defendants, "[o]nce Director Wilson received the email dated May 5, 2014, from the Monitor . . . he took immediate steps to expedite the payment." (*Id*.).

7

Following the filing of Defendants' Response, the Court issued an Order on May 12, 2014 that set a status conference for May 27, 2014. (Dkt. No. 819). At the conference, counsel for Defendants and Director Wilson stated that the failure to timely pay the Monitor's March 2014 invoice was an "oversight" due, in part, to the emergency absence of Attorney Robertson from the office and Director Wilson's misunderstanding of his role in the payment process. As with the first failure to timely pay the Monitor, there was no dispute regarding the amount of the invoice. Further, Director Wilson explained that the money to pay the Monitor was already in the Bureau of Corrections' budget, and thus there was no issue regarding the availability of funds to pay the Monitor's monthly invoices. Director Wilson acknowledged that the failure to timely process the March 2014 invoice was the mistake of the Bureau of Corrections, and stated that he would implement a process to ensure timely payment.

Once again, the Monitor expressed to the Court that late payment of his monthly invoices creates an issue of retaining his consultants. He explained that given the difficulty in recruiting consultants with their level of qualifications, he does not want to risk losing them. The Court then expressed its concern that only two-and-a-half months had passed since Defendants assured the Court that timely payment of the Monitor's invoices would not be an issue, and, in fact, that payment could be made within three days. The Court further stated that, because the issue is not the availability of funds but rather the implementation of a process to ensure that the Monitor is paid on time, there is no reason that funds cannot be dispersed in a timely manner given that Director Wilson indicated he would put a system in place to address the issue. Nonetheless, unwilling to simply accept the assurances of Defendants' counsel and Director Wilson for the second time, the Court concluded the status conference by discussing with and then advising the parties that an Order would be forthcoming requiring Defendants to pay the Monitor timely or be

8

subject to sanctions.[8] The Court further noted that it would not hesitate to impose sanctions if the untimely payment problem persisted.

Accordingly, the Court issued an Order on June 6, 2014 that requires Defendants to "pay the Monitor's monthly invoices within thirty days of receipt—in accordance with the Defendants' contract with the Monitor, executed pursuant to the Court's May 14, 2013 Order adopting the parties' Settlement Agreement—or be subject to sanctions." (Dkt. No. 830 at 2). In an accompanying Memorandum Opinion, the Court noted that the Monitor's work is "'essential to remedy the [constitutional] violation[s]' found to exist at Golden Grove, and is instrumental to 'provid[ing] the parties with the relief originally bargained for in the consent order.'" (Dkt. No. 831 at 10, quoting *Holland v. N.J. Dep't of Corrections*, 246 F.3d 267, 283 (3d Cir. 2001)). The Court concluded that:

> Because the Monitor's work is contingent upon Defendants paying him—as they are obligated to do under the Settlement Agreement—and because Defendants have now failed to timely pay the Monitor twice, the Court finds that entering an Order requiring Defendants to pay the Monitor within thirty days of receipt of an invoice—as required by the contract between Defendants and the Monitor—or be subject to sanctions, is a "reasonable action taken . . . to secure compliance" and "protect[ ] the integrity of . . . [the] [consent] decree[.]"

(*Id.* at 10-11, quoting *United States v. Local 359, United Seafood Worker*s, 55 F.3d 64, 69 (3d Cir. 1995)). The Court cautioned that it "hopes the threat of sanctions—which the Court will not hesitate to impose if the problem persists—will result in the appropriate degree of attention being paid by Defendants to the timely payment of the Monitor's invoices." (*Id.* at 10).

### 3.  Defendants' Third Failure to Timely Pay the Monitor

Notwithstanding the Court's warning to Defendants—both orally and in writing—that sanctions would be imposed for future untimely payments, the Court received a *third* Notice

---

[8] Counsel for Defendants acknowledged that there was nothing that legally precluded the Court from entering such an Order. In fact, counsel for Defendants deemed such an Order preferable to the establishment of an escrow account as advocated by the Monitor.

from the United States on November 13, 2014. In the Notice, the United States informed the Court that the September 2014 invoice, submitted by the Monitor on October 10, 2014, had not been timely paid by Defendants in accordance with this Court's June 6, 2014 Order. (Dkt. No. 865 at 1). Once again, the United States requested an emergency telephonic status conference to address the issue. Later that same day, the Court issued an Order, which directed Defendants to file a response to the United States' Notice and, if payment of the Monitor's September 2014 invoice was not timely, to show cause why sanctions should not be imposed for failing to comply with the Court's June 6, 2014 Order. (Dkt. No. 866 at 2).

On November 17, 2014, Defendants filed a "Response to Notice and Request for Emergency Telephonic Status Conference" (Dkt. No. 867), in which they claimed—without any details or support—that the Bureau of Corrections had "timely processed" the Monitor's invoice, but that the check was delayed because the Department of Finance had "technical difficulties with its software program." (*Id*. at 1). While acknowledging that payment of the Monitor's September 2014 invoice was not timely, Defendants argued against the imposition of sanctions by noting that their payment was "merely four days tardy"; that they acted "[i]mmediately" and "promptly" *after* being informed that the Monitor had not received payment; that the Department of Finances' technical difficulties were "unforeseen"; and that Defendants did not "willfully violate" the Court's June 6, 2014 Order. (*Id*. at 2).

By Order entered on November 24, 2014, the Court scheduled a Show Cause Hearing for December 10, 2014, after finding that Defendants' Response to the November 13, 2014 Order to Show Cause was "both factually and legally inadequate." (Dkt. No. 868 at 2). As stated in the Order, the purpose of the Show Cause Hearing was for "the Court's consideration of whether a finding of contempt should be entered and sanctions imposed[.]" (*Id*. at 3).

At the hearing, Defendants retracted their Response in its entirety, disclaiming that the delay in payment was due to technical difficulties at the Department of Finance, and disclosing instead that it was due to a series of delays at the Bureau of Corrections. Defendants' Response—including the representations that the Bureau of Corrections "timely processed" the Monitor's September 2014 invoice and that the delay was due to "unforeseen" technical difficulties with the software program at the Department of Finance—was reportedly based on incorrect information received from Bureau of Corrections personnel.

In presenting Defendants' newly-discovered explanation, counsel for Defendants stated that the invoice was received from the Monitor on October 9, 2014. On October 22, 2014—thirteen days later—Director Wilson approved the invoice and sent it to the Bureau of Corrections' Business Office.[9] Then, for some unexplained reason, the invoice remained in the Business Office for eight days—from October 22, 2014 until October 30, 2014—before it was sent to the Department of Property and Procurement.[10]

On November 3, 2014, the Department of Property and Procurement approved the invoice as a requisition and converted it to a purchase order. The purchase order was then sent to, and received by, the Bureau of Corrections on November 5, 2014. Counsel for Defendants stated that once a purchase order is received from the Department of Property and Procurement, the proper procedure is to enter it into the Bureau of Corrections system the same day for payment through the Department of Finance. However, it was not until eight days later—on November

---

[9] According to Director Wilson, the invoice was not approved until October 22, 2014, because he was out of the country for a family emergency. Director Wilson informed the Court that there was no one at the Bureau of Corrections who could act in his stead in approving the invoice.

[10] Counsel for Defendants could not provide a reason for the delay in the Business Office. Director Wilson surmised that the delay may have been due to the unavailability of funds to pay the Monitor at the end of the month.

13, 2014—that the purchase order was entered in a queue for payment.[11] The check was issued by the Department of Finance the same day.

## II.     DISCUSSION

It is well-established that federal courts "have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see also United States v. Harris*, 582 F.3d 512, 514 (3d Cir. 2009) ("It has long been recognized that courts possess the inherent authority to hold persons in contempt.").[12] "Civil contempt is remedial in nature, serving to coerce compliance with a court order or to compensate the other party for losses sustained due to noncompliance." *United States v. Pozsgai*, 999 F.2d 719, 735 (3d Cir. 1993). Thus, courts are generally "afforded broad discretion to fashion a sanction that will achieve full remedial relief." *John T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 554 (3d Cir. 2003).

To hold a party in civil contempt, three elements must be established by clear and convincing evidence: "(1) that a valid order of the court existed, (2) that the defendant had knowledge of the order, and (3) that the defendant disobeyed the order." *Berne Corp. v. Gov't of the V.I.*, 570 F.3d 130, 139, 51 V.I. 1253, 1265 (3d Cir. 2009) (quoting *Roe v. Operation Rescue*,

---

[11] According to the Operations Director at the Bureau of Corrections, there was a scheduled upgrade to the "ERP system" from approximately November 6, 2014 to November 12, 2014, which prevented the Bureau of Corrections from entering payments. It was acknowledged, however, that the Business Office was aware in advance of the dates of the scheduled upgrade. In view of the impending shutdown of the system, there was an even more compelling need for the Bureau of Corrections to follow the proper procedure of entering the purchase order in the system on the day it was received—November 5, 2014. However, there was no indication from Defendants that any effort was made to enter the purchase order in the system for payment before the scheduled system shutdown.

[12] This inherent contempt power is derived from Section 401 of the United States Code, which provides that:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as--
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; (2) Misbehavior of any of its officers in their official transactions; (3) Disobedience or resistance to its lawful writ, process, order, rule, decree or command.

18 U.S.C. § 401.

54 F.3d 133, 137 (3d Cir. 1995) (internal quotation marks omitted)). Each element of civil contempt is present here.

First, on June 6, 2014, the Court entered a valid Order warning Defendants that they would be "subject to sanctions" if they did not "pay the Monitor's monthly invoices within thirty days of receipt[.]" (Dkt. No. 830 at 2). The Court's Order was accompanied by a Memorandum Opinion which detailed the factual and legal bases for the Order. (Dkt. No. 831).[13]

Second, Defendants knew of the Order because it was discussed at the May 27, 2014 status conference prior to its issuance, and the Court stated at the status conference that it would enter the Order. Moreover, Defendants' Response to this Court's November 13, 2014 Order to Show Cause (Dkt. No. 867) further confirms their knowledge of the June 6 Order.

Third, Defendants' acknowledgment in their Response that payment of the Monitor's invoice was "merely four days tardy," and that they did not violate the Court's Order "willfully" (*id*. at 2), reflects Defendants' knowledge that they had violated the Court's Order.

Defendants' assertion that they did not violate the Order "willfully" (*id*.) is unavailing because "[w]illfulness is not a necessary element of civil contempt." *John T.*, 318 F.3d at 552 (quoting *Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 148 (3d Cir. 1994) (internal quotation marks omitted)). Thus, even assuming that Defendants could demonstrate that they acted in good faith, such evidence "does not bar the conclusion . . . that [Defendants] acted in contempt." *Id*. (quoting *Harley Davidson, Inc.*, 19 F.3d at 149); *see also Robin Woods, Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994) ("[G]ood faith is not a defense to civil contempt.").

The Court is mindful that its contempt power is not "without limits, particularly when directed against governmental defendants." *Inmates of Allegheny County Jail v. Wecht*, 901 F.2d

---

[13]   As noted earlier, when the then-proposed Order was discussed with the parties' counsel at the second status conference on May 27, 2014, counsel for Defendants acknowledged that there was nothing that legally precluded the Court from entering such an Order.

1191, 1198 (3d Cir. 1990). It also recognizes that "in selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (internal citations and quotation marks omitted). With these principles in mind, the Court concludes that the monetary sanction that the Court will impose is amply warranted under the circumstances here.

As the Third Circuit has explained:

> Because a court would not be justified in holding a [party] in contempt until [it] demonstrated a refusal to comply with an order, prior instances of disobedience will almost always accompany an order of contempt. Thus, . . . a valid order of civil contempt . . . reacts to prior instances of disobedience by seeking to compel and coerce *future* obedience.

*Harris*, 582 F.3d at 519 (citation omitted). Accordingly, the Court's finding of contempt and decision to impose sanctions in response to Defendants' violation of the Court's June 6, 2014 Order cannot be divorced from the history that preceded it.

As the record in this matter indicates, during the status conference following Defendants' first failure to timely pay the Monitor, the Court clearly set the stage regarding its expectations for the timely payment of the Monitor. In this regard, the Court, among other things:  (1) stressed the essential and integral role of the Monitor in the fulfillment of the terms of the parties' Settlement Agreement; (2) emphasized the sense of urgency that needed to attach to actions by Defendants necessary to implement the Settlement Agreement, including timely payment of the Monitor; (3) expressed its concern that Defendants' actions thus far suggested that Defendants did not share the same sense of urgency; and (4) expressed the need for Defendants' counsel to advise the individuals who are necessary to the implementation of the Settlement Agreement of the Court's expectation that they will proceed with dispatch with regard to the activities that are necessary to implement the Agreement. Attributing the delayed payment solely to the lengthy

14

contracting process and emphasizing that the payment process for the Monitor should take only three days, Defendants responded with assurances that there would be no future problems with payment of the Monitor within thirty days. Relying on these assurances, the Court took no further action.

Notwithstanding counsel's assurances, two-and-one-half months later, the Court was called upon once again to address Defendants' failure to timely pay the Monitor. This time, the delay was attributed to an "oversight" by the Bureau of Corrections stemming, in part, from the emergency absence from the office of one of Defendants' counsel, coupled with the Director's misunderstanding of his role in processing the Monitor's invoices. Finding the Monitor's work "essential to remedy the [constitutional] violation[s] found to exist at Golden Grove" and the Defendants' repeated failures to timely pay the Monitor an obvious impediment to that work, the Court deemed it necessary to enter an Order requiring Defendants to pay the Monitor within thirty days "to secure compliance" and "protect[ ] the integrity of . . . [the] [consent] decree[.]" (Dkt. No. 831 at 10-11 (citation and internal quotation marks omitted)).

Five months later, the same problem surfaced yet again, and the Court is now faced—for the third time this year—with addressing Defendants' failure to timely pay the Monitor. Defendants' explanation of its delay-ridden processing of the Monitor's invoice reflects inexcusable, contumacious conduct. The Bureau of Corrections appears to be proceeding with utter disregard of, and completely unfazed by, the Court's articulation of its expectations regarding the timely payment of the Monitor, the Court's oral admonitions in connection therewith, and the Court's June 6, 2014 Memorandum Opinion and Order, including the threat of sanctions contained therein. It is quite apparent that the Bureau of Corrections, its Director Julius

Wilson, and its counsel are not attaching to the payment of the Monitor the sense of urgency that this Court has ordered and the circumstances here require.

In sum, in view of Defendants' *third* failure to timely pay the Monitor within a short time span of only nine months—which occurred after two conferences on this issue, coupled with an Order threatening sanctions designed to secure compliance with the parties' Settlement Agreement—the Court concludes that there is no other way to coerce Defendants into compliance than to impose monetary sanctions. *See Inmates of Allegheny County Jail*, 901 F.2d at 1198 (finding "monetary sanctions were warranted by the defendants' continuing non-compliance with the district court's remedial orders"). The Court further concludes that the sanctions must be designed to address Defendants' most recent failure to timely pay, and to coerce Defendants' future compliance. *See Int'l Union v. Bagwell*, 512 U.S. 821, 828 (1994) ("Most contempt sanctions . . . to some extent punish a prior offense as well as coerce an offender's future obedience.").

Accordingly, the Court will impose a sanction of $1,000.00 for Defendants' noncompliance with the June 6, 2014 Order—$250.00 for each of the four days that Defendants acknowledge the payment was late. The Court will further order that any future noncompliance with this Court's June 6, 2014 Order—without good cause or other legally sufficient reason—will subject Defendants to a fine of $250.00 per day for each day that the payment is late, plus payment to the Monitor of any fees and expenses reasonably incurred as a result of the untimely payment.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that Defendants are in contempt of the Court's June 6, 2014 Order, for failing to timely pay the Monitor's September 2014 invoice, and concludes that monetary sanctions are warranted. An appropriate Order accompanies this Memorandum Opinion.

Date:  December 30, 2014

_____/s/_____
WILMA A. LEWIS
Chief Judge
