```
          IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                    DIVISION OF ST. CROIX

UNITED STATES OF AMERICA,      )
                               )Civil No. 1:86-CV-00265
                  Plaintiff,   )
                               )April 4, 2019
      vs.                      )1:16 p.m.
                               )
TERRITORY OF THE VIRGIN ISLANDS, )
                               )
                  Defendant.   )
_____ )
```

STATUS CONFERENCE


BEFORE THE HONORABLE CHIEF JUDGE WILMA A. LEWIS


<u>APPEARANCES</u>:
        <u>For the Plaintiff</u>:
        MARLYSHA MYRTHIL, ESQ.
        WILLIAM MADDOX, ESQ.
         Washington, D.C.
        ANGELA TYSON-FLOYD, ESQ., AUSA
         St. Croix, USVI


        <u>For the Defendant</u>:
        SHARI N. D'ANDRADE, ESQ.


Reported by:
YVONNE SAMUEL-SETORIE, RPR
ELITE REPORTING SERVICES, INC.
P.O. Box 5619
Christiansted, St. Croix
U.S. Virgin Islands  00823
(340) 718-1318

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2

 3            THE CLERK:    The matter on the docket this

 4   afternoon is the United States of America versus the

 5   Territory of the Virgin Islands, Status Conference in

 6   Civil Case No. 1:86-CV-00265.

 7            THE COURT:    Good afternoon, everyone.

 8            (Response.)

 9            THE COURT:    Counsel, may I have your

10   appearances, please.

11            MS. MYRTHIL:    Good afternoon, Your Honor.

12   Marlysha Myrthil for the United States Department of

13   Justice.

14            THE COURT:    Attorney Myrthil.

15            MS. MYRTHIL:    I am accompanied here by my

16   colleague, William Maddox.

17            MS. TYSON-FLOYD:    Good afternoon, Your Honor.

18   Angela Tyson-Floyd on behalf of the U.S. Attorney for the

19   Virgin Islands.

20            THE COURT:    Attorney Tyson-Floyd.

21       Attorney Maddox, I know this is your first Status

22   Conference, is it not?

23            MR. MADDOX:    Yes.

24            THE COURT:    Welcome to the team.

25            MR. MADDOX:    Thank you, Your Honor.
```

```
1              THE COURT:     Glad to have you.

2              MS. D'ANDRADE:     Good afternoon, Your Honor.

3    Shari D'Andrade on behalf of the Territory of the

4    Virgin Islands.  And seated at counsel's table is

5    Director Wynnie Testamark, and also at counsel's table is

6    Chief Deputy Attorney General Joseph Ponteen.

7              THE COURT:     Attorney D'Andrade, good

8    afternoon.

9         Director Testamark, welcome.

10             MS. TESTAMARK:     Thank you.

11             THE COURT:     Good to have you.  Welcome both to

12   the District Court and to the team that has been working so

13   hard on compliance with the Settlement Agreement.  Welcome

14   aboard.

15        Attorney Ponteen, good afternoon to you as well.

16        Let me start by commending the team.  I think that's a

17   good place to start.

18        Oh, before we start, why don't we have appearances

19   from our monitoring team.

20             Good day, Your Honor.  Kenneth Ray, Monitor.

21             THE COURT:     Dr. Ray, good afternoon.

22             MR. SHANSKY:     Ronald Shansky, Medical Monitor.

23             THE COURT:     Dr. Shansky.

24             MR. PARRISH:     Good afternoon, Your Honor.

25        David Parrish, Director of Operations.
```

1              THE COURT:     Mr. Parrish.

2              DR. DUDLEY:     Richard Dudley, Mental Health.

3              THE COURT:     Dr. Dudley, welcome and good

4      afternoon to all of you, everyone else, the rest of the

5      team, good afternoon as well.

6          I am going to start, as I said, by commending the

7      entire team for where we are as reported by the monitor,

8      Dr. Ray.  As we all know, we have been working very hard

9      for quite some time now, past several years actually to get

10     to this point.  And we should look at this in stages or in

11     phases.  But I think this is a phase that it is appropriate

12     to celebrate in that we have gotten to the point where the

13     overwhelming majority of the various provisions with which

14     the Bureau must comply are now out of noncompliance.

15         For several years now we have been looking at charts

16     in which virtually all of the provisions were in

17     noncompliance, and now we are at a point where of the 123

18     provisions, only seven are in noncompliance.  We have 94 in

19     partial compliance, 17 in substantial compliance, and 5 in

20     sustained compliance, based on the last report submitted by

21     the monitoring team.

22         And as reported there, a big part of that jump is due

23     to the fact that we have now reached a point where

24     95 percent of the uniformed staff has successfully

25     completed the training that was prepared and implemented

1    with a minimum passing score of 80 percent.  I think

2    that's, as I indicated, certainly something to commend the

3    entire team for, because I know a lot of hard work went

4    into getting us to the point that we are at this time.  So

5    congratulations.

6         I, of course, hasten to add that, as the monitor has

7    pointed out, with regard to each of those areas of

8    improvement, there is still substantial work left to be

9    done.  So while we have seen a significant amount of

10   progress, I think there has to be a recognition that this

11   is certainly far from the end.  There is a lot more that

12   needs to be done, and it is my hope that it will be done

13   with the continued cooperation and collaboration of

14   everyone involved; namely, of course the leadership and the

15   entire staff at the Bureau, counsel, Attorney D'Andrade for

16   the Territory, counsel for the United States, who plays an

17   important role as well, the monitoring team that we're

18   fortunate to have working with us.  The cooperation,

19   collaboration of everybody involved will continue to be

20   needed.  So congratulations and let's saddle up and get

21   ready for more hard work.

22        Director Testamark, I'm sure you heard quite a bit

23   about this matter by now.  I would be surprised if you

24   hadn't.  So I know you appreciate the work that has gone

25   into this thus far, and I'm sure you appreciate as well the

1  work that has to continue.  The leadership of the Bureau is

2  important in getting this done.

3      I'm sure that you have heard by now that I am quick to

4  commend when I believe commendations are due, and I am

5  equally quick to criticize when I believe criticism is

6  warranted.  I look to the leadership as those who are

7  driving the ship, and those who need to be particularly

8  attentive to all aspects of what needs to be done, because

9  when there are issues that arise, I tend to look to the

10  leadership for answers.

11      So I welcome you to the team, and I look forward to

12  your very, very active participation, because my

13  expectation is that this issue is one of the top priorities

14  for the Bureau of Corrections.  And my expectations from

15  one Status Conference to another is that the things we

16  agree will be done are in fact done.  And if they're not,

17  that there is a very good excuse, very good reason why it

18  hasn't been completed.  So, again, welcome and look forward

19  to having you partake.

20      We just received, thank you very much, the

21  Compliance Measures.  It was on the top of my list.  So I

22  was very happy when I learned it had just come in, and I

23  was able to sort of do a check mark with regard to the

24  compliance measures that I was going to inquire about

25  first.

1          Thank you as well for filing the Staffing Plan, which

2     was going to be next on my list.  So I was happy again to

3     be able to put a check mark to the fact that that had been

4     completed.  So thank you for the work put into that, and

5     thank you for getting it here.

6          I haven't had a chance, of course, to review them, but

7     I know that in fact they are filed.  If there is anything

8     in particular that you need to tell me about them, you can

9     do so as we move forward.

10         Attorney D'Andrade, why don't you come on up.

11         I want to start with two areas that I think are sort

12    of overarching, as opposed to specific areas that we're

13    working on.  And the first deals with a conversation that

14    we had at the last status conference regarding the issue of

15    sustained compliance.  And the fact that under the approach

16    that we're using, sustained compliance is achieved when a

17    particular area has been in substantial compliance for at

18    least a year.

19         And the question that we were discussing the last time

20    was what happens if something falls out of sustained

21    compliance with regard to the year requirement of being in

22    substantial compliance.  And I asked the parties and the

23    monitors to think about that a little bit to figure out how

24    you are interpreting how that circumstance would be

25    addressed.  So why don't we talk about that first.

1          MS. D'ANDRADE:     So we've had some discussion

2     on site about what we'd all do collectively in the event

3     that there's a provision that potentially will regress.

4     And the agreement that we came up with is that if there is

5     a provision that is in sustained compliance that

6     potentially will regress, that would be flagged by the

7     monitoring team, who would then come up with

8     recommendations for corrective action that would be

9     implemented within a specified time frame.

10         If the Territory fails to implement those

11    recommendations -- and those recommendations would be, of

12    course, the monitor's independent recommendations as well

13    as some collaboration with the parties about the course of

14    action to remedy whatever the problem may be.  But if the

15    Territory does not implement that corrective action within

16    that specified time period, then the provision would fall

17    back most likely to partial compliance.

18         THE COURT:     And then if it fell back to

19    partial compliance -- of course, I am not assuming this is

20    going to happen.

21         MS. D'ANDRADE:     No, it would be a rare

22    instance.

23         THE COURT:     Exactly.  If it fell back to

24    partial compliance, then it would be in the position of

25    having to be -- no, it would fallback to substantial

```
 1    compliance; right?
 2            MS. D'ANDRADE:     No.  Sustained compliance is
 3    really substantial compliance.  So in the agreement there's
 4    noncompliance, partial compliance, and substantial
 5    compliance.
 6            THE COURT:    Correct.
 7            MS. D'ANDRADE:    And once something has been in
 8    substantial compliance for 12 consecutive months, then
 9    there will be the sustained compliance, which is not
10    specifically outlined in the Settlement Agreement but a
11    designation that the monitor gave.  And so because it's
12    already in substantial compliance, even though it has this
13    other designation, it would potentially fall back to
14    partial.
15            THE COURT:    So you're saying it falls back to
16    partial, and then it has to work its way back up to
17    substantial?
18            MS. D'ANDRADE:    Correct.
19            THE COURT:    And then it has to be in
20    substantial for a year to work its way back up to
21    sustained?
22            MS. D'ANDRADE:    Correct.
23            THE COURT:    Obviously you don't want that to
24    happen.
25            MS. D'ANDRADE:    No.
```

1           And we fleshed that out in the core measures that were

2      filed today.  There's a paragraph addressing what I just

3      expressed to Your Honor.

4                THE COURT:    Okay.

5                MS. MYRTHIL:    Your Honor, if I may --

6                THE COURT:    Yes.

7                MS. MYRTHIL:    -- provide some further

8      clarification on this point?

9           On page 2 on the full core measures that were filed

10     this afternoon, you will find an expanded language under

11     the section outlining noncompliance, partial compliance,

12     and substantial compliance definitions.

13               THE COURT:    Okay.

14               MS. MYRTHIL:    And the sustained compliance

15     category that the monitor -- designation that the monitor

16     had derived, and that was all in the last filing.  That

17     paragraph expands to include the discussion that

18     Attorney D'Andrade is explaining right now, and a new

19     status of provisional substantial compliance, that would

20     attach to a circumstance where if you had a provision that

21     would potentially regress or show signs of regression,

22     there would be almost sort of like a grace period provided

23     to allow the Territory to take whatever corrective actions

24     have been identified by the monitoring team and mutually

25     work upon with the parties to remedy that within either a

1    specified period of time or by the next on-site visit.

2        And assuming that those corrective actions had been

3    taken, that provision could retain its substantial

4    compliance designation, so you wouldn't have to necessarily

5    restart the clock all over again to reach the sustained

6    compliance level.

7        However, if you had a provision that wasn't the

8    situation, had been identified as provisional substantial

9    compliance, but the Territory failed to take those

10   corrective actions as outlined by monitor and agreed upon

11   by the parties, then the monitor may regress it all the way

12   back to partial.

13           THE COURT:    Okay.

14           MS. MYRTHIL:    And that would restart the clock

15   under those circumstances.

16           THE COURT:    Okay.  Let me take this one step

17   further.  The agreement says that -- so I'm looking -- as

18   you can see I'm looking down the road here.  The agreement

19   indicates that it terminates when defendants achieve

20   compliance with the substantive provisions of the agreement

21   and maintain compliance for one year.  So that's the

22   language of the agreement itself.  "It terminates when

23   defendants achieve compliance with the substantive

24   provisions of this agreement and maintain compliance for

25   one year."

 1          And then at the beginning of the agreement in the

 2     definition section, there is a definition of compliance.

 3     And it says that "it's discussed throughout the agreement

 4     in terms of substantial compliance, partial compliance and

 5     noncompliance."  And that "substantial compliance indicates

 6     that the defendants have achieved compliance with most or

 7     all components of the relevant provisions of the

 8     agreement."

 9          Now, this language was obviously the parties' language

10     with regard to this agreement.  I'm assuming that when it

11     speaks to maintaining compliance for one year, we would be

12     talking about substantial compliance; is that right?

13               MS. D'ANDRADE:     Yes.

14          THE COURT:     And substantial compliance is

15     defined as defendants having achieved compliance with most

16     or all components of the relevant provisions of the

17     agreement.

18          So in terms of the termination of this agreement and

19     its compliance, here in section 11.2 is read "as achieving

20     compliance with most or all components of the relevant

21     provisions of the agreement."

22          Then I'm assuming this means that when defendants

23     achieve compliance with most or all components of the

24     relevant provisions of the agreement for one year, the

25     agreement terminates.  Is that your interpretation?

1          MS. D'ANDRADE:     Yes, Your Honor.

2          THE COURT:     So as we move forward, then the

3    assessment is looked at in sort of a holistic perspective,

4    right.  I know we're looking at each provision now, and we

5    are measuring each provision.  I think that obviously that

6    goes into the totality of the assessment.  But at the end

7    of the day, in order to determine whether or not the

8    agreement terminates, you would be looking at whether

9    defendants have achieved compliance with most of the

10   provisions of the agreement for at least a year?

11         MS. D'ANDRADE:     Yes.

12         THE COURT:     With most of the 123 provisions?

13         MS. D'ANDRADE:     Yes.

14         THE COURT:     That's where the focus would be

15   for purposes of determining whether or not it is time for

16   the agreement to terminate.  Is everybody sort of on the

17   same page with that interpretation of the language here?

18         MS. D'ANDRADE:     Yes, and that's defendant's

19   position with respect to the Settlement Agreement and the

20   requirement for termination.

21         MS. MYRTHIL:     Your Honor, if I may provide the

22   perspective for the United States?

23         THE COURT:     Yes.

24         MS. MYRTHIL:     I do agree, with Your Honor,

25   that we should, and obviously I believe the monitoring team

1    is also taking a holistic approach to gauging compliance

2    with the provisions of the agreement.  I did want to just

3    emphasize though, as it relates to the definitional term of

4    compliance as outlined here, that most or all refers to the

5    components of the relevant provisions; so not necessarily

6    most of all provisions of the agreement but most of all --

7    most or all of the relevant -- of the components of the

8    relevant provision.

9          As Your Honor will see, obviously notes from the

10   agreement itself and the monitor's reports, which are also

11   quite substantial and lengthy, there are provisions that

12   have multiple parts and subparts to them.  And so our

13   understanding is that the most or all refers to an analysis

14   of achieving the out stated goal at the beginning of each

15   section and major subsection of the agreement as it relates

16   to all these different components and factors that go into

17   accomplishing that overarching goal of that section of the

18   agreement.  So not necessarily most or all the provisions

19   of the agreement, but most or all of the different

20   components that go into satisfying a particular provision.

21            THE COURT:    So it is your position that we

22   would not be analyzing this by provision, but we would be

23   analyzing it by each of the underlying components?

24            MS. MYRTHIL:    Yes, Your Honor.

25            THE COURT:    But when the assessment is done as

1    to whether a provision is moved, as in this case, for

2    example, from noncompliance to partial compliance, for

3    substantial compliance, isn't it the case that the various

4    components are taking into account in deciding whether or

5    not something is in substantial compliance, for example?

6            MS. MYRTHIL:    Yes, Your Honor.  And I think we

7    see that reflected in the monitor's reports especially as

8    it relates to, for example, provisions that are in

9    substantial, there are -- there may be some components of

10   that particular provision where the Territory has

11   satisfied, but there's still significant work that remains

12   as to other components of that provision.

13       And from what I've seen the monitor team do

14   collectively is not necessarily hold a provision in

15   noncompliance for failing to achieve one or more of those

16   components for that particular provision, but using their

17   discretion and their experience.  If it looks like progress

18   is being made, then the designation of partial will be

19   granted, and noting in the recommendations as well the

20   factual findings for that relevant section outlining what

21   work -- what that significant work needs to be -- that

22   needs to be completed by the next on-site visit.

23           THE COURT:    Let me make sure I understand,

24   because I think there might be a difference in

25   interpretation here then.  Are you saying that if the

1    monitor team moves something from partial compliance to

2    substantial compliance, based on their assessment, so this

3    particular provision is now in substantial compliance, but

4    there are two or three components that there is some

5    indication that there is more work to be done.  Okay.  But

6    the monitoring team has still moved that particular

7    provision to substantial compliance.

8         Is it your position that what we are counting for

9    most, most of the components would be the individual

10   components as opposed to the provision itself that has now

11   been moved to substantial compliance?  Do you understand

12   what I'm asking you?

13        MS. MYRTHIL:    I do understand, Your Honor.

14   And I think that it's -- there's quite a bit of discretion

15   allowing for the monitors to use their experience in

16   gauging compliance in terms of making that determination.

17   So I caution to say that it's -- you know, if there are

18   five sub-provisions, if they have completed the majority of

19   the five, then it's sort of a check mark that moves them

20   up, or if they haven't completed the majority, it doesn't.

21   Because there may be some provisions that say, if one has

22   not been completed, substantial compliance may still be

23   warranted, looking at that entire provision in its

24   totality, and then the monitor for that relevant section of

25   the agreement may in his -- or discretion say this still

 1   warrants substantial compliance, but we will note in the

 2   findings section and in the recommendations what additional

 3   work needs to be done.  It needs to be done as it relates

 4   to that particular provision.

 5          THE COURT:     I understand what you're saying.

 6   My question is probably something that the parties and the

 7   monitoring team need to discuss.  My question is this:

 8   There are 123 provisions, right.  There could be double the

 9   number of components, because each provision has several

10   components.  It might be triple the number in terms of

11   components.  So when you're deciding whether or not this

12   agreement has reached a stage where it is to be terminated,

13   are you looking at the designation by the monitoring team

14   of 75 of these provisions have reached substantial

15   compliance?

16       There might be 75 of them that have reached

17   substantial compliance, but you are saying that most of the

18   provisions have reached substantial compliance; so we

19   should be looking at termination.  But there might be a few

20   hundred components in those 123 total.  So are you then

21   going back and looking to see, well, the monitoring team

22   said that these three components were satisfied, and

23   looking at the totality for this provision, they were ready

24   to move into substantial compliance, but there were three

25   others here that there were concerns about, so we're

1    counting the components as opposed to the provisions?

2              MS. MYRTHIL:    No, Your Honor.

3              THE COURT:    Okay.

4              MS. MYRTHIL:    So for termination purposes, I

5    believe that the agreement stands with the proposition that

6    it would have to have all the provisions.  And our

7    understanding of that are all the provisions as they have

8    already been outlined and for monitoring assessment

9    purposes in the agreement.

10              THE COURT:    All of the provision of what?

11              MS. MYRTHIL:    All would have to have been in

12   substantial compliance for 12 consecutive months.

13              THE COURT:    Then that is an issue that the

14   parties and the monitors need to discuss, because that is a

15   different position than the one I originally outlined, and

16   it's a different position than the one that

17   Attorney D'Andrade said she agreed with.  I think you need

18   to discuss that, and then we can discuss it at the next

19   status.

20              MR. MYRTHIL:    Right.

21              THE COURT:    But I want you to have the

22   opportunity to flesh it out first, because what you just

23   said is not entirely clear from what is written here.  And

24   I agree with you that what's written here says "most or all

25   components of the relevant provision."  So there is an

1    issue, are we talking components?  Are we talking

2    provisions when we say most or all, most or all of what,

3    provisions or components?  And you're saying it's really

4    all provisions.  Where is that reflected in the agreement?

5       So I want you to talk about those issues first before

6    we have a conversation about them.  I am raising that issue

7    because I'm flagging it because, as I read through, and as

8    I know we sort of gotten to this one point where we can

9    celebrate that we've gotten there, it's important for us to

10   look ahead, so that by the time we get down the line we're

11   all in agreement as to what it is is the ultimate goal.  So

12   I will give you the opportunity to speak about it first.

13              MS. MYRTHIL:     Thank you, Your Honor.

14       Just for context on that, and we definitely will

15   continue to have that discussion, the monitor's report

16   already breaks out by section and by provision the ways in

17   which the monitoring team is assessing compliance for a

18   particular provision.  So I say that to say that -- and we

19   have never have taken an issue with the way that the

20   monitor has proceeded with gauging compliance in his

21   reports and neither has the Territory I believe either.

22   But using the report as a guide, I believe, that it already

23   takes into account that breaking up into the provisions

24   under each major section of the agreement, and to the

25   extent that there are any components that factor into a

1    provision, I believe that that has already sort of been

2    broken out for assessment.

3             THE COURT:     As I said, I am going to give you

4    all an opportunity to think about it, to talk about it.

5    But you know, as I look at, as I mentioned before, the

6    progress that we have to date now with only 7 in

7    noncompliance, 94 in partial compliance, 17 substantial,

8    and 5 in sustained, I think we just need to be thinking

9    ahead and looking to see what the ultimate goal is, so that

10   by the time we get there, everybody is on the same page as

11   to what we're shooting for.  Okay.

12        There is in the agreement as well provision dealing

13   with a semiannual impact evaluation.  You're familiar with

14   that provision, Attorney D'Andrade?

15            MS. D'ANDRADE:     Yes, Your Honor.

16            THE COURT:     So when does that start?

17            MS. D'ANDRADE:     I think that the Territory is

18   on the cusp of that.  We now have the core measures for all

19   the provisions of the Settlement Agreement, and we've asked

20   the monitor to develop an audit tool for one of the

21   policies that we have so that we can have a document that

22   shows qualitatively and quantitatively where the Territory

23   stands on this particular policy.  And we're going to take

24   that audit tool and replicate it for the other policies so

25   that we can do our own measured self-assessment that of

1    course we can share with the monitoring team and the

2    United States so they can verify, but that that information

3    collectively would be contained in the semiannual impact

4    evaluation.

5         THE COURT:    So what's your goal for when you

6    think that that assessment is going to start?

7         MS. D'ANDRADE:    That would take a discussion

8    between the Territory and the monitor as to when we'll get

9    the audit tool.

10        THE COURT:    The audit tool?

11        MS. D'ANDRADE:    Right.

12        THE COURT:    So put that on your list of things

13   to talk about.

14        Let's talk a little bit about hiring in terms of the

15   staff.

16        MS. D'ANDRADE:    So, Your Honor, as you've seen

17   in the Territory's report, the Territory has not moved

18   since the last status conference with any hires.  And since

19   the December status conference, the Territory has been

20   struggling in its HR department.  Ms. Clark abruptly went

21   out on family medical leave.  And since the time that she's

22   been out, a lot of the information had not been shared with

23   the Bureau to have a complete status of where we are with

24   the hires and what needs to be done.

25        There were -- so the HR department is comprised of the

1    HR manager and two HR staff members.  And so once Ms. Clark

2    went out, one of the staff members was charged with taking

3    the lead of determining where the Territory is with hiring

4    officers and these other positions.  And some preliminary

5    work had been done to assess where the Bureau stood, but

6    that person abruptly left, and there was really no turnover

7    of information.  So right now we're left with one HR

8    person.

9         And the Territory recently hired -- the Fiscal and

10   Budget Manager has been temporarily put in place to oversee

11   what's going on with HR.  So a lot of the underlying

12   documentation, for example, the PRF, which stands for the

13   Personnel Requisition Form, which is the underlying

14   foundational document encumbering the salary for that

15   position, that's been an item that's kind of been up in the

16   air.  And since the fiscal manager has been put to oversee

17   HR, we've learned that with the HR staff it hadn't moved

18   for any of the positions.

19        So she has now had meetings with the Division of

20   Personnel and with the Office of Management and Budget to

21   understand the process and to get those agencies on board

22   to expedite doing these PRFs for these positions.  Because

23   if that piece isn't in place, the Territory can't bring

24   anyone on.

25             THE COURT:     So your HR person went out, and so

1    there were no records of where things were?  Is that what

2    you're saying?

3              MS. D'ANDRADE:     There was no sharing of the

4    information, no.

5              THE COURT:     What do you mean sharing of the

6    information?

7              MS. D'ANDRADE:     As far as the status on all of

8    the positions.  So from contact information for the people

9    who would be put in the place, if there were people that

10   the Territory had indicated it would hire, to whether the

11   money encumbering -- whether the encumbrance for the

12   position had been done.  That information had not been

13   shared with the rest of the HR staff at the Bureau.

14             THE COURT:     And there was no documentation?

15             MS. D'ANDRADE:     No, there was no

16   documentation.  The Bureau reached out to the Division of

17   Personnel to kind of track where things were, and the

18   Division of Personnel was able to advise the Bureau that

19   there was some preliminary documentation to encumber these

20   positions that was submitted.  The Division of Personnel

21   did their review, they flagged some issues, and they sent

22   it back.  And the person who they sent it back to was

23   Ms. Clark.  The corrections had not been made to get these

24   documents approved, then we had a change of administration.

25        We do have a new HR person who is starting April 15th.

1    So hopefully that would put an end to this issue that the

2    Bureau is having with all of the hires.  I mean, it's

3    unfortunate news that I have to bear, but there was -- at

4    the root of it, there was really no sharing of information.

5    And where HR was left -- HR was not left in a position

6    where all of the documentation was together and someone can

7    pick it up and continue on.

8                 THE COURT:    Okay.  Why don't we go through

9    some of these issues and positions, and then I hear the

10   general problem, and you could tell me where we are.

11                MS. D'ANDRADE:    Okay.  So the August exam,

12   there were three people who -- four people sat for the

13   exam; three people passed.  Currently there is only one

14   person that successfully passed the agility, the

15   psychological, and the criminal background check that can

16   move forward in the process.  The other two either were

17   nonresponsive or indicated that they were no longer

18   interested.

19       And so this person who's ready to move forward, the

20   Bureau cannot bring them on board because the PRF for that

21   position has not been approved and is not in place.

22                THE COURT:    This was the one that at the last

23   status you anticipated would be starting in January?

24                MS. D'ANDRADE:    Yes.  That was based on the

25   information that was given to me.

1          THE COURT:     When did Ms. Clark go out?

2          MS. D'ANDRADE:     Ms. Clark went out in the

3     second week of December.

4          THE COURT:     So we're now in the first week of

5     April.

6          MS. D'ANDRADE:     Yes.

7          THE COURT:     I hear, can't quite understand why

8     that would happen, but I hear what you're saying.  So

9     between December and April, what has happened with regard

10    to that one candidate?

11         MS. D'ANDRADE:     If you would allow me to

12    call -- if Ms. Monroe could step forward.

13         THE COURT:     Yes.

14         MS. D'ANDRADE:     So Ms. Monroe is the Bureau's

15    recently hired Fiscal and Budget Manager who is overseeing

16    HR.

17         THE COURT:     Good afternoon, Ms. Monroe.

18         MS. MONROE:     Good afternoon, Your Honor.

19     I've been working with OMB and Personnel, as Shari

20    mentioned.  And currently I've provided some new, well,

21    PRFs.  OMB has some discrepancies with it; so we're in the

22    process of correcting them to move forward.

23     It was a bit stagnant because OMB, the staffing, some

24    were out on leave as well; so I would send e-mails out.

25    And just recently, to call her name, Ms. Henry came back on

1    board, and she sent me some PRFs that was out there.  But

2    we still have to redo them because of the new

3    administration.  So I'm in the -- well, I did a few of 'em,

4    like I said, and we had some discrepancy with it, and we

5    are trying to clear it up.

6                    THE COURT:    Do you know in particular about

7    this individual for the corrections officer position?

8                    MS. MONROE:    Yes, that's one.  That one is

9    included as well.

10                   THE COURT:    That one is one of the --

11                   MS. MONROE:    Many that we have.

12                   THE COURT:    So tell me, tell me where that one

13   is in the process, if you know.

14                   MS. MONROE:    We have to get the approved PRF.

15                   THE COURT:    Tell me what the PRF is again,

16   please.

17                   MS. MONROE:    It's the personal request for

18   funding.

19                   THE COURT:    For funding?

20                   MS. MONROE:    (Nodding.)

21                   THE COURT:    So in December the expectation was

22   that this person would be on board in January.  So as of

23   December there was no approval of funding for the position?

24                   MS. D'ANDRADE:    So in January, towards late

25   January after trying to get some information on where the

1    Bureau stood with bringing this person on board, the Bureau

2    reached out to the Division of Personnel to find out at

3    least from that agency what the status of the PRF was.  And

4    that is when the Bureau found out that the PRF for this

5    individual had been submitted prior to December, reviewed

6    by the Division of Personnel, and there were errors that

7    were flagged, and they were sent back to the Bureau in

8    December.  And so the Division of Personnel was just

9    waiting for those corrections to have it returned to

10   review, approve and move forward.

11       And so in January when the Bureau found that out, the

12   other individual who comprises the HR staff was tasked with

13   getting those PRFs, correcting them, and resubmitting them.

14   While that was supposed to be taking place, she left the

15   Bureau.  And so when she left -- before she left there was

16   no indication -- there was no -- she had not advise the

17   Bureau whether they had been submitted, who they were

18   submitted to, whether they were corrected, the status at

19   all.

20       And then we have Ms. Monroe, who then stepped in to

21   first find out what the status is and then correct the

22   problems to usher this through.

23            THE COURT:    When you say that it wasn't shared

24   with the Bureau, isn't this personnel, HR part of the

25   Bureau?

1          MS. D'ANDRADE:     Yes.

2          THE COURT:     So not that Ms. Monroe is planning

3    to leave.  I am not suggesting that for a moment, but it

4    seems to me that the Bureau has learned the hard way about

5    having one person responsible for an area.

6          Now, I know Ms. Monroe is going to retire from the

7    Bureau of Corrections.  However, however -- she'd be there

8    for a very long time.  However, what has been put in place

9    now to make sure that the next time that we meet you're not

10   telling me, well, unfortunately, Ms. Monroe left, and she

11   did not share with the Bureau where things were?  Because

12   this is a mess.

13         MS. D'ANDRADE:     Yes.

14         THE COURT:     This is a problem.

15         MS. D'ANDRADE:     Yes.

16         THE COURT:     As much as a problem as there is

17   with -- because as I read through, I kept thinking, it's

18   been what, eight months since the August exam, eight months

19   and this person is not on yet.  Why is it taking eight

20   months to get through this process.

21         You know, we have a big problem as it is in keeping

22   people interested, which is a topic that I will get to in a

23   moment.  But now that we have had this unfortunate set of

24   circumstances, what has been put in place?  Who other than

25   Ms. Monroe is privy to whatever the documentation is,

1    whatever the process is, where things are in the process?

2    Who other than Ms. Monroe is privy to that?

3              MS. D'ANDRADE:    There is one additional HR

4    staff person who is privy to the information and

5    Director Testamark.  In the meetings that --

6    Director Testamark was also part of the meetings with the

7    Division of Personnel up to, you know, find out the status

8    of the PRFs and the process to get this resolved.

9              THE COURT:    This corrections officer, is he

10   still interested eight months later?

11             MS. MONROE:    Yes.  Currently, yes.  I mean,

12   they have not turned in --

13             THE COURT:    He hasn't indicated -- he or she

14   hasn't indicated a lack of interest or hasn't found

15   something else to do?

16             MS. MONROE:    They are patiently waiting.  That

17   shouldn't be the way, but they're waiting.

18             THE COURT:    Now, I know that this is the

19   process.  Is it being expedited?

20             MS. MONROE:    Yes.

21             THE COURT:    How is it being expedited?

22             MS. MONROE:    I'm working diligently on a day

23   to day to find out the status.  Right now the --

24             THE COURT:    Put the microphone closer.

25             MS. MONROE:    Right now I am waiting on the

1    corrections to be made.  She's going to send it back.  I

2    just have to retype them.  On, you know, a day to day -- I

3    mean, I know how important it is, so I am really working

4    diligently to expedite the process.

5              MS. D'ANDRADE:    And, Your Honor, the director

6    of OMB, Office of Management and Budget, and the Division

7    of Personnel, they are both aware of how important it is to

8    expedite processing the PRFs to bring these individuals on

9    to -- to bring these individuals on board and to be able to

10   bring individuals for those vacant positions that we have.

11             THE COURT:    Okay, so the issue, the underlying

12   problem that we have here has been addressed because

13   Ms. Moore (sic) and someone else and Director Testamark is

14   familiar with where things stand in the process with regard

15   to the hiring; am I correct?

16             MS. MONROE:    Right.  Correct.

17             MS. D'ANDRADE:    Yes, Your Honor.

18             THE COURT:    And with input from director of

19   OMB and Director Testamark, and, of course, the diligent

20   work of Ms. Moore (sic), things are moving forward?

21             MS. MONROE:    Right.

22             THE COURT:    So once this funding document is

23   finalized, all the corrections are made, what is the next

24   step?  What has to happen next?

25             MS. MONROE:    The next step is to send it to

1    Personnel for approval, and then we have to enter it into

2    the system.  I guess we make contact with the individual

3    and Personnel, and once we get back the NOPA, the start

4    date.

5         THE COURT:    So give me a time frame.  Let's

6    talk about this person, this corrections officer, give me a

7    time frame when you expect to be able to bring that person

8    on board.

9         MS. MONROE:    I would say within the next two

10   weeks.  With the individual holding interest, within the

11   next two weeks.

12        MS. D'ANDRADE:    Your Honor, can the Territory

13   advise, Your Honor, in the next two weeks the status?

14        THE COURT:    I'm sorry?

15        MS. D'ANDRADE:    In the next two weeks, can the

16   Territory file a notice, Your Honor, advising of the status

17   of this position?

18        THE COURT:    Yes.  In fact, in two weeks I'd

19   like you to file a notice telling me the person is ready to

20   come on board.  So I don't want to hear that we're still

21   working on it.

22        MS. D'ANDRADE:    Yes.  Court's indulgence.

23      Then, Your Honor, with the October exam, both

24   candidates indicated that they're no longer interested.

25        THE COURT:    Let me ask you this.  That seems

1      to be a recurring theme as I read through the staffing

2      issues.  It seemed like there were folks, well, the

3      corrections officers that pass the exam and then later

4      express no interest or didn't follow up on the

5      documentation that needed to be submitted to the Bureau.

6      With regard to this position, as well as others where it

7      seems that that occurred as well, do you have any sense of

8      why people, potential candidates are dropping out in that

9      way?

10          In other words, do you ask them, you know, why are you

11     no longer interested?  Do you have any sense from them or

12     otherwise about why potential candidates are falling out of

13     the process in that way?

14          MS. MONROE:    Your Honor, I have one candidate

15     that, you know, was in the pipeline for hiring, and she

16     indicated that she got accepted to college off island; so

17     she wouldn't be coming.

18          THE COURT:    So she is going to college?

19          MS. MONROE:    Right.

20          THE COURT:    Any other input from individuals

21     who --

22          MS. D'ANDRADE:    My understanding in the past

23     from Ms. Clark and the rest of the HR staff is that at

24     least with those individuals that are exempt from the exam,

25     they are just on this list, and they're just forwarded to

1  the Bureau, because in general they're looking for a

2  government job, not necessarily a job with Corrections.

3  And, unfortunately, the Bureau of Corrections is not the

4  most desirable place to work because of the nature of the

5  work.  And so to address the Bureau's public image, that

6  under our new director's leadership, that's what's at the

7  forefront, really to turn the public image around and make

8  the Bureau a desirable place to work.

9      And thus far, the director has been on various radio

10  shows to talk about the great work that is available at the

11  Bureau, the great staff that she does have.  The Bureau is

12  in the process of revamping its Facebook page to include a

13  lot of positive things that the Bureau has done that it's

14  not necessarily connected to the work.

15      So, for example, there are a group of officers we call

16  them Shop With a Cop officers who are integral in

17  instituting this activity, annual Christmas event where

18  they take about 100 children into Kmart for Christmas

19  shopping.  And so the director has discussed using those

20  officers to be part of like this PR campaign to turn the

21  Bureau's image around.

22      But at the forefront that's part of the problem with

23  even attracting individuals to even take the exam.  And so

24  it contributes to our low applicant pool from the outset.

25  And it is also something that when the Bureau met with the

1    Division of Personnel, that was something that the Division

2    of Personnel also raised.

3            THE COURT:     I am glad that you mentioned that,

4    because as I read through, that was the first thing that

5    popped into my mind.

6        And so, Director Testamark, I'm glad you are taking

7    the initiative to try to do that.  People have impressions

8    of places, not only the Bureau but of all places, and I

9    think it is up to those who are there to make sure that the

10   look, the face to the public of that place is as attractive

11   as possible.

12       And notwithstanding the nature of the work, I'm sure

13   with some creative thinking, just as you are attempting to

14   engage in here, the Bureau can be depicted and should be

15   depicted as an important part of this community with

16   important work that is done, and that should be portrayed

17   as a place that people should want to be a part of.  I

18   think that's up to the leadership to make sure that image,

19   as well as the staff who work there, to portray the place

20   as someplace that is more attractive than it appears that

21   people are perceiving it now.

22       But that's a big issue.  And I was actually going to

23   check the Staffing Plan, because I know that recruitment is

24   supposed to be part of that plan.  I was looking forward to

25   seeing whether or not there is a portion of this

1    recruitment that is focusing on attracting applicants,

2    because we have a problem it seems to me that is

3    multidimensional.

4         The applicants who apply to go to Corrections, we've

5    had the issue with the exam and people not passing.  So you

6    have a number of people who apply, much smaller number of

7    people who pass.  And then you have the psychological,

8    agility, another test they have to go through, and then

9    they get weeded down there as well.  So you end up with a

10   very small percentage of the people who actually apply

11   getting through the process.

12        And that is another reason why I want to make sure

13   that the part that is within the Bureau's control, that

14   once you get an applicant who has gone through this

15   process, who has passed all the tests, that they are not

16   sitting for eight months waiting for the Bureau to hire

17   them.  That part of the process has to be as quickly done

18   as possible.  That has to be -- you know, all the i's have

19   to be dotted; the t's have to be crossed with regard to

20   that process.  Once you know that they are there, that

21   process should be moving like clock work.  We can't afford

22   to lose people who have actually gotten through the

23   process, because it is such a problem to get people to that

24   level to begin with.

25        So there's that side of it.  And then there's the side

1    that we're talking about now, getting people to apply.

2    Obviously, we are seeing that people are applying, they're

3    going through part of the process, and then all of a sudden

4    they are disappearing.  Not interested anymore.  I don't

5    live on St. Croix, et cetera, et cetera, et cetera.  And

6    that's why I think it's important to figure out what are

7    the reasons why people are saying that they are no longer

8    interested, because to the extent that there is anything

9    that they say that can be addressed by the Bureau, you need

10   to be addressing it.  So it's important to do that extra,

11   you know, why is it that you are no longer interested,

12   there is a great place to work kind of thing and finding

13   out from them what the source of their displeasure with the

14   particular agency is.

15        I will look forward to hearing more, and I will be

16   looking at the plan to see sort of the recruitment, you

17   know, initiatives that you all have come up with jointly.

18   I encourage you to continue to focus on that issue, because

19   the staffing, as we know, is particularly in the

20   Corrections area, but in other areas as well is the root of

21   the issues here.  We have gotten to a particular point

22   which is great, but if we are going to get from this

23   partial compliance now, to move as we have so well from

24   noncompliance to partial compliance to substantial, that

25   staffing issue has got to be dealt with.

1        Director Testamark, I have been preaching this now for

2     quite a long time.  The staffing issue is something that we

3     need to deal with.

4        Let me ask you something about the test for the

5     corrections officers.  This is one that we talked about

6     that you were working with UVI about sort of making sure

7     the test is appropriate.  Where are you with that and the

8     rolling out of that test?

9          MS. D'ANDRADE:    So the Bureau met with UVI in

10    January, beginning of January, and UVI provided some sample

11    questions for the exam.  The director at the time, former

12    director, reviewed the questions and determined that they

13    were appropriate.

14          THE COURT:    They were appropriate?

15          MS. D'ANDRADE:    Appropriate, yes.  And so the

16    plan was to then use his input and develop the remainder of

17    the exam, the draft exam, which would again be turned over

18    to the Bureau for review.

19       And since Director Testamark has come on board, she

20    has also reviewed the initial test questions that were

21    provided in January and deemed them to be appropriate.

22    She's also met with UVI to confirm where the Bureau -- what

23    the Bureau's needs are with the exam.  And this week the

24    University of the Virgin Islands provided the full draft

25    examination.  I don't believe the director has had a full

1    opportunity to review it yet.  I know that Warden Booker

2    has reviewed the exam, the draft exam, and is comfortable

3    with it.

4        And so assuming that Director Testamark is also

5    comfortable, the next step would be to validate the exam.

6    And what that would require would be presently employed

7    officers within the Bureau of various ranks taking the

8    exam, and then there being an assessment on the outcome of

9    that exam.  And the University of the Virgin Islands would

10   use that information to make tweaks to the exam.

11       What also needs to happen in this process is that

12   currently the Division of Personnel is the agency charged

13   with administering the exam.  And currently that's

14   administered through an outside vendor.  And so the Bureau

15   has to get approval to move in this new direction with the

16   University of the Virgin Islands proctoring the exam and

17   taking over.  And so there have been preliminary

18   discussions with the Division of Personnel, so they are

19   aware that -- they are aware of the Bureau's desire to

20   change over to UVI.  And so those discussions are taking

21   place.  But they also need to see the exam as well.

22       And so once the director has done her part, assuming

23   the exam is fine, it's validated and adjustments are made,

24   then it would also be shared with the Division of Personnel

25   to get their blessing so that we can then move forward with

1    the process.

2        And in our discussions with the University of the

3    Virgin Islands, I believe we initially talked about the

4    exam being offered on a quarterly basis.  And that is just

5    kind of keeping with the schedule that we have now with the

6    number of applicants.  We have quarterly standing

7    examination dates.  However, if we learn that there is

8    someone who is interested in becoming a corrections officer

9    and they are not exempt from the exam, then we can request

10   UVI to -- outside of these four standing dates, to

11   administer the exam for this new individual outside of this

12   period or individuals.  And so they would do that.  Once

13   they get advance notice, then they would accommodate in

14   that way.  But once the Bureau works on changing its public

15   image and there is a larger pool of candidates, then there

16   can be an increased frequency of the examination.

17             THE COURT:    It appears that there's

18   considerable amount left to be done before getting to this

19   new exam.  Are you anticipating that that's going to happen

20   this year?

21             MS. D'ANDRADE:    Yes.

22             THE COURT:    When do you anticipate it's going

23   to happen?

24             MS. D'ANDRADE:    We are striving for the last

25   quarter of this year.

```
1              THE COURT:     The exam waiver issue that --

2              MS. D'ANDRADE:     That will remain.

3              THE COURT:     Right.  I believe that you

4    indicated the last time that you were meeting with and/or

5    had met with Personnel --

6              MS. D'ANDRADE:     Yes.

7              THE COURT:      -- about another exam waiver.

8              MS. D'ANDRADE:     Yes.  Yes.  So the Bureau is

9    exploring providing an exam waiver for individuals that are

10   already corrections officers in the mainland.  And when the

11   Division of Personnel was approached about this, because

12   the corrections officers are a part of a union, they wanted

13   to ensure that the chief negotiator is aware and is a part

14   of these discussions.  But of course then we had a change

15   of administration.  We now have a new chief negotiator, and

16   the Bureau is scheduled to meet with her on Friday.

17             THE COURT:     That's tomorrow?

18             MS. D'ANDRADE:     Yes.

19        Last week the entrance examination was scheduled, and

20   there was one person who registered for the exam and sat

21   for the exam, but unfortunately did not pass.

22             THE COURT:     Okay.

23             MS. D'ANDRADE:     Court's indulgence.

24             THE COURT:     Yes.

25             MS. D'ANDRADE:     So Director Testamark is going
```

1    to meet with the Division of Personnel to review the

2    promotional exam.  It was scheduled -- it was originally

3    scheduled to -- this meeting was originally scheduled for

4    last week, but it will take place next week.

5        As you'll see in the updated Staffing Plan that was

6    filed, there are certain correctional officer positions

7    that the agency needs to fill, namely sergeants and

8    lieutenants.  To become a sergeant or lieutenant you have

9    to take the promotional exam.  And so that is the exam that

10   the director is going to look at to determine whether it's

11   appropriate or not.

12       Traditionally or historically the Bureau has not had

13   any issue with the promotional exam.  The promotional exam

14   is in large part the Bureau's rules and regulations.  But

15   now that we have a new director, once she deems the

16   examination appropriate, then it would be scheduled.

17           THE COURT:    So there is at this point a

18   question as to the nature of the promotional exam and if

19   and when it will be?

20           MS. D'ANDRADE:    Yes.

21           THE COURT:    I think we had talked a little bit

22   about that before.  I know that the monitor, Dr. Ray, as I

23   recall, had suggested that improved rates of internal

24   promotions might be something that might make the Bureau a

25   more attractive place, if people knew that promotional

1    opportunities existed.  So I will be interested in hearing,

2    since that's something that has sort of been -- we

3    discussed before, what the result of the director's

4    meetings and determinations are with regard to those

5    promotional examinations.

6              MS. D'ANDRADE:    And this is not included in

7    the report, but on April 3rd the Bureau participated in a

8    job fair with University of the Virgin Islands, and about

9    20 to 25 interested people stopped by.  Correction officer

10   positions were promoted during this job fair and all other

11   vacancies.

12             THE COURT:    Okay.  The nursing staff, there's

13   this full-time LPN position, and that is still unfilled?

14             MS. D'ANDRADE:    Yes.

15             THE COURT:    And there's a second RN position

16   that remains unfilled?

17             MS. D'ANDRADE:    Yes.

18             THE COURT:    This mental health coordinator who

19   is in process, is that the same candidate who the Bureau

20   was aware of and indicated an interest in back in December?

21             MS. D'ANDRADE:    Yes, Your Honor.

22             THE COURT:    Is that one of the positions for

23   which the funding documentation is in process?

24             MS. D'ANDRADE:    Yes, Your Honor.

25             THE COURT:    The part-time physician position?

1    MS. D'ANDRADE:    So the person who expressed an

2    interest and who the Bureau wanted to come on board is

3    unable to work within the Bureau's schedule.  The Bureau

4    diligently, you know, tried to come to a compromise on his

5    work schedule to bring this individual on board, but those

6    discussions were not fruitful.

7    THE COURT:    So those discussions are no longer

8    ongoing?

9    MS. D'ANDRADE:    Correct.

10    THE COURT:    And the position has been

11    announced?

12    MS. D'ANDRADE:    Yes.

13    THE COURT:    The vacancy has now been

14    announced?

15    MS. D'ANDRADE:    Yes.

16    THE COURT:    Let me ask you this just so I'm

17    clear, and in light of the confusion that has occurred with

18    the hiring.  When you announce a vacancy, is it normally

19    the case that this funding issue has already been resolved?

20    MS. D'ANDRADE:    Yes.

21    THE COURT:    So in the normal course of things

22    then, if you announce a vacancy and you go through the

23    process and somebody is hired or selected to be hired, then

24    you would not at that point be then getting this funding

25    document?  What is it called again?

1          MS. D'ANDRADE:     The PRF.

2          THE COURT:     The PRF, you would not normally be

3     dealing with this PRF; right?

4          MS. D'ANDRADE:     Correct.

5          THE COURT:     So with respect to these positions

6     that remain unfilled and for which an announcement is out,

7     the PRFs have already been taken care of; is that accurate?

8          MS. MONROE:     They have been, but due to the

9     new administration, new director at OMB, new director at

10    Corrections, we have to put the old -- do a new -- redo it

11    and put the old one behind and send it through again.

12         THE COURT:     Let me make sure I understand.  So

13    if a PRF has already been approved and a position has been

14    announced, you're saying when the administration changes,

15    you basically have to get a PRF signed by the current

16    administration?

17         MS. MONROE:     Right.

18         THE COURT:     So you have to send it back and

19    have --

20         MS. MONROE:     Yes.

21         THE COURT:     -- it re-signed?

22    So that's what you are in the process of doing now

23    with regard to these positions that have been announced?

24         MS. MONROE:     Right.

25         THE COURT:     Correct?

1          MS. MONROE:     Yes.

2          THE COURT:     There was a training coordinator

3     position.  There was a revised job description approved by

4     Personnel in December.  Does that sound familiar?

5          MS. D'ANDRADE:     Yes, Your Honor.

6          THE COURT:     What is the status of that?

7          MS. D'ANDRADE:     Court's indulgence.

8          THE COURT:     Yes.

9          MS. D'ANDRADE:     So, Your Honor, for this

10    position the PRF has to be corrected and submitted for

11    approval.  So for all classified positions the PRFs have to

12    be corrected and submitted, and the training coordinator

13    position is a classified position.

14         THE COURT:     Then we have a procurement officer

15    coming on board -- just came on board?

16         MS. D'ANDRADE:     Yes.  That individual started

17    this week.

18         THE COURT:     What about this quality assurance

19    manager, last time we talked about that position, and there

20    was an indication, I believe that there was going to be

21    internal recruitment for it?

22         MS. D'ANDRADE:     Court's indulgence?

23         THE COURT:     Yes.

24         MS. D'ANDRADE:     The quality assurance manager

25    has been identified.  That person will be starting on

1    April 15th.

2         THE COURT:    So that person has been hired and

3    will be starting on April 15th?

4         MS. D'ANDRADE:    Yes.

5         THE COURT:    With regard to all of these

6    positions and going forward, I'm assuming that by the next

7    time we meet that this problem that you are trying to

8    correct now will have been addressed?

9         MS. D'ANDRADE:    Yes, Your Honor.

10        THE COURT:    Is that a fair assumption?

11        MS. D'ANDRADE:    Yes, Your Honor.

12        THE COURT:    So the expectation would be that

13   all of the PRFs that need to be corrected and resubmitted,

14   whatever back and forth needs to occur, whether with

15   Personnel or OMB or whomever will have been completed for

16   all of these positions that we are talking about here;

17   correct?

18        MS. D'ANDRADE:    Yes.

19        THE COURT:    Let me ask you about one other

20   position that we talked about a little bit the last time,

21   and that was a suggestion from, I believe, the monitor,

22   Dr. Ray, and it was a qualified curriculum writer.  Has

23   there been any further discussion or movement with regard

24   to that position?

25        MS. D'ANDRADE:    Court's indulgence.

1          Your Honor, there hasn't been any movement on this

2     position yet.  It presently does not exist within the

3     Bureau.

4               THE COURT:    I guess that raises for me the

5     issue that we discussed the last time, which is this issue

6     of continued training and the development of training

7     materials, which I certainly got the impression from our

8     last discussion was something that was going to be rather

9     time consuming but that had to be done.  So what is the

10    thought -- what is the plan for this training?  My

11    understanding is training in specific areas for the various

12    positions; correct?

13              MS. D'ANDRADE:    Yes, Your Honor.

14              THE COURT:    So it would be the ongoing

15    training.  So you've done the training on the policies and

16    procedures that were developed, but there has to be ongoing

17    training?

18              MS. D'ANDRADE:    Right, annual or refresher

19    training.

20              THE COURT:    Refresher training in each of the

21    various areas.  The various curricula for those training

22    programs have to be developed?

23              MS. D'ANDRADE:    Yes.

24              THE COURT:    Is that accurate?

25              MS. D'ANDRADE:    Yes.

1          THE COURT:     Okay.

2      I got the impression from the last conference that

3  this was something that was going to take a considerable

4  amount of time and that necessitated the hiring of someone

5  to do it, and that's how we got to this qualified

6  curriculum writer.

7          MS. D'ANDRADE:     Court's indulgence?

8          THE COURT:     Sure.

9          MS. D'ANDRADE:     Your Honor, in the interim

10  there are several individuals within the Bureau who are

11  certified instructors.  They have gone through the

12  necessary training, and so they are competent and able to

13  deliver training and also develop curriculum.

14      The present approved training policy calls for a

15  training committee, and the Bureau is moving forward with

16  including these individuals into the training committee,

17  which is also supposed to be a multidisciplinary committee;

18  so you have individuals, certified instructors from health

19  services, from security, and from other divisions within

20  the Bureau.  And those individuals will be charged with

21  doing this ongoing training and with making adjustments to

22  the training materials that the Bureau already has, and

23  will be carrying this out along with the training

24  coordinator, once that individual comes on board.

25      Our training administrator recently resigned, so her

1    replacement, and also with the training specialist who

2    serves as the support staff of this training department,

3    who is already employed with the Bureau, and who is not

4    leaving the Bureau.  And so the director just needs up to

5    60 days to put these individuals in place.

6              THE COURT:    So the idea then is that instead

7    of hiring a curriculum writer, that the responsibilities

8    for developing or tweaking the existing training modules

9    that you have would be done internal?

10             MS. D'ANDRADE:    Yes, for now.  Because that

11   position, the qualified curriculum writer position does not

12   exist, the budget has to be examined and funding has to be

13   identified to create that position.  And I believe it's too

14   late to do so now.

15        Essentially, yes, it's too late to do that now.  And

16   so --

17             THE COURT:    That would be funding for 2020?

18             MS. D'ANDRADE:    (Nodding.)

19             THE COURT:    Okay.

20             MS. D'ANDRADE:    So the Bureau is not

21   foreclosing proceeding with this idea of a qualified

22   curriculum writer.  But now with the new director and our

23   new recently hired fiscal and budget manager, that would be

24   assessed.

25             THE COURT:    Speaking about the budget, was the

1    Staffing Plan that you filed with the court today

2    contemplated in the budget for 2020?

3              MS. D'ANDRADE:    Yes.

4              THE COURT:    Why don't we take a ten minute

5    recess.

6              (A recess was taken at this time.)

7              MS. MYRTHIL:    Your Honor, if I may speak to

8    the last point that was being discussed regarding the

9    curriculum writer?

10             THE COURT:    Yes.

11             MS. MYRTHIL:    I understand that staff position

12   that has been budgeted for or outlined in the Territory's

13   current staffing.  However, as the Territory did advise the

14   Court, there currently are vacant positions for the

15   training administrator, given Ms. Reeves' departure as well

16   as the training coordinator and the training specialist.

17   And to the extent that those positions already exist and

18   continue to be budgeted for, we would encourage the

19   Territory to seek in recruiting for those positions someone

20   who may be able to shoulder some of these tasks.

21       As I review the task that Mr. Ray -- Dr. Ray outlined

22   for the curriculum writer at the last status conference,

23   several of these responsibilities Ms. Reeves did carry to

24   some extent, not to the full-time extent given her

25   basically taking the lead and helping to get the Territory

1    to complete the initial training.  But someone who would be

2    in that position could -- would, we believe, have some of

3    the qualifications and skills needed to carry out for doing

4    some of the curriculum writing and implementation of the

5    training program, and that could hopefully help shoulder

6    some of the way until a curriculum writer is able to be

7    added to a future BOC budget.

8            THE COURT:    Attorney D'Andrade, is that

9    something that is in the cards in terms of -- I mean,

10   giving the fact that you are splitting the responsibilities

11   among people, is that --

12           MS. D'ANDRADE:    Yes, Your Honor, it is a

13   requirement of the training administrator position to know

14   how to develop curricula.  So we agree with the

15   United States.  And, again, the plan right now is to put

16   together this committee and hire people to fill those two

17   vacant positions, which are the training administrator and

18   training coordinator position.

19           THE COURT:    I think I am done for now with the

20   HR related hiring issues.

21       Ms. Moore, I didn't want you to stand up

22   unnecessarily.  Don't go too far, but you can have a seat.

23           MS. D'ANDRADE:    Your Honor, if I may just one,

24   one additional area within staffing that's in the report is

25   that the former governor in October 2018 had announced a

1    3 percent salary increase for all exempt and nonunion

2    classified employees, which would include several of the

3    Bureau's civilian and correctional staff; and that has been

4    fully implemented.

5              THE COURT:    Great.  It's always good news.

6         Let me ask you about the classification system.  The

7    information is to be transferred to these two new servers;

8    is that right?

9              MS. D'ANDRADE:    Yes, Your Honor.

10             THE COURT:    Now, a part of the problem that

11   occurred before with the hurricanes and everything was the

12   fact that information was lost?

13             MS. D'ANDRADE:    Right.  There was no

14   redundancy within the Bureau.

15             THE COURT:    There was no redundancy.  And the

16   purpose of these servers is to help deal with that problem;

17   correct?

18             MS. D'ANDRADE:    Right.  So then there will be

19   additional storage of the information.  So in the event of

20   destruction to the Bureau, the Bureau will still be able to

21   access it with this newly procured server.

22             THE COURT:    So when are you anticipating that

23   transfer of the information to take place?  Since obviously

24   we're hoping that we don't have any other hurricanes for a

25   very, very long time, but since that was the genesis of the

1    problem that occurred before, I would think that we want to

2    make sure that we're in a position that would not happen

3    again.

4              MS. D'ANDRADE:    So the IT manager at the

5    Bureau indicated to me that he's meeting with the vendor

6    this week; so that may or may not have happened.  I don't

7    have a timeline for when the server will be completely on

8    board and when this redundancy will be implemented, but I

9    can provide an update within 30 days.

10             THE COURT:    Do you have any sense of how long

11   that process would take --

12             MS. D'ANDRADE:    No, Your Honor.

13             THE COURT:    -- to do this transfer?

14      I would think that we would want to try to get that

15   done before the throes of hurricane season are upon us.

16             MS. D'ANDRADE:    Yes, Your Honor.

17             THE COURT:    Moving to the capital

18   improvements.  The outer perimeter fence had this drainage

19   issue.

20             MS. D'ANDRADE:    Yes, there's a water gut

21   trench that is preventing the completion of the perimeter

22   fence.  More than 90 percent of the fence has been

23   installed.  The Department of Public Works came on site to

24   review the area and adjust the scope of work.  The sketch

25   was submitted to the Bureau.  The Bureau's construction

1    manager reviewed it, had some concerns, and met with the

2    Department of Public Works this week to get some clarity on

3    it.  And the Bureau expects the revised plan to address

4    this issue next week.

5            THE COURT:    And so the idea is that this

6    remaining portion of the fence would be completed that is

7    the 60 day period that you've given?

8            MS. D'ANDRADE:    Yes.

9            THE COURT:    The locks.  There was a reference,

10   I believe, in the monitor's report that during the

11   December 2018 visit the monitor found that control doors to

12   the four male housing units were not locked.

13           MS. D'ANDRADE:    I'll allow Warden Booker, Your

14   Honor, to address that.

15           THE COURT:    Yes.

16       Mr. Booker, good afternoon.

17           MR. BOOKER:    Good afternoon, Your Honor.  Your

18   Honor, the review this time, unless there was something

19   that the monitors found, doors were all locked.  I think on

20   one occasion, maybe one door that was not, but all the

21   doors were locked.

22           THE COURT:    So that issue is -- that issue is

23   an issue of the past, I take it?  Because I'm having

24   trouble understanding, and maybe I am missing something

25   with regard to the challenge of having doors locked in a

1    place where I think doors should be locked.  And I don't

2    know what the problem is or has been, but are you prepared

3    to tell me that that's a problem of the past?

4         MR. BOOKER:    Correct, Your Honor.  Your Honor,

5    I'll only add that there is -- there always is the issue

6    that there could -- the way the locks are done, could be

7    done better.  In other words, if we had a system in place

8    where we could do automatic locks, where it can run from

9    the control center, and we can lock from outside, it will

10   be a lot more practicable.  However, the situation that we

11   have is corrected.

12        THE COURT:    I know we've had conversations

13   about precisely what you talked about, especially with

14   regard to outer doors and having them be able to be locked

15   from the towers.  Where is that issue right now?

16        MR. BOOKER:    Your Honor, we just talked about

17   that today, and Attorney D'Andrade could explain that.  We

18   have a project in place that we are looking at.

19        THE COURT:    All right.  Thank you.

20        MS. D'ANDRADE:    So there was an assessment

21   done on the electrical system to correct -- to repair the

22   issues that we have now with the doors not being accessible

23   from the tower, not being controlled by the tower.  And

24   that assessment is with the construction manager, who is

25   going to forward it to the director to identify funding to

1    address this issue.  Right now standing here I don't have

2    an idea of how much it would take to repair, but that

3    information would be forwarded to Director Testamark for

4    her review.

5              THE COURT:    It is in the hands of the

6    construction --

7              MS. D'ANDRADE:    Manager.

8              THE COURT:    -- manager?

9              MS. D'ANDRADE:    Uh-huh.

10             THE COURT:    Who is going to do an assessment

11   that would include the cost?

12             MS. D'ANDRADE:    An assessment -- he indicated

13   that an assessment was already completed.  And that will be

14   -- the assessment includes an estimate of how much it would

15   cost to correct this matter.  And that would be forwarded

16   to Director Testamark so that she and Ms. Monroe can

17   determine whether there's already existing funding that can

18   be targeted to address this or not.

19             THE COURT:    And so that would be to address

20   the outer doors; is that right?  Or is it all the doors?

21             MR. BOOKER:    Yes, Your Honor, that plan is

22   going to address all of our electrical locks to be

23   controlled by the control center.

24             THE COURT:    Thank you.

25         By the next time that we meet, where do you expect

1      that project to be?

2              MS. D'ANDRADE:     Court's indulgence.

3          Your Honor, because it is a priority security issue,

4      it's going to be addressed immediately.  If there is

5      funding, then depending on the cost to complete this

6      project, either a vendor will be immediately identified, or

7      it will go through the RFP process.

8              THE COURT:     And if there is no funding?

9              MS. D'ANDRADE:     If there's no funding then the

10     Bureau will find the funding.  We'll start that endeavor.

11             THE COURT:     So is it fair to assume that by

12     the time we next meet that if there is funding, that the

13     project will be where?

14             MS. D'ANDRADE:     If there's funding, again it

15     depends on how much this project is.  So by the time we

16     return before Your Honor the -- if we have to proceed

17     through that manner, which we probably will, the RFP would

18     be advertised.  Hopefully we will be at the point where the

19     evaluation committee has come together and made a

20     selection, but you will definitely see forward progress on

21     this.

22             THE COURT:     And if there is no funding, my

23     expectation should be what?

24             MS. D'ANDRADE:     A reasonable expectation would

25     be the Bureau indicating what efforts have been made to

```
1    identify funding -- to get funding, whether it be through

2    grants, through going to PFA, and any other available

3    avenues to get funding.

4           THE COURT:    How are we doing on submission of

5    monitoring records, timeliness?

6           MS. D'ANDRADE:    It continues to be an issue

7    that the Bureau has to continually address.  For the most

8    part the records are being submitted to the monitoring team

9    timely.  The Bureau on a monthly basis turns over

10   voluminous set of records.  And so the bulk of it -- the

11   bulk of those records are being forwarded.

12       Where we are seeing issues still are, for example, if

13   there are several people that are involved in an incident,

14   let's say seven people, we may have five incident reports

15   ready to be turned over; we may be missing two reports.  So

16   we're still having those kinds of problems that are being

17   addressed by the warden, the chiefs, and the other

18   supervisory staff.

19       But for the most part, that sort of challenge that the

20   Bureau has been facing, and then with the absence of --

21   with the HR manager and the information, of course, that

22   goes with HR, that report, I believe, may not have been

23   timely submitted.

24           THE COURT:    But now that Ms. Moore --

25           MS. D'ANDRADE:    Ms. Monroe.
```

```
 1              THE COURT:     Ms. Monroe.  I'm sorry, I kept

 2     calling her Ms. Moore.

 3         Now that Ms. Monroe is on the job, we are going to get

 4     that taken care of?

 5              MS. D'ANDRADE:     Yes.

 6              THE COURT:     Right, Ms. Monroe?

 7              MS. MONROE:     Correct.

 8              THE COURT:     Thank you.

 9         There are a number of I guess capital projects that

10     are ongoing or in process?

11              MS. D'ANDRADE:     Yes.

12              THE COURT:     Correct?

13         I want you to run down for me the kitchen.

14              MS. D'ANDRADE:     So for the kitchen, for the

15     most part the work had been completed by the vendor.  There

16     was some damage by the hurricanes, and the Bureau is

17     soliciting quotes from potential vendors to complete the

18     work.  Much of it is aesthetic work that has to be

19     completed.  There may be a roofing issue, but for the most

20     part, aesthetic.  And there is grant money to support that

21     work.

22              THE COURT:     So the funding is there, so it's

23     at the point where there will be what, an RFP?

24              MS. D'ANDRADE:     Again, it depends on the

25     price.  Most likely, yes, there will be an RFP to get this
```

1    work done.

2         THE COURT:    The roof repair and mold

3    remediation.

4         MS. D'ANDRADE:    Yes.  So as we indicated at

5    the last several conferences and prior conferences, to

6    remediate the mold within the housing units, the roofs have

7    to be repaired.  The Department of Public Works came on

8    site and they developed -- they had developed an initial

9    scope, which the former director reviewed and had some

10   concerns, because he wanted a more permanent fix, and that

11   was not reflected in the scope.

12       After some discussion with the Department of Public

13   Works and them coming back on site, we finally have a scope

14   of work that encompasses this permanent fix that was

15   desired.  So funding has been identified for this project,

16   and it was submitted to the Department of Property &

17   Procurement to put out the advertisement, and we anticipate

18   that the RFP will go out next week.

19        THE COURT:    That certainly is important

20   progress, given the nature of that project.

21       The fire life safety, the suppression system, and the

22   water filtration system, there was an assessment that began

23   March 20th of 2019.

24        MS. D'ANDRADE:    Yes, the initial assessment

25   was done March 20, 2019.

```
1            THE COURT:     It was done or it was just begun?

2            MS. D'ANDRADE:     Just begun.  Just begun.  And

3    our fire life safety manager is here, who can give a

4    timeline on when that assessment will be completed.

5            THE COURT:     Thank you.

6            MR. THOMAS:     Good afternoon.

7            THE COURT:     Good afternoon, sir.  Please

8    remind me of your name.

9            MR. THOMAS:     Ma'am?

10           THE COURT:     Please remind me of your name.

11           MR. THOMAS:     William Thomas.

12           THE COURT:     Thank you, Mr. Thomas.

13           MR. THOMAS:     The initial assessment was

14   started with the suppression system.  They are on their way

15   back this week coming to complete the assessment.  They did

16   send a report.  The report had been transferred to all

17   responsible parties.  After that then we will know exactly

18   which way we are going to head with the repair that need to

19   be done.

20           MS. D'ANDRADE:     Again, Your Honor, so this

21   report is also going to include estimated cost for repair.

22   And funding again has to be identified, if the Bureau is

23   going to proceed with addressing the suppression system.

24           THE COURT:     Okay.  So is there -- you said

25   that the report has been sent out to all responsible
```

1    parties.  Is there some -- and the responsible parties are

2    whom?

3              MR. THOMAS:    The wardens, the directors, and

4    the chiefs.

5              THE COURT:    Or internal to the BOC?

6              MR. THOMAS:    Yes, ma'am.

7              THE COURT:    Is there any -- and maybe you're

8    not the person to ask, but I will ask you anyhow.  Is there

9    any timeline or time frame when you are expecting some sort

10   of response, some sort of resolution of the issues?

11             MR. THOMAS:    We should have a resolution to

12   this within a two week period of time.  Because if they

13   come back in this week coming, as I said, it would take one

14   week for them to do the final part of the assessment.  And

15   as always I will push to get the paperwork back into our

16   hands.  So I will give them a short timeline to work

17   within, but I may have to expand it due to what their --

18   because you've got eight, nine buildings you got to go

19   through.  They are going to bring in at least four or five

20   people.  They bring in some equipment, and with that we

21   will find out exactly where the leaks are, and we will go

22   from there.  We will know whether we need to keep it

23   underground or go on top.

24             THE COURT:    What is the -- this is sort of a

25   continuation of the assessment then; right?

1          MR. THOMAS:    Yes, ma'am.  Well, the assessment

2     is being done in two parts.  First part we had to evaluate

3     the pumping system to see whether it was functional.  If it

4     wasn't functional, then we had to start from scratch.

5     Since the pump system does work and it doesn't hold

6     pressure -- because we tried it two different ways.  We

7     tried it from putting a gauge on there, and we tried it

8     from just holding pressure on the line.  The gauge was

9     fine; so that mean that since the pressure was dropping,

10    that means you got some internal problems at one point or

11    the other throughout the facility.

12         When we found that out, that mean that we have to

13    bring in some other equipment to go through the line to

14    find out just exactly where it's losing pressure.  And if

15    it's too much of an excess of pressure being lost, that

16    means that with the underground lines of just corroded to a

17    point and then the next part of that means we will have to

18    go to second plan, which means your lining would have to be

19    aboveground.

20         THE COURT:    So when you said that there was a

21    report --

22         MR. THOMAS:    20 pages.

23         THE COURT:    And that report went out to, you

24    know, the warden, the director, and chief?

25         MR. THOMAS:    Yes, ma'am.

1          THE COURT:     The report is sent to them for

2     their review and approval in terms of what needs to be

3     done?

4          MR. THOMAS:     Yes, they do have to look and see

5     what's been done so far.

6          THE COURT:     And then the next step would be

7     what?

8          MR. THOMAS:     Same process.  Once we get that

9     final part of the report back, it will go to the

10    responsible parties again, and then they will make the

11    decision which way we are going to go with repairing it.

12         THE COURT:     So it's with them now, it has to

13    go back, and then it comes back to them?  The report is

14    with the responsible parties now?

15         MR. THOMAS:     Yes.

16         THE COURT:     They are going to review it to

17    make a determination at this stage what direction?

18         MR. THOMAS:     We'll have to, because either --

19    if we try to go underground with it, it will cost a lot

20    more.

21         THE COURT:     So they are going to make a

22    determination now, and based on the determination, you will

23    know what work is going to be done; is that right?

24         MR. THOMAS:     Right.  The contractor is also

25    going to give us the best way to go about it.  Then there

1    is always the old way and the new way.  The new way would

2    be aboveground.  The old way would be tied up to the

3    ground, putting in new lines, going back.

4         THE COURT:    So once a determination is made by

5    the warden, director, and chief as to what direction the

6    Bureau will be going with this, will the next step be then

7    putting the project out for bids?  Is that where it will

8    then be?

9         MR. THOMAS:    It will have to be.  Because of

10   the cost of it, they will have to go out for bids.

11        THE COURT:    Okay.

12        MS. D'ANDRADE:    Your Honor.

13        THE COURT:    Yes, go ahead.

14        MS. D'ANDRADE:    Before it can be put out to

15   bid, the Bureau has to identify the funding.

16        THE COURT:    The funding source.  Okay.  All

17   right.

18      Thank you, Mr. Thomas.

19        MR. THOMAS:    Thank you.

20        THE COURT:    The lighting system, it's just

21   basically lighting in individual cells and --

22        MS. D'ANDRADE:    No.  This is the lighting

23   system at the perimeter of the facility.

24        THE COURT:    Okay.

25        MS. D'ANDRADE:    And it was damaged during the

1    hurricane.  And initially the Bureau discussed obtaining --

2    well, it had obtained an assessment and discussed putting

3    it out to bid, but the funding to support this project is

4    part of the ongoing discussions between the government and

5    FEMA.  And because it's a protracted process, the Bureau

6    determined to handle -- repair the lighting system

7    in-house.  So the present staff, maintenance staff are the

8    ones that are addressing the lighting, the perimeter

9    lighting system.  But they can only take it so far.

10        They have started that work.  They began on March 5th,

11   and so they've repaired about 60 percent of the perimeter

12   lighting.  And there are some electrical issues that

13   prevent the Bureau staff from completing the project.  So

14   they are going to take it up to a certain point, and then a

15   vendor will complete it.  And the anticipated completion

16   will be approximately three months.

17             THE COURT:     Three months from now?

18             MS. D'ANDRADE:     Yes.

19             THE COURT:     Does that mean that you have the

20   work in process for retaining a vendor?

21             MS. D'ANDRADE:     A vendor has been identified.

22             THE COURT:     The x-ray machines?

23             MS. D'ANDRADE:     So the x-ray machines were

24   placed at the front entrance, at receiving and discharge,

25   also at the front lobby.  About 15 staff members were

1     trained on using the x-ray machine.  The x-ray machines are

2     still operational.  The Bureau discussed training

3     additional staff in how to use those materials -- excuse

4     me, in how to use, properly use the x-ray machine and

5     screen items.

6          The training materials have been developed.  They have

7     not yet been shared with the monitor or with the

8     United States.  And we plan to do so, and then schedule

9     training.

10              THE COURT:    Are they ready to be shared?

11              MS. D'ANDRADE:    There are just a few minor

12    edits that need to be made.  But we anticipate sending it

13    out to the United States and the monitoring team within two

14    weeks.

15              THE COURT:    Okay, you can go ahead, whatever

16    else you have.

17              MS. D'ANDRADE:    At the last status conference

18    the Bureau had successfully trained 93 percent of the

19    security staff on the security policies and procedures.

20    Since the last status conference, the Bureau has trained

21    95 percent of the staff successfully meeting the training

22    requirement under the Settlement Agreement.

23          Because many of the security policies and procedures

24    impose certain responsibilities on the civilian staff, the

25    Territory has to now train those individuals.  Because in

1    large part the nature of the policies, the bulk of the

2    responsibilities lie with the security staff, the security

3    staff was prioritized.

4        Some of the civilian staff have been trained on the

5    security policies.  They participated in the training that

6    took place.  For example, our administrative investigator

7    and our maintenance staff participated in the training.

8    The Territory hasn't rolled out the training for the

9    civilian staff.

10       So what we did was we developed a training matrix, and

11   looked at all of the security policies and identified those

12   portions of the policies that require certain groups of

13   civilian staff to carry out certain functions.  And so this

14   training matrix has, for example, it may say the use of

15   force policy, these groups of staff have to be trained on,

16   sections A through B -- A through C, and it then designates

17   the training block for that.  And so that matrix was

18   provided to United States and to the monitoring team.

19   Dr. Ray did provide feedback, and that is being

20   incorporated.

21       The Territory already has existing training materials

22   that have to be somewhat revised since the target audience

23   is now civilian staff versus security staff.  But with the

24   present deficit in the training department, the Territory

25   -- it's going to take some time to actually revise the

1    training materials and submit them to the United States and

2    the monitoring team for approval and then schedule the

3    training.

4        But because several individuals have gone through the

5    instructor training class, this will probably be one of

6    their first items to begin to tackle, but it will take some

7    time.

8              THE COURT:    Okay.

9              MS. D'ANDRADE:    As far as recruitment efforts,

10   radio advertisement are currently running announcing the

11   corrections officer position, encouraging people to apply.

12   And that is a new recruitment effort being undertaken by

13   the Bureau.

14       We did not talk about the medical case manager.  That

15   individual had been identified.  There was a delay from

16   that candidate in submitting the paperwork, and because of

17   the significant delay, the Bureau communicated to that

18   candidate a deadline within which to provide that

19   documentation, failing which the position would be posted.

20   And that individual did not comply with submitting the

21   documentation; so that position remains vacant.

22             THE COURT:    When you have these individuals,

23   are you usually communicating with them by phone, by

24   e-mail, by regular mail?

25             MS. D'ANDRADE:    Both, by phone and by e-mail.

```
1              THE COURT:      And are you having the opportunity
2      usually to speak with them?
3              MS. D'ANDRADE:      For some candidates, yes.  For
4      this particular candidate, I'm not sure.
5              MS. MONROE:      That's prior to my arrival to the
6      Bureau.  But, yes, to my understanding, Ms. Joshua, she
7      communicates with them.  If we need any additional
8      documents, we'll get them, or if they decide, you know, for
9      whatever reason they are no longer interested, they would
10     e-mail or conversate with us.
11             THE COURT:      Let me ask you this other
12     question.  In the interim between when someone has applied,
13     you have identified that person as the candidate, you've in
14     effect selected that person, how much -- because I know it
15     takes some time before the process gets to conclusion.  Do
16     you communicate with that person only if you need to get
17     something from them or they need to get something from you,
18     or is there sort of a more regular communication with
19     somebody whom you've already identified as somebody that
20     you're going to be bringing on board?
21             MS. MONROE:      With the process we stay, you
22     know -- communicate by e-mail, we stay connected, you know,
23     through e-mail, okay this is the process, this is where we
24     are at, and this is what we probably might need in order,
25     you know, if you know, the NOPA -- whenever the NOPA comes
```

1    in, you know, that would designate when is your starting

2    date.  That's the process, but I would think, yes, we do.

3    And moving forward we will be communicating.

4                THE COURT:     More.

5                MS. MONROE:     More with the client.

6                THE COURT:     All right.  Thank you.

7                MS. D'ANDRADE:     The camera installation, the

8    camera surveillance system installation was completed.  We

9    initially indicated at the last status conference that it

10   would be completed by December of last year.  However,

11   there was a delay, and it was actually completed about a

12   week or two ago.

13        The staffing analysis, the staffing analysis that was

14   provided by the expert, the Territory has met with

15   United States and the monitoring team on several occasions

16   to ensure that -- let me back up.

17        The staffing analysis includes a coverage plan, which

18   is what has been the focus of our discussions and reviews.

19   And the coverage plan, the security coverage plan outlines

20   the security posts that are presently at the Bureau, their

21   hours of operation, and the number of individuals that have

22   to -- that will be assigned to that post.

23        And when the coverage plan was submitted with the

24   entire staffing analysis by the expert, it was missing

25   certain posts, and that's when there was this back and

1    forth communication between the Territory and the expert to

2    include those posts.  The expert complied, included those

3    posts; and then we had further discussions with the

4    United States and the monitor.

5         But because, again, there were some revisions that

6    needed to be made, some posts eliminated, some posts added,

7    we asked the expert to provide the coverage plan in a

8    format that the Bureau can then use to add or remove posts.

9    Because the coverage plan should really be a living,

10   breathing document, and it's already formulated with the

11   formulas that will, once you put in the post, it will then

12   adjust the number of officers overall that you need to

13   operate the facility.

14        So we now have that document.  While on site we

15   discussed the coverage plan and we finalized it.  So it's

16   in place, and it will be used.

17        Again, Your Honor, as Your Honor knows, the

18   Staffing Plan, the updated Staffing Plan was finalized

19   after review and discussion with United States and the

20   monitoring team and filed with Your Honor today.  The

21   Staffing Plan does discuss the staffing analysis, and it

22   incorporates the coverage plan.

23        So what you'll see in the Staffing Plan there are

24   sections with respect to recruitment efforts that are

25   ongoing, other recruitment efforts that are being

1    considered, certain considerations for the present security

2    posts, whether the Bureau is going to civilianize certain

3    posts.  So you will see that in the Staffing Plan, along

4    with a chart that outlines the overall number of

5    corrections officers that the Bureau must hire to safely

6    operate the facility, and it is categorized by rank.

7         And in this chart you'll see it's a -- the

8    Staffing Plan is a five-year plan.  And so for each fiscal

9    year you'll see the Bureau's goal with respect to hiring

10   the different levels of correctional officers.  So from one

11   fiscal year you may see an additional five, bringing an

12   additional five on board.  And you'll see that through the

13   end of the five year period where the Bureau would then

14   reach a hundred percent of staffing needs, security

15   staffing needs.  So that is fleshed out in the

16   Staffing Plan.

17            THE COURT:    As of right now, what does the

18   plan say with regard to the number of corrections officers

19   that is needed?

20            MS. D'ANDRADE:    So overall, the Bureau needs

21   111 officers; six security management, so that would

22   include the warden, assistant warden, and chiefs.  Excuse

23   me, so overall 111, and that is comprised of six security

24   management staff, which include those positions that I just

25   mentioned, five lieutenants, six sergeants, and 94

1    frontline correctional officers.

2              THE COURT:     94?

3              MS. D'ANDRADE:     Yes.

4              THE COURT:     What do we have now?

5              MS. D'ANDRADE:     Currently overall the Bureau

6    has 75 security staff, and that is comprised of 4 out of 6

7    security management, 0 out of 5 lieutenants.  The Bureau

8    currently has 7 sergeants, 7 out of 6.  However, those 7

9    sergeants are comprised of some hard rank sergeants,

10   meaning sergeants who successfully passed the promotional

11   exam.  I believe about three hard ranked sergeants, and 4

12   that are in the acting position.  And of the frontline

13   corrections officers, the Bureau has 64 of the 94 that it

14   needs.

15             THE COURT:     Okay.  Let me ask you this:  So

16   when I read the Staffing Plan, I will be seeing the

17   projection as to what the Bureau anticipates with regard to

18   hiring over the next five years to get to 94 --

19             MS. D'ANDRADE:     Yes, Your Honor.

20             THE COURT:     -- officers.

21        And that plan starts as of when?

22             MS. D'ANDRADE:     That plan starts as of now.

23   So it's a five-year plan starting 2019.  It's not in line

24   with the fiscal year, but it starts now.

25             THE COURT:     So it's 2019 to 2024?

1          MS. D'ANDRADE:     Yes.

2          THE COURT:     From 2019 to 2020, a year from

3    here, just give me a sense, what is the projection with

4    regard to the number of officers who would be hired?

5          MS. D'ANDRADE:     So about six officers would be

6    hired.  Well, 2019 to 2020, yes.

7       Of course, the Territory -- this is just the baseline

8    number.  The Territory hopes to exceed that number, but

9    that's the goal.

10          THE COURT:     Understood.

11       And the plan that you have come up with with regard to

12    the -- recognizing the history here with regard to hiring,

13    the plan that you have come up with collectively with

14    regard to recruiting, with regard to test taking, with

15    regard to waivers, et cetera, the things that are sort of

16    in the works, those plans are what you believe would allow

17    you to hire six officers over the next year and at least 30

18    officers over the next five years.  So we're averaging

19    about six a year?

20          MS. D'ANDRADE:     Yes, Your Honor.

21          THE COURT:     So I assume there are new plans?

22          MS. D'ANDRADE:     Yes.

23          THE COURT:     In the recruitment package?

24          MS. D'ANDRADE:     Yes.

25          THE COURT:     And those new plans, as you've

1    indicated, the radio ads, the enhancement of the perception

2    as to the image of the Bureau, et cetera, those things are

3    starting as we speak?

4              MS. D'ANDRADE:    Yes.

5              THE COURT:    Okay.

6              MS. D'ANDRADE:    Your Honor, may I continue?

7              THE COURT:    Yes.

8              MS. D'ANDRADE:    So at the last status

9    conference and before then there had been some discussions

10   about the medical records and the charts not being up to

11   date.  The medical director and the health services

12   administrator are continually addressing this.  And I do

13   not believe it has been an issue during this monitor's

14   visit.

15        With the PREA posters, we had discussed for efficiency

16   purposes that the Bureau was going to procure posters that

17   include three languages, three native languages for the

18   prison population, instead of having a separate poster for

19   each language.  That documentation to apply for that grant

20   has been completed and submitted, and so we hope to hear

21   back soon whether the grant was awarded for this purpose.

22        And in addition, in the area of PREA, PREA pocketbooks

23   have been ordered to support the PREA program.

24        The Inmate/Detainee Handbook has been discussed at one

25   point or another by the monitoring team.  The handbook is

1    outdated.  It is not -- it does not reflect the approved

2    policies and procedures.  And so the Bureau had revised the

3    handbook incorporating the approved policies and

4    procedures, including PREA, and that was submitted to the

5    United States and to the monitoring team back in December.

6        But with the onset of the Bureau's new director, the

7    Territory asked the United States and the monitoring team

8    to stop their review of the inmate handbook so that our new

9    director would have an opportunity to review it and make

10   revisions as she deems fit.  She is reviewing the handbook

11   now, and we anticipate sending the draft to the

12   United States and the monitoring team in the next few

13   weeks.

14       Along those lines we had discussed there being an

15   annual review of the security -- of all policies.  But all

16   of the policies require an annual review by management to

17   make revisions to reflect current needs and operations; and

18   so the Territory, because this is a pretty large

19   undertaking, the Territory is starting with the security

20   policies.  And on a biweekly basis is reviewing policies

21   with the pertinent staff and making revisions.

22       So since the last status conference, the Territory had

23   submitted a revised training policy and one other revised

24   policy.  But, again, because Director Testamark came on

25   board, we ask that she be given an opportunity to review

1    those policies, and then we resubmit it.

2         While we were on site, we did discuss the revised

3    training policy, and had a pretty good discussion on that.

4    And so within the next few weeks we intend to turn those

5    over to the United States and to the monitoring team for

6    their review and approval.

7              THE COURT:    Let me ask you this:  Are we

8    talking about the policies and procedures that were

9    recently completed?

10             MS. D'ANDRADE:    Yes.

11             THE COURT:    Okay, so annually you go over

12   those policies and procedures and make any tweaks to them

13   that might be appropriate?

14             MS. D'ANDRADE:    Yes.

15             THE COURT:    So the plan obviously is to go

16   through -- go over all of the policies and procedures that

17   were done, make any edits that the Territory believes

18   appropriate, and send them to the United States and send

19   them to the monitoring team for approval of those edits?

20             MS. D'ANDRADE:    Yes.

21             THE COURT:    And the training materials would

22   be included as well?

23             MS. D'ANDRADE:    No.  No.  The training

24   materials would -- so the natural progression is once you

25   have the policies, then you can develop training materials.

1    So once the revised policies have been approved, then we

2    can go ahead and make the revisions to the training

3    materials.

4            THE COURT:    Right, but then would those

5    training materials go back through the same process?

6            MS. D'ANDRADE:    Yes.  We don't foresee it

7    being an arduous process.  Thus far the revisions that have

8    been made to the policies are pretty minor; so it should be

9    a quick review process for the United States and the

10   monitoring team.  There hasn't been an overhaul of any of

11   the policies, and that's not anticipated at all.

12           THE COURT:    I mean, I obviously was wondering

13   about that, because I'm assuming that -- yeah, I think it's

14   obviously good practice to have a review of policies and

15   procedures to make sure they are current and meeting the

16   current needs, but at the same time I am also assuming that

17   given the time and effort put into the policies that were

18   just put into place, policies and procedures that were just

19   put into place, that any edits would be minor?

20           MS. D'ANDRADE:    Yes.

21           THE COURT:    Unless there is some major change

22   in Corrections' approach or activities or whatever, I would

23   assume that changes would be relatively minor?

24           MS. D'ANDRADE:    Yes.  They're minor and they

25   were identified through the training.  Several officers

1    alerted the various instructors of certain ways to enhance

2    the policies.  And certain areas that don't really fall

3    into -- don't align with the current practice.  And even at

4    various points on site with the monitoring team, we

5    collectively looked at -- one policy that stands out, the

6    grievance policy, and we all came to the conclusion that

7    there was one minor change that needed to be made.

8         So, no, it's not going to an overhaul; it's not going

9    to be a long arduous process.  But because we are talking

10   about a large number of policies and procedures, with the

11   limited resources that the Bureau has, and, you know, staff

12   having to manage other responsibilities, we're just doing

13   this in piecemeal in sending it over.  So we don't

14   anticipate once the policies have been turned over that

15   there will be much discussion on them.

16        For example, the Territory working with the

17   United States and the monitoring team recently revised the

18   suicide policy based on what was learned from the completed

19   suicides that happened recently at the jail.  And so that

20   process didn't take much time, and those enhancements that

21   were made to the policy -- I am not going to characterize

22   them as minor, they were critical, but we're not time

23   consuming.

24             THE COURT:    And then you all are pretty much

25   in agreement with them --

1          MS. D'ANDRADE:     Yes.

2          THE COURT:     -- because you have seen the need

3     for the particular type of change?

4          MS. D'ANDRADE:     Yes.

5          THE COURT:     That's fine.

6          MS. D'ANDRADE:     Refresher training on the

7     health care policies.  The Territory -- I believe the

8     health care policies were approved back in 2014, and the

9     Bureau had trained the health care and the security staff

10    over the next year, 2015 on the security policies.  And

11    those policies require there be an annual refresher.  And

12    so that has started with the health care staff.  It's

13    easier.  It's a smaller group of individuals.

14         So that training began on March 25th.  It's going to

15    be done in two phases.  The first phase would be this

16    refresher training for the health care staff, and then the

17    second phase would be refresher training for the officers.

18         I recall the initial training on the health care

19    policies for the officers taking several months.  And

20    because we have limited staff, the Bureau's plan of action

21    is to prioritize suicide policy and provide that refresher

22    training with an emphasis on identifying suicidal ideations

23    and risk factors, which go along with the Territory's

24    corrective action plan that was developed after the

25    completed suicides.

1          So the Territory is going to start with that first,

2     and depending on when the training administrator and the

3     other training positions come on board, then there can be a

4     full schedule with completing the health care training for

5     the officers.

6               THE COURT:     Okay.

7               MS. D'ANDRADE:     Inmate clothing.  In the

8     monitor's 17th report, it was noted that the prisoners were

9     not given the requisite number of uniforms in compliance

10    with the approved security policies.  Since the new

11    director has come on board, she issued a directive that all

12    prisoners be issued the requisite number of uniforms, and

13    that was completed.

14         In the monitor's report there was also a mention of

15    the ice machine.  The ice machine has been down for some

16    time.  And in the past the Bureau identified a grant to

17    support the cost of procuring one, but, unfortunately, the

18    grant was not awarded to the Bureau; so it's still an

19    outstanding issue.  There was a vendor in the community

20    that indicated that they would donate an ice machine.

21    However, upon the Bureau's assessment of that machine, it's

22    unsuitable.  So it's still a lingering item.

23         A procurement officer was recently hired and started

24    on April 1st.  This procurement officer is responsible for

25    managing all of the prison inventory, security equipment,

1    prisoner essentials, so managing and ordering those

2    supplies and materials needed for the prison.  And that has

3    been a position that has been vacant for over a year.  So

4    that individual started and is on board.

5         The lights in the cells.  In the 17th report and in

6    the 18th report there had been mention of the lights not

7    being operational within the cells, adding to the officers'

8    difficulty in looking in the cells when they are doing

9    their checks.  Those lights have been repaired in all of

10   the housing units, with the exception of 9 Alpha, where

11   there is only one cell without operable lighting.  And I

12   believe that cell has been taken offline.  So it's not

13   being used.

14        And that concludes my report.

15             THE COURT:    Okay, Attorney D'Andrade, thank

16   you.

17        Attorney Myrthil.

18             MS. MYRTHIL:    I have nothing further to add,

19   Your Honor.

20             THE COURT:    Okay, thank you.

21        Dr. Ray, you're up.

22             DR. RAY:    Good afternoon, Your Honor.

23             THE COURT:    Good afternoon.

24             DR. RAY:    You're looking well.  Good to see

25   you again.

1          THE COURT:     Thank you and likewise.

2          DR. RAY:     Well, we had another outstanding

3    visit.  And I guess even more so because my plane had all

4    kinds of trouble, so I couldn't get here till Tuesday; so

5    we had to squeeze a lot more in a short amount of time, but

6    we did it for the most part.  And I appreciate the

7    Territory's support with that, and the United States' help

8    to distill down the priorities to focus on what needed to

9    be done, and we got it done.  I appreciate that.  I also

10   appreciate the Territory staff that participated in this

11   visit.

12          We enjoyed a good visit with Director Testamark.

13   Quite impressed.  Brings with her clearly the requisite

14   credentials, pedigrees and experience I think to take where

15   the facility is, where this order is, and help lead the

16   department to the finish line.  The trick is going to be

17   perseverance and stamina, but I think the director has

18   that, so.

19          We were most impressed with the director's emphasis on

20   accountability and the quality.  And also sort of unique in

21   our experience here from this level, emphasis on the humane

22   treatment of inmates.  And that's ultimately what this

23   order is about.  In addition to the safety of staff, it's

24   all about their civil rights, which gets back to, you know,

25   their human rights and so -- that was good to hear.

1          I'd like to focus my information to you in three

2     areas, and then I will go any direction you would like to

3     go, Your Honor, with the reporting topics.  There's three

4     areas that I think you need to add a little more emphasis

5     to.  One of them has to do with the staffing.  Not the

6     Staffing Plan nor the matrix.  I think that's all ready to

7     go with regard to implementation.  What I am talking about

8     are sort of the core or some foundational positions that if

9     not timely filled are going to stop this process dead in

10    its tracks.  Okay.  Because these are positions that are

11    sort of behind the scenes in a lot of places, getting a lot

12    of the things done that have to be done in order to

13    implement efforts and plans and policies to achieve

14    compliance, measurable compliance.

15         There's six position types that are vacant that you

16    are aware of.  The human resources director.  Fortunately,

17    there's some help from the finance director for that.

18    However, the concern there is, I'm sure finance is an

19    enormous task.  The Staffing Plan and policies, they direct

20    the HR director to implement the Staffing Plan, which in

21    itself is a large task.  And you saw that the difficulty

22    and challenges in achieving the goals that the previous

23    Staffing Plan had when there was a full-time director.  So

24    that's a concern.

25         Obviously the training administrator and the training

1    coordinator positions.  The coordinator position has never

2    been filled.  They were fortunate to get a, I felt, very

3    qualified training administrator temporarily to get them

4    where they are.  That's a concern.

5         And I appreciate creative thinking and resource

6    management, but to burden the instructors, who are all for

7    the most part security leaders, to try to write curriculum

8    and to try to implement curriculum without the support of a

9    administrator and/or a coordinator fairly soon, I think

10   it's an onerous task, and I think it sets up that training

11   for failure.  I think it also takes away from those leaders

12   the time they need to ensure the quality of the

13   implementation of the policies that were finished and the

14   training had been completed.  And I have examples of my

15   concerns that have to do with policies not being followed.

16   And that really has to do with the look behind and the

17   quality assurance that leadership has to do.

18        Adding to that burden, and I think it's the chiefs and

19   maybe some other subordinate top managers, the positions of

20   lieutenant have not been filled.  Those are the positions

21   the chiefs rely on in large part to keep them abreast of

22   what's going on in the operational side of the facility.

23   In the past the lieutenant was a watch commander, meaning

24   that each shift has a lieutenant who is sort of an

25   administrator supervisor and is there all the time.  That

1    person keeps the chief, the warden, whoever involved.

2    Also, it helps to sort of take a little bit maybe the

3    10,000 foot view to help oversee operations during their

4    shift.  The sergeant is another critical position, you

5    know, in the foxhole supervising the staff.  And ultimately

6    it's about ensuring that the policies are followed

7    consistently, because that's where we are now.

8         So you also have the position of mental health

9    coordinator.  We talked about that, and I think Dr. Dudley

10   is going to take that in a little bit, some depth to that

11   to help you understand the need.

12        My point with number one is without these positions

13   filled fairly timely, staffing -- the staffing levels are

14   inadequate to ensure that -- to ensure the sustainable

15   implementation of this order or these policies.  It can't

16   happen.  We are at a point now with only seven provisions

17   left in noncompliance that they can begin to implement the

18   compliance measures in a fulsome way.

19        That's not suggesting that I would expect that this

20   all 150 pages of those measures be implemented.  I think

21   it's fair and really the appropriate way to take a few

22   measures that are a little less onerous to do and begin to

23   test, which we are going to work together on.  But

24   ultimately to achieve compliance with the measures which

25   ultimately get them to substantial and sustained

1    compliance, it's going to take a lot of quality assurance

2    work.  And that's quality assurance on the part of

3    sergeants and lieutenants and chiefs and deputy chiefs, and

4    wardens and directors and lawyers, line staff.

5        I think I sort of described it in the forward to my

6    report about holding each other accountable to do this.

7    But it takes the resources to do it, because, you know,

8    when we are on site, everybody is working.  They are doing

9    their jobs the best they can with the resources they have.

10   But it is a concern and I think it needs to be something

11   raised to a little bit higher priority in terms of

12   expecting deadlines for positions to be filled.  How that's

13   done, I don't know.

14       But my concern is that we have things, you know,

15   almost completely at a noncompliance.  We don't want to see

16   something or even put the position have to slide something

17   back to noncompliance simply because it couldn't be gotten

18   to because -- or attended to properly because there's too

19   many other tasks being placed on people that are ultimately

20   responsible to ensure that -- you know, to protect the

21   partials to get them to substantial, to protect the

22   substantials to get them to sustained.

23       We sort of entered the phase now where we are in the

24   implementation measurement.  Before the training policies

25   -- the policy training had been completed, we had agreed

1    that we wouldn't generally hold, you know, the Territory

2    accountable for those policies because training had been

3    completed.  Now the training is completed, that's where we

4    are.  And the measures are what help us assess that.  And

5    we are finding that there are policies not being followed

6    in one respect, because it's actually a better way to do

7    it, and the Territory has identified those.  And so those

8    policies will be tweaked.  In other cases there are other

9    policies that are simply not being followed.  In some cases

10   when talking with officers, they don't know the policies.

11        And I don't say that to say gotcha.  I say that to say

12   that's how much work is involved to be sure that the habits

13   that need to be changed, the knowledge that the staff need

14   to retain and apply is something that leadership,

15   sergeants, lieutenants, chiefs, all the way up have to be

16   actively engaged in.  And so I would stay upon it.

17        I am a little concerned you are going to burden those

18   staff with even more work in the context of writing

19   curriculum and -- I commend the idea.  It concerns me that

20   that's a risk.  But ultimately it's the Territory's

21   decision, and whatever consequences or benefits come from

22   it, it is ultimately theirs.

23             THE COURT:    Let me stop you there for a

24   moment, and let me turn to the director and

25   Attorney D'Andrade.

1        You mentioned that the human resources director had

2    left on family emergency -- for family emergency reasons.

3    I didn't hear you indicate whether that position was now

4    vacant.  I may have missed that.  Is that position vacant?

5            MS. D'ANDRADE:    Yes, Your Honor.  And it will

6    be filled on April 15th.

7            THE COURT:    The lieutenants are part of the

8    review, I believe, Director Testamark, that you are

9    conducting with regard to the internal promotions; is that

10   correct?

11           MS. D'ANDRADE:    Your Honor, do you mean for

12   the promotional exam, that the director is going to review

13   the promotional exam?

14           THE COURT:    Well, we had talked last time I

15   believe about these internal promotions, and I think it was

16   sergeants and lieutenants --

17           MS. D'ANDRADE:    Yes.

18           THE COURT:     -- if I am not mistaken.  So the

19   lieutenant position that Dr. Ray mentioned -- and I thought

20   I understand that Director Testamark was taking a look at

21   the test for the internal promotions.

22           MS. D'ANDRADE:    Yes.

23           THE COURT:    Making a determination with regard

24   to what was going to happen in that regard.

25           MS. D'ANDRADE:    Yes.

1          THE COURT:     So that would cover the lieutenant

2     vacancies that exist?

3          MS. D'ANDRADE:     Yes.

4          THE COURT:     So we are hearing Dr. Ray say

5     that's an important or that should be an important

6     priority.

7          So, Director Testamark, I'm just reiterating that,

8     because I know that is one of the many things on your

9     plate, but in terms of trying to fill those positions, that

10    one is being -- that is one of the positions that's being

11    singled out as an important position to fill.

12         The mental health coordinator position.  I'm looking

13    back at my notes here.  That is where the -- it indicates

14    that the Territory is completing the process to bring this

15    person on board; right?

16         MS. D'ANDRADE:     Yes, Your Honor.

17         THE COURT:     And that is anticipated to be

18    when?

19         MS. D'ANDRADE:     Your Honor, the Territory is

20    going to bring this person on by May 1st.

21         THE COURT:     And then the final one was

22    mentioned was the training coordinator.

23         MS. D'ANDRADE:     An individual has not yet been

24    identified for that position.

25         THE COURT:     This is the one where Personnel

1    has approved the revised job description; correct?

2              MS. D'ANDRADE:    Correct.  And I believe the

3    PRF has to be corrected to support the salary for that

4    position.

5              THE COURT:    So this is in Ms. Monroe's --

6              MS. D'ANDRADE:    Yes.

7              THE COURT:    So that's one of the ones that

8    needs immediate attention?

9              MS. D'ANDRADE:    Yes.

10             THE COURT:    Okay, Dr. Ray.

11             DR. RAY:    Thank you.

12        You had discussed earlier entering the qualified

13   curriculum writer.  I think if the training administrator,

14   training coordinators positions were filled, I think the

15   training committee as a group would likely be able to help

16   navigate completion of training assuming that either/or,

17   either the administrator or coordinator were qualified

18   curriculum writers.

19        They have very good instructor staff here, but they

20   would just need the support.  The instructors would need

21   the support to have the qualified curriculum from which

22   direct the lesson plans.  I don't know if they would

23   necessarily have to have a curriculum writer if these

24   positions or at least one of these positions had those

25   credentials.

 1          Another opportunity that might exist -- and it's good

 2     to hear they are reaching out to the university and they

 3     get to build bridges, is I believe the university has a

 4     teachers college, graduate School of Education.  They might

 5     want to reach out to them and see if there is a way they

 6     can partnership to help, because that's all they do is

 7     write curriculum.  Curriculum is curriculum is curriculum.

 8     I have written lots of it.  It's just a topic and the

 9     context.  Of course, working with the instructors who are

10     the topic experts, I think now you got a real good

11     partnership.  So it's just something to think about since

12     it's a territorial university.

13          But I think if those positions, those training

14     positions were filled, I think it will probably resolve the

15     need for a specialized curriculum writer.

16               THE COURT:    It seems the training coordinator

17     and administrator position is currently in a place where

18     the necessary qualifications can be incorporated into that

19     position; correct?  I mean, that shouldn't be a problem?

20               DR. RAY:    That somehow cover all three at

21     once.

22               THE COURT:    It's called efficiency.

23               DR. RAY:    The points are those positions be

24     filled with a timely -- timely.  Be cautious, be judicious

25     in the use of current staff to write curriculum.  Current

1   security leaders do that because of the other

2   responsibilities that they have to help ensure the ratings

3   don't drop and that they keep moving those forward.

4       The other one it was just be sure that policy is

5   followed.  And that's a little more onerous, tedious

6   process because a sergeant -- they got two sergeants that

7   are working the campus, large campus.  They only have so

8   much time to get around, and there needs to be an

9   intentional process when I go into the unit, what I am

10  looking for to determine if policies are being followed and

11  how do I know if the staff know the policy that has to be

12  followed, whether it be a 60 minute round or is it supposed

13  to be a 40 minute round on welfare check.  When you check

14  the logs you look at it, and then you stop to pull the

15  policy manual that's on the desk and say, look guys, this

16  is what we're supposed to be doing, to keep reminding them

17  of that.

18          THE COURT:    The sergeants are among those

19  responsible for ensuring the policies are followed?

20          DR. RAY:    Absolutely.  The supervisor is

21  always responsible to ensure that their staff are doing the

22  jobs that they are supposed to be doing, which is based on

23  policy.

24          THE COURT:    Now, right now we have actually

25  one sergeant over the number that is called for in the

1    Staffing Plan?

2              DR. RAY:     No.   They are acting sergeants.

3    They are not sergeants.

4              THE COURT:     They are all acting sergeants?

5              DR. RAY:     All of them.

6              THE COURT:     Seven acting sergeants?

7              MS. D'ANDRADE:     No.

8              DR. RAY:     Maybe one or two?

9              MS. D'ANDRADE:     There are about three hard

10   rank sergeants and four acting.

11             DR. RAY:     It calls for six; right?

12             MS. D'ANDRADE:     Six.

13             THE COURT:     It calls for six, and I understand

14   that there are seven.   So three are actual sergeants, and

15   four are acting; is that right?

16             MS. D'ANDRADE:     Yes, Your Honor.

17             THE COURT:     Okay, so there are four who are

18   acting in the capacity, but presumably they are acting as

19   supervisors; right?

20        So I guess the point that I was making is that

21   currently, and I know they are acting, there are or there

22   should be enough staff in the sergeant ranks, even

23   considering that four of them are acting, to be addressing

24   the issue of whether or not the staff is following the

25   policies.   Is that incorrect?

1          DR. RAY:     You're asking me, Your Honor?

2          THE COURT:     Yes.

3          DR. RAY:     Oh, yes.  That's how it's put for

4     the line staff.

5          THE COURT:     You're saying that's correct in

6     other words?

7          DR. RAY:     Yes.

8          THE COURT:     You're not saying it's correct?

9     In other words, you're saying that one of the issues is the

10    staff following the policies?

11         DR. RAY:     Right.

12         THE COURT:     And if it is the responsibility,

13    at least in part, of sergeants to monitor and making sure

14    that is happening, my only point was that currently there

15    are enough sergeants on staff to be able to make sure that

16    the subordinates, the officers are in fact complying with

17    the policies?

18         DR. RAY:     In my opinion, there are.

19         THE COURT:     So if that is not happening, then

20    there is a question as to whether the sergeants are

21    operating as effectively as they should be.

22         DR. RAY:     That would be one query.  Another

23    query would be is the officer core shorthanded, now the

24    sergeant has to work a post, so they can't get around to do

25    it, so the only post they can supervise is the one they are

1    assigned to.

2            THE COURT:    Because the sergeants are sort of

3    serving as sergeants, and they are also --

4            DR. RAY:    Right.  Right.

5            THE COURT:    Is that not correct?

6            DR. RAY:    That never happens.  They all serve

7    as relief.

8            THE COURT:    Attorney D'Andrade.

9            MS. D'ANDRADE:    No, Your Honor.

10           THE COURT:    They are just serving as

11    sergeants?

12           MS. D'ANDRADE:    Yes.

13           DR. RAY:    We can eliminate that analysis,

14    which creates a dilemma, almost a new question.  Because I

15    think last month a couple housing units were closed, but

16    they were actually occupied by prisoners because there

17    wasn't adequate staffing.  But my guess there was only one

18    sergeant, x-ray.  And I think -- so the supervisor's

19    logbook said that x-ray had been closed for lack of

20    staffing for I think the 1200 or 800 shift.  But I don't

21    know what closed means.  But it was lack of staffing, so

22    that made me think that, well, you didn't have the

23    sergeants on shift to even help that staff.

24           THE COURT:    I think we are going to get some

25    clarification on that point, because I want to make sure

1    that we are not, you know, taking two steps forward and

2    three backwards, because now that we have the policies in

3    place, and we've done the training, then obviously an

4    important next step is making sure that the policies are

5    being followed.  And if there is a glitch there, then I

6    think we need to figure out what is causing that and try to

7    fix it.

8              DR. RAY:    There is a process though when you

9    roll out a wholesale policy change like this.  My

10   experience it's typically a orientation or training of the

11   sergeants on how to do this.  But they been working at such

12   a pace, you know, to try and get this done, there may not

13   have been something that was part of the plan.

14             THE COURT:    And so that is something that is

15   sort of should be done, I guess, but has not been because

16   of the circumstances?

17             DR. RAY:    I don't see signs of staff saying I

18   am not following that stupid policy.  Not at all.  Several

19   analyses of this we're looking for barriers, what are the

20   barriers, not who's not doing their job per se, but what

21   are the barriers that keep them from doing what they need

22   to do or knowing what they need to do.  And that's kind of

23   where I am in my analysis.

24             THE COURT:    Attorney D'Andrade.

25             MS. D'ANDRADE:    Your Honor, the Territory

1    would ask, if Your Honor would allow, just a brief recess

2    so that the Territory -- so the Bureau collectively could

3    address some of the issues that Dr. Ray raised, because the

4    director has a question as well, and it will require some

5    discussion with the staff to find out exactly what Dr. Ray

6    is referring to.

7         THE COURT:    How about if we do this, I am

8    going to let Dr. Ray continue.  So just hold your points,

9    hold your thoughts.  I am going to let Dr. Ray continue,

10   and then we will come back to the issues.  In fact, I think

11   I am going to let the other members of the monitoring team

12   go as well.  But as usual, Attorney D'Andrade, you have an

13   opportunity to come back up; so at that time I think we can

14   take a break and you can discuss.

15        MS. D'ANDRADE:    Thank you, Your Honor.

16        DR. RAY:    Your Honor, that is really what I

17   thought -- what I felt the most important information

18   provides you.  You'll see in my report the other details.

19   Overall, I continue to see improvement each time, in all

20   areas that I am focusing on.  So I think they are in a good

21   spot.  They are moving in the right direction.  They have,

22   you know -- the new director I believe is going to help

23   bring them to the finish line ultimately.  And I see

24   everyone growing in the same direction; so I think they're

25   in a good place.

1          THE COURT:     Thank you, Dr. Ray.  Thank you for

2     your continued work on the project.

3        Dr. Shansky.

4          MS. D'ANDRADE:     Your Honor, if I may before

5     Dr. Shansky proceeds?

6          THE COURT:     Yes.

7          MS. D'ANDRADE:     Attorney Ponteen -- I'm asking

8     Your Honor, if Attorney Ponteen can be excused at this

9     point.  He has to attend an event on mental health within

10    the Territory, and he's been asked by the senators to

11    participate.

12         THE COURT:     Not a problem.  Thank you,

13    Attorney Ponteen, for being here.  Let me just say before

14    you go, you have heard all of the issues that we have been

15    discussing.  And as I always say, it is your role to

16    provide any assistance that is needed interagency or

17    otherwise to make sure that things that we're focusing on

18    and trying to get done as expeditiously as possible, that

19    those things are in fact done.  You've heard the issues, so

20    please assist in any way that you can.

21         MR. PONTEEN:     Thank you, Judge.

22         THE COURT:     Thank you, Counsel.

23         DR. SHANSKY:     My report is relatively

24    positive.  The intake process, the sick call, the chronic

25    care, the emergency services, all those are being done

1    timely and appropriately.

2         We had a situation, interestingly enough which butts

3    on a different issue which you had questioned the

4    definition of sustained compliance.

5         We had dental as partially compliant.  The problem was

6    since I have been here -- and I talked with Dr. Griffith

7    and the dental assistant, Latoya Jackson, and it turns out

8    that the equipment is not working.  And Dr. Callwood did

9    talk with the representative from Banco, and he preferred

10   not having a maintenance contract but just billing as he

11   found things to be fixed.  The problem with the chair in

12   the operatory is a compressor that lacks both the water and

13   the air pressure to function appropriately.

14        And so it's interesting, this is a unique case where

15   you have partial compliance, but suddenly there's a

16   shutdown of the totality of the service, and that moves

17   things into noncompliance until they get it fixed.  Now,

18   hopefully that will be before the end of the month, and

19   that will be fine, as long as they have an operatory that

20   is functional.

21             THE COURT:     How long has this been

22   nonfunctional?

23             DR. SHANSKY:    I heard two to three months.

24             THE COURT:     When you say a shutdown of the

25   equipment, what are you talking about?

1          DR. SHANSKY:     I talked with Dr. Griffith day

2     before yesterday, and he was complaining that the operatory

3     was nonserviceable.  And Latoya also provided me with a

4     description of the compressor problems creating inadequate

5     air and inadequate water.

6          THE COURT:     Let me just stop you there for a

7     moment.

8          Attorney D'Andrade.

9          MS. D'ANDRADE:     The dental chair has indeed

10    has not been working for quite some time, and the -- I

11    guess it's the vendor that is going to repair the chair is

12    scheduled to come this month to do the repairs.

13         One major contributing factor to the delay in fixing

14    the chair is that the vendor is not located in the

15    Virgin Islands.  They're out of Puerto Rico, and they

16    prefer to schedule visits when there's a certain level of

17    activity or certain level of need in St. Croix.  And so

18    that is the delay that the Territory is experiencing in

19    timely addressing the dental chair.  So we are kind of at

20    their mercy.

21         DR. SHANSKY:     There are three or four national

22    companies.  Patterson is probably the most widely used.

23    Banco and Schein are the two other ones that are utilized.

24    And I was told that the commonwealth was behind in its

25    payment with regard to the maintenance service contract.

```
 1            THE COURT:    So your understanding is that
 2   there is a maintenance agreement with one of these
 3   companies?
 4            DR. SHANSKY:    Yes.
 5            THE COURT:    But that because the Bureau is
 6   behind in its payments, they are not --
 7            DR. SHANSKY:    Correct.
 8            THE COURT:    Attorney D'Andrade.
 9            MS. D'ANDRADE:    Sorry, Your Honor.
10            THE COURT:    That's quite all right.
11       Dr. Shansky says his understanding is there is a
12   maintenance agreement that the Bureau has with some one of
13   these companies, but because the Bureau is behind in its
14   payments, they are not providing the service.  Is that
15   true?
16            MS. D'ANDRADE:    Your Honor, I am unaware of
17   that.
18            THE COURT:    I think you had somebody who is --
19            MS. D'ANDRADE:    Court's indulgence.
20       Your Honor, so with the same vendor, yes, there was an
21   outstanding payment issue.  I'm not aware of an actual
22   agreement.  But there was an outstanding payment issue that
23   the Territory resolved over a month ago, but the delay is
24   still because this vendor is out of Puerto Rico and will
25   only come -- will not just come to the Territory just
```

1    because the jail needs the chair service, but has to have a

2    certain volume of repairs to come to the Territory.

3              THE COURT:    So in other words, you don't have

4    a maintenance agreement with that vendor?

5              MS. D'ANDRADE:    I'm not aware of one.  I can

6    look and see if there's one, but I'm not aware of one.

7              THE COURT:    Is it the case that standing here

8    today that you don't know when that vendor will be coming?

9              MS. D'ANDRADE:    The vendor will be coming this

10   month.

11             THE COURT:    This month?

12             MS. D'ANDRADE:    Yes.

13             DR. SHANSKY:    That's what I heard also.

14             THE COURT:    Will that be to address all of the

15   repair issues?

16             MS. D'ANDRADE:    Yes.  And my understanding is

17   that although there is this compressor issue with the

18   dental chair, that there have been limited dental services

19   being provided in the interim.

20             THE COURT:    So this month that is going to be

21   taken care of; is that right?

22             MS. D'ANDRADE:    Yes, Your Honor.

23             DR. SHANSKY:    Hopefully.

24        And this is an example of where you were in partial

25   compliance, but when there's a key piece of equipment,

1    you're unable to provide services until that equipment gets

2    fixed.

3              THE COURT:     Yes.

4              DR. SHANSKY:     So that's a variation of the

5    decision-making process.

6         The other thing --

7              THE COURT:     There's one thing,

8    Attorney D'Andrade, could you check to see what the

9    relationship is between the Bureau and that vendor?  Do you

10   have a maintenance agreement, or is it the case that you

11   are basically at the mercy of the vendor, which it sounds

12   like you are.  And the question in my mind is whether there

13   is a maintenance agreement or one that is available,

14   because I would assume if you have a maintenance agreement

15   and you have a problem, then they would need to come and

16   address that problem.

17             MS. D'ANDRADE:     Yes.  Yes, I will do so.  I

18   will search for this agreement and determine what the

19   status of the relationship is.  And if there is not an

20   agreement, we will ensure that one is in place.

21        And with the outstanding invoice, it was for a small

22   amount of money, and apparently a very old invoice that had

23   to be tracked down.  So that was the delay with the invoice

24   and in paying it.

25             THE COURT:     All right.

1      DR. SHANSKY:     Anyway, Dr. Griffith provided me

2   with the details.

3      The second issue, which is unrelated to dental, has to

4   do with the implementation of the special medical housing

5   policy, and in order to self-monitor in anticipation of my

6   monitoring, they need to create a log of people who utilize

7   those services.  And I talked to the head nurse, and she

8   assures me that she will create a log that tracks these

9   individuals.

10      And one of the things that needs to be tracked is the

11   name, the admission date, the discharge date, the

12   authorization by medical or mental health or custody.  And

13   each of those requires different kinds of policies in the

14   housing unit policy.  In other words, if it's mental

15   health, it might be suicide observation.  If it's medical,

16   it might be nursing assessments on a regular basis.  If

17   it's custody, those would require the most minimal

18   policies.

19      But they need to self-monitor the fact that based on

20   who authorized the admission, the applicable policies are

21   being carried out.

22      THE COURT:     Have you found that that is not

23   being done or that they have not provided you with a log so

24   that you can do a follow-up check?

25      DR. SHANSKY:     As far as I can tell, it wasn't

1    being done.  But Ms. George assured me that it will contain

2    virtually all of April and future dates forward.

3              THE COURT:    When you say it wasn't being done,

4    you're referring to the log?

5              DR. SHANSKY:    The log.

6              THE COURT:    My question is:  Do you know

7    whether or not, notwithstanding the absence of the log,

8    that depending on who authorized the admission, the proper

9    policies were being followed?  Were you able to determine

10   that?

11             DR. SHANSKY:    I don't know that because I

12   couldn't select records on that basis.

13             THE COURT:    So the person in charge is Ms. --

14             DR. SHANSKY:    Ms. George.

15             THE COURT:    Ms. George?

16             DR. SHANSKY:    Yes.

17             THE COURT:    And she has indicated that from

18   henceforth you will have the log?

19             DR. SHANSKY:    Yes.

20        Thank you.

21             THE COURT:    Okay, Dr. Shansky.

22        Dr. Dudley.

23             DR. DUDLEY:    Good afternoon, Your Honor.

24             THE COURT:    Good afternoon, Dr. Dudley.

25             DR. DUDLEY:    My first issue was going to be

1    staffing; so I am delighted to hear that a mental health

2    coordinator would be on board on May 1st.  This is the

3    first time I heard that.  So it's nice to hear that.

4        The issue I was going to raise is for the last year we

5    haven't had one, and we essentially had one full-time

6    equivalent qualified mental health professional with

7    Dr. Sang, half time physician, which has been raised, half

8    time physician.  And so we've been able to sustain direct

9    services by the two of them kind of working overtime and

10   skimping in other areas in which we had made some progress,

11   and of course not proceeding with the expansion of the

12   programming, which had been planned when Ms. Perez was

13   returned to the arrest.  So maybe this is not going to be a

14   problem.

15            THE COURT:    I am hoping that with the hiring

16   of the mental health coordinator that some of the issues

17   would be rendered moot.

18            MR. DUDLEY:    A second issue that I want to

19   raise against that backdrop was the transfer of inmates

20   from St. Thomas during this last month.  As you may or may

21   not know, there was a transfer of a number of patients --

22   inmates from St. Thomas, including a number of people from

23   their mental health caseload.  The transfer in and of

24   itself is not so much the issue as much as the process.

25   Apparently we knew that we were having this transfer,

1       except mental health didn't know we were having this

2       transfer.

3                  THE COURT:     I'm sorry, except?

4                  MR. DUDLEY:     I said apparently there was some

5       planning with this transfer, except mental health didn't

6       know about it until the day this collection of new inmates

7       arrived.  So they were unable to plan to accommodate for

8       rapidly assessing and integrating those inmates.  And that

9       task made more difficult by the fact that the transfer did

10      not include their mental health records.  So that we were

11      unable to look at the mental health records to facilitate

12      the assessment.

13          I went over these new inmates, these transferred

14      inmates.  There were a lot of issues.  People on multiple

15      medications that they shouldn't have been on.  People on

16      combinations of medications that were contraindicated for

17      use of each other.

18          I only raise that to the -- because with such a

19      transfer, of course the responsibility falls on Golden

20      Grove for their care; and, therefore, these assessments are

21      important.  And not being -- not anticipating their

22      arrival, and, therefore, a lot of times you do the

23      assessments and not having the medical records transferred

24      with them, certainly made that job more complicated.

25                 THE COURT:     Let me stop you there for a

1     moment.

2          Attorney D'Andrade.

3               MS. D'ANDRADE:    Yes, Your Honor.  That is

4     being addressed by the director as far as the communication

5     between the facilities.  We're not quite sure at this point

6     what led to the mental health staff on St. Croix not being

7     advised of the transfer.  Apparently the nursing staff

8     between the two islands were in communication, the medical

9     records were --

10              THE COURT:    They were in communication?

11              MS. D'ANDRADE:    They were in communication,

12    yes.

13              THE COURT:    They were in communication, but

14    they didn't tell them that the inmates were coming over?

15              MS. D'ANDRADE:    No, they told them that the

16    inmates were coming over.

17              THE COURT:    They just didn't know when?

18              MS. D'ANDRADE:    They knew when.

19              MR. DUDLEY:    The nursing staff knew, not the

20    mental health.

21              THE COURT:    I see, the nursing staff knew, but

22    the mental health staff didn't know?

23              MS. D'ANDRADE:    Exactly.

24              THE COURT:    And they were mental health

25    inmates?

1          MS. D'ANDRADE:      Exactly.

2      And so their medical records, the pertinent medical

3  information had come along with the prisoners during the

4  transfer or immediately before the transfer, but the Bureau

5  hasn't pinpointed the breakdown between the communication

6  of the mental health staff on both islands.  So custody

7  staff on both islands knew, nursing staff on both islands

8  knew, and it hasn't quite yet been identified what happened

9  with the mental health staff.

10      So the records did not precede the prisoner transfer.

11  They were subsequently sent over, and there was -- so it is

12  within the possession of Golden Grove mental health staff

13  but not timely, and so that is being investigated and

14  addressed now.

15          THE COURT:      Okay.  Thank you.

16      You know it sort of raises in my mind something that I

17  seem to recall as a recurring theme whenever Dr. Dudley

18  speaks about mental health area.  And it seems to me that

19  there is a continuing lack of communication and

20  coordination when it comes to the mental health area here

21  in Golden Grove.  You know, there are repeated issues

22  about, you know, disciplinary matters and mental health not

23  being consulted in other areas, where it's clear that

24  mental health should be part of the equation, and somehow

25  they are out in left field, and everybody else is in right

1    field.  I don't know why that is, but it is a recurring

2    problem.

3         So to me this is just more of the same.  Mental health

4    inmates are being transferred from St. Thomas to St. Croix;

5    mental health doesn't know anything about it, because

6    mental health seems to be out here, not part of the sort of

7    the knowledge base of whatever is going on.  You know, not

8    only do you have an issue it seems to me between mental

9    health on St. Thomas and mental health on St. Croix with

10   respect to that particular situation, but the nursing, the

11   medical folks over here on St. Croix knew.  So what does

12   that tell you about the communication between the medical

13   unit here on St. Croix at Golden Grove and the mental

14   health unit?

15        I almost can't understand why somebody from the

16   medical unit wouldn't have been talking to mental health

17   saying, yeah, we are getting all these inmates here; they

18   are mental health folks.  There is definitely a

19   communication issue when it comes to mental health.  It

20   needs to be addressed.  Okay.

21            MR. DUDLEY:    Good news is that as it relates

22   to the interaction between mental health and security, as

23   you know, I've lauded for some time the segregation review

24   process, which has really developed very nicely.  With the

25   mental health input into the monthly segregation review

1    process, we are now starting to see that occur and the

2    disciplinary review process as well.  So that this kind of

3    security, mental health interaction seems to be improving

4    and functioning much better over time.

5        The last issue I wanted to just bring to your

6    attention was this kind of larger issue of the management

7    of mental health emergencies.  It kind of suddenly struck

8    me that part of the issue is that on a -- if there was a

9    mental health unit at the facility, you would have security

10   staff and nursing staff who essentially spend their whole

11   day with the population of people who are suffering from

12   mental illness and development disabilities.  And so their

13   identification of mental health emergencies would be, you

14   know, kind of more just a part of what they do.  Those

15   circumstances usually they are the ones going to the

16   psychiatrist saying, you know, can you put this person

17   under special observation, or can we force this person to

18   take medication because we can see.  That's not the issue

19   here, right.

20       And so while the -- we certainly appreciate the fact

21   that the nurses have to watch out for their licenses, the

22   security officers have to function with whatever they

23   understand to be the law, the rules and the procedures for

24   use of force or whatever, the communication around, you

25   know, is this an emergency that requires an emergency

```
 1    intervention, we still need to do some work on that.

 2         And I'm suggesting I think to mental health that when

 3    there are mental health emergencies, as opposed to simply

 4    writing orders, that they may actually ask to sit down and

 5    meet with people to talk about why do we see this as an

 6    emergency and why are we recommending or ordering this

 7    emergency intervention to see if that might help improve

 8    the situation around the management of mental health

 9    emergencies, and to document that you've done it.

10    Hopefully that would be helpful and address kind of these

11    difficulties that we've had.

12              THE COURT:    Okay.  Thank you.

13         Mr. Parrish.

14              MR. PARRISH:    Good afternoon, Your Honor.

15              THE COURT:    Good afternoon.

16              MR. PARRISH:    As Dr. Ray said, as you have

17    read many times in most recent reports, many of the

18    paragraphs were moved to at least partial compliance, but

19    the caveat is there is still a great deal of work to do.

20    And I think that's the core of what I have to say here.

21         I've been coming here, this is my fourth site visit

22    now, and times are very different.  Staffing, I don't know

23    how they do it really, it's through overtime, but people

24    working a lot.  They manage to cover most posts all the

25    time.  They're doing an incredible job with that.  Much
```

1     better than when I first came here.

2         The door security was mentioned.  That's one of my pet

3     topics of course.  And it's very different today than it

4     was when I first came here.  On my first visit I was able

5     to walk through three open security doors.  I could walk

6     right out of the housing unit with -- and I was somewhat

7     incredulous.  That's not the case today.  The really good

8     news is this is the first visit where I have found control

9     room doors, not only closed but locked.  That's a first.

10        The warden mentioned -- I walked through the facility

11    twice for two inspections, once on Monday and a follow-up

12    on Wednesday.  And my first time through, one of the four

13    male control room doors was locked; but on Wednesday when I

14    went back, they were all locked.

15        In addition, the manually operated gates that go into

16    the housing units are routinely kept secured as they should

17    be.  The doors going in and out function, I mean, they're

18    not broken like it was initially.  But there's still work

19    to do, and I ran into that in a couple of places.  One,

20    when an exterior door was just left partly closed.  It was

21    this much.  And when I questioned why, oh, I didn't notice.

22    Well, that's really, really important that it's all the way

23    closed.

24        And then in another area of the facility, it's

25    referred to as Detention RNT, which to me means booking,

1    where you come into the facility.  On Monday when I went

2    through, both safety vestibule doors leading into that from

3    the outside of the building were properly closed.

4    Unfortunately, when I went back on Wednesday, they were

5    both standing open, and I could just walk right on through.

6         So we're making progress, but now it's -- now we have

7    to work on consistency.  All right.  Maintenance people are

8    getting things fixed.  Staff has had to deal with a long

9    history of a lot of broken things, and that's what needs to

10   be overcome now so that we have consistency in security

11   measures.

12        I really appreciate your follow-up on the various

13   projects.  And I am not going through all those things by

14   any means, but the critical one from my perspective of

15   course is the external control of the exterior doors into

16   the men's housing units and also into x-ray, the women's

17   housing, because that's operated the same way, just with a

18   key and officer inside.

19        And that's been a long-standing issue, and I just

20   haven't seen the progress, but I thought it was so

21   important.  That's been that way since 2014, I'm told.

22   That's long before I started coming here.  That precedes

23   hurricanes.  That's something that to my mind should have

24   been fixed back then.  So the sooner that that can get

25   fixed, the safer they will be.

1          And, you know, the only alternative to that is a

2     mechanical, having an officer outside with a key walking up

3     and down between them to open it up and not having the key

4     to that door on the inside.  They're not in a position to

5     create another post doing that sort of thing.  So I am not

6     advocating that, but I am just saying, what are the

7     options.  If it's too expensive, then this is about the

8     only other thing you can do.

9          And then the long-standing problem of fire safety, the

10    old portion of the building apparently of the complex

11    apparently never had a smoke detector system.  The new

12    portion I had originally been told did not either, but now

13    we have some people here who have a recollection of

14    something around 1999 when that opened up that they had a

15    smoke detector system, but within just a few years it was

16    no longer functional.  There is no smoke detector system

17    anywhere in the jail or in the facility.  But what they

18    have done is the next best thing is put individual smoke

19    detectors like you use in your house all over.  That's not

20    a system, but it's better than doing nothing.  So that's a

21    step in the right direction.

22         The other thing is the fire sprinkler system, which

23    has been offline for 14 years.  It's kind of unusual to

24    have a correctional facility without basic fire detection

25    and fire suppression systems in place.  And that also is a

1    high priority.

2         And then lastly, I follow on to what Dr. Ray said,

3    it's a consistency and making practice match policy or

4    making policy match practice if the practice is better than

5    the policy.  And there are examples of both.  One was

6    mentioned earlier, visitation.  They are doing a good job

7    with visitation.  It doesn't match the policy.  I'd change

8    the policy and make it match, because it's a good system in

9    place, but because that's what we're going to be measuring

10   next, and those two things have to match up.

11        The inmate handbook the same way.  Well-being checks,

12   they are done routinely on an hourly basis in general

13   population.  In confinement housing they need to be done

14   twice per hour, not to exceed 40 minutes; and that's not

15   the case.  And that's a case of just not matching policy

16   and practice.  And so that's one that I'm sure we are going

17   to be working on next.

18        And the same way with the clothing issues.  I was so

19   gratified to go around and find that virtually every

20   prisoner I talked to had three sets of uniforms.  That

21   problem seems to be resolved, but the rest of the policy

22   says they also get two sheets.  When they go through

23   booking, they only get one.

24        And that kind of thing is what I'm saying.  It's just

25   a matter of, boy, we're taking care of problems, but now we

1    need to make sure we are doing it completely and

2    consistently.  And so I thank you for your attention.

3            THE COURT:    Thank you, Mr. Parrish.

4        We will take a ten minute recess.  You can have your

5    conversation, and when we come back you will be able to

6    discuss the issue you wanted to discuss.

7            (A recess was taken at this time.)

8            THE COURT:    Before we address your issue,

9    Attorney D'Andrade.  Attorney Myrthil, I would like to ask

10   you one question that goes back to the initial issue I

11   raised about how the parties are interpreting determination

12   provision.  And I want to make sure I understand the

13   position that you articulated.  Because look at either

14   Dr. Ray's and the monitoring team's 18th report, or we

15   could look at the compliance document that you submitted,

16   either one.  But I want to understand what you are

17   articulating when you refer to the components of the

18   provisions.  Which one would you prefer to use?

19           MS. MYRTHIL:    You're saying between the

20   Settlement Agreement and the --

21           THE COURT:    No, not the Settlement Agreement.

22   The report from the monitoring team.

23           MS. MYRTHIL:    Right.

24           THE COURT:    Or the compliance document you

25   just submitted.

```
 1                 MS. MYRTHIL:     Okay.

 2                 THE COURT:     Which one do you want to use?

 3                 MS. MYRTHIL:     I'm fine looking at the

 4      monitor's report.

 5                 THE COURT:     Okay.

 6           Tell me what page you want me to look at.

 7                 MS. MYRTHIL:     I'm on page 31, just open to

 8      that page.

 9                 THE COURT:     Okay, 31 is as good as any.

10           On 31 there is a substantive provision.   Under

11      "Substantive Provisions"; right?

12                 MS. MYRTHIL:     Yes.

13                 THE COURT:     It starts "Defendants will develop

14      and submit to USDOJ and monitor"; correct?

15                 MS. MYRTHIL:     Yes.

16                 THE COURT:     And then it ends with "and systems

17      will include the following."  And A is "Permissible forms

18      of physical force along the use of force continuum."

19      Right?

20                 MS. MYRTHIL:     Yes.

21                 THE COURT:     That's A.

22           And then B is on page 33.  And it says "Circumstances

23      under which permissible forms of physical force may be

24      used."  Correct?

25                 MS. MYRTHIL:     Yes.
```

1          THE COURT:     Under 1(a) it says "Assessments,

2     partial compliance."  Then it has "Findings" and then it

3     has "Recommendations" before it gets to b.  Correct?

4          MS. MYRTHIL:     Yes.

5          THE COURT:     All right.  So I would look at

6     that, and one might say that the provision is 1(a), that's

7     one provision, 1(b) is another provision, 1(c) is a third

8     provision, et cetera.  Okay?

9          MS. MYRTHIL:     Yes, Your Honor.

10         THE COURT:     All right, now, what are you

11    referring to when you say "No, not the provisions, the

12    components"?

13         MS. MYRTHIL:     So, for example, under 1(a),

14    where the monitor has outlined the findings.

15         THE COURT:     Yes.

16         MS. MYRTHIL:     He says that the Territory has

17    achieved compliance on some of the components of this

18    provision, 1(a), of the agreement but significant work

19    remains, and then continues with a quite detailed analysis

20    of what he means by that.

21         THE COURT:     Okay.

22         MS. MYRTHIL:     And so my understanding is that

23    given that --

24         THE COURT:     Let's assume for purposes of

25    argument that this was a set of partial compliance, it was

 1    substantial compliance, but he basically says there is some

 2    more work to be done, but I'm giving them substantial

 3    compliance because that's what we will be talking about,

 4    all right.

 5            MS. MYRTHIL:    Okay.

 6            THE COURT:    What are the components that

 7    you're saying that we would be looking at for the purposes

 8    of determining whether most or all have been -- have

 9    reached compliance?

10            MS. MYRTHIL:    So for this particular

11    provision, which goes to permissible use -- excuse me,

12    "permissible forms of physical force along the use of force

13    continuum," and that's part of the larger substantive

14    provision 1, which relates to policies, procedures and

15    training and implementation --

16            THE COURT:    Right.

17            MS. MYRTHIL:    -- to address use of force

18    generally.  I'm summarizing it.  It's quite a long section.

19    But my understanding in terms of the components here would

20    be coming from an analysis that the monitor is using to

21    discern what is an appropriate use of force continuum

22    applicable here inside the facility and the permissible

23    uses of force, of physical force that would be allowable.

24    And that's something that's been fleshed out in the

25    policies and procedures, as well as the compliance

```
 1    measures.

 2              THE COURT:     So are you saying the components

 3    cannot be discerned from this document?

 4              MS. MYRTHIL:    They are not bulleted out here,

 5    no.

 6              THE COURT:     Let's go to the compliance

 7    document that you just submitted and use that.

 8              MS. MYRTHIL:    If I may ask, Your Honor's

 9    permission to use my laptop because I don't have a printed

10    copy of what was filed just before --

11              THE COURT:     Yes, that would be fine.

12              MS. MYRTHIL:    Okay.

13              THE COURT:     Tell me where you are.

14              MS. MYRTHIL:    I am on page 24 of the filing

15    for the Compliance Measures, under section 4(h), "Use of

16    Force By Staff on Prisoners."

17              THE COURT:     Page 24.  Okay.

18         4(h) "Use of Force By Staff on Prisoners."  My page

19    23, that's fine.  Okay, I'm with you.

20              MS. MYRTHIL:    I apologize, Your Honor, there

21    is some discrepancy between the ECF filing number and --

22              THE COURT:     Not a problem.  I'm with you.

23              MS. MYRTHIL:    Okay.

24         So I'm under (a), 1(a), "Permissible forms of physical

25    force along the use of force continuum compliance
```

 1    measures."

 2              THE COURT:     Yes.

 3              MS. MYRTHIL:     So the compliance measures have

 4    been outlined, "1.  Only permissible forms of physical

 5    force against prisoners are used by correctional staff."

 6              THE COURT:     Then this has 1, 2, 3 and 4 as

 7    compliance measures?

 8              MS. MYRTHIL:     Yes.

 9              THE COURT:     So if, for example, the monitor

10    were to say "Permissible forms of physical force along the

11    use of force continuum," and that was rated substantial

12    compliance.

13              MS. MYRTHIL:     Yes.  But if, for example,

14    compliance measure No. 4 there was an issue there that --

15    compliance measure reads "All required documentation and

16    forms are complete, accurate and reliable and submitted in

17    a timely manner according to the group policies and

18    procedures."

19         If, for example, the monitor found that overall with

20    this provision there was substantial compliance but there

21    seemed to be issues with the documentation, inaccuracies,

22    et cetera, he may in his discretion, as he alerts in the

23    report, and also probably also on site, flag that concern,

24    have a discussion with the Territory and us about

25    recommendations for corrective action to address this

1   issue.

2       And this would be one that, let's say, if it wasn't

3   just one incident report, one use of force report, but it

4   was a persistent problem or related to a persistent issue,

5   he could identify this, (a), 1(a), as being a provisional

6   substantial compliance pending the Territory's or -- yes,

7   pending the Territory's completion with the corrective

8   action as it relates to the documentation concerns.

9           THE COURT:    Right.

10          MS. MYRTHIL:    But it wouldn't necessarily

11  regress all the way back.

12          THE COURT:    Let me bring you directly to my

13  issue though.  If the monitor designated this as

14  substantial compliance --

15          MS. MYRTHIL:    Yes.

16          THE COURT:    -- sort of an overall rating, but

17  there was some things in either 1, 2, 3 or 4 that were not

18  completely perfect, there were some things that still

19  needed to be addressed but his overall rating was

20  substantial compliance, are you saying that what it is that

21  should be looked at for purposes of determining the

22  termination provision, which is whether most or all of the

23  provisions are in compliance would be these individual four

24  compliance measures?  In other words, for this particular

25  one, instead of counting permissible forms of physical

1    force along the use of force continuum as one, you would in

2    effect be counting that as four?

3              MS. MYRTHIL:     No, Your Honor.

4              THE COURT:     How are you using anything other

5    than permissible forms of physical force along the use of

6    force continuum?

7              MS. MYRTHIL:     So the compliance measures and

8    the introduction to this document is meant to help clarify

9    their use for the monitoring team and for the Territory to

10   understand as well how compliance is going to be assessed;

11   how these ratings are going to be assigned.  And so in

12   terms of your questions relates to termination of the

13   agreement, we would have to go with the compliance ratings

14   that are assigned.

15             THE COURT:     That's permissible forms of

16   physical force?

17             MS. MYRTHIL:     Exactly.

18             THE COURT:     So you are only counting the 123

19   provisions?  You're not counting anything more than the 123

20   provisions for purposes of determining whether the

21   Territory has complied with most or all of those

22   provisions?

23             MS. MYRTHIL:     Well, it's not most or all of

24   the provisions.  It's most or all of the components.

25             THE COURT:     How -- hold on.  How does

1    component differ from provision?  If I am saying that the

2    provisions here are -- okay, you start with 4(h).  1(a), is

3    one provision.

4              MS. MYRTHIL:     Yes.

5              THE COURT:     1(b) is a second provision.

6              MS. MYRTHIL:     Yes.

7              THE COURT:     1(c) is a third provision, 1(d) is

8    the fourth provision.

9              MS. MYRTHIL:     Yes.

10             THE COURT:     So I am counting that as four in

11   there.  I am assuming that's 4 of the 123.

12             MS. MYRTHIL:     I apologize.  I misunderstood,

13   Your Honor.  I thought you were referring to the four

14   compliance measures.

15             THE COURT:     No.  I am counting those as the

16   provisions.  What are you considering to be the components?

17             MS. MYRTHIL:     I understand.  So I agree with

18   you, those would be four provisions.  And any components,

19   as explained here in the monitor's report, would relate to

20   the compliance measures that are used to discern how the

21   overall rating for that provision is established.

22             THE COURT:     And so if the monitor decides,

23   yeah, there are a few things else here that need to be

24   addressed by the Territory, but I think they've done enough

25   here to give 1(a) a substantial compliance rating, that's

1    what we're looking at --

2              MS. MYRTHIL:     Yes.

3              THE COURT:      -- to see whether they have

4    complied with most or all of the provisions; right?

5              MS. MYRTHIL:    Most or all of the components of

6    that provision, yes.

7              THE COURT:    Okay.  I think we are on the same

8    page.  I think we are on the same page.  That clarifies

9    for me what I thought was a disagreement between the U.S.

10   and the Territory.  And I think we are all on the same

11   page.

12       But have that conversation anyhow to make sure that

13   we're clear as to how that provision is to be interpreted.

14   Okay?

15             MS. MYRTHIL:     Yes, Your Honor.

16             THE COURT:     Attorney D'Andrade.

17             MS. D'ANDRADE:     Yes, Your Honor.  So,

18   Your Honor, when we had asked for a brief recess to allow

19   the Territory to confer internally, that was based on

20   Dr. Ray's statement about one of the housing units being

21   closed, one of the housing units presently occupied by

22   prisoners being closed.  And there needs to be some further

23   discussion with additional staff that are at the facility

24   to really get to the bottom of that closure and action that

25   needs to be taken.  And so that is what the director will

1    be doing when she returns to the facility.

2         But overall, we are in agreement -- the Territory is

3    in agreement with those priority action items, such as

4    reviewing the promotional exam, so that there are -- so

5    that we can get closer to the requisite number of sergeants

6    and lieutenants, bringing the mental health coordinator on

7    board, addressing the fire life safety issue with the fire

8    suppression system, that is a priority for the Territory.

9         And so once the assessment is reviewed with the cost

10   estimate, if that is not within the budget, the director

11   will ensure that funding is identified.  We don't want to

12   be in a position where God forbid there is a fire that

13   breaks out in the facility and the facility is ill-equipped

14   to handle it.

15        And I will get to the bottom of whether there's a

16   maintenance agreement in place for the dental chair and

17   have that resolved.

18        And so those are some of the priority items that the

19   Bureau and the Territory as a whole will be addressing

20   moving forward.  These matters are of serious concern to

21   the director, and she will ensure that when we return

22   before Your Honor that there has been progress overall in

23   all areas, but especially with these priority matters.

24             THE COURT:    Okay.  Thank you.

25        Director Testamark, is there anything that you would

1    like to say?  You can come over to the podium.

2         MS. TESTAMARK:     I just want to say that we

3    have great staff there.  We know that there's a lot of work

4    to do, and we are working diligently.  I know there's a

5    shortage of staff; so we are doing everything that we can,

6    just to sum up basically what Ms. D'Andrade said.  So I

7    assure you there will be progress.  Some of those issues

8    that she talked about they are critical; so they will be

9    addressed, and we look forward to progress and moving

10   forward.

11        THE COURT:     To getting to the finish line;

12   right?

13        MS. TESTAMARK:     And getting to the finish

14   line.

15        THE COURT:     Well, Dr. Ray has already said

16   that he has confidence you have what it takes to take us to

17   the finish line, and I will hold on to that thought as

18   well.

19       You are correct, I think you have a terrific team.  It

20   is clear to me from the several years that I have been on

21   this matter that there's a lot of work that has been done.

22   Yes, we have had glitches.  Yes, we have had times when

23   we've had to press, but I think folks have risen to the

24   challenge on many of occasions, and that's credit to the

25   leadership that we've had, as well as the team that's been

1    behind the leadership.

2        So I have seen a lot of progress over time in a number

3    of areas, but one of the things I guess I would highlight

4    the most, which I think is critical is the collaboration

5    and cooperation that has developed between the Territory,

6    the United States, and the monitoring team.  I think that

7    getting to the finish line cannot happen without that kind

8    of cooperation and collaboration.

9        And I think each entity has a critical role to play.

10   Obviously the Bureau is the subject of this action; so a

11   lot of work falls on the Bureau and appropriately so.  But

12   the United States has an important role and has played a

13   critical role in this entire process in terms of being

14   there to sort of question things, raise issues, make

15   suggestions, et cetera, and I think they have done a great

16   job in that regard.

17       The monitoring team of course is essential.  And I am

18   pleased that we have the folks that we do have on the

19   monitoring team.  I think they have done a great job as

20   well in getting us to where we are.

21       I think we all have to appreciate that there is a lot

22   more work to be done.  You know, getting to the point where

23   we have policies and procedures is great, getting to the

24   point where we now have training for 95 percent of our

25   security staff is terrific, getting to the point where we

1     are now, where virtually all, except I think for seven of

2     the provisions are out of noncompliance is terrific.  But

3     you know in a sense it's sort of the beginning, because now

4     that we have these policies and procedures in place and we

5     started talking about them, we got to make sure that they

6     are followed.  We talked about the annual review, we have

7     to make sure that we keep them up.

8          We have that staffing issue, and that still concerns

9     me a lot, because we are projecting six hires for the next

10    five years of corrections officers.  I was trying to figure

11    out whether we have hired six corrections officers in the

12    last five years.  It's probably close.  That is going to be

13    a tall order, and I don't think we should kid ourselves

14    about that.  We do not have a record of bringing on

15    corrections officers at any pace of which we can be proud.

16    That's the bottom line.

17         And the staffing issue is critical.  It is at the

18    foundation of most of the problems.  I think if we could

19    get this staffing issue under control, everything else, I

20    think, will fall into line relatively easily compared to

21    the issue of getting staffing.

22         That's one, Director Testamark, that you are going to

23    have to spend sleepless nights over, because that is the

24    crux of the problem, as I see it.  That staffing issue, the

25    inability to, one, attract, you know, folks; two, once they

1    are attracted, getting them pass the test.  Once they pass

2    the test, because we keep reducing the numbers as we come

3    through, getting them through the agility and the

4    psychological and all that test, and even once we do that,

5    as we see people are dropping out because no longer

6    interested, oh, doing something else.  It has been a

7    challenge.

8         MS. TESTAMARK:    Yes.

9         THE COURT:    So whatever we can do to enhance

10   the recruitment to, you know, as you are trying to do now,

11   portray the Bureau as a place that people would want to be,

12   and the work of corrections officers is important work, as

13   you know, rewarding work.  That's the area where I think

14   people really need to put their heads together and figure

15   out how we get people on board.

16        So I look forward to continued work and continued

17   creative thinking and implementation, especially in that

18   area, of course in all areas but especially in trying to

19   get people on board and allowing us to move forward.

20        So welcome to the team.  You know, we are going to

21   all continue to stay in the saddle and continue to work

22   hard.

23        I thank everybody for your participation and your hard

24   work.  And we will schedule our next status; so you let me

25   know when you're coming.

1          Thank you, Director Testamark.

2               MS. TESTAMARK:     Thank you.

3               MS. D'ANDRADE:     Your Honor, the parties and

4     the monitoring team have conferred and are in agreement on

5     the next site visit.  And the dates are July 29th to

6     August 1st.

7               THE COURT:    So your last day is the 1st?

8               MS. D'ANDRADE:     Yes, Your Honor.

9               THE COURT:    Does that mean that's the day that

10    the U.S. will be returning, or is that the day that we

11    would be having our status conference?

12              MS. D'ANDRADE:     That's the day that we would

13    prefer to have the status conference.

14              THE COURT:    So that would be the afternoon of

15    the 1st, which is a Thursday?

16              MS. D'ANDRADE:     Yes, Your Honor.

17              MS. MYRTHIL:    Yes, Your Honor.

18              (Off the record.)

19              THE COURT:    It looks like July 1st will work

20    -- I'm sorry, August 1st will work at 1 o'clock.

21         Anything further from the Territory?

22              MS. D'ANDRADE:     No, Your Honor.

23              THE COURT:    Anything further from the

24    Government?

25              MS. MYRTHIL:    No, Your Honor.

1          THE COURT:     Anything further from the

2     monitoring team?

3          DR. RAY:     No, Your Honor.

4          THE COURT:     Thank you all very much.  Have a

5     good evening.

6

7          (Time noted 6:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATE

2

3              I, YVONNE SAMUEL-SETORIE, certify that the

4      foregoing is a correct transcript from the record of

5      proceedings in the above-entitled matter this 10th day

6      of May, 2019

7

8

9

10

11                              _/s/ Yvonne Samuel-Setorie_
                                Yvonne Samuel-Setorie, RPR
12

13

14

15

16

17

18

19

20

21

22

23

24

25