**United States Territory of the Virgin Islands**
**Golden Grove Adult Correctional Facility**
**Settlement Agreement**
**1:86-cv-00265-WAL-GWC**

## Court-Appointed Independent Monitor's
## 19th Compliance Assessment Report

*"Dedicated to public safety, and to community wellness"*

Submitted
July 22, 2019

Dr. Ronald M. Shansky, MD, MPH
Corrections Medicine

Mr. David Parrish
Corrections Operations & Safety

Dr. Richard Dudley, Jr., MD
Corrections Mental Health

Dr. Kenneth A. Ray, DBH, MEd
Court-Appointed Independent Monitor

*"Our goals can only be reached through vehicle of a responsible plan. There is no other route to success."*

*Pablo Picasso*

*"Champions keep playing until they get it right!"*

*Billie Jean King*

United States Territory of the Virgin Islands
Golden Grove Adult Correctional Facility
Settlement Agreement
1:86-cv-00265-WAL-GWC

## Court-Appointed Independent Monitor's
## Nineteenth (19th) Compliance Assessment Report

## Table of Contents

| Contents | Page |
|---|---|
| Cover Pages | NA |
| Table of Contents | 3 |
| Purpose & Summary | 4 |
| **Agreement Sections & Subsections** | |
| 1   IV Safety & Supervision | 8-51 |
| IV.A. Supervision | 8 |
| IV.B. Contraband | 11 |
| IV.C. General Security | 19 |
| IV.D. Security Staffing | 23 |
| IV.E. Sexual Abuse of Prisoners | 25 |
| IV.F. Classification & Housing | 26 |
| IV.G. Incidents & Reporting | 30 |
| IV.H. Use of Force by Staff on Prisoners | 38 |
| IV.I. Use of Restraints on Prisoners | 45 |
| IV.J. Prisoner Complaints | 47 |
| IV.K. Administrative Investigations | 51 |
| 2   V. Medical & Mental Health | 54-83 |
| 3   VI. Fire & Life Safety | 84-87 |
| 4   VII. Environmental Conditions | 88-92 |
| 5   VIII. Training | 93-94 |
| 6   IX. Implementation | 95 |
| 7   X. Monitoring | 98 |
| 8   Appendix A: Assessment Methodology | 99 |

**PURPOSE**

The Monitor intends this report to serve three primary goals: 1) assess, measure, and determine progress toward partial and substantial compliance with all provisions of the Settlement Agreement; 2) assess compliance progress relative to previous assessments; and 3) assist U.S. Virgin Island officials in developing action plans to systematically develop, prioritize, implement, and evaluate policies, procedures, and administrative and operational changes and improvements that ensure consistent substantial compliance with the Agreement and the provision of constitutional care and custody of prisoners incarcerated at the Golden Grove Adult Correctional Facility & Detention Center, St. Croix, Virgin Islands.

**EXECUTIVE SUMMARY**

The 19th involved on and off-site monitoring activities include off-site examination of monthly compliance records provide by GGACF staff, conference calls with the parties, the onsite monitoring visit conducted April 1-4 2019, and Court status conference held onsite.

This assessment found factual basis to advance one provision from Substantial Compliance to Sustained Compliance, 15 provisions from Partial Compliance to Substantial Compliance, and reduce three provisions from Substantial Compliance to Partial Compliance.

1. The following one provision of the Agreement advance from Substantial Compliance to Sustained Compliance:

   V. Medical, Mental Health, Suicide Prevention

   1) V.1f(i): Adequate/Timely Sick-Call, Triage, Physician Review, Logging, Tracking, Responses by QMHP

2. The following 18 provisions of the Agreement advance from Partial Compliance to Substantial Compliance:

   IV.B Contraband

   1) IV. B1a: Clear Definitions of Contraband

   2) IV.D Security Staffing

   3) IV. D1a: Staffing Analysis w/Realistic Shift Factor

   4) IV. D1b: Staffing Analysis-Based Staffing Plan w/Timetables

   IV.H Use of Force

   5) IV.H1a: Permissible Forms of Physical Force & Use of Force Continuum

   6) IV.H1b: Circumstances for Permissible Forms of Physical Force

   7) IV.H1c: Impermissible Force i.e. Restrained Prisoner, For Verbal Threats, Unnecessary/Excessive Force

   8) IV.H1e: Pre-Training/Certification for Authorized Weapons

   9) IV.H1g: Supervision & Videotaping of Planned UOF

   10) IV.H1h: Appropriate Armory Operations and Permitting of Deadly Force at Authorized Posts

IV.I Use of Restraints

    11) IV.I.1a: Permissible/Unauthorized Types of Restraints

    12) IV.I.1b: Defined Circumstances for Restrain-Type Uses

IV.J Prisoner Complaints

    13) IV.J1a: Defined Complaint System, Confidential Access and Reporting, Assistance for C/DD Prisoners

    14) IV.J1b: Timely Complaint Investigations/Prioritized for Safety, Medical/MH Care

IV.K Administrative Investigations

    15) IV.K.1: Timely Prisoner/Staff Interviews Involved in Incidents

3. The following three provisions reduced from Substantial Compliance to Partial Compliance:

IV.B Contraband:

    1) IV.B.1e: Admissions and Escorts of Visitors

V. Medical, Mental Health & Suicide Prevention

    2) V.1o: Medical/MH Rounding Isolation/Segregation to Provide Access to Care/Avoid Decompensation

    **3) V.1s(iv): Comprehensive CO/Clinical Staff Training on Prisoner MH Needs as Specified**

94% (116) of the 123 substantive provisions remained out of Non-Compliance as of this assessment. 81 (66%) are now in Partial Compliance, 29 (24%) are in Substantial Compliance, and 6 (5%) are now in Sustained Compliance. On balance, this assessment found progress and forward movement as shown in the score card below.

**Substantive Sections Compliance Score Card**

| Compliance Ratings Summary | | Non Compliance | | | Partial Compliance | | | Substantial Compliance | | | Sustained Compliance | | | Out of Non-Compliance | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consent Agreement Substantive Sections | Total Provisions | 17th | 18th | 19th | 17th | 18th | 19th | 17th | 18th | 19th | 17th | 18th | 19th | 17th | 18th | 19th |
| IV: Safety & Supervision | 61 | 57 | 5 | 5 | 4 | 53 | 38 | 0 | 3 | 18 | 0 | 0 | 0 | 4 | 56 | 56 |
| V. Medical, Mental Health & Suicide Prevention | 36 | 0 | 0 | 0 | 23 | 17 | 19 | 8 | 14 | 11 | 5 | 5 | 6 | 36 | 36 | 36 |
| VI: Fire & Life Safety | 11 | 11 | 2 | 2 | 0 | 9 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 9 |
| VII: Environmental Health & Safety | 11 | 5 | 0 | 0 | 6 | 11 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 11 | 11 |
| VIII: Training | 4 | 4 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| Total Substantive Provisions | 123 | 77 | 7 | 7 | 33 | 94 | 81 | 8 | 17 | 29 | 5 | 5 | 6 | 46 | 116 | 116 |
| Compliance Rating Percent Total | 100% | 63% | 6% | 6% | 27% | 76% | 66% | 7% | 14% | 24% | 4% | 4% | 5% | 37% | 94% | 94% |

As with all previous onsite visits and assessment periods, this report culminates in various multiple sources of information while on and offsite, including:

1.  Administrative investigation logs and reports
2.  Approved and final draft policies and procedures
3.  Capital improvement status reports
4.  Contraband confiscation (evidence) tracking logs
5.  Disciplinary committee reports
6.  ECF filings
7.  Emergency room transfer logs
8.  Facility census data
9.  Facility tours and inspections
10. Forms used for policy and procedure implementation
11. GGACF Chiefs' monthly reports
12. Health care chronic care logs and reports
13. Housing unit count sheets
14. Housing unit logbooks
15. Incident logs
16. Interviews with GGACF and VIBOC officials and staff
17. Interviews with GGACF prisoners
18. Life and fire safety inspection reports
19. Other requested or provided documents
20. Prisoner Classification records and data reports
21. Prisoner compliance (grievance tracking) logs
22. Prisoner medical and mental health records
23. Prisoner programs reports
24. Prisoner segregation review reports
25. Review of GGACF incident reports and videos
26. Shift overtime reports
27. Shift staffing reports
28. Shift supervisor facility inspection reports
29. Shift supervisor logbooks
30. The Staffing Plan
31. Training curricula, post training records and materials, logs
32. Use of force on prisoner reports
33. Writing and verbal communication with the parties

This list includes a large volume of documents submitted monthly to this Monitor and the United States for routine monitoring purposes pursuant to Agreement (X.D.1, ECF 689-1, p.16). Each month this Monitor audits and examines more than 500 records regarding the status of GGACF/BOC compliance and progress with the Agreement:

1.  Classification, population, and housing stratification
2.  Completed segregation review forms
3.  Admissions, releases, and daily population counts
4.  Capital improvement reports
5.  Prisoner programs
6.  Maintenance reports
7.  Administrative investigations log and case files
8.  Medical urgent care logs
9.  Fire inspection logs
10. Staffing and HR reports and statistics
11. Staffing compliant report
12. Prisoner disciplinary hearing records
13. Facility incident log and incident reports
14. Chronic medical care log
15. Medical / mental health care charts and reports
16. Use of Force commander's reviews

17. Disciplinary lockdown sheets
18. Daily shift supervisor facility inspections
19. Daily shift and staffing rosters
20. Chief's monthly reports
21. Contraband log
22. Training reports
23. Other documents as requested

Submission of monthly records are examined and audited to verify that all documents requested are provided for routine monitoring as per the Agreement. This involves the Monitor examining from 500 to in excess of 1,000 records each month. Some of the records provided are used to maintain a statistical data base used to assess programs while other records are used to determine and track compliance and to identify operational risks and needs and the extent to which risks have been mitigated and/or needs have been adequately addressed.

## SECTION IV. SAFETY AND SUPERVISION

**Substantive Provisions:**

**As required by the Constitution, Defendants will take reasonable steps to protect prisoners from harm, including violence by other prisoners. While some danger is inherent in a jail setting, Defendants will implement appropriate measures to minimize these risks including development and implementation of facility-specific security and control related policies, procedures, and practices that will provide a reasonably safe and secure environment for all prisoners and staff.**

### Subsection IV.A. Supervision

**Progress Summary:** 75% (3 of 4) of the provisions in this subsection are now out of non-compliance. Two (2) provisions are in partial compliance, one maintained Substantial Compliance and one remains in non-compliance as shown in the compliance score card below:

**Compliance Score Card**

| Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. Supervision** | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | IV. A1a: Unit Security Stratification & Management | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 2 | IV. A1b: Post Orders & Unit Office/Supervisor Staffing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | IV. A1c: Officer Communications | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| 4 | IV. A1d(i,ii) Security Rounds All Units & Areas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| # NonCompliance | | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 1 | 1 |
| # Partial Compliance | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| # Substantial Compliance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| # Sustain Compliance | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Progress Points | | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 4 | 4 |
| Percent Toward Full Sustained | | 0% | 0% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 33% | 33% |

**Assessment of Substantive Provisions:**

1. **Defendants will develop and submit to USDOJ and the Monitor for review and approval facility-specific policies regarding supervision of prisoners. These policies will include measures necessary to prevent prisoners from being exposed to an unreasonable risk of harm by other prisoners or staff and must include the following:**

   a. **Development of housing units of security levels appropriately stratified for the classification of the prisoners in the institution, see also Section IV.F. re: Classification and Housing of Prisoners;**

**ASSESSMENT: PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

With completion of the required staff training regarding the Policies and Procedures Manual, Partial Compliance has been achieved; however, no procedural or physical plant changes have been initiated to deal with the classification and security level requirements specified in this section of the Settlement Agreement. Although the average daily census at the GGACF is well below the rated capacity of the housing units that are on line (9A, 9B, 9C, 9D and X), the limited number of options available to Classification staff make compliance impractical. All sentenced male inmates are housed in 9D regardless

of their security level.  All pre-trial male detainees are housed in 9B and 9C.  9A continues to be used to hold male detainees and inmates in the following categories: disciplinary confinement, administrative confinement, protective custody, serious mental health (SMI) and transitional/intake holding.  All female prisoners are held in the X housing unit.  Pre-trial detainees and sentenced inmates are held on separate sides of the unit.

**RECOMMENDATIONS:**

1.  As has been noted previously, there are basically only two options available to address the problem.  The first is to subdivide the existing housing units into smaller modules.  The second is to implement "direct supervision" in the male housing units by placing an officer inside the dayrooms on a 24-hour per day basis.  Both options require additional staff, but the "direct supervision" solution is the most practical and would result in greater accountability and a more effective facility operation.  This recommendation was made in the 16th, 17th and 18th Compliance Assessment Reports, as well as by Rod Miller in the Technical Assistance Report that he submitted to the Bureau of Corrections. The Territory is encouraged to fully implement those recommendations and their revised Staff Plan.

**b.  Post orders and first-line supervision of corrections officers in each housing unit (at least one officer per unit) based on an assessment of staffing needs;**

**ASSESSMENT: NONCOMPLIANCE**

**FINDINGS:**  Post orders have not yet been submitted to the Monitor and DOJ for review.  The existing copies of post orders that are located in each housing unit control room are out-of-date and do not conform to approved policies and procedures.  Post orders, consistent with the Policies and Procedures Manual, are an integral component of the guidance given to officers so that they can supervise detainees/inmates effectively.

The Staffing Plan has been reviewed and updated several times since the December site visit.  It now appears to specify the Operational Posts and Support Posts appropriately, along with required relief factors.  While that is a significant achievement, filling the required and authorized positions has proven to be a significant challenge.  The number of actual correctional officers on board is currently just over half of the authorized positions.  During the April site visit required posts were manned appropriately, but that standard is only maintained through the extensive use of overtime.  The revised Staffing Plan will put an even greater burden on an already overextended staff.

**RECOMMENDATIONS:**

1.  Authorized/funded positions are routinely unfilled.  It is imperative that staff be hired to fill all existing positions as soon as possible.

2.  Require supervisors to document observed unit staffing levels in the unit/post logs when they make their rounds on each shift.

3.  Do not allow officers to leave their posts unless they have a replacement onsite.

**c.  Communication to and from corrections officers assigned to housing units (i.e. functional radios); and**

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:**  The Territory has maintained substantial compliance with this provision since the December site visit.  All staff required to have functioning radios were properly equipped and use of radios appeared to comport with the approved policies and compliance measures.

**RECOMMENDATIONS:**

1. Continue this practice.  Evaluate provision implementation per the compliance measures to maintain Substantial Compliance and achieve Sustained Compliance.

**d.  Supervision by corrections officers assigned to cellblocks, including any special management housing units (e.g., administrative or disciplinary segregation) and cells to which prisoners on suicide watch are assigned, including:**

**(i) conducting of adequate rounds by corrections officers and security supervisors in all cellblocks; and,**

**(ii) conducting of adequate rounds by corrections officers and security supervisors in areas of the prison other than cellblocks.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

A review of unit logs reflected improved documentation of well-being checks.  While some entries were consistently exactly on the hour, others were made within the hourly time frame required for general population detainees/inmates, but at the time actually noted by the officer, whenever that occurred.  In 9A, where special management prisoners are housed, policy calls for well-being checks to be made twice per hour, not to exceed 40 minutes between checks.  The log in that unit revealed that officers routinely made well-being checks on an hourly basis.  When questioned about this apparent discrepancy, they were not familiar with the twice per hour standard.  The situation was further compounded by the fact that the supervisors, who made log entries each shift as they conducted rounds, failed to note the discrepancy and took no corrective action.

Unit log entries often do not reflect that a security check was conducted as required to determine the well-being of each prisoner.  In 9C, one officer simply noted "No changes to document" each hour (at 0315, 0415 and 0515).  While he did make hourly log entries, they were not reflective of any action on his part.

**RECOMMENDATIONS:**

1. Conduct refresher training regarding the frequency of security/well-being checks for prisoners held in special management housing (9A).

2. Develop suggested terminology that officers can use when making log entries that reflect the action, they took to conduct required periodic security/well-being checks.

## Subsection IV.B. Contraband

**Progress Summary:** All five (5) provisions in this subsection are out of non-compliance. IV.B.1a. advanced to Substantial Compliance and IV.B1e was downgraded from Substantial Compliance to Partial Compliance. Two of the five provisions are now in Substantial Compliance, three are in Partial Compliance, and none are in Non-Compliance.

Assessment findings and conclusions are supported by examination of incident reports and related records, relevant policies and procedures, contraband logs, administrative investigation logs, onsite interviews with staff and officials.

**Compliance Score Card**

| Agreement Section & Substantive Provisions | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B. Contraband | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1  IV. B1a: Clear Definitions of Contraband | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 2  IV. B1b: Prevention of Introduction | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 3  IV. B1c(i,ii,iii): Prisoner Supervision, Prisoner Searches, Physical Areas Searching | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4  IV. B1d: Confiscation, Preservation, Destruction | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| 5  IV. B1e: Admission and Escorts of Visitors | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 1 |
| # NonCompliance | 5 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 0 | 0 |
| # Partial Compliance | 0 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Progress Points | 0 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 7 | 7 |
| Percent Toward Full Sustained | 0% | 20% | 20% | 20% | 20% | 20% | 13% | 13% | 13% | 13% | 13% | 13% | 13% | 13% | 13% | 13% | 13% | 47% | 47% |

**Assessment of Substantive Provisions:**

**1.   Defendants will develop and submit to the USDOJ and the Monitor for review and approval facility-specific policies regarding contraband that are designed to limit the presence of dangerous material in the facility.  Such policies will include the following:**

**a.   Clear definitions of what items constitute contraband;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** Training requirements for this provision have been met, which results in a change from noncompliance to partial compliance. The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains as discussed in these findings.

Staff appear to consistently apply the definitions for what constitutes contraband in their application of policies and procedures pertaining to this subjection and provision. Examination of incident reports during this reporting period demonstrate this finding and provide a factual basis for advancing this provision to Substantial Compliance.

**RECOMMENDATIONS:**

1.   Continue practices and methods that sustained compliance.
2.   Ensure all recruit staff and employees successfully complete required training for contraband control.
3.   Ensure all annual in-service training is consistently completed by all staff required to do so.
4.   Continue to monitor contraband intervention documentation to ensure consistent application of the definition of contraband.

**b.  Prevention of the introduction of contraband from anyone entering or leaving Golden Grove, through processes including prisoner mail and package inspection and searches of all individuals**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** Searching of all personnel, sworn, civilian and visitors, are conducted routinely at the point of entry remain in practice.  Electronic screening equipment is in place to scan all materiel.  The problem previously reported regarding the inattentive private security officer station at the entrance security gate was corrected; no other problems were observed at this important security post. This provision remains in Partial Compliance due to the very high prevalence of contraband in the facility. This is detailed in the provision discussed below.

The number of cell phones found in the possession of prisoners and within housing units is extraordinarily higher that in most US prisons. Cell phone confiscations in US jails is very rare.[1] The number of cell phones 2019 was 22.9 per 100 GGACF prisoners for as of April, or 221 per 1000 prisoners for comparison to the maps below (darker green states).



## Where Cell Phones in Prisons are Confiscated

### Where Guards Are Paid Less

Amount below median annual wage for correctional officers/jailers

### Where Phones Are Confiscated

Cell phones confiscated per 1,000 prisoners

**NBC NEWS**

NBC News research, State Corrections Agencies, BLS

Unauthorized access to cell phones by prisoners creates very serious risks to prisoners, staff, and the community. For example, charging cell phones in cells and housing units with faulty electrical outlets and wiring combined with inadequate fire detection and suppression systems exposes prisoners and staff to potential fire-related hazards, and prisoners are known to intimidate other prisoners, staff, crime victims, and community members using cell phones.

The extant cell phone contraband problem at GGACF seems unaffected by the implementation of the Agreement and the problem appears to be increasing. Per 100 prisoner cell phone confiscations increased from 8.7 to 22.9 comparing January through April 2018 and 2019 and trends upward since 2015. Some of the highest risks to staff and prisoner safety and security exist when annual and trends in dangerous conditions increase concurrently.



**Cell Phones**

7.5    8.1    6.2    8.7    22.9
2015   2016   2017   2018   2019

---

[1] https://www.nbcnews.com/news/corrections/southern-prisons-have-smuggled-cellphone-problem-n790251

At least 364 cell phones have been taken from prisoners and/or found in prisoner housing areas since 2013, according to historical records examined. The figure below compares annual decreases in the number of prisoners incarcerated at GGACF (ADP) and the number of cell phones found for January through April 2015-2019. According to official contraband records provided by GGACF officials, cell phones seizures continue to increase while the prisoner population has decreased.



This problem remains a pervasive and persistent safety and security risk that continues to expose staff, prisoners, and the community to unabated risk of harm.

**RECOMMENDATIONS:**

1. Ensure that all prisoner possessions, mail, and packages are consistently and thoroughly inspected and searched according to the policy and procedure.

2. Ensure that all persons having access to prisoners are prevented for providing prisoners cell phones and other contraband items.

3. Ensure that all areas accessible to prisoners are consistently and properly searched for cell phones and contraband on a routine basis.

4. GGACF supervisors and management staff should regular monitor contraband control practices of line staff to ensure fidelity with their training and required policies and procedures.

**c. Detection of contraband within Golden Grove, through processes including:**

**(i) supervision of prisoners in common areas, the kitchen, shops, laundry, clinical and other areas of Golden Grove to which prisoners may have access;**

**(ii) pat-down search, metal detector, and other appropriate searches of prisoners coming from areas where they may have had access to contraband such as intake, returning from visitation or returning from the kitchen, shops, laundry, or clinic;**

---

**(iii) regular and random search of physical areas in which contraband may be hidden or placed, such as cells and common areas where prisoners have access (e.g. clinic, kitchen, dayrooms, storage areas, showers);**

## ASSESSMENT:  PARTIAL COMPLIANCE

This provision remains in Partial Compliance. Interviews with GGACF staff again found that organized searches of the facility are very few due to staffing levels and high workloads. Housing unit staffing remains inadequate to ensure consistent searches of living and common areas, and prisoners as they exit and enter those locations. While touring housing units, none of the prisoners entering or exiting the housing units were searched by officers. Officers were engaging in other duties during those times. Despite these interviews and observations, a review of incidents demonstrates positive outcomes when officers are able to conduct prisoner and area searches in housing units. Contraband is being found and removed. Nonetheless, the high level of contraband being found would likely be higher if staffing levels were adequate and staff had sufficient time to comply with contraband prevention policies and procedures.

The presence of dangerous and nuisance contraband remains high within GGACF. Risk of real and potential harm remains very high for staff and prisoners. Contraband logs were examined to determine changes to contraband prevention outcomes since the policies and procedures. Nine (9) specific types of contraband were reviewed because of risks to inmate and staff harm as listed:

1. Weapons – Physical threat and injury / facilitate escape.
2. Cell Phones – Use to threaten/coerce victims, coordinate criminal/clandestine activity from the facility.
3. Drugs – Altered prisoner mental states/behavior, health risks, overdoses, manipulate prisoners and staff.
4. Drug Paraphernalia – Facilitate use of drugs/alcohol, altered prisoner mental states/behavior, overdose.
5. Alcohol - Altered prisoner mental states/behavior, health risks, overdoes, manipulate prisoners and staff.
6. Unauthorized Electronics and Tools – Ignition of fire, conversion to weapons and lock manipulation
7. Money – Manipulate and coerce prisoners and staff.
8. Handcuff Keys – Facilitate escape and physical harm.
9. Tobacco – health risks, manipulation of prisoners.

Records examined show increases in most contraband items comparing 2018 and 2019, January through April. There were increases in weapons, cell phones, drug paraphernalia, unauthorized electronics and tools, and decreases in drugs, money, tobacco. It is important, however, to note that weapons found have significantly decreased since 2015 and 2016.

### GGACF Contraband Found 2015-2019 (January – April) Compared

| Year/ Contraband | Weapons | Cell Phones | Drugs | Drug Paraphernalia | Alcohol | Unauthorized Electronics & Tools | Money | Handcuff Key | Tobacco | Ttl |
|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | 32.0 | 49.0 | 13.0 | 4.0 | 2.0 | 12.0 | 10.0 | 1.0 | 2.0 | 125 |
| 2016 | 22.0 | 63.0 | 30.0 | 8.0 | 0.0 | 4.0 | 3.0 | 0.0 | 9.0 | 139 |
| 2017 | 8.0 | 24.0 | 26.0 | 1.0 | 1.0 | 2.0 | 0.0 | 1.0 | 3.0 | 66 |
| 2018 | 7.0 | 62.0 | 249.0 | 7.0 | 1.0 | 13.0 | 6.0 | 1.0 | 7.0 | 353 |
| 2019 (Jan-May) | 4.0 | 25.0 | 5.0 | 6.0 | 1.0 | 6.0 | 3.0 | 0.0 | 0.0 | 50 |
| Totals | 73.0 | 223.0 | 323.0 | 26.0 | 5.0 | 37.0 | 22.0 | 3.0 | 21.0 | 733 |
| Jan-Apr 2015 | 15.0 | 20.0 | 8.0 | 3.0 | 2.0 | 10.0 | 3.0 | 1.0 | 1.0 | 63.0 |
| 2016 | 3.0 | 15.0 | 8.0 | 2.0 | 0.0 | 1.0 | 2.0 | 0.0 | 3.0 | 34.0 |
| 2017 | 1.0 | 9.0 | 0.0 | 1.0 | 0.0 | 2.0 | 0.0 | 1.0 | 1.0 | 15.0 |
| 2018 | 2.0 | 13.0 | 247.0 | 3.0 | 1.0 | 3.0 | 5.0 | 0.0 | 2.0 | 276.0 |
| 2019 | 4.0 | 25.0 | 5.0 | 6.0 | 1.0 | 6.0 | 3.0 | 0.0 | 0.0 | 50.0 |
| 2018 - 2019 N +/- | 2.0 | 12.0 | -242.0 | 3.0 | 0.0 | 3.0 | -2.0 | 0.0 | -2.0 | -226.0 |
| % +/- | 100.0% | 92.3% | -98.0% | 100.0% | 0.0% | 100.0% | -40.0% | 0.0% | -100.0% | -81.9% |

January confiscations show an increase for 2019 compared to 2015 thru 2017, as shown in the table below.

Total contraband items found per 100 prisoners continues to trend upward since 2015. The figure below compares prisoner ADP and monthly contraband items found per 100 prisoners.



GGACF Monthly ADP & Contraband Found January 2015-April 2019

There are two fundamental purposes for monitoring this Agreement. The first purpose is to determine whether and the extent to which the Territory is complying the four-corners of the agreement. The second purpose is to determine whether the Territory's compliance efforts are removing and/or mitigating real and potential harm to prisoners and, therefore, creating constitutional conditions of confinement that are likely sustainable. Using data and statistics can be meaningful in helping to make such determinations but not without purposeful interpretation. Our ongoing analyses of contraband activity strongly indicate that risk of harm to prisoner (and staff) has not been effectively mitigated since the execution of this Agreement. The strength of the evidence is illustrated by increases in annual contraband, combined with increases contraband trends. Risk decreases when annual changes in contraband activity and trends together decrease. Real and potential risk increases when annual changes in contraband activity and trends increase together. The matrix below shows this risk dynamic.



Figures below show annual changes and trends in contraband found per 100 prisoners for the months of January through April, 2015-2019. Risks associated with prisoner possession of handcuff keys and tobacco appear to have decreased. Risks associated with weapons, drugs, electronics/tools exist. Risks associated with prisoner possession of cell phones, drug paraphernalia, alcohol, and tools appear to high.













Greater priority and resources are indicated by increases in contraband. The Territory should complete a study of contraband activity, develop and implement a strategic plan that focuses on improving contraband prevention and control.

**RECOMMENDATIONS:**

1. Self-monitor and evaluate implementation approved policies and procedures and training to ensure compliance with both requirements.

2. Ensure staff consistently and adequately search all prisoners entering and exiting facility areas where searches are required.

3. Develop a management tracking tool for monitoring contraband activity on a monthly basis.

4. Ensure that housing units are adequately staffed consistently and that housing unit staff consistently apply contraband control policies and procedures and training acquired.

5. Use the approved compliance measures to evaluate compliance in order to work toward substantial compliance.

6. Reduce introduction of contraband into the facility.

7. Use the Contraband Compliance Measures to inform and guide contraband prevention and control strategies.

---

**d.   Confiscation and preservation as evidence/destruction of contraband; and**

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** Examination of relevant records, observation of confiscation practices, and interviews with staff demonstrate continued Substantial Compliance with this provision. Confiscations continue to be reported on the Confiscation Log and the log now includes the incident number associated with the confiscation.

Additionally, the log has been re-formatted that improves its clarity and legibility. Practices appear to be consistent with the approved policies and producing outcomes expected for this provision. The Territory is commended for this effort.

**RECOMMENDATIONS:**

1. Continue to maintain tracking system for all contraband confiscations.

2. Continue to evaluate implementation of the approved policies and procedures using the approved compliance measures.

3. Monitor contraband reporting and ensure consistent and accurate reporting by staff.

**e.   Admission procedures and escorts for visitors to the facility.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** Notwithstanding the findings described below, high amount and variety of contraband being seized continues to demonstrate that some contraband may be due to gaps in compliance with contraband and/or admissions and escort policies and procedures. The Territory will need to provide evidence to the contrary before this provision can return to Substantial Compliance.

We again observed visitors and staff routinely searched as they come into the facility.  Visitors were observed being escorted and the monitoring team was consistently escorted during the onsite visit. In addition, scanning equipment is in place and fully functional.  If visitors require escort to the appropriate location within the facility, they are held at the point of entry until a support staff member is available.  I.D. cards are issued and personal forms of identification (Driver's Licenses, etc.) are retained at the point of entry.

Visitors and staff are routinely searched as they enter the facility.  Fully functional scanning equipment is in place in the public lobby.  Agency ID cards are issued to all visitors in exchange for their personal identification (driver's licenses), which are retained at the point of entry.  Visitors, including the monitoring team, are routinely escorted by staff as they move throughout the facility.

It should be noted that the scanning equipment located in the entry safety vestibule of Detention R & D does not work.  It has not been functional for at least a year.  Staff indicated that it will be utilized again once it has been repaired.

It should also be noted that the contract employee who was identified in the 18th Compliance Assessment Report because of his inappropriate dress, inability to articulate his responsibilities and complete failure to fulfill his assigned responsibilities, was found to be still working at the entry gate to the GGACF facility grounds during the April site visit. Once again, he did not follow established procedure.  He actually allowed the monitoring team to pass through his post without requiring standard identification.

The negative findings discussed above should be timely corrected in order to maintain the Substantial Compliance rating.

**RECOMMENDATIONS:**

1. Continue adherence to the approved policies and procedures.

2. Repair the non-functioning scanning device in Detention R & D.

3. Require the front gate contractor to provide qualified employees to staff that post.

4. Monitor and evaluate adherence to the approved policies and procedures using compliance measures to maintain substantial compliance and achieve sustained compliance.

## Subsection IV.C. General Security

**Progress Summary:** Compliance ratings did not change as shown in the score card below.

### Compliance Score Card

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.C. General Security | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | IV. C1a: Authorized Prisoner & Staff Clothing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 2 | IV. C1b: Prisoner, Staff, Visitor Identification | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 3 | IV. C1c: Locking & Unlocking Gates & Doors | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | IV. C1d: All Locks Inspections & Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 5 | IV. C1e: Staff Preemployment Checks, Tracking, Supervisor Review of Records | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # NonCompliance | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 2 | 2 |
| | # Partial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Progress Points | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| Percent Toward Full Sustained | | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 20% | 20% |

**Substantive Provisions:**

**1.   Defendants will develop and submit to USDOJ and the Monitor for review and approval, facility-specific policies designed to promote the safety and security of prisoners and that include the following:**

**a.   Clothing that prisoners and staff are required or permitted to wear and/or possess;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Since the last site visit, the discrepancy between policy and practice with regard to the initial issuance of clothing and other items during the intake process has been partially corrected.  Based on inspection and questioning of prisoners and staff, it is clear that both pretrial detainees and sentenced inmates now receive three complete sets of uniforms.  In the past, only sentenced inmates received the required allotment.  Unfortunately, while Policy #: BOC-SEC-3002 specifies that all inmates and detainees will receive two sheets as well as two sets of underclothing, only one sheet is issued during the intake process in Detention R&D; no underclothing is issued.  When questioned about this apparent discrepancy, the officer assigned to that post was not familiar with the specific initial issuance requirements of the policy.

The policy also indicates that a pillow is issued.  It then goes on to say that if a prisoner has a mattress that is not designed with a built-in pillow, one may be ordered from his/her home.  It would seem that a pillow should not be listed as an item to be issued if, in fact, the only way that a prisoner can get one is by having a family member send one to the facility.  The simple way to resolve this issue is to ensure that all prisoners are issued mattresses with the built-in pillow feature.

**RECOMMENDATIONS:**

1.   Provide refresher training to staff with regard to Policy #: BOC-SEC 3002.

2.   Revise Policy #: BOC-SEC 3002.  Delete the reference to issuance of a pillow.  Ensure that only mattresses with the built-in pillow feature are issued to prisoners.

3. Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

---

**b.   Identification that prisoners, staff, and visitors are required to carry and/or display;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Historically, sentenced inmates have been issued an identification card which they must display when requested and are required to have on their person when outside of their housing unit. Pretrial detainees have been issued a wristband, which is subject to destruction/decay when worn while taking a shower. In addition, because of miscommunication and/or lack of supplies, responsibility for issuing wristbands and ID cards was removed from Detention R&D and given to an officer assigned to Education. Consequently, both types of ID's are not issued during the intake process. As has been suggested in previous Compliance Assessment Reports, issuing one standard form of identification (the ID card) would help to resolve problems associated with the bifurcated system. In addition, responsibility for the issuance of ID's should be returned to Detention R&D so that all incoming prisoners are given proper identification immediately upon entry to the GGACF.

**RECOMMENDATIONS:**

1. Issue identification cards to all prisoners.

1. Issue identification cards in Detention R&D as part of the intake process.

2. Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

---

**c.  Requirements for locking and unlocking of exterior and interior gates and doors, including doors to cells consistent with security, classification, and fire safety needs;**

**ASSESSMENT:  NONCOMPLIANCE**

**FINDINGS:**  While some progress was noted during the April site visit, particularly with regard to staff's awareness of the need to keep security doors closed and locked, basic security problems outlined in previous Compliance Assessment Reports remain uncorrected.

During the first walkthrough of the housing units on the April site visit, all of the control room doors in 9A, 9B, 9C and 9D were found to be closed, but only one was locked. During the second walkthrough of the site visit, all four control room doors were closed and locked. The retrofitted "cage" doors that allow entrance to the housing units were routinely closed and locked when officers were not inside the units. However, because there is generally no one to provide backup inside the control room when an officer enters a unit, standard practice is to leave both the control room door and the "cage" door ajar. If an officer is overpowered by prisoners, they have his/her keys and the means to open both the vestibule sliding door and the exterior door to either 9A/9B or 9C/9D. During one walkthrough of the housing units, an exterior door was left partially open by the control room officer. When not completely closed, those doors can be pushed open by hand.

The problem with doors being left open is not limited to the housing units. During the April site visit both entry safety vestibule doors in Detention R & D were found to be closed during the first walkthrough, but on the second walkthrough, **both** doors were standing open—this in spite of the sign on each that says, "Keep This Door Closed at All Times".

Prior to 2014, the exterior doors to the male housing units were opened and closed by the officer in the Central Control Tower. Since that time, staff have only been able to open and close those doors from **inside**

---

the housing unit control rooms. This gross breach of basic security should have been corrected immediately, not allowed to continue for five years.  If the matter cannot be resolved promptly, the only alternative is to post an officer outside of the housing units to open and close them manually with a key.

Work on the (third) perimeter fence is almost complete.  Drainage issue problems have forced a redesign at three points around the facility.  Funding to cover the additional expense may or may not be an issue. The Territory has assumed financial responsibility for repair of the two original perimeter fences.  While this resolves the conflict that existed between the Territory and FEMA, there is as yet no projected timeframe for starting or completing the project.

**RECOMMENDATONS:**

1.  Allow the control of exterior door locks to be managed from a central point exterior to the housing units. If this cannot be done in a timely manner, an officer should be assigned to a post outside of the housing units to open and close them manually with a key.  It should be noted that Housing Unit X, female housing, should be included in these plans.

2.  Require staff to close and lock security doors.

3.  Move ahead with repairs to the two existing security fences.

**d.   Procedures for the inspection and maintenance of operational cell and other locks in Golden Grove to ensure locks are operational and not compromised by tampering; and**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

The All Locks Inventory Spreadsheet serves as a management tool to help identify and keep track of malfunctioning locks; however, it does not include housing unit access security doors and cell doors.

**RECOMMENDATIONS:**

1.  Expand the All Locks Inventory Spreadsheet to reflect all housing unit access security doors as well as cell doors.

2.  Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

**e.   Pre-employment background checks and required self-reporting of arrests and convictions for all facility staff, with centralized tracking and periodic supervisory review of this information for early staff intervention.**

**ASSESSMENT:  NONCOMPLIANCE**

**FINDINGS:**  There has been no change in the findings for this section for the last four Compliance Reports. There does not appear to be a system in place to review and update personnel files, conduct appropriate criminal history checks, and to verify the inclusion of required information such as fingerprint cards and mental health evaluations.

**RECOMMENDATIONS:**

1.  Standardize the employee folder/record system.  Include applicant personal history statements and criminal history verification documents.

2.  Keep medical records separate from the general personnel file.

3.   Continue to maintain separate staff training files.

## Subsection IV.D. Security Staffing

**Progress Summary:** All four (4) provisions in this subsection remained out of non-compliance. Two provisions, IV.D1a and IV.D1b, advanced to Substantial Compliance as shown in the score card below.

### Compliance Score Card

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.D. Security Staffing** | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | IV. D1a: Staffing Analysis w/Realistic Shift | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 2 | IV. D1b: Staffing Analysis-Based Staffing Plan w/Timetables | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 3 | IV. D1c: Periodic Review & Amending of Staffing Analysis & Staffing Plan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4 | IV. D2: Staffing Plan Implementation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | # NonCompliance | 4 | 4 | 4 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 0 | 0 |
| | # Partial Compliance | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 2 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Progress Points** | | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 6 |
| **Percent Toward Full Sustained** | | 0% | 0% | 0% | 8% | 8% | 8% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | 50% |

**Substantive Provisions:**

**1.  Defendants will develop and submit to USDOJ and the Monitor for review and approval facility-specific policies and a staffing plan that provides for adequate staff to implement this Agreement, as well as policies, procedures, and practices regarding staffing necessary to comply with the Constitution that include the following:**

**a.  A security staffing analysis, incorporating a realistic shift factor for all levels of security staff at Golden Grove;**

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** The staffing analysis was updated to include the requisite shift factors for all security levels. The Territory shared this study and revised staffing plans with this Monitor and the United States for review and comment. On April 4, 2019, the Territory re-submitted revised staffing plans that incorporated comments and recommendations provided by this Monitor and the United States. This process demonstrates Substantial Compliance with this provision.

**RECOMMENDATIONS:**

1.  Implement the revised staffing plan and staffing matrix.
2.  Use the Compliance Measures to guide and evaluate implementation of the revised staffing plan.
3.  Update the revised staffing plan in accordance with this Agreement and the approved policies and procedures.

**b.  A security staffing plan, with timetable, to implement the results of the security staffing analysis;**

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** The revised staffing plan proposes full implementation over a five-year fiscal period beginning in 2020 (year one). However, we have not been advised by the Territory that the new staffing plan has been implemented as of yet, as was stating during the previous onsite status conference with the court. The draft staffing plan provided by the Territory appears incomplete as it omits all specific information regarding staff recruitment activities and timelines.

The Territory informed this Monitor and the United States that staffing shortages will be covered using overtime to ensure the staffing levels are adequate. This is problematic in the absence of full implementation of a completed staffing plan and staff matrix. The Territory has historically relied excessively on high levels of overtime for facility safety and security operations. Consequently, security staff working excessive overtime can become mentally fatigued and complacent. This can have a direct and negative impact on facility safety and security. This issue has been described and discussed in previous reports and we will continue to monitor the use of overtime.

Finally, this provision will return to Partial Compliance if the new staffing plan is not completed, approved per the terms of the Agreement, and implemented before the issuance of the 20th monitoring report.

**RECOMMENDATIONS:**

1.   Same as above.

2.   Once implemented, the Territory should evaluate implementation of the staffing plan according to the approved policies and procedures and compliance measures.

**c.   Policies and procedures for periodic reviews of, and necessary amendments to, Golden Grove's staffing analysis and security staffing plan.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has not submitted proposed revisions to staffing-related policies and procedures that are affected by the revised staffing plans. We look forward to reviewing those proposals. This provision will be eligible for Substantial Compliance upon final approval and implementation of all staffing-related policies and procedures.

**RECOMMENDATIONS:**

1.   Review and revised all policies where indicated by the revised staffing plans. Submit revision proposals to this Monitor and the United States in accordance with the terms of this Agreement. Implement revised policies and procedures.

2.   The Territory should evaluate implementation of these policies and procedures using the approved compliance measures to determine the efficacy of these policies and the staffing plan to ensure desired outcomes are consistently achieved.

**1.   Defendants will implement the staffing plan developed pursuant to D.1.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** We have not been notified that the revised staffing plans have been implemented in accordance with the terms of the Agreement.

**RECOMMENDATIONS**:

1.   Implement the revised staffing plan.

2.   Notify this Monitor and the United States of implementation and update documents used by the Territory for tracking and monitoring implementation of the revised staffing plan (i.e. staffing matrix, job fair dates, etc.).

3.   Self-assess implementation using the approved Compliance Measures.

## Subsection IV.E.  Sexual Abuse of Prisoners

**Progress Summary:** Compliance rating did not change as shown in the score card below.

**Compliance Score Card**

| Agreement Section & Substantive Provisions | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.E Sexual Abuse of Prisoners | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1  IV. E1: Substantive PREA Requirements Implemented | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| # NonCompliance | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| # Partial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Progress Points | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| Percent Toward Full Sustained | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | 33% | 33% |

1.   **Defendants will develop and submit to USDOJ and the Monitor for review and approval facility-specific policies that incorporate the definitions and substantive requirements of the Prison Rape Elimination Act (PREA) and any implementing regulations.**

**ASSESSMENT: PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Although the new PREA Coordinator assumed her responsibilities on December 1, 2018, several months after her predecessor vacated the position, there has been no break in service to the detainees and inmates at the GGACF.  Her name, title and telephone number were found posted in the women's housing unit but that information was not noted in the male housing units.  The Coordinator confirmed that her contact information will be reposted in each unit whenever needed.

PREA related information is provided to prisoners during the intake process in the form of a brochure.  It is also available in the housing units in poster format.  There are efforts underway to combine the various individual language posters into one that covers, English, Creole and Spanish.  Funding is being sought through a grant.  Copies of *End the Silence* were found in each control room.  Revision of the Inmate Handbook has been delayed so that the new Director can review it.  Once it has been approved and published, that important document will be consistent with policies and procedures.

**RECOMMENDATIONS:**

1.   Continue to take advantage of outside resources such as the National PREA Resource Center, the National Institute of Corrections, the American Jail Association and the American Correctional Association.

2.   Send one qualified staff member to the USDOJ's PREA auditor certification training.

3.   Implement the revision of the Inmate Handbook.

4.   Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

5.   Complete corrective action determined by the PREA self-audit.

## Subsection IV.F.  Classification and Housing of Prisoners

**Progress Summary:** Compliance ratings did not change as shown in the score card below.

### Compliance Score Card

| Agreement Section & Substantive Provisions | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.F. Classification & Housing | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 IV.F1a: Objective System Annually Validated / Timelines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 2 IV.F1b: Classified Prisoner Housing/Separation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 IV.F1c: Other Unit Access Prevention System for Prisoners | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4 IV.F1d: Specified Re-Classification System | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 5 IV.F1e: Specified Incident Data Collection/Reporting | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 6 IV.F1f: Regular Review Prisoner Segregation/Out-time | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| # NonCompliance | 6 | 6 | 4 | 4 | 5 | 5 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 1 | 1 |
| # Partial Compliance | 0 | 0 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 |
| # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Progress Points | 0 | 0 | 2 | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 |
| Percent Toward Full Sustained | 0% | 0% | 11% | 11% | 6% | 6% | 6% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 28% | 28% |

**Substantive Provisions:**

1. **Defendants will develop and submit to USDOJ and the Monitor for review and approval facility-specific policies that will appropriately classify, house, and maintain separation of prisoners based on a validated risk assessment instrument in order to prevent an unreasonable risk of harm.  Such policies will include the following:**

   a. **The development and implementation of an objective and annually validated system that classifies detainees and sentenced prisoners as quickly after intake as security needs and available information permit, and no later than 24-48 hours after intake, considering the prisoner's charge, prior commitments, age, suicide risk, history of escape, history of violence, gang affiliations, history of victimization, and special needs such as mental, physical, or developmental disability;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Compliance with this section is hampered by the lack of specialized housing.  With only four male units on line, new detainees must be housed in 9A until they are classified and cleared by Medical.  That means that they are held in a lockdown status in the same unit as the most problematic prisoners in the facility.  As was noted in the Findings under paragraph IV. A. 1a. above, the Territory's two most practical solutions involve the addition of staff and the subdivision of existing housing units, or a change in operations from Podular Remote Surveillance (existing) to Direct Supervision (proposed).

**RECOMMENDATIONS:**

1. Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

2. Develop and implement a plan to ensure that prisoners are separated according to their unique classification and needs.

**RECOMMENDATIONS:**

1. Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

2. Develop and implement a plan to ensure prisoners are separated according to their unique classification and needs.

**b.   Housing and separation of prisoners in accordance with their classification;**

**ASSESSMENT:  NONCOMPLIANCE**

**FINDINGS:  FINDINGS:**  This provision is still carried as Noncompliance because the lack of adequate specialized housing makes stratification of the various classification categories impractical.  Indicative of this problem is the fact that SMI prisoners and newly arrested detainees are both housed in 9A instead of unique modules.

**RECOMMENDATIONS:**

1. See the previous Recommendation above (IV. F. 1. a.).

**c.   Systems for preventing prisoners from obtaining unauthorized access to prisoners in other units;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

This provision is now carried as Partial Compliance  the required initial training was completed on classification policies and procedures. While it is unlikely that a prisoner can physically gain unauthorized access to prisoners in another housing building, the need to house different categories of prisoners within a single housing unit makes compliance with the intent of this provision problematic.

**RECOMMENDATIONS:**

1. See the previous Recommendation above (IV. F. 1. a.).

2. Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

**d.   The development and implementation of a system to reclassify prisoners, as appropriate, following incidents that may affect prisoner classification, such as prisoner assaults and sustained disciplinary charges/charges dismissed for due process violations;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

As was previously reported, Policy #: BOC-CLAS-2001 deals with special housing management and classification.  Although it is detailed and comprehensive, implementation of the specified procedures is not practical considering the limited housing options that are available.

**RECOMMENDATIONS:**

1. See the previous Recommendation above (IV. F. 1. a.).

2.  Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

**e.  The collection and periodic evaluation of data concerning prisoner-on-prisoner assaults, prisoners who report gang affiliation, the most serious offense leading to incarceration, prisoners placed in protective custody, and reports of serious prisoner misconduct;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Although the specified data is collected from incident reports and is collated into classification and reclassification decisions, there are no options available to staff other than to leave a prisoner in confinement/segregation (9A) or else place him in general population (9B, 9C or 9D).  In female housing (X), there are single cells on one side of the officer's station for pre-trial detainees with a similar configuration on the other side for sentenced inmates.  There is no separate confinement/segregation area for females.

**RECOMMENDATIONS:**

1.  See the previous Recommendation above (IV. F. 1. a.).

2.  Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

**f.  Regular review of prisoners in segregation to minimize time in segregation, and provision of adequate opportunities for out-of-cell time for prisoners in segregation.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

During the April site visit, one officer was found to be on duty in 9B, 9C and X on each shift.  In 9A, two officers were on duty during the day and evening shifts but only one manned that post on the midnight shift.  The Revised Staffing Plan calls for two officers to be assigned to 9A twenty-four hours per day.  In 9D, two officers were noted on duty during the day shift during each walkthrough of the facility.  Although that level is not required by the Staffing Plan, supervisors explained that the number of inmates in the unit (51) justified the assignment of two officers.

In 9A, a Segregation Activity Record (SAR) is supposed to be maintained on each prisoner, with the exception of new detainees who have not yet been cleared by Classification and Medical.  While there was a SAR on file for each detainee/inmate, many of them had significant gaps of several days when no entries were made.  Especially troubling is the fact that supervisors routinely signed off on the individual SAR's, but never made any notation regarding the glaring gaps in coverage.  They simply signed the documents and moved on.

Although there are two officers routinely assigned to 9A, they must share one set of keys.  Standard correctional practice in most facilities requires each officer on post to have his/her own set of keys as an officer safety measure.  Based on the explanation of operational practice provided by the officers on duty, all prisoners (regardless of classification) in 9A are kept locked down in their cells except for when they are allowed in the outdoor recreation yard or to use the telephone or take a shower.  This does not appear to comport with policy (see #: BOC-CLAS-2001), which specifies that prisoners classified as Administrative Segregation, Protective Custody and Transitional Housing (Intake Detainees) "…are allowed out of their cells between Unlock and Lockdown Secure Hours."

**RECOMMENDATIONS**

1.  See recommendation above (IV. F. 1. a.).

2.  Supervisors should verify that Segregation Activity Records are maintained in accordance with policy and should note corrective action taken when they find discrepancies.

3.  Compare policy to operational practice in 9A to ensure consistency.

4.  Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

## Subsection IV.G. Incident and Referrals

**Progress Summary:** Compliance ratings did not change as shown in the score card below.

This assessment finds no substantive improvement in the Territory's compliance with this provision. Review of previous monitoring reports strongly indicate systemic problems related to training, staff and supervisory accountability, compliance quality assurance, and administrative oversight of reporting and referral practices. This assessment finds extant noncompliance with this provision and the approved policies and procedures related to incident reporting and referrals. The depth and breadth of incident report errors, inconsistencies, incompleteness and untimeliness are inconceivable considering the fact that the training was completed and having clearly written policies and procedures. Consistently inadequate incident reporting adversely impacts the Territory's ability to demonstrate compliance with many, if not most, of the other sections in this Agreement. Effective incident reporting is fundamental to assessing and evaluating compliance with the Agreement and policies. Effective incident reporting is also fundamental to effectively managing the agency.

The Territory is here advised that some or all provisions in this subsection of the agreement will return to non-compliance in the absence of evidence that demonstrates substantive improvement during the 20th onsite monitoring assessment despite the fact that the training required to achieve Partial Compliance was completed Incident reporting and referral compliance issues described in this section have not improved substantially since the completion of training and the Territory has provided no evidence that demonstrates efforts to achieve needed improvement as recommended herein and in previous reports.

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.G. Incidents & Referrals** | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | IV.G1a: Reporting of Ten (10, i-x) Defined Incidents Categories | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 2 | IV.G1b: Mgmt. Review of Incidents for Administrative/Criminal Investigations, Incident Trends | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 3 | IV.G1c: Preservation of Incident Evidence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4 | IV.G1d: Centralized Incident Tracking System | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 5 | IV.G2: Prompt Reporting, Reviews, Corrective Action Per Specific Timelines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | # NonCompliance | 5 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 0 | 0 |
| | # Partial Compliance | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Progress Points** | | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 |
| **Percent Toward Full Sustained** | | 0% | 7% | 7% | 7% | 7% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | 33% |

**Substantive Provisions:**

**1.   Defendants will develop and submit to USDOJ for review and approval facility-specific policies to alert facility management of serious incidents at Golden Grove so they can take corrective, preventive, individual, and systemic action.  Such policies will include the following:**

**a.   Reporting by staff of serious incidents, including:**
 **(i)**  **fights;**
 **(ii)**  **serious rule violations;**
 **(iii)**  **serious injuries to prisoners;**
 **(iv)**  **suicide attempts ;**
 **(v)**  **cell extractions ;**
 **(vi)**  **medical emergencies;**
 **(vii)**  **contraband;**
 **(viii)**  **serious vandalism;**
 **(ix)**  **fires; and**
 **(x)**  **deaths of prisoners;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains. Examination of incident logs and reports for January through April 2019 indicate some improvement in compliance with the incident reporting / documentation-related approved policies and procedures but additional improvement is warranted to achieve substantial compliance.

41 reports for 56 (73%) reported incidents did not meet requirements in the approved policies and procedures. Policy compliance issues found by this assessment include, for example, inconsistencies of fact between officers involved in the same incident, reports not submitted according to timelines required by policy, omission of important facts i.e. not listing all contraband found, reporting force when no force was involved in an incident, omitting names of staff, witnesses, and others involved in an incident, inaccurate dates, omitting incident type and category, omitted or illegible signature of approving authority. The number of incidents reported and reports that did not meet policy requirements are shown below.

**January – April 2019 Incidents Reported**

| Year | 2019 Jan | Feb | Mar | Apr | Total |
|---|---|---|---|---|---|
| Staff Assault | | | 1 | 2 | 3 |
| Prisoner Assault | 1 | | | 1 | 2 |
| Suicide Attempt | 1 | 1 | | 1 | 3 |
| Contraband | 12 | 7 | 6 | 5 | 30 |
| Disorderly Prisoner | 1 | | 1 | 2 | 4 |
| Prisoner Fight | 2 | | 3 | | 5 |
| Lost Facility Keys | | 1 | | | 1 |
| Missing / Stolen Radio | | 1 | 1 | | 2 |
| Injection? | | | | 1 | 1 |
| Not Recorded | | 2 | | 3 | 5 |
| Total | 17 | 12 | 12 | 15 | 56 |
| Incidents Report Packets with Compliance Problems | 14 | 10 | 4 | 13 | 41 |
| % Problem Report Packets | 82% | 83% | 33% | 87% | 73% |



Policy-related problems with incident reports:

**January 2019.**

1. GGACF 01-0001-19: has error in the incident number (01-01-19 per [ a CO] Same report has omitted officer name from page 2, "Employees involved". Included with this report is a Chief Supplemental Report. The Reporting Chief's name is missing with only an illegible set of initials. The date signed is 2/5/19 on all supplemental reports per each incident submitted for January. Left blank on this Chief Supplemental Report is the reason for supplement, Approving Officer name/signature and date. This report accompanies all incident reports submitted and reveal the same omissions, signature illegibility and the question of identity of the author.

2. GGACF 01-0002-19: An officer's report failed to list charger and apple headset on page 3 under contraband. The contraband log has a scale listed for this incident number but this was not revealed in reports. Same report by this officer marks N/A for contraband given to GIST and N/A for property inventoried. Same incident # report prepared by another officer has error in the incident # and lists the year as 2018 and failed to document type and description of incident and instead documents N/A. The officer also documents YES that both inmates involved were seen by medical but the other reports submitted for this incident marked NO. Same incident #, another officer's report does not list the type or description of the incident and instead documents N/A. Same incident reported by another officer does not document the type or description of incident and instead types N/A. Page 2 of one officer's report is missing. The Chief's Supplemental Report is as above (identity is unknown, blank areas of report). Additionally, the next to the last sentence of the Chief's report "NOTHING WAS FOUND IN THE CELLS" According to one officer's report, marijuana in a yellow can, phone charger and white apple headset with microphone were found in cell #23 9C.

3. 01-0003-19: incident # on report prepared by an officer is in error, using the year 2018.

4. 01-0004-19: report prepared by the same officer uses the year 2018 in incident report # instead of 2019.

5. 01-0007-19: report prepared by R. Brathwaite omitted own name from involved employees page 2. Omitted phone charger from list of contraband on page 3. Report prepared 4 days after incident. Same incident, report prepared by another officer does not list the phone charger or marijuana on page 3 Contraband.

6. 01-0008-19: report prepared by an officer does not list portable DVD player and DVDs, phone charger on page 3 Contraband section. Same incident, report prepared by another officer fails to list himself under involved employees on page 2, fails to list DVD player, DVDs. phone charger on page 3 Contraband section. This report was dated 3 days after incident.

7. 01-0009-19: is reported as a UOF event. There is no Commander's UOF review of this incident included in the document submission for January.

8. 01-0010-19: report prepared by an officer does not list the incident type or description and opts for N/A. The officer omitted listing self on page 2 under involved employees. 5 days to submit.

9. 01-0011-19: report prepared by an officer did not list PlayStation 3, DVDs, rolling papers, marijuana, tobacco, speakers or money under the contraband section and only listed the 2 broken cell phones.

10. GGACF 01-0012-19: report prepared by an officer marks YES for Force Used but narrative does not support this determination and the other reports submitted selected NO for Force Used. Same report, page 3 Contraband Section does not list the money confiscated. Same incident, report another officer does not list himself on page 2 of employees involved, nor does he list the amount of US dollars confiscated. Same incident, report prepared another officer was prepared 8 days after incident.

11. 01-0013-19: report prepared by an officer selects YES for Force Used but documentation on his report does not support that determination according to the definitions of force in the approved policies and

procedures. The officer did not list charger under Contraband section page 3. Same incident, report prepared by another officer did not list himself on page 2 under employee involvement nor did he list the phone charger that was found (referenced in another officer's report) in the Contraband section. Chief's supplemental report for same incident also did not document the phone charger.

12. 01-0014-19: report prepared by an officer has contradicting information regarding Medical Evaluation of inmates involved in the force event reported for this incident. The officer marks N/A for Evaluated by Medical for both inmates. Then further in the documentation marks YES for Medical Evaluation Completed.

13. 01-0016-19: report prepared by an officer did not list self on page 2 under Employees involved, marked NO for property inventoried (contraband was money) and was 4 days after the incident in completing the report.

14. 01-0017-19: report prepared by an officer did not list the type or description of the incident, failed to list any employees involved or inmates involved and it is questionable that a report based on the description of the "incident" was in fact necessary, based on his involvement.

**February 2019.**

1. 02-0018-19-IR:  the officer's report omitted self and another involved officer from Employee List, page 2. Another officer omitted the same officer from Employee List, page 2. There is no approving Authority signature on officer's report. The same officer's report was not prepared or signed until more than 1 month after incident. Supplemental Report by a supervisor left blank the section Reason for Supplemental Report. The supplemental report by the same supervisor was prepared and signed more than 1 month after the incident.

2. 02-0019-19-IR: the officer left blank section Reason for Supplemental Report. This report was prepared and signed 7 days after incident. Supplemental Report prepared by another officer left blank the section Reason for Supplemental Report. Another supplemental report has an unidentifiable signature, Reason for Supplement is blank and the report was prepared more than 1 month after incident. 02-0020-19-IR: an officer did not list self under Employees, page 2. Same report, question "property inventoried? If NO, explain" was marked NO without explanation. There was a supplemental report with unrecognizable signature, therefore did not know the author. Same report was prepared 1 month after incident. 02-0021-19-IR: the officer's supplemental report left blank section Reason for Supplement. There is a second supplemental report but based on the signature, author is unknown. Same report was prepared 1 month after incident and also left blank the section Reason for Supplement.

3. 02-0022-19-IR: Report prepared by an officer has NO SIGNATURES. Report prepared another officer has no date by his signature and NO APPROVING AUTHORITY SIGNATURE. Another officer's supplemental report left blank section Reason for Supplement. The supervisor Supplemental Report (cannot determine author based on signature) left blank Reason for Supplement and this report was prepared 1 month after incident.

4. 02-0023-19-IR: Report prepared by an officer has NO APPROVING AUTHORITY SIGNATURE. Report prepared by another officer omitted the incident numbered and has NO APPROVING AUTHORITY SIGNATURE. Shift Supervisor Supplemental Report was prepared 19 days after incident. A supervisor's report of incident was 3 weeks after incident. Same report has NO APPROVING AUTHORITY SIGNATURE (Warden?).

5. 02-0024-19-IR: Report prepared by an office was NOT SIGNED by the officer. His report was checked NO for force, which is not in agreement with all other reports for this incident (all others checked YES). The supervisor Supplemental Report left blank section Reason for Supplement. His report was prepared and signed 2 weeks after incident. Supplemental Report by another has NO APPROVING AUTHORITY SIGNATURE.

6.  02-0025-19-IR: Report prepared by an officer did not list self or another involved officer under Employees, page 2. The supervisor Supplemental Report was prepared 10 days after incident date. This supervisor also left blank the section Reason for Supplement.

7.  02-0026-19-IR:  Report prepared by an officer marked YES for force used.  This should be NO, based on report content.  Location of incident on his report is "Golden Grove Facility".  This should be more specific "supervisor's station".  Shift Supervisor Supplemental report was prepared 2 weeks after incident.

8.  02-0027-19-IR:  Report prepared by an officer on 2/24 was not approved with signature until 19 days after the incident.  Report prepared by another officer was not submitted/signed by either the officer or the approving authority until 19 days after incident.  The supervisor Supplemental Report is signed but was unable to determine from the signature the author or the approving authority.  Reason for Supplement section if blank and report was submitted and signed 8 days after incident.

9.  02-0028-19-IR:  The supervisor Supplemental Report left blank the Reason for Supplement.  Unable to determine author or approving authority based on the signatures alone. (illegible).

10. 02-0029-19-IR:  Report prepared by an officer has NO SIGNATURES.  Shift Supervisor's Supplemental report was prepared and signed 1 week after incident.  Chief Supplemental report was prepared and signed 9 days after incident.  GGACF self-audit noted a few of the above errors but was not comprehensive.

**March 2019:**

1.  According to the Incident Log, 8 incident reports were not submitted/received. (03-0034-19 through 03-0041-19).  The first 4 sets of Incident Reports were duplicated within the submission document set.

2.  GGACF 03-0031-19: prepared by an officer omitted another involved officer's name from the employee list on page 2 of the report.  The supervisor supplemental report had no approving authority signature/date and did not select from the list a Reason for the Supplement.

3.  GGACF-03-0032-19: An acting supervisor did not select from the list a Reason for Supplemental report. Another supervisor review did not select Reason for Supplemental report and did not have an approving authority's signature or date.

4.  GGACF 03-0033-19: The supervisor review did not select a Reason for Supplement from the list provided nor did his report have an approving authority's signature/date.  In addition to the Incident Reports were 2 UOF reports, prepared each by 2 officers. These 2 UOF incident reports do not match the incident number for the same UOF event in the UOF Commander's Review, although they are the same incident. (i.e., 03-0005-19-UOF-IR vs. 03-0006-19-UOF-IR) Additionally, both of these UOF reports document NO INJURIES.  However, according to the incident reports, one of the inmates involved in the altercation was evaluated and treated by Medical, which may have determined there were no injuries.

**April 2019.**

1.  GGACF 04-0042-19: An investigator's report did not include any names under Employees Section on page 2 of the report; did not fill in the contraband description.  The approving officer's signature is unreadable and there is no other identifier such as printed name.

2.  GGACF 04-0043-19: An officer did not date and time his signature on the report; The approving officer's signature is unreadable on shift supervisor's supplemental report and there is no other identifier, such as a printed name.  Supplemental report by a supervisor is left blank the "Reason for Supplement".  This supervisor did not have an approving officer signature on his report.

3.  GGACF 04-0044-19: the approving officer's signature on report prepared by an officer cannot be read and there is no other identifier, such as printed name.  Report by a supervisor had no approving

authority signature after his (Warden?).  Of note: this case was a suicide attempt and it was documented that no suicide gown was available in Detention R&D, therefore the inmate had to keep clothing on until a gown could be procured.

4.  GGACF 04-0045-19: Supplemental report prepared by a supervisor did not have another approving authority signature.

5.  GGACF 04-0047-19: All supplemental reports supplied - there is no routine/regular incident report submitted for this incident.  Supplemental report prepared by and officer is signed with a signature that does not remotely resemble the name of the preparing officer. It is unclear why supplemental form was used for this instead of a regular IR review form.

6.  GGACF-04-0047-19: it is unclear why the officer used a supplemental form for the IR.

7.  GGACF 04-0048-19: An officer's report has date inconsistencies.  Incident date is documented as April 13 on the form at the top but in the narrative portion is dated April 4.  A shift supervisor's supplemental report has an unreadable approving officer signature and there is no other identifier, such as a printed name.  Another supervisor's report has no approving officer signature.

8.  GGACF 04-0049-19: The Supervisor Supplement Report has an approving officer signature that is unreadable and there is no other identifier, such as a printed name.  Another supervisor's supplemental report has no approving authority signature/date/time.

9.  GGACF-04-0050-19:  An officer's supplemental report has an approving officer signature that is unreadable and there is no other identifier, such as a printed name.  A supervisor's supplemental report has no approving authority signature/date/time. 04-0051-19: A Supervisor's Supplemental Report has an approving officer signature that is unreadable and there is no other identifier, such as a printed name.

10. GGACF 04-0052-19: An officer's supplemental report has an approving officer signature that is unreadable with no other identifier, such as a printed name.  A supervisor's supplemental report omitted the Reason for Supplement and there is no approving authority signature/date/time besides his.

11. GGACF-04-0053: An officer documents the following for the type of incident "I-22 Attempted to commit any of the above offenses".  Nothing else is listed.  This is not correct documentation for this incident category.  The incident involved contraband.  An officer's supplemental report has an unreadable approving officer signature and there is no other identifier, such as printed name.

12. GGACF-04-0055: An officer does not document a Category level on his IR and does not list himself on page #2 under Employees.  Another officer omitted an involved civilian staff member from the report (this is how she is identified in the narrative) on page #2.  There is no approving signature/date/time for the supplemental report prepared by a supervisor.

13. GGACF 04-0056-19:  Contraband (telephone charger) was omitted from all three officers' reports under the items of contraband that were retrieved and turned over.

**RECOMMENDATIONS:**

1.  Implement use of the Incident Report Audit tool provided by the Monitor.

2.  Continue to self-monitor and evaluate implementation of the incident reporting policies according to the approved compliance measures.

3.  Ensure that all incidents are accurate, complete, completed timely, reviewed by supervisors, and that facts and circumstances are consistent among reporting staff.

4.  Improve the quality assurance process to ensure that no report is approved by a supervisor until the report meets all requirements of the incident reporting policies and procedures.

**b.   Review by senior management of reports regarding the above incidents to determine whether to refer the incident for administrative or criminal investigation and to ascertain and address incident trends (e.g., individuals, shifts, units, etc.);**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

The incident reporting log is management's primary incident tracking record. As such, it is the primary record document for tracking incidents to detect and manage incident trends and related issues. However, problems with information recorded on the log would make it very difficult, if not impossible, for GGACF management to fully comply with this provision. Documentation problems founding for this assessment period include, for example, illegible entries, missing incident-types, incomplete and/or inaccurate location entries, etc.

Additionally, the assessment of incident reports described above seem to indicate that management / supervisor review of incident reports is less than adequate to comply with this provision. Several reports that did not meet policy requirements were completed by management and supervisory staff, and management and supervisor staff appear to be accepting and approving reports from officers that do not meet policy requirements. Compliance with the approved incident reporting policies and procedures for 56 incidents should be far greater than 27%, especially considering that 95% of staff have successfully completed the policy and procedure training program with a passing score of 80% or better.

The primary responsibility for improving compliance rests squarely on the should of management and supervisor staff.

**RECOMMENDATIONS:**

1.  Develop and implement a management tracking tool to routinely ascertain and address incident trends, according to this provision and the approved policies and procedures.

2.  Self-monitor and evaluate implementation of this provision and related policies, procedures, and training using the approved compliance measures.

**c.   Requirements for preservation of evidence; and**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains. Notwithstanding incident reports involving contraband collection problems discussed above, assessment of the Contraband subsection of this agreement finds adequate effort to achieve partial compliance for this provision.

**RECOMMENDATIONS:**

1.  Ensure that incident reports completely and accurately document contraband collection and disposition activities according to the approved policies and procedures.

2.  Self-monitor and evaluate implementation of these policies and procedures according to the approved compliance measures.

3.  Continue to improve quality assurance activities.

**d.   Central tracking of the above incidents.**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** As discussed in provision "b" above.

**RECOMMENDATIONS:**

1.  Ensure that the incident log completely and accurately documents all incidents according to the approved policies and procedures.

2.  Self-monitor and evaluate implementation of these policies and procedures according to the approved compliance measures.

3.  Implement the management tracking reporting system previously discussed.

---

**2.   The policy will provide that reports, reviews, and corrective action be made promptly and within a specified period.**

---

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains. As noted above, many incident reports did not meet required reporting or review timelines, we could not determine from some reports whether supervisory reviews were completed, and we could not determine whether or what corrective actions were taken to ensure compliance with the approved policies and procedures.

The Territory provided no evidence to assess compliance with incident notification and reviews required by the approved policies and procedures. Regarding required reviews, policy requires that an Administrative Review and Debriefing for all category I and II incidents. The purpose of this process is to discuss and determine what, if any, corrective and other measures are warranted. This process is to be documented on a prescribed form and completed within 30 days of the incident. Policy requires participation in the review by at least the Warden, Chief of Security, Shift Supervisor, Compliance Coordinator, Medical Director, and Chief Inspector.

Incident reports and related records examined for this assessment found no basis to determine that the required review and debriefing process was completed for any of the estimated 50 category I and 29 category II violations documented in the 41 incidents reported for January through April, 2019. It is assumed that these reviews were not conducted as require by policy. This provision will return to noncompliance in the absence of adequate documentation that demonstrates compliance with the approved polices.

**RECOMMENDATIONS:**

1.  Ensure that incident reports, supervisor reviews, and correction actions are completed in a timely manner according to the approved policies and procedures.

2.  Use the compliance measures to self-monitor and evaluation implementation of the approved policies, procedures, and training to determine compliance, the efficacy of performance, and whether outcomes intended by policies, procedures, and training are being achieved.

## Subsection IV.H.  Use of Force by Staff on Prisoners

**Compliance Summary:** All provisions remain out of Non-Compliance and six provisions advance from Partial Compliance to Substantial Compliance as shown in the compliance score card below.

### Compliance Score Card

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | IV.H. Use of Force by Staff on Prisoners | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | IV.H1a: Permissible Forms of Physical Force & Use of Force Continuum | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 2 | IV.H1b: Circumstances for Permissible Forms of Physical Force | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 3 | IV.H1c: Impermissible Force i.e. Restrained Prisoner, For Verbal Threats, Unnecessary/Excessive Force | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 4 | IV.H1d: Defined Competency & Scenario-Based Pre-Service/Annual UOF Training | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 5 | IV.H1e: Pre Training/Certification for Authorized Weapons | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 6 | IV.H1f: Comprehensive/Timely Reporting of UOF by User and Witnesses | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 7 | IV.H1g: Supervision & Videotaping of Planned UOF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 8 | IV.H1h: Appropriate Armory Operations and Permitting of Deadly Force at Authorized Posts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 9 | IV.H1j: Prompt Medical Evaluation, TX After UOF, Photographic Documentation of Injuries | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 10 | IV.H1j: Prompt Admin Review of UOF Report Accuracy | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 11 | IV.H1k: Timely Referral for Criminal/Admin Investigation Per Specified Clear Criteria | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 12 | IV.H1l: Admin Investigation of UOF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 13 | IV.H1m: Defined UOF Tracking All UOF, Periodic Evaluation for Early Staff Intervention | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 14 | IV.H1n: Specified Supervisory UOF Reviews | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 15 | IV.H1: Staff Re-training / Sanctions as Indicated | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | # NonCompliance | 15 | 13 | 14 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 0 | 0 |
| | # Partial Compliance | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 9 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Progress Points | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 21 |
| | Percent Toward Full Sustained | 0% | 4% | 2% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | 47% |

**Substantive Provisions:**

**1.   Defendants will develop and submit to USDOJ and the Monitor for review and approval of facility-specific policies that prohibit the use of unnecessary or excessive force on prisoners and provide adequate staff training, systems for use of force supervisory review and investigation, and discipline and/or retraining of staff found to engage in unnecessary or excessive force.  Such policies, training, and systems will include the following:**

**a.   Permissible forms of physical force along a use of force continuum;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** Four (4) UOF incidents were reported for October (2), November, (1), and December (1). The force used on prisoners appear to be permitted by policy. Examination of the records submitted to the Monitor present several problems with incident report accuracy, consistency, and completeness. Some of the supervisor review records do not accurately reflect compliance with the approved policies and procedures.

1.   January 14, 2019, 01-0009-19: Incident report states the prisoner became very aggressive toward officers when being escorted to the treatment building. Prisoner reportedly pull away from the offices who then used physical force to gain control by taking the prisoner to the ground.  When the escort proceeded, the prisoner again attempted to pull away from the officers and was again taken to the ground by the officers to gain control. The prisoner reportedly struck himself in the mouth with his own

hand when pulling away from the officers. No injuries were reported to officers or the prisoner. The prisoner was offered by refused medical evaluation. No UOF reports were provided and it is unclear whether a UOF Commanders Review was completed.

The force used by officers appears justified and minimal. The officers appear to have used minimal physical force to control the aggressive and resistant prisoner when verbal commands failed. The officer's reports are reasonably clear but appear to be independently completed.

2. January 17, 2019, 01-00012-19: An officer reports "yes" that force was used during the confiscation of contraband form a prisoner but the report does not include any information about the force used. The other two officers involved in the incident reported that no force was used and their reports seem consistent with the facts described by the officer reporting that force was used. We conclude that force was not used. It appears that the supervisor approved the reports without resolving these inconsistencies and requiring the corrections to the report indicating that force was used. This may have been an oversight by the supervisor on this occasion but supervisors are required by policy to only approved accurate and complete incident reports.

3. January 17, 2019, 01-0001319: The incident is similar to the incident described above. Incident reports conflicted regarding whether force was used during a contraband seizer from a prisoner. None of the report narratives described any force being used. Same policy compliance issues described above are indicated.

4. January 22, 2019, 01-0001419: Physical force was used to control verbally aggressive prisoner brandishing a broom and threatening another prisoner. The report does not describe when, if any, verbal de-escalation was used by the officer before grabbing the prisoner by the waist and moving him to another area. No UOF report was completed, no Commander's review was included for assessment. Additionally, the report has contradicting information regarding Medical Evaluation of inmates involved in the force event reported for this incident.  The officer marks N/A for Evaluated by Medical for both inmates.  Then further in the documentation marks YES for Medical Evaluation Completed.

5. February 15, 2019, 02-000319: This incident involved forced psychotropic medication to a female prisoner. Reports indicate the prisoner became combative and refused the ordered injection. At one point, an officer brandished a Taser and advised the prisoner to stop their aggressive physical behavior or be tased. The prisoner reportedly physically forced facedown by officers in order to complete the injection by a nurse. Examination of reports and the Commander's review present several policy compliance problems. One officer was NOT SIGNED their report. His report was checked NO for force, which is not in agreement with all other reports for this incident (all others checked YES).  The supervisor Supplemental Report left blank section Reason for Supplement.  His report was prepared and signed 2 weeks after incident.  Supplemental Report by another has NO APPROVING AUTHORITY SIGNATURE.  The Commander's review states that all policies and procedures were following but problems with reports and documents prove otherwise. Several documents are incomplete. Additionally, it is unclear whether all force reported was necessary or whether force medication was indicated by the prisoner's condition.

6. March 17, 2019, 03-003219: Officers used physical force to stop a fight between two prisoners. The supervisor review did not select a Reason for Supplement from the list provided nor did his report have an approving authority's signature/date.  In addition to the Incident Reports were 2 UOF reports, prepared each by 2 officers. These 2 UOF incident reports do not match the incident number for the same UOF event in the UOF Commander's Review, although they are the same incident. (i.e., 03-0005-19-UOF-IR vs. 03-0006-19-UOF-IR) Additionally, both of these UOF reports document NO INJURIES. However, according to the incident reports, one of the inmates involved in the altercation was evaluated and treated by Medical, which may have determined there were no injuries. Medical evaluation documents provided are not fully completed. The Commander's review of the incident states that all policies and procedures were followed but reporting and documentation problems prove otherwise. It appears that the force used was justified, necessary, and minimal.

7. April 9, 2019, 04-004619: This incident involved forced psychotropic medication to a female prisoner. Officers used physical force to control the resistant prisoner. The injection was administered and no

injuries to staff or the prisoner were reported. The documentation appears adequate. However, it is unclear whether forced medication was required even though ordered by the psychiatrist. The record is unclear regarding whether the prisoner was actively engaged in harmful behavior that would necessitate chemical restraint. This incident was referred to Dr. Dudley, monitoring team psychiatrist, for review and comment.

8. April 13, 2019, 04-004819: Officers used physical force to gain control of a combative prisoner after verbal de-escalation attempts by officers failed. An officer's report has date inconsistencies.  Incident date is documented as April 13 on the form at the top but in the narrative portion is dated April 4.  A shift supervisor's supplemental report has an unreadable approving officer signature and there is no other identifier, such as a printed name.  Another supervisor's report has no approving officer signature. No staff or prisoner injuries were reported. The Commander's review states that the incident complied with policies and procedures despite the document problems that prove otherwise. The Commander's review also omits required information the force used appears to have been justified, necessary, and minimal considering the facts described in the reports.

9. April 18, 2019, 04-004919: This incident involved and officer pushing an inmate from behind during an escort procedure. The description of the incident by involved indicate that this was no a reported use of force. The force used was justified and minimal. The Supervisor Supplement Report has an approving officer signature that is unreadable and there is no other identifier, such as a printed name. Another supervisor's supplemental report has no approving authority signature/date/time.

10. April 19, 2019, 04-005019: Officers used physical force to move a resistant prisoner into their cell. The prisoner refused verbal orders by officers to get down from a table. When the prisoner did comply, the prisoner came off the table with the help of the office and fell to the ground. The officer physically picked up the prisoner and place them in their cell.  An officer's supplemental report has an approving officer signature that is unreadable and there is no other identifier, such as a printed name.  A supervisor's supplemental report has no approving authority signature/date/time.   The Commander's Review appears adequate. The forced used appears justified, necessary, and minimal.

**RECOMMENDATIONS:**

1. Ensure that UOF incidents are appropriately documented according to the approved policies and procedures.

2. Ensure that administrative investigation reviews are performed for all incidents when requirement by policy or practice.

3. Use the approved compliance measures to evaluate the effectiveness of implementation for related policies and procedures and training according to the agreement.

4. Use the Compliance Measure for Use of Force to guide compliance management efforts.

**b.  Circumstances under which the permissible forms of physical force may be used;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** Overall, the circumstances in the UOF incidents reported above appear to justify use of force and the force used.

**RECOMMENDATIONS:**  Same as above.

**c.  Impermissible uses of force, including force against a restrained prisoner, force as a response to verbal threats, and other unnecessary or excessive force;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** The records reviewed and interviews during the onsite visit indicate compliance with this provision. The incidents reported do not appear to involve impermissible use of force or restraint in response to verbal threats. All force use appears to have been justified and necessary.

**RECOMMENDATIONS:**  Same as above.

**d. Preservice training and annual competency-based and scenario-based training on permitted/unauthorized uses of force and de-escalation tactics;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

It is unclear whether all in-service training requirements have been complete. Documentation provided does not clarify whether the in-service requirements in the Training Plan were met.

**RECOMMENDATIONS:**

1. Continue to provide per-service and annual in-service training as required by this provision.
2. Finalize and implement the non-custody-staff training plan.

3. Use the approved compliance measures to evaluate the effectiveness of implementation for related policies and procedures and training according to the agreement.

**e. Training and certification required before being permitted to carry and use an authorized weapon;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** Examination of training records and discussion with staff indicate that staff only carry weapons after they are properly trained and authorized to do so.

**RECOMMENDATIONS:**

1. Continue to adhere to policies and procedures pertaining to this provision.

2. Continue to maintain organized, accurate, and complete training records and documentation that demonstrates compliance with this provision.

**f. Comprehensive and timely reporting of use of force by those who use or witness it;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Refer to the findings regarding to the four use of force incidents discussed. Reporting documentation problems persist as described.

**RECOMMENDATIONS:**  Same as above.

**g. Supervision and videotaping of planned uses of force;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** One incident involved planned use of force. The incident was reportedly videoed as required by policy.

**RECOMMENDATIONS:**

1.  Continue to video planned use of force incidents as required by policy and procedure.

2.  Preserve all videos for investigative and compliance monitoring purposes.

**h.   Appropriate oversight and processes for the selection and assignment of staff to armory operations and to posts permitting the use of deadly force such as the perimeter towers;**

**ASSESSMENTS:  SUBSTANTIAL COMPLAINCE**

**FINDINGS:** Examination of training records and staff assigned to overseeing the armory indicated compliance this provision. Training records also evidence that staff authorized to use deadly force are properly trained.

**RECOMMENDATIONS:**

1.  Continue to adhere to policies and procedures pertaining to this provision to achieve sustained compliance.

2.  Continue to maintain a consistent and accurate inventory of all use of force equipment, it's condition, and location.

**3.**  Continue to maintain a log of all staff issued and returning use of force equipment.

**i.   Prompt medical evaluation and treatment after uses of force and photographic documentation of whether there are injuries:**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Refer to the findings and discussion for the four use of force incidents reported. It appears that prisoners involved in these incidents were evaluated by medical staff and necessary treatment was provided. However, photographs of injuries reported were not submitted for review and some of the incidents involving injuries did not include the required anatomical report form.

**RECOMMENDATIONS:**

1.  Ensure that all required medical documentation for use of force incidents is completed in accordance with the approved policies and procedures. Compliance with this component of the policies and procedures should be part of the supervisory and administrative review of incidents.

2.  Use the approved compliance measures to evaluate the effectiveness of implementation for related policies and procedures and training according to the agreement.

**j.   Prompt administrative review of use of force reports for accuracy;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** Examination of the administrative investigation log provides no information to determine compliance with this provision. Notwithstanding Commander Review documentation problems, the Territory

provided no information or documents to determine what, if any, actions have been taken to correct the problematic incident reporting problems discussed in this report.

**RECOMMENDATIONS:**

1.  Ensure that supervisory reviews of use of force incidents adhere to the requirements of the approved policies and procedures.

2.  Use the approved compliance measures to evaluate the effectiveness of implementation for related policies and procedures and training according to the agreement.

**k.   Timely referral for criminal and/or administrative investigation based on review of clear criteria, including prisoner injuries, report inconsistencies, and prisoner complaints;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** Examination of the administrative investigation log indicates that reported uses of force were referred for review. However, it is unclear from the records whether previously discussed inconsistencies were resolved or how those issues were corrected.

**RECOMMENDATIONS:**

1.  Ensure that an administrative investigation is completed on all use of force incidents when required by policy or practice.

2.  Use the approved compliance measures to evaluate the effectiveness of implementation for related policies and procedures and training according to the agreement

**1.   Administrative investigation of uses of force;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** As stated above.

**RECOMMENDATIONS:**  Same as above.

**m.  Central tracking of all uses of force that records: staff involved, prisoner injuries, prisoner complaints/grievances regarding use of force, and disciplinary actions regarding use of force, with periodic evaluation for early staff intervention;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

As previously stated, a formal central tracking system has not been fully developed and implemented according requirements of this provision. The administrative investigation and grievance log currently serve as the primary method for tracking use of force events.

**RECOMMENDATIONS:**

1.  Develop and implement the required tracking system.

2.  Use the approved compliance measures to evaluate the effectiveness of implementation for related policies and procedures and training according to the agreement.

**n.  Supervisory review of uses of force to determine whether corrective action, discipline, policy review or training changes are required; and**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Refer to this discussion regarding related findings from the for use of force incidents commander's review.

**RECOMMENDATIONS:**

Same as above.

**o.  Retraining and sanctions against staff for improper uses of force.**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** None of the incidents reported indicate the need for staff retraining. Historically, the administrative investigation log records a recommendation for retraining. However, the Territory will need to be proactive in demonstrating compliance with this provision with specific examples of compliance.

**RECOMMENDATIONS:**

1. Use the approved compliance measures to evaluate the effectiveness of implementation for related policies and procedures and training according to the agreement.
2. Review use of force incidents to determined when re-training is indicated. Review training records to determine whether required training was completed. Report findings to this monitor for compliance assessment purpose.

## Subsection IV.I.  Use of Physical Restraints on Prisoners

**Compliance Summary:** All provisions remain out of Non-Compliance and two provisions, IV.I.1a and IV.I.1b advanced from Partial Compliance to Substantial Compliance as shown in the compliance score card below.

**Compliance Score Card**

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.I. Use of Restraints on Prisoners** | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | IV.I.1a: Permissible/Unauthorized Types of Restraints | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 2 | IV.I.1b: Defined Circumstances for Restrain-Type Uses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 3 | IV.I.1c: Duration of Permitted Restraint Use | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4 | IV.I.1d: Required Observation of Prisoners in Restraints | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 5 | IV.I.1e: Restraint Limitations on MI Prisoners, Appropriate Consultation w/MH Staff | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 6 | IV.I.1f: Required Termination of Restraints | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | # NonCompliance | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 0 | 0 |
| | # Partial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 3 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Progress Points** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 8 |
| | **Percent Toward Full Sustained** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | 44% |

**Substantive Provisions:**

**1.   Defendants will develop and submit to the USDOJ and the Monitor for review and approval, facility-specific policies to protect against unnecessary or excessive use of physical force/restraints and provide reasonable safety to prisoners who are restrained.  Such policies will address the following:**

**a.   Permissible and unauthorized types of use of restraints;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** The incidents reviewed demonstrate appropriate and authorized use of restraints. None if the incidents appear to have involve use of restraints for punishment. Uses of restraints appears to have been properly documented.

**RECOMMENDATIONS:**

1.   Use the approved compliance measures to evaluate the effectiveness of implementation for related policies and procedures and training according to the agreement.

2.   Continue to monitor use of force and restraints.

**b.   Circumstances under which various types of restraint can be used;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** The circumstances involved in reported use of force restraints seem to justified the use of the restraints.

**RECOMMENDATIONS:**  Same as above.

**c. Duration of the use of permitted forms of restraints;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** Reports involving uses of force and restraints do not specify the duration of restraint use. Although one could opine that duration of restraint use was not longer than necessary, the records do not support that conclusion.

**RECOMMENDATIONS:**

1.  Ensure that incident reports clearly state when restraints are removed from a prisoner.

2.  Monitor incident reports for consistency and accuracy.

**d.   Required observation of prisoners placed in restraints;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** All incidents reviewed that involved use of force/restraints involved direct and constant observation by officers. However, these records don't document whether medical and/or mental health staff conducted and documented required monitoring of prisoners who were place in restraints.

As stated above.

**RECOMMENDATIONS:**

1.  Same as above.

2.  Ensure medical and/or mental health staff monitoring or restrained prisoners is performed according to the approved policies and procedures and documented.

**e.   Limitations on use of restraints on mentally ill prisoners, including appropriate consultation with mental health staff; and**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The records reviewed do not clarify whether mental health staff were consulted if required and in accordance with the approved policies and procedures.

**RECOMMENDATIONS:**  Same as above.

**f.   Required termination of the use of restraints.**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The incident records reviewed do not specify when restraints were removed in all cases. Incidents involving use of restraints, particularly where force is involved, should clearly state when restraints are removed in order to accurately assess compliance with this provision.

**RECOMMENDATIONS:**

3.  Ensure that incident reports clearly state when restraints are removed from a prisoner.

4.  Monitor incident reports for consistency and accuracy.

## Subsection IV.J.  Prisoner Complaints

**Compliance Summary:** Four provisions remain out of Non-Compliance, one remains in Non-Compliance, and two provisions advance from Partial Compliance to Substantial Compliance as shown in the compliance score card below.

### Compliance Score Card

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.J. Prisoner Complaints** | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | IV.J1a: Defined Complaint System, Confidential Access and Reporting, Assistance for C/DD Prisoners | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 2 | IV.J1b: Timely Complaint Investigations/Prioritized for Safety, Medical/MH Care | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 3 | IV.J1c: Defined Corrective Action for Staff as Indicated | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4 | IV.J1d: Centralized Complaint System w/ Disposition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 5 | IV.J1e: Periodic Mgmt. Review for Trends/Individual/Systemic Issues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # NonCompliance | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 1 | 1 |
| | # Partial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 2 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Progress Points** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 6 |
| | **Percent Toward Full Sustained** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 27% | 40% |

**Assessment of Substantive Provisions:**

**1.    Defendants will develop and submit to USDOJ and the Monitor for review and approval, facility-specific policies so that prisoners can report and facility management can timely address prisoner's complaints in an individual and systemic fashion.  Such policies will include the following:**

**a.   A prisoner complaint system with confidential access and reporting, including assistance to prisoners with cognitive difficulties;**

### ASSESSMENTS:  SUBSTANTIAL COMPLIANCE

**FINDINGS:** There were 31 inmate grievances recorded on the prisoner complaint (grievance) tracking log. This included:

1.  Access to legal materials (1)
2.  Grievance appeal (2)
3.  Classification (1)
4.  Commissary (3)
5.  Housing / Conditions of Confinement (4)
6.  Mail (1)
7.  Medical (3)
8.  Mental health (1)
9.  Other (3)
10. Programs access / participation (5)
11. Recreation Access (1)
12. Food Service (4)

Information recorded on the grievance tracking log has improved. The information appears to be complete and is provides adequate detail. The written summary of the prisoner's complaint is succinct but adequate to better understand reported concerns. The response section is much more comprehensive, specific and detailed with regard to who responded to the complaint and how it was resolved. The responses seem fair

and appropriate. The responses seem to provide prisoner complainants clear reasons for actions take and what actions will be taken to resolve their complaint when indicated.

Overall, compliance with this provision has achieved Substantial Compliance. The records reviewed indicate that prisoner complaints are adequately investigated by staff who are empowered to address reported complaints. It appears that the grievance program has the necessary equipment needed to adequate process and resolve complaints. Prisoners appear to have reasonably confidential access to the grievance process from start to finish, the majority of complaints are resolved before required deadlines.

**RECOMMENDATIONS:**

1. Complete a quality improvement evaluation for this provision to identify compliance strengths and gaps. Submit study results to the Monitor and the United States for review. The Monitor is developing an audit tool to assist the Territory initiate this process.

2. Use the compliance measures to self-monitor and evaluate implementation of the approved policies, procedures, and training to determine compliance, the efficacy of performance, and whether outcomes intended by policies, procedures, and training are being achieved.

3. Continue to improve and sustained practices that caused Substantial Compliance.

**b. Timely investigation of prisoners' complaints, prioritizing those relating to safety, medical and/or mental health care;**

**ASSESSMENTS: PARTIAL COMPLIANCE**

**FINDINGS:** The grievance tracking log demonstrates good improvement. Examination of complaint timelines on the log evidence that complaints to resolved in a timely manner and prioritized according to the seriousness of the complaint. The one medical complaint involved a prisoner complaining about the timely response to his sick call requests. There was no specific medical problem reported by the prisoner. The complaint was forwarded to the medical department within 3 days of receipt and resolved within 2 days following that referral. The tracking log reports that the medical department had seen the prisoner several times by clinical staff, including two medical doctors. The remaining 30 prisoner complaints were recorded as "informal" and appear to have been adequately resolved. However, one appeal grievance involving disciplinary sanctions that was responded to within the required deadline but the log states, "there was no response to this grievance by the Warden.

Overall, prisoner complaints appear to be prioritized according to safety, health, and security importance and are timely investigated and resolved.

**RECOMMENDATIONS:**

1. Continue to ensure that the grievance log is consistently valid, complete, and reliable.

2. Use the approved compliance measures to self-monitor and evaluate the effectiveness of implementation of and compliance with the approved policies and procedures according to the terms of the agreement.

**c. Corrective action taken in response to complaints leading to the identification of violations of any departmental policy or regulation, including the imposition of appropriate discipline against staff whose misconduct is established by the investigation of a complaint;**

**ASSESSMENTS: SUBSTANTIAL COMPLIANCE**

**FINDINGS:** The administrative investigation log does not include complete information regarding corrective action taken against staff whose conduct violated department policies, regulations, etc. The Territory

provided no information to determine whether and what corrective action was taken relative to incidents involved violations by staff.

**RECOMMENDATIONS:**

1.  Consistently Provide this Monitor reliable evidence to assess this provision accurately.

2.  Apply the relevant Compliance Measure to inform and guide compliance activities.

---

**d.  Centralized tracking of records of prisoner complaints, as well as their disposition; and**

---

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** The grievance tracking log evidenced substantial improvement. The grievance coordinator continues report some difficulties in getting all documents needed to update the log. This matter should be more effectively addressed by GGACF leadership to permanently resolve considering the fact that the issue has been discussed during previous onsite visits. As an ongoing issue, it appears that the tracking log and process is not adequately review by management for quality control purposes. This provision remains in Partial Compliance until the provision adequately meets the approved Compliance Measures in this regard:

1.  Ensure that the prisoner complaint tracking system is periodically reviewed by management for quality control purposes.

2.  Ensure that appropriate corrective action is taken to ensure that the prisoner complaint program and the prisoner complaint tracking system is consistently accurate and compliant with the approved policies and procedures.

**RECOMMENDATIONS:**  Same as above.

---

**e.  Periodic management review of prisoner complaints for trends and individual and systemic issues.**

---

**ASSESSMENT:  NONCOMPLIANCE**

**FINDINGS:** The Territory again provided no evidence of periodic management review of prisoner complaints as required by this provision and the approved policies and procedures. The approved Compliance Measures inform this process and describe what actions and outcomes are needed to achieve Partial and Substantial, compliance.

1.  There is a management review process of prisoner complaints and the prisoner complaint system that assesses for trends in prisoner complaints and reported issues and concerns, the effectiveness of the complaint system and outcomes, and/or for individual and systemic issues.

2.  The management review process uses accurate and reliable information and data in its review of prisoner complaints.

3.  All documentation and records used in the prisoner complaint management review program is accurately and reliably maintained according to the approved policies and procedures.

4.  Management actions to correct and/or improve prisoner conditions of confinement indicated by the management review process are consistently well-documented and those documents are properly maintained according to the approved policies and procedures.

5.  All required documentation and forms are complete, accurate, and reliable, and submitted in a timely manner according to the approved policies and procedures.

---

**RECOMMENDATIONS:**  Same as stated above.

## Subsection IV.K.  Administrative Investigations

**Progress Summary:** All provisions remain out of Non-Compliance and one advanced to Substantial Compliance as shown in the compliance score card below.

### Compliance Score Card

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.K. Administrative Investigations** | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | IV.K.1: Timely Prisoner/Staff Interviews Involved in Incidents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| 2 | IV.K1.2: Defined Adequate Investigation Reports, Attempt to Resolve Statement Inconsistencies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 3 | IV.K.1.3: Defined Centralized Tracking/Supervisory Review of Admin Investigations for Systemic/Staff Actions. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4 | IV.K1.4: Defined Pre/In-Service Investigator Training | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 5 | IV.K1.5: Disciplinary Action for Staff Misconduct | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | # NonCompliance | 5 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 0 | 0 |
| | # Partial Compliance | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 3 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Progress Points** | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 6 |
| | **Percent Toward Full Sustained** | 0% | 7% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | 40% |

**Assessment of Substantive Provisions:**

**1.   Defendants will develop and submit to USDOJ for review and approval facility-specific policies so that serious incidents are timely and thoroughly investigated and that systemic issues and staff misconduct revealed by the investigations are addressed in an individual and systemic fashion. Such policies will address the timely, adequate investigations of alleged staff misconduct; violations of policies, practices, or procedures; and incidents involving assaults, sexual abuse, contraband, and excessive use of force.  Such policies will provide for:**

**1.   Timely, documented interviews of all staff and prisoners involved in incidents;**

**ASSESSMENTS:  SUBSTANTIAL COMPLIANCE**

**FINDINGS:** There were 13 administrative investigations listed on the administrative investigation log for this reporting period. None were listed for the month of January. Cases include UOF (5), Official Misconduct (5), Erroneous Prisoner Release (1), and Prisoner Grievance (2). Nine of 13 cases were closed for Review (5), Unsubstantiated (1), Unfounded (1), and Founded (2). Closed reported within one day of the incident on average and were completed either the same day as assigned up to 28 days. It appears that case reporting and completion times are acceptable considering the description of the incident and assumed importance. Examination of case files appear to indicate that staff and prisoners are being interview as required.

Incident report numbers are not listed on the log to cross reference cases with incident documentation as previously recommended. This should be done consistently.

**RECOMMENDATIONS:**

1.   Add incident numbers to the AI log as stated above.

2.   Use the approved compliance measures to self-monitor and evaluate implementation of training and the approved policies and procedures according to the terms of the agreement.

**2. Adequate investigatory reports that consider all relevant evidence (physical evidence, interviews, recordings, documents, etc.) and attempt to resolve inconsistencies between witness statements;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

Consistent adherence to the incident reporting and referral policies, procedures, and provisions in this agreement is necessary for effective investigative processes and outcomes. Investigations cannot consider all relevant evidence unless incident reports are complete, accurate, and free of inconsistencies. Inadequate incident reporting jeopardizes the efficiency and completeness of an investigation. Inaccurate reports can mislead the investigative process and ultimately lead to erroneous conclusion.

Extant problems with compliance with incident reporting policies and procedures create a formative barrier for advancing this provision to Substantial Compliance.

**RECOMMENDATIONS:**

1.  Continue with improvements achieved.

2.  More closely monitor incident reports for inconsistencies.

3.  Use the approved compliance measures to self-audit and evaluate implementation of the approved policies, procedures, and training to determine compliance levels.

**3.   Centralized tracking and supervisory review of administrative investigations to determine whether individual or systemic corrective action, discipline, policy review, or training modifications are required;**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

As previously stated, the AI log is the primary record used for tracking administrative investigations. To be effective for case tracking and management purposes, all fields on the log should be completed consistently, especially for closed cases. Important entries were omitted for six of the nine closed cases.

This provision can be eligible for Substantial Compliance with the administrative log is completed consistently.

**RECOMMENDATIONS:**

1.  Continue with progress achieved.

2.  Use the approved compliance measures to evaluated implementation of related policies, procedures, and training to determine the effectiveness of implementation and what, if any, improvements are indicated.

**4.   Pre-service and in-service training of investigators regarding policies (including the use of force policy) and interviewing/investigatory techniques; and**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

The new investigator is being assigned cases to investigate under the supervision of the well-qualified and competent Chief Inspector. The Chief Inspector stated that the new investigator is "learning the ropes" and seems to possess good potential for carrying a full caseload soon. We were advised that the new investigator will attend a qualified Interview and Interrogation training on April 4, 2019. This provision can become eligible to advance to Substantial Compliance upon verbal and documented verification of successful completion of the training, and when all other Training Policy requirements for these positions have been completed.

**RECOMMENDATIONS:**

1.  Ensure that the investigations continue to train on areas of their responsibility and in accordance with this provision and the agreement.

2.  Use the approved compliance measures to evaluated implementation of related policies, procedures, and training to determine the effectiveness of implementation and what, if any, improvements are indicated.

**5.   Disciplinary action of anyone determined to have engaged in misconduct at Golden Grove.**

**ASSESSMENTS:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

The administrative investigations log indicates that disciplinary actions were recommended and records very limited information to verify whether and what actions were taken. GGACF leaders have consistently advised this Monitor that appropriate disciplinary action has been and is consistently taken when indicated. Some newspaper reports indicate that GGACF have been disciplined and criminal charged in some circumstances. However, the Territory has not been proactive with informing this Monitor of whether and what disciplinary actions have been taken for verified staff misconduct. This provision can become eligible for advancement to Substantial Compliance when adequate proof of consistent compliance is provided by the Territory.

**RECOMMENDATIONS:**

1.  Provide this Monitor adequate proof of consistent compliance with this provision, related policies and procedures.

2.  Use the approved Compliance Measures for this provision to inform and guide verification of compliance.

## SECTION V. MEDICAL & MENTAL HEALTH CARE

**Progress Summary:** All provisions remain out of Non-Compliance, one provision advanced from Substantial Compliance to Sustained Compliance and two provisions were downgraded from Substantial Compliance to Partial Compliance as shown in the compliance score card below.

### Compliance Score Card (Provisions 1-25)

| Agreement Section & Substantive Provisions | Monitoring Reports & Scores | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **V. Medical & Mental Health Provisions** | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1  V.1a: Adequate Intake Screening for Serious Med/MH by QMHS | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 |
| 2  V.1b: Comprehensive Initial/Follow-up Assessments by QMMHS w/in 3 Days of Admission | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 2 | 2 | 2 |
| 3  V.1c: Timely Access/Provision Adequate Medical/MH Care | 0 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| 4  V.1d(i,ii,iii, iv): Timely RX Orders & Labs, Timely & Routine Physician Review of RX & Clinical Practices; Qualified Review of RX for Side Effects, Qualified Review of RX for Side Effects; Sufficient RX Upon Discharge for Serious M/MH Needs, | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 5  V.1e: Maintenance of Adequate Prisoner Health Records | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 |
| 6  V.1f(i): Adequate/Timely Sick-Call, Triage, Physician Review, Logging, Tracking, Responses by QMHP | 1 | 1 | 1 | 1 | 0 | 1 | 2 | 2 | 2 | 3 |
| 7  V.1f(ii): Adequate Tracking, Care, Monitoring of Prisoners w/ Med/MH Needs. | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 |
| 8  V.1f (iii): Appropriate/Timely Chronic/Acute Care/Follow-up w/Clinical Practice Guidelines | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 9  V.1f(iv)(1,2,3): Adequate measures for emergency care / staff training, recognize seriousness; provide first aid; timely response | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| 10  V.1f(v): Adequate/Timely Referral to Specialty Care | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| 11  V.1f(vi): Adequate Care/Follow-up After Return From Outside DX or TX | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 |
| 12  V.1g: Adequate Care for Alcohol/Drug intoxication/Detox | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| 13  V.1h: Infection Control, Guidelines, Precautions, Testing, Monitoring, TX Programs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 2 |
| 14  V.1i(i): Suicide Prevention - Immediate Referrals Prisoner Suicide or SMI Needs to QMHP/S | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 15  V.1i(ii): Suicide Prevention - Constant Observation Pending QMHP Assessment of Supervision Needs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| 16  V.1i(iii): Timely Suicide Risk Assessment/Instrument by QMHP Not to Exceed 24Hrs of Suicide Precautions Placement | 0 | 1 | 1 | 1 | 2 | 2 | 3 | 3 | 3 | 3 |
| 17  V.1i(iv): Readily Available, Safety Secured Suicide Cutdown Tools | 0 | 0 | 0 | 1 | 1 | 2 | 2 | 3 | 3 | 3 |
| 18  V.1i(v): Scenario-Based SP Response &Cutdown Tool Training | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 2 | 2 | 2 |
| 19  V.1i(vi):Suicide Prevention, ID Risk, Instruction & Competency-Based Training | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| 20  V.1i(vii): Availability of Suicide Resistant Cells | 0 | 0 | 0 | 0 | 1 | 2 | 2 | 3 | 3 | 3 |
| 21  V.1i(viii): Protocols/Constant / Close Supervision of Suicidal Prisoners as Indicated by Assessed Risk | 0 | 0 | 0 | 0 | 1 | 2 | 2 | 3 | 3 | 3 |
| 22  V.1i(ix)(1,2,3): Assurance of QMHP Directives for Care & confinement; Removal from SP Watch; Follow-Up Assessment at Clinically Appropriate Intervals | 0 | 0 | 0 | 1 | 1 | 2 | 2 | 1 | 2 | 2 |
| 23  V.1j: Clinically Adequate Med/MH Staffing Levels, Periodic Staffing Analysis/Plans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| 24  V.1k: Adequate CO Staffing/Training -ID/Refer/Supervise Prisoners with Serious M/MH Needs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| 25  V.1l: Protocol/Periodic Assessment of Compliance with PPs re ID, Handling, Care of Prisoners w/Med/MH Conditions | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 1 |

**Score Card (Provisions 26-36)**

| Agreement Section & Substantive Provisions | | Monitoring Reports & Scores | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **V. Medical & Mental Health Provisions** | | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 26 | V.1m: Adequate Dental Care | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 27 | V.1n: Defined Morbidity/Mortality Reviews | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| 28 | V.1o:Medical/MH Rounding Isolation/Segregation to Provide Access to Care/Avoid Decompensation | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 2 | 1 |
| 29 | V.1p: Defined Isolation SMI Prisoners Prohibited, Regular Reviews | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 30 | V.1q: QMHP Review/Consults of Proposed Disciplinary Action MI Prisoners for Specified Determinations | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 31 | V.1r: Medical Facilities, Scheduling/Availability of Appropriate/Private Clinical Spaces | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| 32 | V.1s(i) Mental Health Treatment Timely, Current, Adequate TX Plans and Implementation | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 33 | V.1s(ii): Mental Health Programming for SMI Adequacy | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 |
| 34 | V.1s(iii): Psychotropic RX Practices/Side Effects Monitoring/Informed Consent Adequacy | 1 | 1 | 1 | 2 | 2 | 2 | 3 | 3 | 3 | 3 |
| 35 | V.1s(iv): Comprehensive CO/Clinical Staff Training on Prisoner MH Needs as Specified | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 2 | 2 | 1 |
| 36 | V.1s(v): Cease Placement of SMI in Seg Housing or Lock Down as Substitute for MH TX | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Monitoring Assessment | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| | # NonCompliance | 27 | 22 | 22 | 13 | 13 | 8 | 10 | 0 | 0 | 0 |
| | # Partial Compliance | 9 | 14 | 14 | 22 | 21 | 22 | 19 | 23 | 17 | 19 |
| | # Substantial Compliance | 0 | 0 | 0 | 1 | 2 | 6 | 5 | 8 | 14 | 11 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 5 | 5 | 6 |
| | Verify | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 |
| | Progress Points | 9 | 14 | 14 | 24 | 25 | 34 | 36 | 54 | 60 | 59 |
| | **Percent Out of Noncompliance** | 25% | 39% | 39% | 64% | 64% | 78% | 72% | 100% | 100% | 100% |
| | **Percent Toward SA Termination Eligibility** | 8% | 13% | 13% | 22% | 23% | 31% | 33% | 50% | 56% | 55% |

**ASSESSMENT OF SUBSTANTIVE MEDICAL, MENTAL HEALTH
& SUICIDE PREVENTION PROVISIONS**

**Defendants shall provide constitutionally adequate medical and mental health care, including screening, assessment, treatment, and monitoring of prisoners' medical and mental health needs. Defendants also shall protect the safety of prisoners at risk for self-injurious behavior or suicide, including giving priority access to care to individuals most at risk of harm and who otherwise meet the criteria for inclusion in the target population for being at high risk for suicide.**

**1.   Accordingly, Defendants will develop and submit to USDOJ and the Monitor for review and approval, facility-specific policies regarding the following:**

**Medical Overview:** I take this section to provide an overview of the issues that I found on this visit. Number 26, Adequate Dental Care, was assessed as noncompliance. I had a meeting with the oral surgeon, and also talked with the dental assistant. What I came to learn was that the dental operatory is not available and hasn't been available for several weeks. Therefore, patients may not be seen with regard to a functional operatory. The compressor is part of the problem as it lacks air and water in order to provide services. The problem relates to a difficulty keeping up with payments as well as an expired maintenance contract. The Medical Director has talked with the representative from Benco, which is one of the companies that provides maintenance and services, and this representative told the Medical Director that he would prefer just billing for his services without a maintenance contract. In any event, because the services have been significantly disrupted, I find them in noncompliance.

The second issue relates to the ability to self-monitor on the medical housing policy. In order to self-monitor the policy needs to contain a log-in of patients admitted to the special medical beds. The logbook should contain the name of the patient, the date of the admission, the authorization of the admission by medical, mental health or custody, as well as the discharge date and the reason why the patient was admitted. Because there has been no self-monitoring in the absence of a logbook, the self-monitoring has not occurred. I was assured by the Nursing Director that she will start a logbook next week which will contain all of the fields that are required in order to self-monitor. Then when I return, I will review the self-monitoring as well as conduct my own monitoring review.

This medical policy needs to be reviewed as part of the quality improvement program. Without it the quality improvement program is not adequate in terms of its comprehensiveness.

**a.   Adequate intake screenings for serious medical and mental health conditions, to be conducted by qualified medical and mental health staff;**

**ASSESSMENT: SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** We reviewed 15 records of patients seen between our last visit and the current visit. All records revealed that the visits were both timely and appropriately done.

**RECOMMENDATIONS:**

1.   Continue to use only trained RNs to perform intake screenings.

**MENTAL HEALTH FINDINGS:** See above medical findings as they relate to the timeliness and adequacy of the intake screenings.  Specifically, with regard to mental health, the quality of the intake screenings has continued to be quite good.  A review of the 'mental health intake log', which tracks the mental health intake and assessment process for all new admissions, indicates that virtually 100% of new admissions ultimately placed on the mental health caseload were first identified at intake.  This provides further evidence of the

quality of the intake screens as they relate to mental health.  In addition, the intake nurses have continued to immediately engage mental health staff at the point of intake whenever it appears that a new admission is presenting with a mental health emergency, or a new admission's mental illness and/or intellectual disability was impairing the new admission's ability to adequately participate in the intake screening process.

**RECOMMENDATIONS:**

1. Continue the practice of having the intake nurse immediately contact the mental health team when it is the opinion of the intake nurse that a new admission is unable or unwilling to participate in the intake screening process due to a mental illness and/or intellectual disability, and/or the new admission is presenting with a psychiatric emergency or mental health difficulty for which an urgent mental health assessment is indicated.

---

**b.  Comprehensive initial and/or follow-up assessments, conducted by qualified medical and mental health professionals within three days of admission.**

---

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** All of the intake records reviewed were based on the patients presenting since our last site visit. All of the intake medical assessments were both timely and professionally appropriate. Both the nurse screens were timely and appropriate, and the history and physical exams were timely and appropriate as well.

**RECOMMENDATIONS:**

1. Continue to adhere to the approved policies and procedures.

2. Continue practices to achieve sustained compliance.

**MENTAL HEALTH FINDINGS:** Initial mental health assessments continue to be performed on all new admissions; these are performed by a qualified mental health professional, and a review of the 'mental health intake log' indicates that they are consistently being performed within three days of admission.  The quality of these assessments has continued to be quite good, and those who have required an additional psychiatric examination were immediately referred to the psychiatrist and examined by the psychiatrist in a timely manner.

It should be noted here that there was an incident that occurred during this monitoring period that disrupted this process and impact on the ability of the mental health team to perform initial assessments in a timely manner.  More specifically, in the middle of March 2019, about 19/20 prisoners with serious mental illness were transferred from the prison in St. Thomas to Golden Grove. It at least appears that administration and the medical staff were expecting this transfer, but mental health was not told to expect this transfer, thus mental health was not prepared to attempt to assess such a large number of new prisoners in a timely manner.  Then, this situation was made all the worse for the mental health staff because the transferred prisoners arrived without their medical records, which meant that there was no information about their diagnoses, the treatment that they may or may not have been receiving, or their current mental status and capacity to function within the facility.  Therefore, mental health didn't even have enough information to determine which transferred prisoners were the most urgently in need of an evaluation.
.

**RECOMMENDATIONS:**

1. Continue performing initial mental health assessments on all new admissions, followed by psychiatric examinations when indicated.

2. Continue to maintain the 'mental health intake log' as a mechanism for documenting and tracking compliance with this provision of the agreement.

3. If a prisoner, who was not identified as in need of mental health services at intake or during the initial mental health assessment, is ultimately placed on the mental health caseload, then the prisoner's case should be closely reviewed. This review is for the purpose of identifying any problems with the intake and assessment process (for example, missed signs and symptoms of illness, or a failure to recognize the prisoner's vulnerability to deterioration while being detained) and/or any stressors or other factors that might have contributed to the prisoner developing mental health difficulties while detained in the facility.

4. Improve the communication with mental health staff regarding incidences that will clearly impact on mental health staff, such as the above described transfer of prisoners from St. Thomas

**c.   Prisoners' timely access to and provision of adequate medical and mental health care for serious chronic and acute conditions, including prenatal care for pregnant prisoners;**

**ASSESSMENT: PARTIAL COMPLIANCE (Substantial Compliance for Medical)**

**FINDINGS:** We reviewed 10 records from sick call services received since our last visit. All records were handled timely as well as appropriately.

**MEDICAL FINDINGS:**  We reviewed 10 records from medical sick call services received since our last visit. All 10 records were handled timely as well as appropriately.

**RECOMMENDATIONS:**

1. The head nurse should continue to review the work of the nurses and counsel with them regarding areas that require improvement.

2. The Medical Director should continue to review the work of the physician and provide feedback to him with a summary that is the same as provided previously.

**MENTAL HEALTH FINDINGS:**  A review of the various logs and records used to assess prisoners' timely access to mental health care indicates that prisoners are receiving mental health care in a timely manner. More specifically, the information contained in the 'mental health follow-up log' and the 'behavioral checklist/sick call log', reviewed in combination with randomly selected medical records that include treatment plans and treatment notes, indicates that prisoners are receiving mental health care in a timely manner.

A review of the various logs and records used to assess the adequacy of such mental health care indicates that the mental health team is doing an incredible job with the range of services currently available to them. There are clear indications that more aggressive management of seriously mentally ill prisoners, an increased focus on prisoners with significant trauma histories and trauma-related mental health difficulties, and increased coordination with the nursing staff have improved treatment outcomes, despite the limited range of interventions currently available.

Despite these improved outcomes, there is still an urgent need to expand the range of mental health therapeutic interventions offered at the facility.  Such an expansion of services would provide mentally ill inmates with indicated therapeutic interventions that are not currently available, such as interventions specifically designed for persons with trauma-related mental health difficulties, dual-diagnoses, intellectual or other cognitive deficits, and/or significantly impaired daily living skills.  Expansion of services would also allow mentally ill inmates to spend more time involved in therapeutic activities instead of just sitting in their cells. In addition, expansion of services would include interventions that would help mentally ill inmates gain a better understanding of their illnesses and how they can best participate in their own treatment, thereby increasing the possibility of their compliance with treatment while being detained and upon their release. It is anticipated that ultimately, this expansion of mental health services would increase safety within the facility and decrease recidivism.  Although there is a sound plan for the expansion of services, and although a part time QMHP has been brought on board to focus on the expansion of services, she has been unable to do this because she is currently assuming the responsibilities of the mental health coordinator's position while that important position remains vacant.

**RECOMMENDATIONS:**

1.  Continue to maintain the logs and medical records that are part of the basis for assessing the timeliness and the adequacy of mental health therapeutic interventions.

2.  Develop additional mechanisms for the assessment of the adequacy and the quality of the mental health services provided.

3.  Fill the mental health coordinator's position as quickly as possible, so that the planned expansion of mental health services can begin.

---

**d.  Continuity, administration, and management of medications that address:**
   **(i)  timely responses to orders for medications and laboratory tests;**
   **(ii)  timely and routine physician review of medications and clinical practices;**
   **(iii)  review for known side effects of medications; and,**
   **(iv)  sufficient supplies of medic*ation upon discharge for prisoners with serious medical and mental health needs;***

---

**ASSESSMENT: SUBSTANTIAL COMPLIANCE (Substantial Compliance for Medical)**

**MEDICAL FINDINGS:** We reviewed the medication administration in the morning of both the jail housing and the felon housing. One officer should be singled out for assisting in the review after the mouth check. There is a new form titled "Health Services Facility Release Form," and we found a few patients having received these records and signed for them at the time of release.

**RECOMMENDATIONS:**

1.  Continue the use of the form which documents receipt of the medications.

**MENTAL HEALTH FINDINGS:** See above medical findings regarding medication administration and the timeliness of the response to physician orders.  It should be noted, however, that with regard to mental health there continues to be a problem with the emergency forced medication of prisoners who the psychiatrist deems an imminent danger to themselves or others as a result of their mental illness, and who have refused to voluntarily take medication.  More specifically, when the psychiatrist has made such a finding, been unable to convince the prisoner to voluntarily take medication, and therefore, consistent with prevailing law and clinical standards of care, ordered force medication, nursing staff and security staff have

refused the order.  There appears to be multiple issues that factor into this refusal of the nursing staff and security staff to follow the psychiatrist's orders, and each of these issues have to be addressed before an acutely ill prisoner harms him/herself or one of the other prisoners or staff persons.

Indications for the prescribing of psychoactive medications continue to be well-documented, including in the above noted emergency situations where forced medication is ordered.  In treatment plans, the role of medication as part of a comprehensive treatment plan is explained.  The monitoring of medication compliance, efficacy and adverse effects is well-documented and consistent with recognized standards of practice.

Prisoners with serious mental health needs who are released directly from the facility are given an adequate supply of medication upon their release.  However, assuring that prisoners with serious mental health needs, who are released directly from court without returning to the facility, have sufficient supplies of medication upon their release continues to be a problem.  As has been previously noted, the planned expansion of mental health services includes interventions designed to attempt to address this problem, such as psychoeducation groups (focused on helping mentally ill inmates better understand their illness, their need for treatment including medication, and their responsibility for participating in their own treatment) and discharge planning groups (focused on planning for and obtaining outpatient mental health treatment upon release from the facility). It is anticipated that the addition of such mental health interventions will significantly increase the possibility that those mentally ill inmates who are released directly from court without supplies of medication will recognize their continued need for medication and know how to rapidly obtain the medication they need.

This provision will remain in Partial Compliance until the mental health requirements have been implemented consistently and reliably.

**RECOMMENDATIONS:**

1.  Continue to document the indications for the use of medications in psychiatric notes and treatment plans.

2.  Address the range of issues related to the refusal of nursing staff and security staff to force medication when ordered by the psychiatrist

3.  Continue to document the monitoring of medication compliance, efficacy and safety.

4.  Continue to assure that mentally ill prisoners who are released from the facility receive an adequate supply of medication to cover them until they go for outpatient mental health treatment.

5.  Once staff shortages have been addressed, move forward as quickly as possible with the expansion of mental health therapeutic interventions, including psychoeducation groups and discharge planning groups.

**e.  Maintenance of adequate medical and mental health records, including records, results, and orders received from offsite consultations and treatment conducted while the prisoner or detainee is in Golden Grove custody;**

**ASSESSMENT: SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** All of the records reviewed, including those requiring offsite services either from the emergency room or hospital or from specialist consultations or procedures, had the appropriate documentation in the medical record.

**RECOMMENDATIONS:**

1. Continue to adhere to approved policies and procedures.

2. Continue practices that will achieve sustained compliance.

**MENTAL HEALTH FINDINGS:**  There has been considerable improvement with regard to the maintenance and the organization of the mental health section of the medical records.

Treatment plans are available for all prisoners on the mental health caseload.  However, the treatment plans did not consistently include planned follow-up for those who refused treatment or were noncompliant with treatment, discharge plans, and indications that the treatment plan had been periodically reviewed. Consistent inclusion of this information in treatment plans is required to maintain Substantial Compliance and advance to Sustained Compliance. We will review these records during the 20th onsite assessment and determine whether to advance or downgrade this compliance rating.

**RECOMMENDATIONS:**

1. Continue to adhere to approved policies and procedures with regard to the maintenance and the organization of medical records.

2. See section s(i) with regard to treatment plan development and implementation.

3. Assure that all treatment plans include discharge plans and indications that the treatment plan is being reviewed on a periodic/scheduled basis.

4. When prisoners fail to comply with and actually refuse indicated treatment, a plan for addressing this should become part of the treatment plan.

**f.   Prisoners' timely access to and the provision of constitutional medical and mental health care to prisoners including but not limited to:**

**(i) adequate sick call procedures with timely medical triage and physician review along with the logging, tracking and timely responses to requests by qualified medical and mental health professionals**

**ASSESSMENT:  SUSTAINED COMPLIANCE**

**MEDICAL FINDINGS:**  See report letter c findings and recommendations.

**RECOMMENDATIONS:** See letter c findings and recommendations.

**MENTAL HEALTH FINDINGS:**  The 'behavioral checklist/sick call log' continues to be well-maintained. The information contained in this log, along with the review of the mental health sick call process by the psychiatrist, indicates that the response to sick call requests, whether a request made by the prisoner, the medical staff or security staff, is consistently timely, appropriate to the request, and clinically sound.

**RECOMMENDATIONS:**

1. See section '1c' findings and recommendations.

2. Consider adding a space at the end of the 'behavioral checklist/sick call log' for the psychiatrist's signature, documenting that the log has been reviewed by the psychiatrist as required by policy.

**f.   (ii) an adequate means to track, care for and monitor prisoners identified with medical and mental health needs;**

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** This is the area where the chronic program resides. There were no records seen by the staff physician who performed the chronic care visit. The records demonstrated that the Medical Director performed both timely and appropriately.

**RECOMMENDATIONS:**

1. The Medical Director should continue to see all chronic care patient visits. The staff physician has demonstrated problems historically and the Medical Director indicated that she would see all chronic care patients.

2. Nursing should continue to track both the degree of control and the date of the next visit so that they are consistent with policy.

**MENTAL HEALTH FINDINGS:** The 'mental health follow-up log' and the 'behavioral checklist/sick call log' continue to be well-maintained.  Viewed in combination with a review of medical records, these logs provide an adequate means to track and monitor prisoners on the mental health caseload.  This review indicated that prisoners were receiving the best mix of the currently available mental health interventions that were responsive to their needs.

**RECOMMENDATIONS:**

1. Assure that the 'mental health follow-up log' and the 'active chronic care program log' and the 'behavioral checklist/sick call log' continue to be adequately maintained.

**f.   (iii)  chronic and acute care with clinical practice guidelines and appropriate and timely follow-up care;**

**ASSESSMENT:  PARTIAL COMPLIANCE (Substantial Compliance for Medical)**

**MEDICAL FINDINGS:** We reviewed several records which were presented during the timeframe from the last visit to the current visit, and the responses to the findings were both timely and clinically appropriate.

**RECOMMENDATIONS:**

1. See report letter f (ii) recommendations.

**MENTAL HEALTH FINDINGS:**  See sections '1b', '1c', '1d', and '1f' subsections i and ii.

Essentially, prisoners on the mental health caseload are receiving, in a timely manner, the best mix of the mental health services that are currently available at the facility.  However, with regard to the seriously, chronically mentally ill population, a program of expanded services must be implemented in order to meet

this provision of the agreement, this would include development, implementation and evaluation of requisite evidence-based clinical practice guidelines.

**RECOMMENDATIONS:**

1.  See sections '1b', '1c', '1d' and '1f' subsections I and ii.

---

**f.   (iv) adequate measures for providing emergency care, including training of staff:**
>    **(1)     to recognize serious injuries and life-threatening conditions;**
>    **(2)     to provide first-aid procedures for serious injuries and life-threatening   conditions;**
>    **(3)     to recognize and timely respond to emergency medical and mental   health crises;**

---

**ASSESSMENT: SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** This section addresses medical emergency room trips as well as onsite emergencies. In each instance we found the emergency room and the hospital records as well as a follow-up discussion with the patient regarding the nature of the findings and plan. Apparently, access to the hospital record has been improved.

**RECOMMENDATIONS:**

1.  Continue current practice.

**MENTAL HEALTH FINDINGS**: When mental health emergencies or urgent situations are identified by members of the mental health team or brought to the attention of the mental health team by other medical staff or security staff, such emergency or urgent situations are responded to and addressed by the mental health team in a timely and appropriate manner.  However, the mental health team must continue to assess the capacity of other medical staff and security staff to recognize mental health difficulties that require emergency or urgent intervention; identify any difficulties in this regard, and propose any training and/or other interventions that might be required.

**RECOMMENDATIONS:**

1.  Continue current practices for responding to mental health emergency or urgent situations.

2.  Continue to assess the capacity of other medical staff and security staff to recognize mental health difficulties that require emergency or urgent intervention, and propose training and/or other interventions that might be required to address any identified deficiencies.

---

**f.   (v) adequate and timely referral to specialty care;**

---

**ASSESSMENT: SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** We reviewed five records of patients who received specialty services or procedures since our last visit. All were handled both timely and appropriately, including the follow-up visit documentation of discussion with the patient.

**RECOMMENDATIONS:**

1.  I continue to be pleased with the offsite services coordinator's work and the approach of the program to ensuring adequate continuity and appropriateness.

---

**MENTAL HEALTH FINDINGS:** No prisoners have been referred outside of the facility for specialty care for mental health difficulties. Furthermore, given that there are no emergency psychiatric beds on the island, and given that the facility's infirmary can be used by the mental health team to treat acute psychiatric emergencies, such outside referrals for emergency mental health services are extremely unlikely to occur.

**RECOMMENDATIONS:** Defer to medical recommendations.

---

**f.   (vi) adequate follow-up care and treatment after return from referral for outside diagnosis or treatment; See above**

---

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** As indicated previously under f (v), the documentation of the discussion with the patient continues to be noted on the report. However, there is also an additional visit with the clinician after the visit and report are back, so that there is a counseling note and a discussion with the patient regarding the findings and plan.

**RECOMMENDATIONS:**

1.   See f (v).

**MENTAL HEALTH FINDINGS:**  See f (v).

**RECOMMENDATIONS:  Defer to medical recommendations**

---

**g.   Adequate care for intoxication and detoxification related to alcohol and/or drugs;**

---

**ASSESSMENT:  PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** I was informed that in the three months since our last visit there were no new detox cases.

**RECOMMENDATIONS:**

1.   Ensure that all clinicians as well as nursing staff understand the withdrawal guidelines and the need to monitor for withdrawal for a period of days.

**MENTAL HEALTH FINDINGS:**   Defer to medical with regard to medical care for intoxication and detoxification related to alcohol and/or drugs.

With regard to mental health, this monitor has repeatedly raised the fact that there needs to be better cooperation and coordination between medical and mental health for both the acute and ongoing assessment and management of prisoners who have abused alcohol and/or other drugs and also evidenced other symptoms of mental illness.  In so doing, this monitor has noted that there are a considerable number of dual-diagnosis prisoners at the facility (i.e., those who have suffered from substance abuse difficulties and some other type of mental health difficulty and/or developmental disability); that it has been well-established that dual-diagnosis individuals require coordinated and integrated assessment and treatment of their substance abuse and other mental health difficulties; and that therefore, coordination and integration of services is required for any therapeutic interventions to be successful.  While there have at times been efforts to coordinate and integrate services, those efforts have not been sustained and they need to be sustained.

During the site visit that formed the basis for the last/18th monitoring report, this monitor reviewed the records of and interviewed a subset of the dually-diagnosed prisoners on the mental health caseload. As was noted in the 18th monitoring report, the findings of that review confirmed the lack of coordination and integration of health and mental health with regard to the assessment and treatment of those prisoners and the impact that that had on the quality of their care. More specifically, for example, given that drug tests were not done in a timely manner, it was impossible to confirm to what extent any specific substance and the amount of that substance in the prisoner's system might have contributed to the prisoner's symptoms of mental illness. There was not a full record of the course of the prisoner's clinical presentation over time, from initial presentation to the point where the prisoner was considered to be drug free; and what was known about the prisoner's individual and family history of substance abuse and other mental health difficulties did not appear to be considered at every point in the process of assessment and treatment where such information might have been relevant and helpful. A similar set of case reviews was performed by this monitor during this most recent site visit. The above noted findings were unchanged and there were additional findings that raised concerns. More specifically, clearly one and possibly two prisoners have used substances while detained in the facility, which should have been confirmed by a more coordinated assessment. Since in these cases it seems quite clear that access to drugs resulted in a deterioration in the prisoner's mental health status and a related deterioration in the prisoner's ability to function in the facility that ultimately resulted in placement in segregation, such confirmation of what happened could have resulted in a very different discussion with security staff and an exploration of alternatives to the placement of such mentally ill prisoners in segregation,

**RECOMMENDATIONS:**

1. Work to improve the mutual consultation between medical and mental health and the coordination of medical and mental health services for prisoners with a history of substance abuse and other symptoms of mental illness, as well as for other prisoners with a combination of serious medical and mental health problems.

2. Review the assessments and treatment plans for prisoners who are carrying the diagnosis of a substance-induced mental disorder, and assure the timely availability of the blood tests that form part of the basis for such a diagnosis.

3. Mental health and security staff should work together to develop an approach for the better management of prisoners with substance-induced psychiatric difficulties or psychiatric difficulties that are exacerbated by their use of substances

**h.   Infection Control, including guidelines and precautions and testing, monitoring and treatment programs.**

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** The TB data with regard to screening are complete.

**RECOMMENDATIONS:**

1. Begin reporting sexually transmitted disease cases where there are symptoms and treatment is initiated.

**MENTAL HEALTH FINDINGS:**  Defer to medical findings and recommendations.

**RECOMMENDATIONS:**  None

**i.   Adequate suicide prevention, including:**

**(i)   the immediate referral of any prisoner with suicide or serious mental health needs to an appropriate mental health professional;**

**ASSESSMENT:   PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** See mental health findings and assessment.

**MENTAL HEALTH FINDINGS**: Medical staff and security staff immediately refer a prisoner for a mental health evaluation when such staff suspects that the prisoner might be suicidal or that the prisoner might have other serious mental health needs.

In response to suicides that had occurred at the facility, and what was known about the facts surrounding the suicides, in the last monitoring report this monitor had suggested that the mortality review of these suicides should include an assessment of whether or not security staff need additional training on the identification of prisoners who are suicidal or are at risk of becoming suicidal.  This has not been done, and this monitor continues to believe that such an assessment is indicated.

**RECOMMENDATIONS:**

1.   Continue efforts to comply with this provision, with regard to the immediate referral of any prisoner who is suspected to be suicidal, suspected to be at risk of becoming suicidal, or suspected to have other serious mental health needs. Maintain all records and logs that document compliance with this provision.

2.   Reassess the capacity of security staff to identify prisoners who might be suicidal or at risk of becoming suicidal, and identify the best ways to continue to enhance staff capacity to do so.

**(ii)   a protocol for constant observation of suicidal prisoners until supervision needs are assessed by a qualified mental health professional;**

**ASSESSMENT:   PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** See mental health findings and assessment.

**RECOMMENDATIONS:**

1.   Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS:** At the time of the last monitoring report, the policies and procedures for "suicide assessment, intervention, observation & psychiatric close observation" had been developed and approved. Staff training for policy revisions is required to meet the implementation requirements of the settlement agreement.

**RECOMMENDATIONS:**

1.   As this new policy and associated procedures are implemented, it must be made clear to security staff that as per the policy, when they suspect that a prisoner might be suicidal, the prisoner must be placed

under constant observation until supervision needs are assessed by a qualified mental health professional.

2. Senior security staff and mental health staff should regularly review documentation of both pre- and post-evaluation observation to ensure security's compliance with this provision, related policy, and associated procedures

**(iii)  timely suicide risk assessment instrument by a qualified mental health professional within an appropriate time not to exceed 24 hours of prisoner being placed on suicide precautions;**

## ASSESSMENT:  SUSTAINED COMPLIANCE

**MEDICAL FINDINGS**: See mental health findings and assessment.

**RECOMMENDATIONS:**

Defer to mental health recommendations

**MENTAL HEALTH FINDINGS:**  A well-developed suicide risk assessment instrument is in place and continues to be effectively used by qualified mental health professionals as is indicated in the approved policy and procedures.  The suicide risk assessments have been treated as a mental health emergency, with assessments being performed virtually immediately.  Even during weekends, if a potentially suicidal prisoner is identified, the psychiatrist can be and has been contacted for an immediate assessment and intervention.

**RECOMMENDATIONS:**

1. Continue to comply with this provision, related policies and associated procedures as described above.

2. Continue to review each case to demonstrate the quality of the suicide risk assessment instrument as that relates to compliance with this provision.

3. Ensure annual training is completed as required.

**(iv)  readily available, safely secured, suicide cut-down tools;**

## ASSESSMENT:   SUSTAINED COMPLIANCE

**MEDICAL FINDINGS:** See mental health findings and assessment.

**MENTAL HEALTH FINDINGS:** Suicide cut-down tools are readily available on each unit, and all security staff persons have been trained to retrieve and utilize the tool.  However, given that occasions for employing such tools are rare, confidence that all security staff can, in fact, rapidly retrieve and utilize the tool when indicated will require more formal, scenario-based assessment.

**RECOMMENDATIONS:**

1. Continue to assure that rapid access to cut-down tools is possible.

2. Provide adequate and appropriately designed opportunities to formally assess what staff has learned about mental health policies and procedures, including the rapid retrieval and use of cut-down tools.

3. Should an opportunity to retrieve and use suicide cut-down tools occur, review security staff's use of the tools.

**(v)  instruction and scenario-based training of all staff in responding to suicide attempts, including use of suicide cut-down tools;**

**ASSESSMENT:   SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS**: See mental health findings and assessment.

**MENTAL HEALTH FINDINGS:** See above sub-section iv.

**RECOMMENDATIONS:** See above sub-section iv.

1. The Training policies and procedures must be fully implemented to ensure that all required pre-service and in-service/refresher training is successfully completed by staff required to complete that training before this provision can achieve Sustained Compliance. As such, this provision, as with all to provisions in this Agreement that specific training, is subject to being down-graded in the absence of reliable evidence that demonstrates full implementation of the Training policy.

**(vi)  instruction and competency-based training of all staff in suicide prevention, including the identification of suicide risk factors;**

**MEDICAL FINDINGS:** See mental health findings and assessment.

**RECOMMENDATIONS:**

1. Defer to mental health recommendations.

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**MENTAL HEALTH FINDINGS:** See above subsection i with regard to the identification of potentially suicidal prisoners.  Instruction and competency-based training regarding suicide risk factors must make it clear that suicide risk factors are factors that place the individual at high risk of becoming suicidal, and therefore, when such suicide risk factors are identified, the individual should be closely monitored and a request for a mental health assessment should be made.

Although the assessment of suicide risk is performed by a qualified mental health professional, the suicide prevention training for security staff should include a presentation of the signs, symptoms and behaviors of suicidal individuals that mental health professionals look for when performing such assessments.  This will also help security staff identify individuals who might be suicidal.  For example, security staff should learn that individuals who have decided to kill themselves may deny being suicidal (so that they will have the opportunity to kill themselves); manipulative individuals or individuals who are  really only crying out for help may kill themselves by mistake, even if they didn't really intend to; and those individuals who have begun to implement a plan for killing themselves are at much greater risk of attempting suicide compared to those who have simply had transient, nonspecific thoughts about suicide.

**RECOMMENDATIONS:**

1. See above sub-section i.

2. Assess staff's need for mental health training, including additional ongoing and refresher training on suicide prevention; augment and timely complete the initial and refresher training as indicated; and explore options other than formal training for continuing to enhance staff's knowledge base, sensitivity and skills as they relate to the management of prisoners with mental illness or developmental disabilities.

3. The Training policies and procedures must be fully implemented to ensure that all required pre-service and in-service/refresher training is successfully completed by staff required to complete that training before this provision can achieve Sustained Compliance. As such, this provision, as with all to provisions in this Agreement that specific training, is subject to being down-graded in the absence of reliable evidence that demonstrates full implementation of the Training policy.

**(vii)  availability of suicide-resistant cells;**

**ASSESSMENT:   SUSTAINED COMPLIANCE**

**MEDICAL FINDINGS:** See mental health findings and assessment.

**RECOMMENDATIONS:**

1.  Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS:**  Suicide-resistant cells are available and being appropriately maintained.

**RECOMMENDATIONS:**

1.  Continue to maintain suicide resistant cells.

**(viii) protocol for the constant supervision of actively suicidal prisoners and close supervision of other prisoners at risk of suicide;**

**ASSESSMENT: SUSTAINED COMPLIANCE**

**MEDICAL FINDINGS**: See mental health findings and assessment.

**MENTAL HEALTH FINDINGS:** The protocols for the constant supervision of actively suicidal prisoners and close supervision of other prisoners at risk of suicide are clear and continue to be followed.

**RECOMMENDATIONS:**

1.  Continue to follow the protocols for the supervision of suicidal prisoners and those at risk of suicide.

2.  Mental health staff and senior security staff should continue to monitor this process to assure that such protocols continue to be followed.

**(ix) procedures to assure implementation of directives from a mental health professional regarding:**
**(1)  the confinement and care of suicidal prisoners;**
**(2)  the removal from watch; and**
**(3)  follow-up assessments at clinically appropriate intervals;**

**ASSESSMENT:  SUBSTANTIAL COMPLIANCE**

**MEDICAL FINDINGS:** See mental health findings and assessment.

**RECOMMENDATIONS:**

1.  Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS:** Directives from mental health professionals with regard to the confinement and care of suicidal prisoners, the removal from suicide watch, and follow-up assessments at clinically appropriate intervals are now all being followed by medical and security staff as per approved policy.

**RECOMMENDATIONS:**

1.  Continue to ensure that appropriate mechanisms are in place to facilitate the notification of all *medical staff*, especially nursing staff, of mental health directives and care plans for suicidal prisoners. Monitor the effectiveness of such mechanisms for notification, and monitor the implementation of the directives for which nursing and any other medical staff is responsible.

2.  Should another incident arise where nursing staff refuse a mental health directive regarding the management of a suicidal prisoner, such a refusal should immediately prompt a meeting between medical and mental health to discuss and resolve the incident.

3.  Continue to ensure that appropriate mechanisms are in place to facilitate the notification of *security staff* of mental health directives and care plans for suicidal prisoners; monitor the effectiveness of such mechanisms; and monitor the implementation of the directives for which security staff are responsible.

**j.   Clinically adequate professional staffing of the medical and mental health treatment programs as indicated by implementation of periodic staffing analyses and plans.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** We were informed that there has been no change in the vacancy rate so that there continues to be one LPN vacancy. With regard to RNs, there continues to be only two full-time RNs on board, including the head nurse and one other full-time RN. There are two part-time RNs who fill in hours up to 20 hours per week. There is one full-time offsite services coordinator and one full-time medical records clerk and one full-time administrative assistant. Unfortunately, we find that the urgency of filling these positions is problematic.

**RECOMMENDATIONS:**

1.  Ensure that you have 16 hours of clinical coverage seven days per week with regard to the nursing program.

2.  Ensure that the intake screening is performed only by nurses who have completed the required training and passed the exams at the required rate.

**MENTAL HEALTH FINDINGS:** As was noted in section '1c', the mental health coordinator's position remains vacant, and at this point there has not been a mental health coordinator for about one year.  Also noted above, as a result of this vacancy the part-time qualified mental health professional who was hired to focus on the much-needed expansion of mental health services has had to use all of her time to maintain critical documents and logs that would be maintained by the full-time mental health coordinator.  She has also had to perform other tasks that would fall to the full-time mental health coordinator such as initial mental

health assessments and participation in activities such as the monthly segregation review process. Of course, this means that the part-time qualified mental health professional has often worked more hours/week than she is hired to work, and also means that she has not been able to focus on the much-needed expansion of mental health services, also discussed in section '1c', which is what she was hired to do. Therefore, filling the mental health coordinator's position continues to be a priority with regard to coming into compliance with this provision of the agreement.

In addition, there is still no mental health nurse (i.e., a nurse with special training in mental health, or specific, meaningful experience in mental health, or even just an affinity for working in the area of mental health). The importance of including a mental health nurse as part of the medical and mental health staff has been described in prior monitoring reports, and the issues in this regard remain the same.

As was noted in the introduction to this section of the monitoring report (i.e., this section on 'Medical and Mental Health'), subsequent to the April 2019 site visit that has formed the basis for this monitoring report, the psychiatrist resigned from the facility. Given all of the tasks that this psychiatrist was responsible for, and given her willingness to make herself available whenever needed, despite the fact that she was only a part-time employee, the monitoring team is very concerned about the potential short and long-term impact of this loss. However at present, the monitoring team has insufficient information about any short or long-term plan to fulfill the responsibilities that were assumed by that psychiatrist, or the implementation of any plan that might exist, to offer findings on the state of mental health care at the facility at the time that this report is being issued.

**RECOMMENDATIONS:**

1. Urgently develop a plan for providing psychiatric services at the facility that is clinically adequate and responsive to the provisions of the agreement.

2. Identify and hire a new mental health coordinator as quickly as possible.

3. Identify and hire a mental health nurse, and resolve any issues related to the allocation of some portion of that nurse's time to the mental health program.

4. As mental health staff continues efforts to address all the provisions of this agreement, including expansion of the range of mental health services provided, staffing analyses should continue to ensure adequate staffing of the mental health program.

**k. Adequate staffing of correctional officers with training to implement the terms of this agreement, including how to identify, refer, and supervise prisoners with serious medical and mental health needs;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** We were unable to document access with regard to dental services because the dental services program was cancelled due to lack of maintenance of the dental operatory.

**RECOMMENDATIONS:**

1. Continue to add custody resources in order to ensure timely access to care.

**MENTAL HEALTH FINDINGS:** Refer to the multiple other sections of this report that discuss the training of correctional officers as it relates to the identification, referral, and supervision of prisoners with serious mental health needs.

In addition, as has been noted in prior reports, as mental health programming is expanded and an adequate level of staffing for correctional officers is reached, it would be reasonable and highly desirable to identify a subset of correctional officers who would be specifically assigned to supervise and work with prisoners who are suffering from mental illness and/or intellectual disabilities. Such officers would be selected based on their interest in working with this population, their sensitivity to the needs of this population, their capacity to learn/obtain additional knowledge about working with this population, and their capacity to develop the skills required to work with this population. Even now there are opportunities for such identified and trained officers to work with the mental health team and prisoners on the mental health caseload. As the mental health treatment program is expanded/enhanced, those opportunities will become more plentiful, and of course, if/when a mental health unit is established, it will be extremely important to have such officers assigned to that unit.

**RECOMMENDATIONS:**

1.   See other sections of this report that discuss the training of correctional officers on mental health issues.

2.   To the extent possible, assign correctional officers who have an interest in and affinity for working with prisoners who suffer from mental illness and/or intellectual disabilities to posts where they are most likely to come into contact with such prisoners, and provide them with additional training to enhance their knowledge about and skills for working with such prisoners.

---

**I.   A protocol for periodic assessment of the facility's compliance with policies and procedures regarding the identification, handling, and care of detainees and prisoners with serious medical and mental health conditions;**

---

**ASSESSMENT:  PARTIAL COMPLIANCE (Substantial Compliance for Mental Health)**

**MEDICAL FINDINGS:** Unfortunately, the quality improvement program continues to be a one-person effort. We were provided with data once again on timeliness review of receipt of medications. Given all of the areas that this agreement covers, in order to meet the definition (created by JCAHO) the program must review annually all substantial services that are provided. This would include intake screening, intake follow up, sick call including segregation sick call, chronic care, specialty care, scheduled offsite procedures, inpatient housing, dental and mental health.

**RECOMMENDATIONS:**

1.   Develop a calendar for the program at which all of the services listed in the last sentence of medical findings are reviewed annually.

**MENTAL HEALTH FINDINGS:** There are multiple mechanisms for the ongoing assessment of compliance with policies and procedures regarding the identification, handling, and care of detainees and prisoners with serious mental health conditions.

There are a range of logs that document and track the mental health team's compliance with many of the provisions of the agreement and many of the specific policies and procedures that have been developed. Although the maintenance of these logs is the responsibility of the mental health coordinator, as noted above, these logs are still being maintained even in the absence of a mental health coordinator (although at the cost of postponing other program development efforts).

At present, the assessment of the quality of the mental health services provided is based on a review of the above noted logs in conjunction with evaluations, treatment plans and progress notes found in the medical

records.  This monitor has suggested that the addition of a more formal treatment plan review and case conference would further enhance the quality assessment process.   This monitor has also suggested that when a certain indicated mental health intervention is not available at the facility and an alternative but possibly less effective intervention has to be employed, that should be noted in the treatment plan, because that, too, would aid the monitoring of the facility's compliance with the agreement.

The assessment of the quality and significance of mental health's participation in activities such as disciplinary review and segregation review is performed by reviewing the documents specifically related to such activities, the logs that document the work performed in connection with such activities, a comparison of the recommendations made by mental health with the ultimate decisions rendered through the disciplinary review and segregation review processes, and the medical records.

Then there are additional documents that are used to assess the compliance of the security staff with the policies and procedures regarding the identification, handling, and care of detainees and prisoners with serious mental health conditions.  These documents include observation logs for detainees and prisoners suspected of being at risk of suicide and those actually placed on suicide watch; observation logs for detainees and prisoners placed on mental health observation; and 'behavioral checklists' completed by security staff when such staff suspect that a detainee or prisoner might be evidencing a deterioration in his/her mental status.  These documents are reviewed by the mental health team in order to assess compliance with policies and procedures, the quality of these efforts, and whether or not any additional mental health training of security staff might be indicated.

**RECOMMENDATIONS:**

1. Continue to employ the above noted procedures for monitoring and assessing compliance with approved mental health policies and procedures, and other policies and procedures for which the mental health team has some responsibility.

2. Continue to assess whether additional protocols for monitoring such compliance need to be developed. This might particularly be the case in areas where the mental health team shares responsibilities with other staff units.

**m. Adequate dental care;**

**ASSESSMENT: PARTIAL COMPLIANCE (Substantial Compliance for mental health)**

**MEDICAL FINDINGS:** Because the dental program was cancelled and there was an opportunity to interview both the dental assistant and the oral surgeon this week, my medical findings have changed. The dental program was cancelled for several weeks because the operatory was not functional. The compressor has been problematic and it leads to inadequate air pressure as well as fluid pressure. The scheduling of the dental services requires maintenance of the dental operatory. I am told that maintenance will occur before the end of April of this year.

**RECOMMENDATIONS:**

1. Proceed with the maintenance of the dental operatory.

2. Also proceed with the dental renovations.

**MENTAL HEALTH FINDINGS:**  See medical findings and recommendations.

In addition, the mental health team has continued to include identifying the need for dental care and accessing dental care as part of the mental health treatment plan for seriously mentally ill prisoners. This has been especially important for prisoners who have historically failed to focus on their need for dental care due to impaired functioning associated with their mental illness.

**RECOMMENDATIONS:**

1. Continue to include appreciating the need for dental care and accessing dental care in the mental health treatment plan for seriously mentally ill prisoners.

**n.   Morbidity or mortality reviews of all prisoner deaths and of all serious suicide attempts or other incidents which a prisoner was at high risk for death within 30 days of the incident triggering the review;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** Fortunately, there have been no additional deaths, which would require a review, so that process is under review.

**RECOMMENDATIONS:**

1. Have the Medical Director perform a review of the care provided at GGACF for patients who are hospitalized, including at least one.

2. Ensure that the policy is finalized and training is provided.

**MENTAL HEALTH FINDINGS:**  Refer to medical findings.

**RECOMMENDATIONS:**

1. Such reviews must include a review of the management of the involved inmate by all units within the facility, including mental health, health and security; the policies and procedures that govern such management; and compliance or lack of compliance with policies and procedures, as well as the adequacy of policies, procedures and the training on the policies and procedures.

2. Successful suicides should be presumed to be preventable in a facility with 24/7 supervision; so, when a successful suicide occurs, the mortality review should result in a corrective action plan. The review should also include a schedule for the implementation of the corrective action plan.

**o.   A protocol for medical and mental health rounding in isolation/segregation cells to provide prisoners access to care and to avoid decompensation;**

**ASSESSMENT: PARTIAL COMPLIANCE (Substantial Compliance for Medical)**

**MEDICAL FINDINGS:** We reviewed the log and found three records in which the patient needed to be assessed based on his symptoms. In each instance, the patient had been taken to the clinic to be evaluated by the physician. This is a step forward. Identify those patients who are in segregated housing and who must be brought to the clinic for an assessment, either by a nurse or a physician.

**RECOMMENDATIONS:**

1. Maintain documentation of patients seen each day who deny any complaints. Also maintain a record of patients who make a symptomatic complaint and therefore need to be taken for a sick call assessment.

**MENTAL HEALTH FINDINGS:** The weekly mental health rounds performed by the mental health counselor for all prisoners being held in segregation have continued. The mental health status of each inmate is documented, as are indications for any new/additional therapeutic interventions that might be required. Any issues that should be brought to the attention of security staff are documented and immediately shared with security staff.  There also continues to be participation by mental health in the interdisciplinary, monthly segregation rounds.  During these monthly rounds, mental health reports on the mental health status of each prisoner held in segregation for more than 30 days, offers recommendations for addressing any mental health difficulties that might have been identified, and if indicated, urges a change in housing status.

The level of coordination and cooperation between mental health and security is now such that those inmates who need to be removed from segregation due to deterioration in their mental health status are quickly identified, and a plan of action with regard to placement and the provision of mental health services is immediately developed and implemented.  The capacity for such rapid intervention is made possible by the fact that the communication between mental health and security, with regard to inmates being held in segregation, actually goes far beyond that outlined in the above described, established protocols.  It is clear that this is indicative of and has actually resulted from the shared commitment of security and mental health to decrease the mental health morbidity of inmates being held in segregation, and the steps that they have jointly taken have done just that. However, we continue to find problems in the segregation review forms and monthly submissions that have been previously discussed with staff and that required additional corrective attention.

The 18th report stated, *"It is very important that segregation review records are consistently completed, accurate, and reliable to accurately and efficiently assess compliance and conditions of confinement according to the agreement. The Territory is encouraged to implement better quality control measures on this process to maintain substantial compliance going forward. Achieving sustained compliance requires a provision to remain in substantial compliance for 12 months. However, this provision is subject to a partial compliance rating if documentation problems persist going forward."*

According to the monitor, Dr. Kenneth Ray, his examination of segregation review records did not demonstrate adequate improvement as hoped. The technical and substantive problems, as discussed onsite and in previous reports persist:

1. January 2019: There continues to be no inmate identifier for page 2 of each review.  Should the reviews become disordered or misplaced, there is no way to identify to whom the second page belongs.  This has been pointed out previously and at one time a handwritten identifier was placed on the second page of reviews but this practice has ceased. The inmate's name or BOC# would be sufficient as an identifier.

2. *February 2019: There is no inmate identifier on page 2 of any of the reviews. Case Manager was not present for the reviews. Housing Unit Officer did not sign the review until 2 days after the review. Date of Placement does not match Log.  A Date of Placement does not match Log. Housing Officer did not sign off on review until 8 days after review. An inmate's BOC # does not match Log. Inmate was recommended to be placed in GP but the section Recommend Change in Housing is marked NO. Housing unit does not match Log.  Log has Admin Seg but Review documents Disciplinary Seg. Another prisoner's housing unit does not match Log.  Another prisoner's Date of placement does not match Log.*

3. March 2019: Final authority approval of all reviews conducted on 3/7 were not signed off on until 19 days later.  For discrepancies between reviews and log - see above. Of note:  All inmate reviews had an appropriate identifier on page 2 of each review (i.e., name and BOC #)

4. April: The inmate's identifier (name) appears on page two of the reviews. Housing unit for prisoner does not match seg review log; date of placement for prisoner does not match seg review log.  Seg status of another prisoner does not match seg log.  Seg status for another prisoner does not match seg log.

This provision returns to Partial Compliance and will be eligible advancement to Substantial Compliance with the review records demonstrate adequate compliance with policy and procedure requirements and this provision.

**RECOMMENDATIONS:**

1. Correct documentation issues noted and apply better quality assurance methods to clearly demonstrate compliance.

2. Continue weekly mental health rounds in segregation as per policy.

3. Continue mental health participation in the monthly segregation review process as per policy.

4. Ensure all required staff participate in these segregation reviews.

5. Continue the more ongoing coordination and cooperation between security and mental health that has assured the type of rapid and appropriate intervention required when inmates being held in segregation begin to evidence a deterioration in their mental health status.

**p.  A prohibition on housing prisoners with serious mental illness in isolation, regular review of prisoners in segregation to minimize time in segregation, and provision of adequate opportunities for out-of-cell time of prisoners in segregation;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**ASSESSMENT:** See mental health report.

**MEDICAL FINDINGS:** See mental health assessment and findings.

**RECOMMENDATIONS:** Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS**: See above subsection 'o' with regard to the review of prisoners in segregation and the positive impact that this has been having on the facility's capacity to quickly identify and remove prisoners with serious mental health difficulties from isolation.

However, there is still work to be done to ensure that prisoners with serious mental illness are not placed in isolation in the first place.  This can only be accomplished when (1) mental health input into the disciplinary review process is comparable to the input that mental health has in the segregation review process, and (2) there is a special housing unit for prisoners with serious mental health difficulties.

 Although mental health input into the disciplinary review process has been discussed during each site visit and a plan for accomplishing this has been repeatedly outlined, there is still no consistent pattern of obtaining mental health input into the disciplinary review process.  A review of cases reviewed by mental health as part of the disciplinary review process, starting in July 2018, revealed the following:  3 cases from

early July 2018 were not referred to mental health until August 2018; a case from early November 2018 was not referred to mental health until December 2018; there were no cases referred to mental health from December 2018, and 3 cases from January 2019 and 1 from early February 2019 were not referred to mental health until late March 2019.  However, finally in March 2019, the month prior to the site visit, there were 5 additional cases referred to mental health. All 5 of them were referred within a day of the incident that prompted the disciplinary charge, and so therefore in these 5 cases there was an opportunity for a mental health assessment and provision of input and recommendations to the disciplinary review process prior to the time that a decision regarding sanctions was made.  The implications of this failure of the disciplinary review process to consistently obtain and consider mental health input in a timely manner are demonstrated by the fact that seriously mentally ill persons continue to be placed in segregation, and the fact that such  prisoners with serious, pre-existing mental health difficulties are later identified during the segregation review process and then removed from segregation.

As has been previously noted, there is also a subset of prisoners with serious mental health difficulties who are being held in segregation because there is no alternative housing unit designed to keep them safe and/or keep them from harming someone else.  This subset of prisoners was described in some detail in the last monitor's report.  Although there is now a special housing unit policy and set of procedures for such a unit, there is still no clear plan for the actual development of such a unit.

Due to several factors, there continues to be inadequate out-of-cell time for prisoners with serious mental illness who are being held in segregation.  First of all, the more extensive range of therapeutic programming that such prisoners require has yet to be developed, and it cannot be developed until a new mental health coordinator is hired, which will free the QMHP hired to develop such programming to do so.  There also needs to be an appropriate and safe setting for the delivery of such enhanced programming, which will be extremely difficult if not impossible to identify in the absence of a special housing unit for prisoners with serious mental health difficulties. Then in addition, there will need to be an adequate number of security staff especially trained to support this work.

Although the number of prisoners on the mental health caseload who were being held in segregation had been dropping, during this last monitoring period the number has begun to increase again.  It is important to note, however, that a review of the  prisoners on the mental health caseload who are being held in segregation indicates that they all have mental health issues that could be managed on a special mental health unit, and if such a unit existed, they could be placed there instead of in segregation.

**RECOMMENDATIONS:**

1. **As per the provisions of this settlement agreement, prisoners with serious mental illnesses may not be placed in isolation.**

2. There must continue to be a focus on the eventual development of a mental health unit (as a separate unit or as part of a larger safe unit) that would function as a much better alternative placement for mentally ill inmates.  The development of such a unit requires the identification and development of the physical space/unit, the development and implementation of enhanced mental health programming, and the identification and training of the security staff persons who will work on that unit.

The disciplinary review process must consistently obtain and utilize mental health input when indicated in order to avoid the inappropriate placement of mentally ill prisoners in segregation

**q. Review by and consultation with a qualified mental health provider of proposed prisoner disciplinary sanctions to evaluate whether mental illness may have impacted rule violations and to provide that discipline is not imposed due to actions that are solely symptoms of mental illness;**

**ASSESSMENT: PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** See mental health assessment and findings.

**RECOMMENDATIONS:** Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS**:  See above subsection 'p' for a discussion of mental health input into the disciplinary review process.  Also included in above subsection 'p' is a discussion of the need for a special mental health unit.  In addition to the fact that such a unit would offer an alternative and more appropriate placement for seriously mentally ill prisoners who are currently being held in segregation in order to protect them from harm or to stop them from harming others, such a unit would also function as a placement option for mentally ill prisoners undergoing disciplinary proceedings.

It is also important to restate the fact that obtaining mental health input into the disciplinary review process is required when a prisoner is already on the mental health caseload AND is also required when there is any reason to suspect that a prisoner's problematic behavior might be a product of mental health difficulties, regardless of whether or not the prisoner is already on the mental health caseload.  In order to fully meet this requirement, security staff persons who manage the disciplinary review process must be adequately trained in mental health and sufficiently thoughtful about the review of disciplinary matters.  In addition, the request for mental health assessment and input must be made in a timely way so that mental health input can be obtained before decisions are made regarding degree of culpability and any punishment and/or therapeutic interventions that might be indicated.

**RECOMMENDATIONS:**

1. GGACF must continue efforts to consistently obtain meaningful mental health review and input into the disciplinary process, including for inmates who are not already on the mental health caseload but appear to be suffering from mental health difficulties.

2. The chief who is responsible for the disciplinary review process might consider setting up a monthly meeting with mental health and the chief who is responsible for segregation review to jointly monitor the effectiveness of the disciplinary review process with regard to identifying prisoners with mental illness and diverting such prisoners to alternatives to segregation when appropriate.

3. If/when the monitoring suggested in recommendation #2, and/or the monitoring of prisoners in segregation performed by mental health staff, and/or the segregation review process identifies a prisoner with mental health difficulties who went through a disciplinary review process that did not include adequate consideration of the prisoner's mental health difficulties, the case should be jointly reviewed by the responsible chief for the disciplinary review process and mental health, and any corrective action that might be indicated should be taken.

**r. Medical facilities, including the scheduling and availability of appropriate clinical space with adequate privacy;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** There are four exam rooms in the housing units which are currently not being utilized. I am told the conditions in them have remained unchanged. There has been no progress on the capital improvements, including the new dental operatory.

**RECOMMENDATIONS:**

1. Complete the medical program physical modifications, including the mold abatement in the exam rooms.

**MENTAL HEALTH FINDINGS:** There have been successful efforts to develop some of the appropriate clinical spaces required to meet the various provisions of this agreement, including suicide-resistant cells and one mental health group treatment room.  However, space for expanded/enhanced mental health programming for chronically mentally ill prisoners and prisoners with intellectual disabilities is still unavailable, as is an actual mental health unit.

**RECOMMENDATIONS:**

1. Plan for the development of the additional space required for expanded/enhanced mental health programming and special housing for chronically mentally ill and/or intellectually disabled prisoners.

**s.  Mental health care and treatment, including:**

**(i)  timely, current, and adequate treatment plan development and implementation:**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

**MEDICAL FINDINGS:** See mental health assessment and findings.

**RECOMMENDATIONS:** Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS:** During a random review of the medical records of prisoners on the mental health caseload, there was a fully developed treatment plan for each prisoner.  Although the therapeutic interventions included in the treatment plans were limited by the range of therapeutic options currently available at the facility, it is expected that as services are expanded/enhanced, those additional, newly developed options will be included in treatment plans where appropriate.

The establishment of a regularly scheduled 'treatment planning/treatment plan review conference' should be considered, especially as mental health programming is expanded/enhanced.  Such a staff conference would allow for more meaningful/targeted use of the range of available services to address treatment goals. It would also allow for interdisciplinary input into the treatment planning and review process, and would facilitate the supervisory review of treatment plans and treatment plan reviews by the psychiatrist.

Mental health treatments are not considered fully implemented until staffing and the lack of an adequate array of therapeutic programs and interventions issues are resolved.

**(ii) adequate mental health programs for all prisoners with serious mental illness;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

**MEDICAL FINDINGS:** See mental health assessment and findings.

**RECOMMENDATIONS:** Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS:** As has been noted in multiple prior sections of this report, the development of adequate mental health programs for all prisoners with serious mental illness cannot be accomplished until several issues are addressed. These include (1) a new mental health coordinator is hired, which will free up the QMHP, who has been hired to develop new programs, to actually develop those new programs; (2) a special mental health unit is developed, and (3) security staff persons who would support such programs (i.e., be assigned to the special unit and/or other areas where mental health programs are provided) are identified and trained.

**RECOMMENDATIONS:**

1. The mental health team will need to develop a global treatment menu designed to meet the needs of prisoners with different levels of housing and treatment needs.

2. Group programming should continue to be designed to meet the clinical needs of individuals who should be assigned to those programs based on prisoner's clinical and psychosocial needs assessment findings and their individual treatment plan.

3. The facility should continue to consider how it might create a special mental health housing unit (either as a separate unit or part of a larger safe unit), which would be an alternative to housing for vulnerable mentally ill prisoners and make the delivery of services more efficient for all prisoners who require enhanced mental health services.

4. As has been previously recommended, a protocol for responding to prisoners who refuse clearly indicated mental health treatment should be formally developed, and then compliance with that protocol should be documented in the prisoner's medical record.

**(iii) adequate psychotropic medication practices, including monitoring for side effects and informed consent;**

**ASSESSMENT: SUSTAINED COMPLIANCE**

**MEDICAL FINDINGS:** See mental health assessment and findings.

**RECOMMENDATIONS:** Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS:** There continues to be consistent documentation of adequate psychotropic medication practices, including monitoring for side effects and obtaining informed consent.

**RECOMMENDATIONS:**

1. Continue to consistently employ all appropriate psychotropic medication practices and document that such practices have been employed.

**(iv) comprehensive correctional and clinical staff training and a mechanism to identify signs and symptoms of mental health needs of prisoners not previously assigned to the mental health caseload;**

**ASSESSMENT:   PARTIAL COMPLIANCE**

**MEDICAL FINDINGS:** See mental health assessment and findings.

**RECOMMENDATIONS:** Defer to mental health recommendations.

**RECOMMENDATIONS:** Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS:** Mental health training for correctional staff has been completed.  When correctional staff suspect that a prisoner who is not already on the mental health caseload is suffering from mental health difficulty or that a prisoner known to have mental health difficulty might be deteriorating, staff formally communicate their concern to the mental health team via the 'behavioral checklist'.  A comparison of the information contained on 'behavioral checklist' submitted with the findings of the mental health assessments that the checklists prompted indicate that correctional staff have gained a good understanding of mental health issues.  In addition, when mental health staff persons are on the units, correctional staff persons often mention their concerns about a prisoner to the mental health staff, and these discussions provide further evidence of their understanding of mental health issues, including some of the subtle indications of mental health difficulties.  All of this information, along with any training issues identified during mortality and morbidity reviews and any other formal reviews, should be taken into consideration when developing the refresher training program for security staff.

Since nursing staff persons communicate their concerns about a prisoner's mental health verbally/directly to the mental health team, their capacity to identify signs and symptoms of mental illness is more difficult to measure.  However, it at least appears that nursing staff are quite adept at identifying symptoms of mental health needs of prisoners not previously assigned to the mental health caseload, and also adept at recognizing that prisoners on the mental health caseload are having difficulty.  Given the daily contact that the nurses have with prisoners, nursing staff play an important role in identifying prisoners with mental health needs.

Although compliance with this provision of the agreement is quite substantial, there is one area of concern, and that is the identification of a seriously mentally ill detainee or prisoner who is essentially 'suffering in silence' – this is the quiet person, who isn't an identified management problem, but who is plagued by thoughts of suicide and/or paranoid/persecutory psychotic thoughts that he/she feels compelled to respond to.  The most dramatic and problematic example of this is when the mental health team identifies such a person; the person refuses medication and/or some other indicated emergency intervention; and so the mental health team is pushed to request forced medication and/or some other indicated emergency intervention; but the nursing staff and security staff who must assist with this forced emergency intervention, unaware of the information that has been uncovered by the mental health team, refuse to assist.  Therefore, this monitor recommends that policy and procedures be reviewed to assure that they address this type of situation, consistent with applicable law and accepted clinical practice, that training around this set of issues be incorporated into the mental health training for all staff, and that when such instances arise, case discussions should be employed as a way to further the educational process around such issues and attempt to avoid potentially dangerous outcomes.

Additionally, we understand that all staff require to completed in-service training on mental health and suicide prevention have not done so due, in-part, to the departure of the training director and being no training coordinator to facility and administer the in-service training program.

This provision returns to Partial Compliance until the Territory demonstrates that in-service training required in the training policy has been adequately implemented.

**RECOMMENDATIONS:**

1.  Continue to utilize the 'behavioral checklist' and other direct communication with mental health regarding perceived mental health needs of prisoners, regardless of whether or not a prisoner is already on the mental health caseload.

2.  Mental health training should be expanded to include training on seriously mentally ill persons who are essentially 'suffering in silence', and issues related to the identification and management of such persons.

3.  The mental health team should implement relevant Health Care Compliance measures and forward them to the monitoring team for review, focused on the adequacy of the mental health training for each staff unit as it relates to the ability of staff to identify signs and symptoms of mental illness.

4.  Ensure consistent compliance by security staff and clinical staff with the approved policy and associated procedures that relate to this provision of the agreement.

5.  Completed all required in-service training in the training policy that pertains to this provision.

**(v) ceasing to place seriously mentally ill prisoners in segregated housing or lockdown as a substitute for mental health treatment.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** The Territory has achieved compliance on some of the components of this provision of the Agreement, but significant work remains.

**MEDICAL FINDINGS:**  Defer to mental health findings.

**RECOMMENDATIONS:** Defer to mental health recommendations.

**MENTAL HEALTH FINDINGS:**  See subsection 'p' with regard to the prohibition on housing prisoners with serious mental illness in segregation; subsection 'q' with regard to mental health input into the disciplinary review process; subsection 'r' with regard to the availability of clinical space; and section 'ii' with regard to adequate mental health programs for all prisoners with serious mental illness.

If/when there is a mental health unit developed with adequate mental health services for the seriously mentally ill, there may still be a very small number of seriously mentally ill prisoners who refuse treatment; and who, in the absence of treatment, are too vulnerable or present too much of a risk of harming someone else that they can't even be maintained on a special housing unit.  It is likely that such prisoners will end up being placed in segregation, while efforts continue to encourage them to engage in treatment as per the above recommended protocol for prisoners who refuse mental health treatment.  It is important to note however that even those prisoners shouldn't be held in segregation for more than an extremely brief period of time. The above recommended protocol should include a clear decision point where the prisoner is deemed at such risk of self-harm, being harmed by someone else, or harming someone else that prescribed legal steps have to be taken to force treatment.

**RECOMMENDATIONS:**

1. **GGACF must continue the practice of ceasing to place seriously mentally ill prisoners in isolation/segregated housing as a substitute for mental health treatment and/or other appropriate mental health intervention.**

2. The health services administrator needs to coordinate regular monthly medical administration committee (MAC) and quality improvement meetings, documented by minutes and attendance sign-in sheets.  This issue should be an important agenda item for such meetings.  These meetings should include the director or the director's designee and the warden or the warden's designee to assure that plans for addressing this issue take all aspects of the problem into consideration.

3. A protocol for responding to those who refuse clearly indicated mental health treatment must be developed and implemented, and when employed in an individual case, such must be documented in the prisoner's medical records.

## SECTION VI. FIRE AND LIFE SAFETY

**Compliance Summary:** There is not change to compliance ratings as shown in the compliance score card below.

**Compliance Score Card**

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VI. Fire & Life Safety | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | V.1a: Adequate Fire Safety Program/Plan/Fire Marshall Review | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 2 | V.1b: Adequate Fire Safety Steps / Fireload Maintenance/Equipment Inspections / Alarms / Smoke Detection in all Housing Units | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 3 | V.1c: Defined Comprehensive/Documented Fire Drills/Staff Competency | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4 | V.1d(i): Regular Housing Unit Inspections/Lock Functioning/Repair | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 5 | V.1d(ii): Regular Housing Unit Inspections/All Remote Locking Mechanisms Functional | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 6 | V.1e: All Staff Tested on Fire Safety Procedures | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 7 | V.1f: Reporting/Notification of Fires/Audible Alarms | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 8 | V.1g: Prisoner Evacuation as Indicated | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 9 | V.1h: Fire Suppression | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | V.1i: Medical TX of Persons Injured from Fires | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | V.1j: Control of Highly Flammable Materials | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | # NonCompliance | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 2 | 2 |
| | # Partial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 9 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Progress Points | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 9 |
| | Percent Toward Full Sustained | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 27% | 27% |

**Assessment of Substantive Provisions:**

**Defendants will protect prisoners from fires and related hazards by providing constitutionally adequate living conditions.**

**1.   Accordingly, Defendants will develop and submit to USDOJ and the Monitor for review and approval facility-specific policies regarding the physical plant, emergency preparedness, and fire and life safety equipment, including the following:**

**a.   An adequate fire safety program with a written plan reviewed by the local Fire Marshal;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  While significant progress has been made, there are still major areas of concern which must be addressed.

The Fire Safety Officer completes an extensive fire inspection report on a monthly basis which specifies discrepancies in every area of the facility, as well as what action is required to correct them.  He checks on the status of fire extinguishers throughout the facility.  Based on a spot check in each area of inspection during the April site visit, they are current and located appropriately.

Rather than obtain replacement self-contained breathing apparatuses (SCBA's) that were removed from the facility years ago, four-phase respirators have been placed in the control rooms and in key locations throughout the GGACF.  Since the last Report was submitted, they have been placed in the women's housing unit (X) and Detention R&D; however, when asked to produce it, the officer assigned to Detention R&D was not familiar with the respirator and was unable to produce it until an extensive search of her work area was conducted.  It would appear that refresher training is in order for this post.  Since Policy #: BOC-

EHS-3003, the Monthly Fire Inspection Report and the Fire Drill Observer's Report all make reference to SCBA's, not four-phase respirators, those referenced documents should be updated.

A private contractor (OTL Mechanical) conducted an analysis of the non-functioning sprinkler system in March, which revealed that the fire pump **does** work.  It had previously been reported to the Monitor that the fire pump had not worked for approximately fourteen years.  The contractor also determined that the full sprinkler system could not maintain pressure, indicating that there may be leaks in the piping.  Once further testing isolates the problem, a decision will be made as to what steps are taken next.

There is no smoke detection system in place; instead, individual, battery-operated smoke detectors are located throughout the facility.  They do not have the capability to activate an alarm at a central point of control.  There is no plan currently under review to install a smoke detection system.

While inspections and fire drills are conducted and individual smoke detectors and four-phase respirators have been put in place, the GGACF still lacks the basic smoke detection and fire suppression systems that are routinely found in correctional facilities.  As was recommended in the 18th Compliance Assessment Report, the Fire Marshal should look into these shortfalls.  Specifically, the Territory should request a written report from the Fire Marshal.  It should be noted that the requested walkthrough of the facility by the Fire Marshal during the April site visit did not occur.

**RECOMMENDATIONS:**

1. Develop a comprehensive plan to reactivate the fire sprinkler system with time-specific dates for completion.

2. Request a walkthrough of the facility by the Fire Marshal during the next site visit.

3. Request a written report from the Fire Marshal as to how/why the GGACF has been allowed to operate for over fourteen years without a functioning fire suppression system (sprinkler) or a smoke detection system.

4. Update Policy #: BOC-EHS-303, the Monthly Fire Inspection Report and the Fire Drill Observer's Report.

**b.   Adequate steps to provide fire and life safety to prisoners including maintenance of reasonable fire loads and fire and life safety equipment that is routinely inspected to include fire alarms, fire extinguishers, and smoke detectors in housing units;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  Fire drills and inspections continue to be done as supported by documentation, but the fact that the critical sprinkler system has not been operational for at least **fourteen years** is unacceptable, as is the lack of a smoke detection system.

**RECOMMENDATIONS:**

1. See Recommendations above (VI. 1. a.).

**c.   Comprehensive and documented fire drills in which staff manually unlock all doors and demonstrate competency in the use of fire and life safety equipment and emergency keys that are appropriately marked and identifiable by touch;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  The Fire Safety Officer maintains documentation in support of mandated fire drills.  Emergency keys are properly marked and staff are proficient accessing and using them, but the lack of an operational

smoke detection system and a non-working sprinkler system place the staff and prisoners in the GGACF at risk.

**RECOMMENDATIONS:**

**1.** See the previous Recommendation above (VI. 1. a.).

---

**d. Regular security inspections of all housing units that include checking:**
**(i) that cell locks are functional and are not jammed from the inside or outside of the cell; and;**
**(ii) that all facility remote locking cell mechanisms are functional;**

---

**ASSESSMENT: PARTIAL COMPLIANCE**

**FINDINGS:** The Daily Shift Supervision Rounds inspection sheet, completed by the shift supervisor, provides a general overview of conditions in the GGACF, but it does not address the status of individual cell door locking mechanisms. That information is contained in the Maintenance Supervisor's Monthly Door Lock Inspection and Preventative Maintenance log. It specifies the condition of individual cell door locks and motorized security doors that are given preventative maintenance or are repaired during the month. It **does not address longstanding security breaches,** such as that exemplified by the exterior security doors (which allow entrance to each housing unit) that have not been operable from outside of the units since at least 2014. The All Locks Inventory Spreadsheet provides a more comprehensive listing of all security doors/locks and their status. Once again, however, it does not address what action is contemplated with regard to correcting the security breach caused by allowing entrance to, and egress from, the housing units from **inside** those units.

**RECOMMENDATIONS:**

1. See Recommendations above (IV. C. 1. a. and b.).

---

**e. Testing of all staff regarding fire and life safety procedures;**

---

**ASSESSMENT: PARTIAL COMPLIANCE**

**FINDINGS:** Based on the completion of required training, this provision is moved from Noncompliance to Partial Compliance Staff have been trained on policies and procedures regarding fire and life safety procedures.

**RECOMMENDATIONS:**

1. Continue to maintain training records that reflect the number/percentage of staff that have completed required training.

---

**f. Reporting and notification of fires, including audible fire alarms;**

---

**ASSESSMENT: PARTIAL COMPLIANCE**

**FINDINGS:** Although there is no smoke/fire alarm system in place to notify staff of a fire, individual battery-operated smoke alarms are located throughout the GGACF. There is no record available that reflects whether or not there has been an alarm notification. The Fire Drill Observer's Report makes reference to an alarm, but the documentation as to whether or not all alarm devices operate correctly is listed as "N/A".

**RECOMMENDATIONS:**

1. Update the Monthly Fire Inspection Report to reflect the history of actual notifications of fires, including audible alarms by location throughout the facility.

---

**g.   Evacuation of prisoners threatened with harm resulting from a fire;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  Required training of staff has been completed to allow for Partial Compliance rating.

**RECOMMENDATIONS:**

1.   Maintain training records as well as fire drill records to support continued compliance.

**h.   Fire suppression;**

**ASSESSMENT:  NONCOMPLIANCE**

**FINDINGS:**  This provision continues to be carried as being in Noncompliance because fire suppression, through the fire sprinkler system, cannot protect staff and inmates since it has not functioned for at least fourteen years.  Although a contractor is now examining the feasibility of repairing and reactivating it, there is no estimated date as to when it will become operational again or whether that is even practical, considering the financial implications.

**RECOMMENDATIONS:**

1.   Develop a plan to repair the sprinkler system to include a specific timeframe.

**i.   Medical treatment of persons injured because of a fire; and**

**ASSESSMENT:  NONCOMPLIANCE**

**FINDINGS:**  There has been no change in the status of this provision since the 18th Compliance Assessment Report.  The Fire and Life Safety Plan, Policy #: BOC-EHS-3003, does not make reference to medical staff and their involvement in the treatment of persons injured because of fire.

**RECOMMENDATIONS:**

1.   Update the Fire and Life Safety Plan with input from medical and mental health staff.

**j.   Control of highly flammable materials.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  Highly flammable cleaning materials are centrally controlled/stored in the warehouse.  Individual inmate/detainee cells often contain an accumulation of items that can support a fire.  To address this problem, personal storage containers have been issued to all sentenced inmates and pretrial detainees, with the exception of those housed in 9A.  According to information provided by officers who work in that unit, the failure to provide storage units to those prisoners appears to be based on historical practice.

**RECOMMENDATIONS:**

1.   Issue storage containers to those prisoners housed in 9A.

## SECTION VII.  ENVIRONMENTAL HEALTH AND SAFETY

**Progress Summary:** There is not change to the compliance ratings as shown in the compliance score card below.

### Compliance Score Card

| Agreement Section & Substantive Provisions | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VII. Environmental Health & Safety | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 VII.1a: Housing Plans/Proper Cleaning/Preventative Maintenance Plan/Response to Routine/Emergency Needs | 0 | 0 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 2 VII.1b: Adequate Ventilation Throughout Facility | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 3 VII.1c: Adequate Lighting/All Prisoner Housing/Work Areas | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 4 VII.1d: Adequate Pest Control for Housing Units, Medical Units/Food Storage | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 5 VII.1e: Prisoner/Clinical Staff Access to Hygiene/Cleaning Supplies | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 6 VII.1f: Cleaning/Handling/Storing/Disposal of Biohazardous Materials | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 7 VII.1g: Mattress Care/Cleaning | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 8 VII.1h: Chemical Control/Supervision of Prisoners Having Chemical Access | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 9 VII.1i: Laundry Services/Sanitation Providing Adequate Clean Clothing,Underclothing,Bedding at Appropriate Intervals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 10 VII.1j: Defined Food Services Safety/ Hygiene/ Temps/ Storage/ Transportation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 11 VII.1k: Sanitary/Adequate Drinking Water Supply | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| # NonCompliance | 11 | 8 | 5 | 6 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 0 | 0 |
| # Partial Compliance | 0 | 3 | 6 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 11 | 11 |
| # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Progress Points Achieved | 0 | 3 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 11 | 11 |
| Progress Points | 0 | 3 | 6 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 11 | 11 |
| Percent Toward Full Sustained | 0% | 9% | 18% | 15% | 18% | 18% | 18% | 18% | 18% | 18% | 18% | 18% | 18% | 18% | 18% | 18% | 18% | 33% | 33% |

**Substantive Provisions:**

**Defendants will protect prisoners from environmental health hazards by providing constitutionally adequate living conditions.**

**1.   Accordingly, Defendants will develop and submit to USDOJ and the Monitor for review and approval facility-specific policies regarding the physical plant and environment, including the following:**

**a.   Written housekeeping and sanitation plans that outline the proper routine cleaning of housing, shower, and medical areas along with an appropriate preventive maintenance plan to respond to routine and emergency maintenance needs;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**   The status of shower repairs remains basically unchanged since the last Compliance Assessment Report.  With minor exceptions, the showers in each housing unit (with the exception of 9A) are functional.  Some shower doors do not close properly and need to be re-anchored to the wall, but the showers themselves work.  In 9A, there are still only three operable showers, all on the ground level.  Once secure gates are added to each of the remaining five shower stalls, maintenance staff will install plumbing and fixtures.

In the past three Compliance Assessment Reports it has been noted that Cell #9 in 9A is unusable due to damage caused by a prisoner.  During the April site visit, the officers assigned to that unit pointed out nine additional cells that are currently offline due to a number of maintenance problems (primarily plumbing issues).  They are Cells 9, 12, 13, 14, 16, 24, 25, 28 and 32.  Fortunately, the loss of these cells does not greatly affect the operation of 9A because the count is so low, but all ten cells should be made fully functional again as soon as possible.

An assessment of required roof repairs was recently conducted by an engineering firm that resulted in a proposal covering the scope of work.  This has been submitted to the Department of Property and Procurement, which is responsible for the issuance of a Request for Proposal (RFP).

While there is still no plan in place to resolve the longstanding problem of access to potable water in the housing units, two additional faucets were recently installed in front of the entrances to 9A/B and 9C/D.  They supplement the existing outlets in the ground floor janitorial closets of each housing unit, but they do not materially address the problem.  The primary source of potable water is now from two points, one inside the housing units and one outside.  Consequently, prisoners still must fill empty containers and keep them in their cells or, in the alternative, purchase bottled water from the Canteen/Commissary.

Since the housing units at the GGACF are not air conditioned, ice is provided to all prisoners on a daily basis.  When the ice machine in the warehouse malfunctioned in late 2018, the unavailability of ice was the most consistent complaint voiced by inmates during the December site visit.  The problem has since been corrected; coolers containing ice were found in each housing unit during the April site visit.

The need to obtain a replacement for the facility's emergency generator has previously been reported.  The GGACF currently depends upon a temporary replacement item provided by FEMA after the 2017 hurricanes.  Recently, a contract was awarded to DVD Construction.  It is now up to that firm to fabricate and install a new 900 kw generator.  As of yet there is no estimated date of completion for this project.

**RECOMMENDATIONS:**

1.  Keep a supply of repair parts in stock so that showers can be repaired as needed.  Give priority to repairing the five showers in 9A.

2.  Obtain a specific timeframe for the permanent repair of the housing unit roofs.

3.  Develop a plan of action, with specific timeframes, for correction of the potable water issue.

4.  Obtain a time-certain date for fabrication and installation of the emergency generator from DVD Construction.

5.  Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

---

**b.   Adequate ventilation throughout the facility;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  The roof-mounted exhaust fans in Housing Units 9A, 9B, 9C and 9D are now operational.

**RECOMMENDATIONS:**

1.  Continue to provide floor-mounted circulation fans in each housing unit to supplement the roof-mounted exhaust fans.

---

**c.   Adequate lighting in all prisoner housing and work areas;**

<mark>ASSESSMENT:  PARTIAL COMPLIANCE</mark>

**FINDINGS:**  Since the hurricanes of 2017, the exterior lighting system has not been operational.  Some lights remain on 24 hours per day, while many lights do not function at all.  Because of the inability to negotiate a satisfactory agreement between the Territory and FEMA regarding exterior lighting repairs, GGACF maintenance staff have begun the repair process on their own.  To date, approximately 60% of the work is done.  If in-house repairs cannot be effectuated for all malfunctioning lighting, a private contractor will be called in to complete the work.

**RECOMMENDATIONS:**

1.  Complete repairs as quickly as possible.

2.  Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

**d.   Adequate pest control for housing units, medical units, and food storage areas;**

<mark>ASSESSMENT:  PARTIAL COMPLIANCE</mark>

**FINDINGS:**  While the problem of pest control was not readily apparent during the April site visit, and it was not a topic of complaint by prisoners, it should be noted that there has been no noticeable progress made toward the repair and replacement of missing and broken cell windows and screens.

**RECOMMENDATIONS:**

1.  Include the repair of cell windows and screens in the monthly status report.

2.  Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

**e.   Prisoner and clinic staff access to hygiene and cleaning supplies;**

<mark>ASSESSMENT:  PARTIAL COMPLIANCE</mark>

**FINDINGS:**  Policy #: BOC-EHS-3004 states--(1) "All hazardous, toxic and caustic products shall be stored in locked secure areas such as janitor closets and supply rooms."  (2) "Security staff shall control entry and exit to janitor closets and supply rooms located in the housing units at all times."  (3) "GGACF staff are responsible for direct supervision of all janitor closets and supply rooms located in his/her area."  (4) "Spray bottles and all other containers shall be labeled and kept in secure areas inaccessible to the inmates/detainees when not in use."

Observed practice followed by staff is not consistent with policy.  Cleaning materials are actually kept inside the control rooms, not in "janitor closets and supply rooms".  While there are storage lockers in the control rooms, they are not locked and, on occasion, cleaning materials have been found stacked on the floor of the control rooms near the entry door.  The janitor closets in each male housing unit are virtually **always** left standing open so that prisoners have ready access to them to obtain potable water and to access a mop bucket and mop.  Although chemical cleaning supplies are sometimes found in the janitor closets, that is not where they are routinely maintained.

During the December site visit, a member of the monitoring team inspected a number of cells in each housing unit.  During that process, he happened to enter a cell in 9D where the inmate had a huge accumulation of various chemical cleaning supplies that included Ajax, Tile Cleaner, Corral and four-gallon jugs of an unidentified and unlabeled chemical.  When questioned about this significant violation of policy, the unit officer explained that the inmate who occupied this cell was the designated "Unit Cleaner".  It should

be noted that smaller amounts of chemical cleaning supplies were found in many cells throughout the facility.  Routinely, prisoners use empty gallon water bottles to keep cleaning supplies in their cells.

**RECOMMENDATIONS:**

1. Develop standards for the amount and type of cleaning supplies that are kept in each control room storage cabinet.

2. Revise policy to reflect practice or uniformly make practice follow policy.  In either case, do not allow prisoners to keep cleaning supplies in their cells.

3. Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement.

---

**f.   Cleaning, handling, storing, and disposing of biohazardous materials;**

---

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  There has been no change in the status of this section.  Policy #: BOC-EHS-3004 does not make reference to biohazardous materials.  There is no record available to reflect that staff are trained and are able to demonstrate competence in the handling, disposal and storage of biohazardous materials.

**RECOMMENDATIONS:**

1. Develop a training program that addresses this issue and that is incorporated into approved policies and procedures.

---

**g.   Mattress care and replacement;**

---

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  There has been no change is the status of this provision since the 18th Compliance Assessment Report.  The standard mattress issued by the GGACF now incorporates a pillow in its design, hence the issuance of pillows has been discontinued; but Policy #: BOC-SEC-3002 states that a pillow is part of the initial issue to prisoners during the intake process.

**RECOMMENDATIONS:**

1. Reflect this change in policy so that it coincides with what is being developed for the revisions to the Inmate Handbook.

2. Evaluate provision implementation per the Compliance Measures to achieve Substantial Compliance in accordance with the Settlement Agreement,

---

**h.   Control of chemicals in the facility, and supervision of prisoners who have access to these chemicals;**

---

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  Chemicals are not adequately controlled and monitored (see paragraph e, above).  Prisoners have ready access to chemicals without adequate supervision.  This fact was confirmed by an examination of cleaning supplies/chemicals that were found in numerous cells.  Prisoners are permitted to use gallon containers to keep cleaning chemicals, such as Corral Foaming Bathroom Cleaner, in their cells.  Staff do not appear to be aware of the standards set by Policy #: BOC-EHS-3004.

---

**RECOMMENDATIONS:**

1. Provide refresher training to staff with regard to Policy #: BOC-EHS-3004.

2. See above Recommendation (VII. 1. e.).

**i.   Laundry services and sanitation that provide adequate clean clothing, underclothing, and bedding at appropriate intervals;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  Conditions in the laundry have not changed since the 18th Compliance Assessment Report. The request for funding through a grant for four new washers and dryers under the previous Director has expired.  Consequently, another request has been submitted to the new Director, but there is no estimate as to if or when it will be approved and the much-needed equipment purchased.

**RECOMMENDATIONS:**

1. Obtain a time-specific schedule for replacement of the outdated laundry equipment.

2. Replace the wooden laundry carts with standard plastic carts that can be sanitized.

**j.   Safe and hygienic food services, including adequate meals maintained at safe temperatures along with cleaning and sanitation of utensils, food preparation and storage areas, and containers and vehicles used to transport food;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  Although the kitchen is now back online, the associated dining room has still not been renovated and is not in use.  Consequently, all meals are served in the housing units, as has been the case for many months, resulting in a conflict between policy and practice.

**RECOMMENDATIONS:**

1. Update Policy #: BOC-EHS-3006 to specify how meals are to be delivered until such time as the dining room is repaired and prisoners are fed there again.  Ensure that the Inmate Handbook and policy are consistent.

**k.   Sanitary and adequate supplies of drinking water.**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:**  As was noted above, and in previous Compliance Assessment Reports, the problem of adequate access to potable drinking water in the housing unit cells has not been addressed and there is no plan in place to resolve it.

**RECOMMENDATIONS:**

1. See Recommendation (VII. 1. a.) above.

## SECTION VIII.  TRAINING

**Progress Summary:** There is no change to the compliance ratings as shown in the compliance score card below.

**Compliance Score Card**

| Agreement Section & Substantive Provisions | | Compliance Assessment Report Number & Scores | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **VIII. Training** | | 1st | 2nd | 3rd | 4th | 5th | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th |
| 1 | VIII.1a: Defined Staff Training Curricula/Scheduling | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 2 | VIII.1b: Pre-Service Training for all New Employees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 3 | VIII.1c: Periodic In-Service Training/Retraining of all Employees Following Pre-Service Training | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| 4 | VIII.1d: Documentation & Accountability Measures to Ensure Staff Completion of Required Training | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| | # NonCompliance | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 0 | 0 |
| | # Partial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| | # Substantial Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Sustain Compliance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Progress Points** | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| **Percent Toward Full Sustained** | | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | 33% |

**Substantive Provisions:**

**Defendants will take necessary steps to train staff so that they understand and implement the policies and procedures required by this Agreement, which are designed to provide constitutional conditions.**

**1.   Accordingly, Defendants will develop and submit to USDOJ and the Monitor for review and approval facility-specific policies regarding the following:**

**a.   The content (i.e. curricula) and frequency of training of uniformed and civilian staff regarding all policies developed and implemented pursuant to this order;**

**ASSESSMENT:  PARTIAL COMPLIANCE**

**FINDINGS:** We were informed that the training director resigned and that the training coordinator position remains vacant. This creates a significant barrier to achieve Substantial Compliance with this provision and subsection of the Agreement. Training policies and procedures have not been sufficiently implemented to achieve Substantial Compliance.

As of this assessment, the following compliance measures cannot be met:

2.   All training curricula and training methods cannot be consistently developed, approved, and administered according to the approved policies.

3.   There is not consistently adequate and qualified oversight, supervision, administration of the staff training program according to the approved policies and procedures.

4.   All staff training curricula cannot be consistently and reliably administered and taught by adequately trained and qualified persons according to the approved policies and procedures.

5.   Pre-service and in-service training curricula would not or consistently include content and instructional methods that are current and relevant to all policies and procedures according to

staff duties, responsibilities, and needs; and, required under this Agreement according to the approved policies and procedures.

6. Pre-service and in-service training curricula training methods, processes, materials, and assessment of training cannot consistently ensure that staff are adequately, properly, competently, and reliably trained according to the approved policies and procedures.

7. The frequency and duration of staff training programs and courses is would likely not be reliably consistent with the facility, operational, and staff needs and requirements according to the approved policies and procedures.

8. Incumbent and new staff would not be able to successfully complete all training requirements in a timely manner according to the approved policies and procedures.

**RECOMMENDATIONS:**

1. Fill the training director and coordinator vacancies.

2. Fully implement the training policies and procedures, develop and implement the required training plan.

---

**b.   Pre-service training for all new employees;**

==**ASSESSMENT:  PARTIAL COMPLIANCE**==

**FINDINGS:** Same as above

**RECOMMENDATIONS:**  Same as above.

---

**c.   Periodic in-service training and retraining for all employees following their completion of pre-service training;**

==**ASSESSMENT:  PARTIAL COMPLIANCE**==

**FINDINGS:** Same as above

**RECOMMENDATIONS:**  Same as above

---

**d.   Documentation and accountability measures to ensure that staff complete all required training as a condition of commencing/continuing employment.**

==**ASSESSMENT:  PARTIAL COMPLIANCE**==

**FINDINGS:** Same as above

**RECOMMENDATIONS:**  Same as above

---

## SECTION IX.  IMPLEMENTATION

**1.   Defendants will begin implementing the requirements of this Agreement immediately upon the effective date of the Agreement.  Within 30 days after the effective date, Defendants will propose, after consultation with the Technical Compliance Consultants ("TCCs"), a schedule for policy development, training, and implementation of the substantive terms of this agreement.  The schedule shall be presumptive and enforceable until the Monitor is appointed.**

**FINDINGS:** Compliance progress remains dynamic and active. The Territory continues to develop and implement compliance plans and schedules. The United States and the monitoring team continue to provide reviews, comments, and approvals as indicated within this agreement. All required policies have been completed and approved by this Monitor and the United States. Updated and/or revising implementation plans and schedule remain a top priority by the parties and the monitoring team.

**2.   Upon appointment, the Monitor will adopt the schedule as proposed or as amended by the Monitor after consultation with the parties and the TCCs.  Either party may seek a modification to the schedule by making a request to the Monitor, or the Monitor may modify the schedule as necessary.  If the parties disagree with each other or with the Monitor and cannot resolve it with the Monitor, either party may submit the dispute to the district court.**

**FINDINGS:** Compliance is ongoing as required.

**3.   Defendants will implement every policy, procedure, plan, training, system, and other items required by this Agreement.  Each policy required by this Agreement will become effective and Defendants will promulgate the policy to all staff involved in its implementation within 45 days after it is submitted to the United States, unless the United States or the Monitor provides written objections.  The Monitor will assist the parties to resolve any disputes regarding any policy, procedure, or plan referred to in this document.  If the parties still cannot resolve a dispute, either party submit the dispute to the district court.**

**FINDINGS:** The Territory continues to work toward full implementation of this agreement and its provisions. The monitoring team and United States continues to provide assistance in the development, implementation, and evaluation of approved policies, procedures, plans, training, and systems as requested by the Territory.

**4.   Defendants will conduct a semiannual impact evaluation to determine whether the policies, procedures, protocols, and training plan are achieving the objectives of this Agreement and to plan and implement any necessary corrective action.  The Monitor will assist Defendants in identifying and analyzing appropriate data for this evaluation.  The evaluation and all recommendations for changes to policies, procedures, or training will be provided to the United States and the Monitor.**

**FINDINGS:** No change from previous report except the completion of the Core Compliance Measures. This Monitor the Territory and the United States continue to closely collaborate on the development of evaluation methods and processes. Monitoring reports include various examples of descriptive assessment and evaluation methods that can be used by the Territory to meet this requirement.

This Monitor (monitoring team) will collaborate with the parties to develop metrics and core measures for qualitative and quantitative evaluation of compliance progress. Core measures and metrics should meet generally accepted standards and recommendations promulgated by the National Correctional Association, American Jail Association, National Commission of Correctional Health Care, American Psychiatric Association, American Nursing Association, ASIS International, National Fire Protection Association, Centers for Disease Control, OSHA, Commonwealth / Territory regulations, American Evaluation Association, and other nationally accepted standards for compliance assessment and management. Policy-based measures are needed to assess compliance with each provision of the agreed order.

The following terms are suggested for implementing and effective compliance evaluation program:

- Compliance Control: Implies activities designed and intended to inspect and reject defective or deficient performance, processes, services, equipment, etc. when applied.
- Compliance Assurance: Implies activities designed and intended to identify performance and services that assure compliance when applied.
- Compliance Improvement: Implies activities designed and intended to correct and/or improve compliance in performance and services.
- Compliance Management: Implies activities designed and intended to ensure targeted compliance outcomes.
- Domain: A core aspect of the organization's performance, such as *access* to care, *costs* of care, or *quality* of care (e.g., consumer level of functioning, relapse and recidivism rates, or consumer satisfaction.)
- Performance Indicator (Core Measure): A defined, objectively measurable variable that can be used to assess an organization's performance within a given domain.  For example, within the domain of consumer satisfaction, a performance indicator might be: "the percentage of consumers who state that they received the types and amounts of services that they felt they needed."

Each policy required under the agreed order is carefully examined to identify specific requirements that are salient to achieving the purpose of the contraband policy such as, elimination/reduction in contraband within the facility and harm reduction (searches are adequately conducted on all prisoners entering and exiting housing units), ensuring prisoner rights and due processes, required documentation is accurately and consistently completed, sharing of specifically required information is consistently done, etc. These specific requirements are translated into written Core Measures that are 1) observable and 2) measurable. For example, the primary purpose of the Contraband Policy is to prevent the presence of contraband within GGACF to prevent the risk of harm to staff and prisoners and prevent possession of unauthorized items by staff and prisoners. One policy-based procedure for achieving these outcomes is to search all prisoners entering and exiting housing units. A core measure to evaluate this procedure is the percentage of prisoners entering and exiting housing units who are properly searched. It is reasonable to conclude that contraband would decrease in housing units as the percentage of prisoners searched increases. A concomitant measure that evaluates compliance is the quantity, type, and frequency of contraband found.

Evaluation of compliance involves qualitative and quantitative approaches. Qualitative evaluation involves collection of information/data to assess the quality of compliance i.e. "adequate searches of prisoners". In this context, the collection of information/data would involve observation of prisoner searches to assess whether those searches are conducted thoroughly and in accordance with policy. Quantitative evaluation, in this context, would measure the frequency (how often) of proper searches conducted and described as the percentage of searches properly conducted. For example, let's say the GGACF Warden assigns a security supervisor to observe a housing unit for four hours to determine compliance with prisoner searches. This supervisor would observe and document the total number of prisoners exiting and entering the housing unit and the total number of those prisoners who were properly searched. If 10 of 20 prisoners entering and/or exiting the housing unit were properly searched the compliance rate would be 50% (10/20). However, it is very important to measurably define the term "proper" or "adequate" search. This definition would be determined according to GGACF's prescribed method for searching prisoners. For example, a prescribed method would include:

1. Staff are wearing proper protective items, i.e. gloves.
2. Staff possess functional search devices, i.e. hand-held metal detector.
3. Staff possess a functional radio for timely communications.
4. Professionally communicating to a prisoner that they will be search for contraband.
5. Asking the prisoner to "please" raise their hands, stand against wall, etc. to prepare for a safe and secure search.
6. Conducting a systematic search from head to feet or vice versa.
7. Seizing any contraband found.
8. Etc.

A form is used by the observing supervisor to document how often each prescribed task is performed for each prisoner searched. This is an example of an evaluation involving both qualitative and quantitative measurements – number of searches (quantitative), adequacy of searches (qualitative).

The monitoring team and the United States are committed to collaborating with the Territory in the development and implementation of an effective compliance evaluation program.

**5.   Defendants may propose modifying any policy, procedure, or plan, provided that the United States is provided with the 14 days' notice in advance of the action.  If the United States or the Monitor provides written objections, the Monitor will assist the parties to resolve any disputes regarding these items.  If the parties still cannot resolve a dispute, the parties agree to submit the dispute to the district court.**

**FINDINGS:** The Territory's practice has been compliant with this requirement. However, this requirement will be discussed with the new BOC/GGACF administration to ensure compliance continues. The Territory has not submitted any proposals for modifications as stated above since the appointment of the new administration. It is very important that the Territory closely adhere to this requirement.

**6.   Defendants shall provide status reports every four months reporting actions taken to achieve compliance with this Agreement.  Each compliance report shall describe the actions Defendants have taken during the reporting period to implement each provision of the Agreement.**

**FINDINGS:** The Territory continues to submit required status reports. These reports will likely become more comprehensive upon the Territory's fulsome implementation of the Compliance Measures.

**7.   Defendants shall promptly notify the Monitor and the United States upon any prisoner death, serious suicide attempt, or injury requiring emergency medical attention.  With this notification, Defendants shall forward to the Monitor and the United States any related incident reports and medical and/or mental health reports and investigations as they become available.**

**FINDINGS:** The Territory continues to notify the Monitor and the United States as required. Documentation is provided when available.

**9.   USDOJ and its attorneys, consultants, and agents shall have sufficient access to Golden Grove, prisoners, and documents to fulfill its duties in monitoring compliance and reviewing and commenting on documents pursuant to this Agreement.  Except to the extent that contact would violate the Rules of Professional Conduct as they apply in the Territory of the Virgin Islands, USDOJ and its attorneys, consultants, and agents shall have sufficient access to Golden Grove's staff.**

**FINDINGS:** This requirement was met for this reporting period

**10.   Excluding onsite tours, within 30 days of receipt of written questions from USDOJ concerning Defendants' compliance with the requirements of this Agreement, Defendants shall provide USDOJ with written answers and any requested documents unless the Defendants obtain relief.**

**FINDINGS:** This requirement was met for this reporting period.

## SECTION X.  MONITORING

**D.1 Monitoring Access:  Within 30 days of appointment by the Court, the monitor will conduct the first site visit and submit to the parties for their review and comment a description of how the Monitor will assess compliance with each of the Compliance Measures, how the monitor intends to gather information necessary for the assessment, and what information the Monitor will require the defendants to routinely report and with what frequency.**

**FINDINGS:**  Work continues to improve submission of complete monthly monitoring documents by the Territory. The Territory will typically forward missing records at the request of the Monitor.

**D.2.      Monitoring Access:  With reasonable advance notice, the Monitor will have full and complete reasonable access to the Golden Grove Correctional Facility and Detention Center, all facility non-privileged records, prisoners' medical and mental health records, staff members, and prisoners, Defendants will direct all employees to cooperate fully with the Monitor. Reasonable advance notice must be provided in this Agreement, this Agreement shall not be deemed a waiver of any privilege or right the Territory or Defendants may assert against a third party, including those recognized at common law or created by statute, rule, or regulation against any other person or entity with respect to the disclosure of any document.   All nonpublic information obtained by the Monitor will be maintained in a confidential manner.**

**FINDINGS:** The Territory is reminded that it bears the burden for demonstrating compliance. Timely production of accurate and reliable information and access to staff during onsite assessment is improves the quality and productively of monitoring work.

## APPENDIX A
## ASSESSMENT METHODOLOGY

This compliance assessment involved activities before, during, and following the onsite visit by the monitoring team and the Parties.

Pre-visit activities ensured involvement and input from officials and legal counsel representing the Territory (defendant) and the United States (plaintiff) in the planning of the site visit. Pre-visit activities included conference calls and exchange of relevant documents intended to maximize clarity and mutual understanding for assessment visit purposes and scheduling, and monitoring compliance expectations in general.

Pursuant to Section X.D.1 of the 2013 Settlement Agreement, the Monitor provided the following information to the Territory and U.S. Department of Justice officials for review and comment. This information intended to provide to the Parties: 1) the description of how compliance with the Agreement will be assessed; 2) how information necessary for on and offsite work will be gathered; and 3) what information the Monitor will require the defendants to routinely report and with what frequency.

1.  <u>Description of how the Monitor will assess compliance with each of the Compliance Measures</u>.

In general, compliance assessment will include the following activities:

A.  Discussions and meetings with facility officials, staff, providers, and prisoners.

B.  Discussions and meetings with community agency officials providing inspection or other regulatory oversight of GGACF.

C.  Discussion and meetings with officials and staff of contract providers and community agencies who provide services within and/or for GGACF and prisoners held in its custody.

D.  Discussions and meetings with other pertinent staff, personnel, and community members, either as requested by the parties or who, in the determination of the Monitor, can provide relevant information for the purposes of monitoring.

E.  Onsite tours of grounds, perimeter security barriers, perimeter access control and entrance points, all external security technology, and methods, building and structural exteriors, roofs, and utility systems.

F.  Onsite tours of all buildings, housing units, special environments, health care facilities, receiving and discharge areas, segregation units, all cell areas, food service and storage areas, utility closets and chases, utility technology and systems, fire prevention and suppression systems, life safety locations and equipment, other interior areas, and location relevant to determine compliance.

G.  Examination of all security equipment and systems used for perimeter, external, structural, internal, and special security operations purposes.

H.  Examination of health care equipment, supplies, materials, technology, and other material methods and processes used for prisoner health care assessment, diagnosis, treatment planning, treatment (long and short-term), follow-up, and discharge planning.

I.  Examination of agency motor fleet including all cars, buses, trucks, vans, and any other motorized vehicle used for correctional operations purposes.

J.  Examination of all available records, data and/or information relevant to compliance and compliance monitoring not limited to the following:

    •  Administration

- Budget
- Personnel
- Operations
- Training
- Facility construction, renovation, repairs, and maintenance
- Equipment, supplies, and materials
- Prisoner case files
- Medical and mental health screenings, assessments, evaluations, diagnoses, treatment plans, progress charts, notes, medication logs and records, drug formularies, appointment calendars, invoices, etc.
- Labor contracts
- Incident reports and logs
- Evidence/contraband reports and logs
- Use of force incidents and logs
- Prisoner grievances and disciplinary records and actions
- Policies, procedures, protocols, guidelines, post-orders, logs, memos, and other documents and information that support accurate compliance assessment and progress determinations
- Employee complaints, grievances, claims, etc. directly or indirectly related to the compliance provisions
- Other information required to determine compliance and compliance progress

The information described above is intended to assist the Monitor to determine compliance and the degree to which each of the compliance ratings (Noncompliance, Partial Compliance, and Substantial Compliance) apply to each provision assessed. Additionally, the Monitor will collaborate with the parties to develop metrics and core measures for qualitative and quantitative measurement of progress and compliance. Core measures and metrics should specifically pertain to the conditions set forth in the Settlement Agreement, and generally consider accepted standards and recommendations promulgated by the National Correctional Association, American Jail Association, National Commission of Correctional Health Care, American Psychiatric Association, American Nursing Association, ASIS International, National Fire Protection Association, Centers for Disease Control (CDC), OSHA, Territory regulations, and other nationally accepted standards for compliance and assessment and management. Additionally, specific measures articulated in the Order of the Court dated May 14, 2014 [Dkt 742] (the "Order") shall be followed. The following compliance management terms are suggested for assessment and compliance monitoring:

- <u>Compliance Control</u>:  Implies activities designed and intended to inspect and reject defective or deficient performance, processes, services, equipment, etc. when applied.
- <u>Compliance Assurance</u>:  Implies activities designed and intended to identify performance and services that assure compliance when applied.
- <u>Compliance Improvement</u>:  Implies activities designed and intended to correct and/or improve compliance in performance and services.
- <u>Compliance Management</u>:  Implies activities designed and intended to ensure targeted compliance outcomes.
- <u>Domain</u>:  A core aspect of the organization's performance, such as *access* to care, *costs* of care, or *quality* of care (e.g., consumer level of functioning, relapse and recidivism rates, or consumer satisfaction).
- <u>Performance Indicator</u>:  A defined, objectively measurable variable that can be used to assess an organization's performance within a given domain.  For example, within the domain of consumer satisfaction, a performance indicator might be: "the percentage of consumers who state that they received the types and amounts of services that they felt they needed."

2.  <u>How information necessary for on and offsite assessment work will be gathered.</u>

Monitoring will involve gathering various forms of information both on and offsite and not limited to:

- Communications with Territory and U.S. Department of Justice Officials as authorized in the Order

- Onsite visits, tours, meetings, individual and group meetings, and interviews
- Collection and examination of electronic, paper, and photographic records, information, and data
- Photographs taken during inspections (not to be used in any report without expressed written agreement of both parties)
- Online media information
- Online public records
- Electronic and standard mailing of information
- Email communication and phone consultations

3.   <u>What information the Monitor will require the Defendants to routinely report and with what frequency.</u>

It is understood that the Territory will use existing records systems and processes to provide routine reports. However, new records and information systems and methods may become necessary to accurately report progress compliance and related performance.  It is this Monitor's desire to assist the Territory in developing records and information methods and processes that yield accurate, complete, and efficient reporting of compliance efforts and progress.  Therefore, it is assumed that the compliance reporting process will evolve throughout the life of the Order.

Compliance reporting should include statistical reports, narrative descriptions of compliance activities and progress, improvement plans, case reviews, incident reports, and other information and data that helps the parties and the Monitor understand compliance progress as well as to identify issues and concerns that challenge compliance efforts.  As recommended in previous reports, a monthly compliance report is proposed until the reporting system and compliance progress evolves to justify less frequent routine reporting.

Non-exclusive information required for assessments and monitoring include the following:

**A)  Corrections Information:**

1.   The most recent census report.
2.   Last five (years) admission, release, average daily prisoner population.
3.   The housing unit floor plans for all facilities and housing units.
4.   A copy of the facility's policies and procedures manual(s), including the facility's Use of Force policy. [If you have the policies and procedures in electronic form, we would request all of them prior to our visit.  <u>Otherwise, we request only the Use of Force policy prior to our arrival</u>].
5.   The Use of Force Log for the past twelve (12) months and a few sample Use of Force packages [we request only the Use of Force Log prior to our arrival].  Please indicate any use of force on a prisoner on the mental health case list.
6.   <u>The Serious Incident Report Log for the past twelve (12) months</u>.
7.   The Prisoner Disciplinary Log for the past twelve (12) months.
8.   The Contraband Log for the past twelve (12) months.
9.   The Administrative Investigations Log for the past twelve (12) months.
10.  A copy of the Prisoner Grievance Policy.
11.  A copy of the Prisoner Grievance Log for the past twelve (12) months.
12.  All forms and documents used by staff for prisoner intake, assessment, classification, release, housing, supervision, disciplining, etc.  Any form, report, log book, etc. used during a corrections officer's workday.
13.  Documentation reflecting the current classification system, including policies and procedures related to such classification system.
14.  Documentation reflecting any training facility staff has received, including any corrections officer training manuals, pre-service and in-service training completed by all staff over the past 36 months.
15.  Current staffing schedules for security positions and shifts.
16.  Job descriptions for all non-health care staff.
17.  Copies of any self-evaluation reports, grand jury reports, American Correctional Association surveys, National Institute of Corrections reports/evaluations, National Commission on

       Correctional Health Care reports/evaluations, or any other outside consultant reports regarding the facility.

18. Any questionnaires, intake forms, or prisoner handbooks provided to prisoners upon their entry to the facility or during their stay in the facility.
19. The most recent Staff Manpower Report/Matrix that shows all authorized positions and which ones are vacant.
20. Reports and data showing turnover information and statistics for security, medical, mental health, and other staff positions budgeted and authorized for the previous 36 months.
21. Any staffing improvement plan, applications for technical assistance, and Territory budget proposals/authorizations to address staffing shortfalls.
22. Facility maintenance requests and work orders for the past 12 months.
23. Records and/or lists of physical improvements, repairs, and renovation completed to correct security problems and deficiencies over the past 36 months.
24. Past 26 months of agency budgets.
25. List and contact information for all community vendors who provide services of any kind to GGACF and contracts or professional services agreement authorizing those services.
26. List and contact information for community regulatory agencies who inspect, review, approve, and/or provide consultation to the GGACF, i.e., health inspections, fire inspections, etc., and any inter-local agreements involved in these services.

## B) Medical and Mental Health Information:

27. A mock or blank chart containing all forms used, filed in appropriate order.
28. The infection control policies.
29. The names of prisoners who have died in the past year, and access to/or copy of both their records and mortality review.
30. The names of any prisoners diagnosed with active TB in the past year and access to/or a copy of their records.
31. To the extent not provided above, the policies and procedures governing medical and mental health care.
32. A staffing roster with titles and status, part time or full time, and if part time, how many hours worked per week.
33. The staffing schedule for the past two (2) months for nursing and providers, including on-call schedules for the same period.
34. Job descriptions for medical staff and copies of current contracts with all medical care providers, including hospitals, referral physicians, and mental health staff.
35. Inter-local professional services agreements with health care providers, companies, to include health care policies under which those persons and/or entities provide prisoner health care.
36. Tracking Logs for consults and outside specialty care services provided, chronic illness, PPD testing, health assessments, and prisoners sent to the emergency room or offsite for hospitalization listing where applicable name, date of service, diagnosis and services provided.
37. A list of all persons with chronic illness listing name, location, and name of chronic illness.
38. A schedule of all mental health groups offered.
39. Minutes of any meeting that has taken place between security and medical for the past year.
40. Quality assurance and Medical Administration Committee minutes and documents for the past year.
41. A list of all emergency equipment at the facility.
42. A list of current medical diets.
43. Sick call logs (i.e., lists of all persons handing in requests for non-urgent medical care to include in the log presenting complaint, name, date of request, date triaged, and disposition) and chronic illness appointments for the past two (2) months.
44. A copy of nursing protocols.
45. To the extent not provided above, a copy of any training documentation for security and medical staff on policies and procedures and emergency equipment.
46. A list of all the prisoners housed at the facility by birthdate, entry date, and cell location.
47. To the extent not provided above, external, and internal reviews or studies of medical or mental health services including needs assessments and any American Correctional Association and National Commission on Correctional Healthcare reports.

48. <u>List of all prisoners placed in restraints, and all prisoners receiving mental health treatments, under suicide watch, or taking psychotropic drugs.</u>

49. Current mental health case list including prisoner name, number, diagnosis, date of intake, last psychiatric appointment, and any case lists of prisoners followed only by counseling staff with last appointment date and follow-up appointment.

50. Documentation reflecting any training that facility staff have received on suicide prevention, including certificates and training materials.

51. All documents related to any suicide occurring within the past year.

52. List of all persons on warfarin, Plavix, digoxin.

**C) Suicide Prevention Information:**

53. All policies and directives relevant to suicide prevention.

54. All intake screening, health evaluation, mental health assessment, and any other forms utilized for the identification of suicide risk and mental illness.

55. Any suicide prevention training curriculum regarding pre-service and in-service staff training, as well as any handouts.

56. Listing of all staff (officers, medical staff, and mental health personnel) trained in the following areas within the past year: first aid, CPR/AED, and suicide prevention.

57. The entire case files (institutional, medical, and mental health), autopsy reports, and investigative reports of all prisoner suicide victims within the past three years.

58. List of all serious suicide attempts (incidents resulting in medical treatment and/or hospitalization) within the past year.

59. List of names of all prisoners on suicide precautions (watch) within the past year.

60. The suicide watch logs for the past year.

61. Clinical Seclusion logs for the past year.

62. Use of clinical restraint logs for the past three years.

63. Any descriptions of special mental health programs offered.

64. A list of all uses of emergency and forced psychotropic medications in the past year.

65. A list of any use of force associated with administration of psychiatric medications for the past year.

66. A description of medical and mental health's involvement/input into the disciplinary process and clearance for placement in segregation.

67. List of all prisoners referred for off-site psychiatric hospitalization in the past three years.

It is also understood that the above lists are not all inclusive and the Monitor retains the discretion to request additional information and documents deemed necessary for legitimate monitoring purposes and within the scope of conditions provided within the Agreement.

END 19th Compliance Report